IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ROOSEVELT BUSSEY,


Plaintiff,

v.

Civil Action No.
9:10-CV-1021 (NAM/DEP)

BRIAN FISCHER, Commissioner NYSDOCS;
MICHAEL HOGAN, Commissioner NYSOMH;
DONALD SAWYER, Director CNYPC; `JOHN
DOE 1, Coordinator Attica ICP; JOHN DOE 2,
Unit Chief Attica MHU; MS. STRICKLAND,
Unit Chief Auburn MHU; MR. MAYER, Unit
Chief Auburn MHU; and JOHN DOE 3,
Director Mid-Hudson PC,

Defendants.

_____

APPEARANCES:                          OF COUNSEL:


FOR PLAINTIFF:


ROOSEVELT BUSSEY, *Pro Se*
09-A-0782
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13021


FOR DEFENDANTS:


HON. ERIC T. SCHNEIDERMAN          JUSTIN C. LEVIN, ESQ.
Attorney General of                Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT, RECOMMENDATION AND ORDER</u>

Plaintiff Roosevelt Bussey, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, commenced this action pursuant to 42 U.S.C §1983, alleging that during the course of his incarceration he was deprived of his civil rights by various employees of the New York State Office of Mental Health ("OMH") and the New York State Department of Corrections and Community Supervision ("DOCCS") (formerly the New York State Department of Correctional Services). Plaintiff's complaint alleges that while confined in two DOCCS prisons, as well as in a facility operated by the OMH, he was denied adequate mental health care in violation of his rights under the Eighth Amendment to the United States Constitution.  Plaintiff further alleges that the lack of adequate mental health treatment for inmates is pervasive throughout both the DOCCS and OMH facilities that provide services to prison inmates.  Plaintiff's complaint requests injunctive, declaratory, and monetary relief.

Currently pending before the court is a pre-answer motion by the defendants for an order dismissing plaintiff's complaint in its entirety. In

their motion, defendants seek dismissal of plaintiff's claims on several grounds, arguing that at least some of his claims are procedurally barred as being untimely, and in any event that his claims are wholly lacking in merit.  Defendants also contend that dismissal is warranted based upon their lack of personal involvement in the violations alleged, as well as on the ground of qualified immunity.

Having carefully reviewed plaintiff's complaint, I have concluded that it fails to disclose the existence of a plausible constitutional deprivation. Accordingly, I recommend that the defendants' motion, which plaintiff actively opposes, be granted, though with leave to replead.

I.     BACKGROUND[1]

Plaintiff is a prison inmate who, during the relevant times from 1993 to present, has been entrusted to the care and custody of the DOCCS. *See generally* Complaint (Dkt. No. 1).  From 1993 to 2001, and again between 2002 and 2005, plaintiff was designated to the Intermediate Care

---

[1]     In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

Program ("ICP") at the Attica Correctional Facility ("Attica").[2]  Complaint (Dkt. No. 1) ¶ 27; *see also id.* at ¶ 3 (claiming that plaintiff was assigned to Attica from 2000 until 2005).  Plaintiff further asserts that he was a patient at the Mid-Hudson Psychiatric Center ("MHPC") from 2007 to 2008.[3]  *Id.* at ¶¶ 2, 41.  While plaintiff is currently housed within the Auburn Correctional Facility ("Auburn"), his complaint does not disclose when he was transferred into Auburn.  *Id.* at ¶ 4.

Plaintiff's complaint alleges that he "is burdened with a serious and chronic mental illness[,]" but does not provide any specifics regarding his condition.  Complaint (Dkt. No. 1) ¶ 25.  His memorandum in opposition to defendants' motion provides some additional information; in it, Bussey asserts that he was previously diagnosed with both post-traumatic stress

---

[2]     According to information contained on the DOCCS website, the ICP at Attica provides a physically-separate residential treatment program for inmates who suffer from debilitating mental illnesses and are unable to function within a general prison population.  *See* http://www.docs.state.ny.us/PressRel/DOCSToday/May2004edition.pdf (last visited July 29, 2011) (a copy attached as Appendix A).

[3]     The MHPC is a secure facility run by the OMH and houses "the criminally insane, individuals accused of crimes but found incompetent to stand trial, and individuals who were previously housed in other OMH facilities as a result of civil commitments and thereafter became too dangerous for that type of environment," necessitating a more secure confinement.  *Jennings v. N.Y. State Office of Mental Health,* 786 F.Supp. 376, 378 (S.D.N.Y. March 16, 1992).  The facility employs an array of medical professionals, who are responsible for patient care, including "registered nurses, medical doctors, psychiatrists, social workers, occupational therapists, recreation therapists and Security Hospital Treatment Assistants."  *Id.*

disorder and schizophrenia.  Plaintiff's Memorandum of Law (Dkt. No. 19)

p. 2.  Plaintiff alleges that during his period of incarceration at Attica, the

treatment he received was substandard, failing to address his mental

health issues.  Complaint (Dkt. No. 1) ¶¶ 28-30, 39.  Plaintiff claims, *inter*

*alia,* that while housed at Attica his complaints were seldom addressed,

his psychiatric appointments were too brief to permit a viable assessment

of his psychiatric condition, and that the mental health care that he

received lacked continuity.  *Id.* at ¶¶ 28-38.  Plaintiff further maintains that

Attica failed to abide by a legal mandate which requires that he be

provided with twenty hours of out-of-cell therapeutic programming.  *Id.* at ¶

38.

　　　Plaintiff's complaint also addresses his treatment while housed at

the MHPC from 2007 until 2008.  While there, he alleges, medical

personnel did not treat his mental illness and instead elected to medicate

him so that he could appear in court.  *Id.* at ¶¶  2, 41, 42.  Plaintiff did not

receive any mental health treatment while at MHPC beyond being

provided with a variety of tranquilizing medications.  *Id.* at ¶ 43.

　　　Plaintiff maintains that since his transfer into Auburn, he has

continued to receive inadequate mental health care.  *Id. at* ¶ 46.

According to Bussey, as was the case at Attica, prison officials at Auburn have failed to provide him with the legally mandated therapeutic programming, consisting of a minimum of twenty hours per week of out-of-cell therapeutic programming.  *Id.* at ¶ 38, 46.

On March 23, 2010, while at Auburn, plaintiff filed a grievance complaining of "insufficient and ineffective mental health care."  Complaint (Dkt. No. 1) ¶ 48 and Exh. A, p. 11.  C. Mayer, the Unit Chief of the Mental Health Unit ("MHU") at Auburn, responded to the grievance in writing on March 31, 2010, advising the plaintiff that he should express any concerns to his therapist, Ms. Bordonaro.  *Id.* at ¶ 49 and Exh. A, p. 12.  Defendant Mayer ended his memorandum by providing his assurance that OMH staff was "following the rules and regulations established."  *Id.*

Plaintiff's appeal of the grievance denial to the superintendent at Auburn was denied on April 22, 2010.  Complaint (Dkt. No. 1) at Exh. A, p. 13.  The superintendent's decision notes that policies of outside agencies, such as the OMH are outside the purview of the DOCCS and thus not addressable through the grievance process.  *Id.*  Plaintiff pursued the grievance to the DOCCS's Central Office Review Committee ("CORC"), which upheld the superintendent's determination denying the grievance.

*Id.* at ¶ Exh. A, p. 14.  In its decision, the CORC advised the plaintiff that he should "address any further similar concerns to the [OMH] Unit Chief and/or [plaintiff's] primary therapist."  *Id.*

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on August 24, 2010, and was granted *in forma pauperis* status.  *See* Dkt. Nos. 1, 5.  Named as defendants in plaintiff's complaint are Brian Fischer, the Commissioner of the DOCCS; Michael Hogan, the Commissioner of the OMH; Donald Sawyer, the Director of Central New York Psychiatric Center ("CNYPC")., Ms. Strickland and C. Mayer, two unit chiefs at Auburn.[4]  *See generally* Complaint (Dkt. No. 1)  In his complaint, plaintiff seeks $1,000,000 in compensatory damages as well as declaratory and injunctive relief.  *Id.* at ¶¶ 65-67.

In lieu of filing an answer to plaintiff's complaint, defendants have interposed a motion seeking dismissal of his claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Dkt. No. 17.   In their motion defendants have generally challenged the sufficiency of plaintiff's

_____

[4]      Plaintiff's complaint also lists three unnamed "Doe" defendants, including John Doe 1, the Coordinator of the ICP at Attica; John Doe 2, Unit Chief of the Attica MHU; and John Doe 3,  Director of the MHPC.  Complaint (Dkt. No. 1) ¶¶ 9, 10 and 13.

allegations and maintain that the complaint does not support a plausible Eighth Amendment claim, arguing that 1) some of plaintiff's claims are time-barred; 2) plaintiff has failed to state a claim on which relief can be granted; 3) the named defendants were not personally involved in plaintiff's medical care and are therefore not subject to liability; and 4) defendants are entitled to dismissal based upon the doctrine of qualified immunity.[5]  (Dkt. No. 17).  Plaintiff has opposed defendants' motion.[6]  Dkt. No. 19.

The pending motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

## III.   DISCUSSION

---

[5]     Defendants' motion also requests a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure staying discovery during the pendency of the dismissal motion.

[6]     While technically the rules of notice pleading anticipate that the entirety of plaintiff's allegations against each defendant will be contained in the complaint, in light of plaintiff's *pro se* status I have considered plaintiff's opposition papers in conjunction with his complaint in order to assess the sufficiency of evidence as to each defendant's personal involvement in the civil rights violations alleged.  *Negron v. Macomber*, No. 95 Civ. 4151, 1999 WL 608777, at *5 (S.D.N.Y. Aug. 11, 1999); *see also Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987); *Tsai v. The Rockefeller Univ.*, 137 F. Supp.2d 276, 280 (S.D.N.Y. 2001); *Donahue v. United States Dep't of Justice*, 751 F. Supp. 45, 49 (S.D.N.Y. 1990).  Copies of all unreported decisions are attached hereto for the convenience of the *pro se* plaintiff.

A.     Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second

Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949. In the wake of *Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting

*Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995))

(citations and quotations omitted).

When assessing the sufficiency of a complaint against this

backdrop, particular deference should be afforded to a *pro se* litigant

whose complaint merits a generous construction by the court when

determining whether it states a cognizable cause of action.  *Erickson*, 127

S. Ct. at 2200  (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct.

285, 292 (1976)) ("'[A] *pro se* complaint, however inartfully pleaded, must

be held to less stringent standards than formal pleadings drafted by

lawyers.'") (internal quotations omitted); *Davis v. Goord*, 320 F.3d 346,

350 (2d Cir. 2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp.

2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.) (citation omitted).  In the event of a

perceived deficiency in a *pro se* plaintiff's complaint, a court should not

dismiss without granting leave to amend at least once if there is any

indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d

698, 705 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) ("The court should

freely give leave [to amend] when justice so requires.").

B.    Statute of Limitations

In their motion to dismiss plaintiff's complaint, defendants

collectively seek dismissal of certain of plaintiff's claims based upon the governing statute of limitations.  The focus of defendants' statute of limitations argument is upon those of plaintiff's claims that are predicated upon events occurring more than three years prior to commencement of his action.  Plaintiff opposes this portion of defendants' motion, arguing his entitlement to the benefit of the continuing violation exception.

Consistent with the Supreme Court's pronouncement that in actions brought under 42 U.S.C. § 1983 the applicable limitations period is derived from the general or residual statute of limitations for personal injury actions under the laws of the forum state, *see Owens v. Okure,* 488 U.S. 235, 249-50, 109 S. Ct. 573, 582 (1989), plaintiff's federal claim in this action is governed by the three-year statute of limitations which applies in New York to personal injury claims of an otherwise unspecified nature.  *See* N.Y. C.P.L.R. § 214(5); *see also Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (quoting *Owens*); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995); *Lugo v. Senkowski*, 114 F. Supp. 2d 111, 113 (N.D.N.Y. 2000) (Kahn, J.) (citing *Pinaud* and *Owens*).  When applying the applicable limitations period the courts consider a claim to accrue when the plaintiff "'knows or has reason to know of the injury which

is the basis of his [or her] action.'"  *Singleton v. City of New York*, 632

F.2d 185, 191 (2d Cir. 1980) (internal quotations and citation omitted),

*cert. denied*, 450 U.S. 920, 101 S. Ct. 1368 (1981).

In gauging the timeliness of plaintiff's claims, I have taken notice of

the fact that while plaintiff's complaint in this action was filed on August

24, 2010, it is dated August 1, 2010.  For purposes of calculating the

three-year statutory limitation period, under the "prison mailbox rule"

courts presume that a pleading is filed when it is submitted to the prison

officials.  *McLaurin v. Paterson*, No. 07 Civ. 3482, 2008 WL 3402304, at *

10 (S.D.N.Y. Aug. 11, 2008); s*ee also Nobel v. Kelly,* 246 F.3d 93, 97 (2d

Cir.), *cert. denied*, 534 U.S. 886, 122 S. Ct. 197 (2001).  At this juncture,

without the benefit of more information concerning when plaintiff's

complaint was given to prison officials for mailing to the court, all that can

be said with certainty is that his claims are facially untimely unless found

to have accrued on or before August 1, 2007.  As such, plaintiff's claims

related to violations occurring during his incarceration in the ICP at Attica

from 1993 to 2001 and from 2002 to 2005 appear to be time-barred

absent a basis to find equitable tolling or to invoke the continuing violation

rule.

Equitable tolling is a doctrine applied in "'rare and exceptional circumstances,' where [the court finds] that 'extraordinary circumstances' prevented a party from timely performing a required act and that party 'acted with reasonable diligence throughout the period he [sought] to toll.'" *Czernicki v. U.S. Dep't of Justice*, 137 Fed. App'x 409, 410-11, 2005 WL 1498456, at *1 (2d Cir. 2005) (summary order cited in accordance with Fed. R. App. Proc. 32.1) (citing and quoting *Doe v. Menefee*, 391 F.3d 147, 159-60 (2d Cir. 2004)). The doctrine may be applied where a statute of limitations has passed due to "'defective pleading'" or defendant's "'misconduct'" in preventing the plaintiff from bringing his claim or learning of the cause of action.  *Id.* (citing *Irwin v. Dep't of Veterans Affairs*, 489 U.S. 89, 96, 111 S. Ct. 453 (1990); *Kronisch v. United States*, 150 F.3d 112, 123 (2d Cir. 1998).

In opposing defendants' motion, plaintiff has failed to allege any circumstances which would support a finding of equitable tolling.  Instead, relying on the Second Circuit's decision in *Shomo v. City of New York*, 579 F.3d 176 (2d. Cir. 2009), plaintiff argues that his claims are subject to the continuing violation doctrine since he has alleged an ongoing policy of medical indifference.  In its relatively recent decision in that case, the

Second Circuit addressed the question of whether the continuing violation

doctrine, a concept often associated with claims of employment

discrimination, *see e.g., National R.R. Passenger Corp. v. Morgan*, 536

U.S. 101, 116-117, 122 S. Ct. 2001, 2074-75 (2002), could apply to an

inmate's challenge under the Eighth Amendment to the adequacy of his or

her medical care.  *See generally, Shomo,* 579 F.3d 176.  Addressing the

issue, the Second Circuit responded as follows:

> We agree that the continuing violation
> doctrine can apply when a prisoner challenges a
> series of acts that together comprise an Eighth
> Amendment claim of deliberate indifference to
> serious medical needs. . . . To assert a continuing
> violation for the statute of limitations purposes*,* the
> plaintiff must "allege both the existence of an
> ongoing policy of [deliberate indifference to his or
> her serious medical needs] and some non-time-
> barred acts taken in the furtherance of that policy.".
> . . This test screens out Eighth Amendment claims
> that challenge discrete acts of unconstitutional
> conduct or that fail to allege acts within the
> relevant statutory period that are traceable to a
> policy of deliberate indifference.

*Id.* at 182 (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir.

1999)).

In this instance plaintiff's complaint alleges neither the existence of a

systemic, ongoing policy of deliberate indifference to his mental health

needs extending into multiple DOCCS and OMH facilities nor the commission of non-time barred acts taken in furtherance of that policy. Careful review of plaintiff's complaint reflects that it alleges discrete types of violations at each of the three facilities involved.  At Attica, for example, plaintiff alleges that he receive ineffective treatment from mental health providers while there, undergoing frequent changes in medication, appointments of insufficient duration to make viable diagnoses, the lack of continuity of care, the failure to provide proper psychological testing, and a lack of therapeutic training and programming.  *See* Complaint (Dkt. No. 1) ¶¶ 28-39.  These allegations do not appear to suggest an overriding OMH policy or practice leading to the alleged deprivations, and in fact, to the contrary, allege that the practices at Attica were inconsistent with OMH policies and requirements.  *See id.*

Having reviewed plaintiff's allegations, I recommend a finding that plaintiff's complaint does not satisfy the requirements of *Shomo* by plausibly alleging both the existence of an ongoing policy of deliberate indifference and acts taken in accordance with that policy within the limitations period.  I therefore recommend that plaintiff's claims related to his incarceration within the ICP at Attica from 1993 to 2001, and again

2005 to 2006, be dismissed based upon the applicable statute of limitations.[7]

### C.    Personal Involvement

In defendants' motion to dismiss, defendants assert that plaintiff's complaint fails to allege the requisite personal involvement of defendants Fischer, Hogan, Sawyer, and Strickland in the constitutional deprivations alleged to support a finding of liability against them.  Defendants also contend that any claims concerning the MHPC and defendant Mayer should be dismissed.

Personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983 against that defendant.  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some

---

[7]    Without more information from the plaintiff with respect to the specific claims arising from his confinement at the MHPC in 2007 and 2008, I am unable to determine whether his claims involving that facility are subject to the statute of limitations.  As will be seen, since the plaintiff's claims will be dismissed on the merits, and defendants' statute of limitations argument does not focus upon plaintiff's claims stemming from his confinement at that facility, I have not addressed the statute of limitations as it applies to the MHPC.

tangible connection between the constitutional violation alleged and that

particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir.

1986).

>    1.    Defendants Fischer, Hogan, Sawyer, and Strickland

Three of these four defendants occupy central positions of authority

within the DOCCS or OMH, and clearly were not directly involved in

plaintiff's care and treatment while confined in DOCCS and OMH facilities.

Defendant Brian Fischer, for example, was at the relevant times the

Commissioner of the DOCCS (formerly "DOCS"), while defendant Michael

Hogan was his counterpart at the OMH.  Defendant Donald Sawyer

appears to be the director of the CNYPC, a facility in which plaintiff does

not allege he was ever confined, but is also alleged to have responsibility

for the Center's respective "satellite units" which, presumably, the MHPC

is.  Defendant Strickland is alleged to be a unit chief at Auburn,

responsible for operations of that unit.

Each of these four defendants appears to have been named by the

plaintiff as a defendant based solely on his authoritative position within the

DOCCS or OMH system.  It is important to note, however, that a

supervisor cannot be held liable for damages under section 1983 solely by

virtue of being a supervisor;  there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring.[8]  *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on*

---

[8]        The issue of supervisory liability for civil rights violation was addressed by the Supreme Court recently in its decision in *Ashcroft v. Iqbal*, ____ U.S. ___, 129 S. Ct. 1937 (2009).  The Second Circuit has yet to address the impact of *Iqbal* upon the categories of supervisory liability under *Colon*.  Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability.  *See Sash v. United States*, 674 F. Supp. 2d 531, 542-544 (S.D.N.Y. 2009); *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon*.") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) .  While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010);

*other grounds sub nom.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937; *see also*

*Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.

1995); *Wright*, 21 F.3d at 501.

There is nothing in plaintiff's complaint to suggest that there is any

basis to hold DOCCS  Commissioner Fischer, OMH Commissioner

Hogan, CNYPC Director Sawyer or Auburn MHU Unit Chief Strickland

responsible for any alleged constitutional deprivations, beyond the fact

that these named defendants are responsible for overseeing the various

facilities that plaintiff encountered in the DOCCS and OMH systems.  It is

clear, for example, that the plaintiff claims against Commissioner Fischer

stem principally from his position of authority and the unsuccessful result

of his grievance.  Plaintiff alleges that defendant Fischer, in his capacity

as Commissioner of the DOCCS, is responsible for "the operation and

maintenance of correctional facilities in the state of New York" and "the

care, custody and control" of inmates.  Complaint (Dkt. No. 1) ¶ 6, 58.

Plaintiff also asserts that defendant Fischer has direct oversight and is

responsible for any agency failings within the purview of the DOCCS.  *Id.*

at ¶ 60.  Plaintiff contends that "[t]hrough his disregard of his [plaintiff's]

---

*Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10, 2010).

complaint, Mr. Fisher has exhibited a wanton disregard for a serious mental health need" and "has intentionally allowed for the inadequate treatment stated by the plaintiff."  *Id.* at ¶ 61.  Nowhere in plaintiff's complaint, however, is there any allegation plausibly demonstrating that defendant Fischer was aware of plaintiff's complaints regarding his treatment.  While it is true that plaintiff's grievance regarding his mental health treatment was denied at the DOCCS central office level, it was the CORC, and not defendant Fischer, who effectuated in that denial. Moreover, it is well-established that even if Commissioner Fischer had received letters or grievances directly from the plaintiff, the mere receipt of those letters, without more, would not implicate Commissioner Fischer in any violations which were the subject of those complaints.  *Gonzales v. Wright*, No. 9:06-CV-1424 (JMH), 2010 WL 681323, at * 10 (N.D.N.Y. Feb. 22, 2010) (Hood, J.); *see also Booker v. Doe*, No. 9:06-CV-73, 2008 WL 4527601, at *7 (N.D.N.Y. Sept. 30, 2008) (Sharpe, J.) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement."), *aff'd*, 368 Fed. App'x 186 (2d Cir. 2010).

Plaintiff's allegations against defendants Hogan and Sawyer are

similarly deficient.  Plaintiff asserts that defendant Hogan, in his capacity

as Commissioner of New York State's OMH, "is responsible for the

operating and policy making of all psychiatric centers" in New York, and

that Sawyer, in his capacity as Director of the CNYPC, is responsible for

the facility's operation.  *Id.* at ¶¶ 7-8.  These allegations are similarly

deficient in that they do not satisfy the requirements under *Iqbal* and

*Colon* for finding liability on the part of the supervisory official for a civil

rights violation.

Plaintiff's allegations regarding defendant Strickland's position, and

her capacity as a Unit Chief at Auburn, afford a slightly greater basis for

finding her liability for any medical indifference while plaintiff was confined

within Auburn.  Plaintiff's complaint, however, does not allege her direct

involvement in his care and treatment, asserting only that in her capacity

as a Unit Chief, she was responsible for the unit's operation.  *Id.* at ¶ 11.

This, without more, is insufficient to implicate defendant Strickland in the

constitutional deprivations alleged.  *Richardson*, 347 F.3d at 435.

Based upon the foregoing I conclude that plaintiff has failed to allege

any factual basis upon which a plausible claim of personal involvement on

the part of defendants Fischer, Hogan, Sawyer, and Strickland been

stated, and therefore recommend dismissal of plaintiff's claims against those individual defendants, with leave to replead.

### 2.   Defendant Mayer

The fifth defendant seeking dismissal on the basis of lack of personal involvement, defendant Mayer, stands on different footing than the other four defendants that have been named by plaintiff in his complaint.  In their motion defendants allege that the claims against defendant Mayer should also be dismissed, but fail to articulate a tenable basis for dismissal.

It is true that plaintiff's complaint does not disclose any personal, hands on participation by defendant Mayer in his mental health treatment. His role in the case appears to emanate from his March 31, 2010 response to plaintiff's grievance.  This action would arguably seem to bring him squarely within the second of the five *Iqbal* and *Colon* potential grounds for establishing personal involvement on the part of a supervisory employee.  Even assuming, *arguendo*, that defendant Mayer has been named as a party to this action solely by virtue of his supervisory position, some courts have held that personal liability may lie where a "supervisor's 'involvement went beyond merely the receipt of complaint letters,' to

'responding, explaining the treatment and defending the institution.'"

*Woods v. Goord*, No. 01 Civ. 3255 (SAS), 2002 U.S. Dist LEXIS 7157, at

*27-31, 2002 WL 731691, at *7-9 (S.D.N.Y. Apr. 23, 2002) (Schendlin, J.)

(internal citations omitted); *see also Baez v. Harris,* No. 9:01-CV-807,

2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that

defendant Selsky responds personally to all disciplinary appeals by

inmates found sufficient to withstand summary judgment motion based on

lack of personal involvement)*; Rashid v. Hussain*, No. 95- Civ. 676, 1997

U.S. Dist. LEXIS 16132, at *9-10, 1997 WL 642549, at *3 (N.D.N.Y. Oct.

15, 1997) (Pooler, J.).

Drawing all inferences and resolving all ambiguities in plaintiff's

favor, I conclude that Bussey has sufficiently alleged defendant Mayer's

personal involvement in the constitutional violations alleged to withstand

defendants' dismissal motion.  *See Charles v. N.Y. State Dep't of Corr.*

*Services*, No. 9:07-CV-1274, 2009 WL 890548, at *5-9 (N.D.N.Y. Mar. 21,

2009) (Hurd, J. and DiBianco, M.J.).  Accordingly, I recommend denial of

the portion of defendants' motion challenging the sufficiency of plaintiff's

allegations regarding defendant Mayer's personal involvement.

D.    Deliberate Medical Indifference

24

In plaintiff's complaint, he alleges that each of the named defendants, in their various capacities, have failed to properly treat his serious mental illness.  In response to this assertion, defendants contend that they are collectively entitled to dismissal of that claim as a matter of law on the ground that plaintiff has failed to allege that he suffers from a mental illness sufficiently serious to implicate the Eighth Amendment and, in any event, his complaint fails to show that the named defendants were indifferent to any such need, either objectively or subjectively.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976).  The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).*  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer v.*

*Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).  To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).  Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by

'wantonness.'"  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

Claims of medical indifference are subject to analysis utilizing this Eighth

Amendment paradigm.  *See Salahuddin v. Goord,* 467 F.3d 263, 279-81

(2d Cir. 2006).

### 1.   Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into

"whether the prisoner was actually deprived of adequate medical care . .

.", and centers upon whether prison officials acted reasonably in treating

the plaintiff.  *Salahuddin*, 467 F.3d at 279.  A second prong of the

objective test addresses whether the inadequacy in medical treatment

was sufficiently serious.  *Id*. at 280.  If there is a complete failure to

provide treatment, the court must look to the seriousness of the inmate's

medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir.

2003).  If, on the other hand, the complaint alleges that treatment was

provided but was inadequate, the seriousness inquiry is more narrowly

confined to that alleged inadequacy, rather than focusing upon the

seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at

280.  "For example, if the prisoner is receiving on-going treatment and the

offending conduct is an unreasonable delay or interruption in treatment. . .
[the focus of] the inquiry is on the challenged delay or interruption, rather
that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*,
316 F.3d at 185) (internal quotations omitted).  In other words, at the heart
of the relevant inquiry is the seriousness of the medical need, and whether
from an objective viewpoint the temporary deprivation was sufficiently
harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of
course, "when medical treatment is denied for a prolonged period of time,
or when a degenerative medical condition is neglected over sufficient
time, the alleged deprivation of care can no longer be characterized as
'delayed treatment', but may properly be viewed as a 'refusal' to provide
medical treatment."  *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219
F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a
condition untreated may or may not raise constitutional concerns,
depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting,
*inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).
Relevant factors informing this determination include whether plaintiff
suffers from an injury or condition that a "'reasonable doctor or patient

would find important and worthy of comment or treatment'", a condition

that "'significantly affects'" a prisoner's daily activities, or "'the existence of

chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted);

*Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3

(N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

It is well-established that the Eighth Amendment's requirements that

a prison inmate's serious medical needs must be met extends beyond

physical impairments to include mental impairments as well. *Guarneri v.*

*Hazzard*, No. 9:06-CV-0985, 2008 WL 552872, at * 6 (N.D.N.Y. Feb. 27,

2008) (Homer, M.J.) (citing *Guglielmoni v. Alexander*, 585 F. Supp. 821,

826 (D. Conn. 1984)); *see also Cuoco v. Moritsugu*, 222 F.3d 99,106 (2d

Cir. 2000).  The allegations in plaintiff's complaint concerning the

diagnoses rendered over time for his mental impairments suffice, at this

early procedural juncture, to satisfy the objective component of the

prevailing test.  *See Hamm v. Hatcher*, No. 05-CV-503, 2009 WL

1322357, at *7 (S.D.N.Y. May 5, 2009).

In the instant case, plaintiff alleges that he has been diagnosed with

schizophrenia and post-traumatic stress disorder, which he has

characterized as being both chronic and severe.  At this early stage, the

court must accept the plaintiff's allegations as true and these allegations regarding his mental health condition are sufficient to objectively show that he suffers from serious mental health disorders.  Even without plaintiff's self-characterization of his mental condition, I am able to reasonably draw the inference that his mental condition is sufficiently serious since  plaintiff was previously housed at MHPC from 2007 to 2008 as well as the ICP at Attica from 1993 to 2001 and 2002 to 2005.  Complaint (Dkt. No. 1)  ¶¶ 2-4, 27, 41.  *See, e.g., Loadholt v. Lape*, Civ. No. 9:09-CV-0658 (LEK/RFT), 2011 WL 1135934, at *4 (N.D.N.Y, Mar. 3, 2011) (recognizing "that allegations of mental illness, especially when accompanied by suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious."); *R.T. v. Gross*, 298 F. Supp. 2d 289, 297 (N.D.N.Y. Jan, 8, 2003) (noting that there are certain circumstances where mental conditions can pose a risk of serious harm).

### 2.   Subjective Element

While the plaintiff's allegations are sufficient to meet the objective requirement of the deliberate medical indifference standard at this early juncture, his claim fails based upon his lack of any type of showing that any of the named defendants in connection with this claim were

subjectively indifferent to his medical condition.  The second prong of the

test mandates a showing of deliberate indifference on the part of one or

more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson v.

Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991)).  Deliberate

indifference, in a constitutional sense, exists if an official "knows of and

disregards an excessive risk to inmate health or safety; the official must

both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he [or she] must also draw the

inference."  *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,*

103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*);

*Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct.

1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a

mental state equivalent to subjective recklessness as the term is used in

criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-

40, 114 S. Ct. 1970).

Mere negligence on the part of a physician or other prison medical

official in treating or failing to treat a prisoner's medical condition, it should

be noted, does not implicate the Eighth Amendment and is not properly

the subject of a section 1983 action.  *Estelle,* 429 U.S. at 105-06, 97 S.Ct.

at 292; *Chance,* 143 F.3d at 703.  "Medical malpractice does not become

a constitutional violation merely because the victim is a prisoner."  *Estelle,*

429 U.S. at 106, 97 S.Ct. at 292.  Thus, for example, a physician who

"delay[s] ... treatment based on a bad diagnosis or erroneous calculus of

risks and costs" does not exhibit the mental state necessary for deliberate

indifference.  *Harrison,* 219 F.3d at 139.   If prison officials consciously

delay or otherwise fail to treat an inmate's serious medical condition "as

punishment or for other invalid reasons," however, such conduct is

actionable as deliberate indifference.  *Harrison,* 219 F.3d at 138;  *Kearsey*

*v. Williams,* No. 99 Civ 8646, 2005 WL 2125874, at *5  (S.D.N.Y. Sep. 1,

2005).

In a wholly conclusory fashion, plaintiff alleges that defendants

either allowed others to provide him with inadequate care or were aware

of substandard care and refused to take any steps to abate it.  Plaintiff's

complaint fails to go further, however, and allege facts plausibly showing

substantive deliberate indifference on the part of the defendants.

Plaintiff concedes in his complaint that while incarcerated he was

seen by a psychiatrist and also placed on a variety of medications.

Complaint (Dkt. No. 1)  ¶¶ 29-31, 43.  Despite receiving some form of

treatment, plaintiff maintains that his psychiatric visits have been too short, and his care has lacked continuity.  *Id.* at ¶¶ 29-31.  Prison medical staff, however, are afforded wide discretion in formulating treatment plans for their wards, and their decisions are thus entitled to a presumption of correctness.  *Williams v. Smith,* 2009 WL 2431948, at *9 (citing *Kulak v. City of New York*, 88 F.3d 63, 77 (2d Cir. 1996)).  Plaintiff has alleged no facts demonstrating that defendants' conduct exposed hm to an excessive risk of harm.  Likewise, there are no allegations suggesting that as a result of the care, or lack thereof, that he was provided, his condition worsened.

In sum, plaintiff's complaint contains nothing more than naked assertions, without additional factual support, of inadequate care.  When analyzed in the context of what little information is currently before the court it is clear that plaintiff's claims stem from his dissatisfaction with the results of treatment provided to him and his contention that defendants treatment of him represents "a practice far below the excepted standard of care."  Plaintiff's Memorandum of Law (Dkt. No. 19) at p. 2.  It is well-settled, however, that such a claim, which sounds in negligence, is insufficient to trigger the protections afforded under the Eighth Amendment in a section 1983 action such as this.  *Estelle,* 429 U.S. at

105-06, 97 S. Ct. at 292.  Plaintiff's complaint, alleging nothing more than his dissatisfaction with defendant's treatment plan and its results, is patently insufficient to state a Eighth Amendment claim is therefore subject to dismissal for failure to state a claim upon which relief may be granted.

### E.    John Doe Defendants

Plaintiff's complaint names three "John Doe" defendants, who apparently have yet to be identified and served by plaintiff.  Plaintiff was advised at the inception of this action that the United States Marshal cannot effect service on a "Doe" defendant and that it is his responsibility to take reasonable steps to ascertain the identities of these defendants.  It appears that plaintiff has failed to do so.

Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal of a plaintiff's claims against a defendant where a summons and complaint is not served upon that party within 120 days after filing of the complaint, absent a showing of good cause.[9]   Fed. R. Civ. P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ 3635, 1999 WL 9847, at *1 (S.D.N.Y.

---

[9]       That period is further restricted by the local rules of this court, which require that service be effected within sixty days.  *See* Northern District of New York Local Rule § 4.1(b).

Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman,* 881 F. Supp. 806, 809 (N.D.N.Y. 1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed. R. Civ. P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel). Inasmuch as the John Doe defendant have not been identified and served, this court has never acquired jurisdiction over them, and the complaint should be dismissed as against those defendants as well.  *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (citing *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 444-45, 66 S. Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

    F.   <u>Leave to Amend</u>

The final issue to be addressed is the question of whether plaintiff should be afforded an opportunity to amend his complaint in order to cure the deficiencies and salvage the Eighth Amendment claim for which I have recommended dismissal.

Ordinarily, a court should not dismiss a complaint filed by a  *pro se*

litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum*, 927 F.2d at 704-05 (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief).  This hold true regardless of whether dismissal comes pursuant to a Rule 12(b) dismissal motion, or instead by way of the entry of summary judgment.  *See Kilgore v. Kaufman*, 374 Fed. App'x 89, 91 (2d Cir. 2010) (cited in accordance with Fed. R. App. Proc. 32.1).

Notwithstanding the fatal deficiencies identified above, in deference to plaintiff's *pro se* status, I recommend that plaintiff be granted leave to amend his complaint in order to develop his Eighth Amendment claim for medical indifference.  While the plaintiff has alleged sufficiently serious medical conditions of schizophrenia and post-traumatic stress disorder, if the plaintiff chooses to amend his complaint, he must specifically identify the named defendant involved in the deprivation and indicate how that defendant is alleged to have acted with knowledge that his or her actions

could cause serious harm to plaintiff's health.

Plaintiff should keep in mind when framing his amended complaint that the law in this circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995 ) (McAvoy, C.J.) (citing *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (other citations omitted)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 U.S. Dist. LEXIS 7136, at *24-25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted).  Therefore, in his amended complaint plaintiff must clearly set forth the facts supporting his claims, including the specific wrongful acts that give rise to each claimed constitutional deprivation.  Such an amended complaint, which will replace the existing complaint, must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court, *see Harris v. City of N.Y.*, 186 F.3d 243, 249 (2d Cir. 1999) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); Fed. R. Civ. P. 10(a), and should specifically allege facts indicating the involvement of each of the named

defendants in each of the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass,* 790 F.2d at 263.

G.    Protective Order

In their motion defendants also move pursuant to Federal Rule of Civil Procedure 26(c)(1) for a protective order barring discovery pending the resolution of defendants' motion to dismiss. That rule provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure of discovery.

Fed. R. Civ. P. 26(c)(1).  In light of my recommendation that the court dismiss plaintiff's complaint with leave to amend, I find that good cause exists for issuing an order to protect defendants from the burden of discovery until the court acts upon this report and, if adopted, until plaintiff files an amended complaint that is accepted for filing by the court.

IV.    SUMMARY AND RECOMMENDATION

When measured against the relevant yard stick of requiring that

facts be articulated in order to demonstrate the existence of a plausible constitutional claim, plaintiff's complaint is subject to dismissal as not alleging facts which show that any of the named defendants were deliberately indifferent to plaintiff's serious medical needs.  Further, plaintiff's complaint is devoid of any allegation revealing personal involvement on the part of defendants Fischer, Hogan, Sawyer, and Strickland in plaintiff's medical treatment.  Additionally, certain of plaintiff's claims are time-barred under the governing statute of limitations.  I therefore recommend that plaintiff's claim of deliberate medical indifference be dismissed, but that in deference to plaintiff's *pro se* status, that he be given an opportunity to amend his complaint to eliminate these shortcomings.[10]

Based upon the foregoing discussion, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 17) be GRANTED, and any of plaintiff's claims relating to his incarceration at Attica from 1993 to 2001 and from 2002 to 2005 be DISMISSED as being time-barred by the applicable statute of limitations; and further that

---

[10]    In view of my recommendations on the merits, I do not find it necessary at this time to address defendants' alternative claim that they are entitled to qualified immunity from suit.

plaintiff's claims against defendants Fischer, Hogan, Sawyer, and Strickland be DISMISSED for lack of personal involvement; and further that plaintiff's complaint be DISMISSED in its entirety, with leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED, that pending a final determination in connection with the instant motion and the submission of an amended complaint accepted for filing with the court, and the filing of an answer to that amended complaint, discovery in this action is STAYED; and it is further

ORDERED, that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:   August 1, 2011
         Syracuse, NY

# DOCS TODAY

*May 2004*     *New York State Department of Correctional Services*     *Vol. 13, No. 5*

# Goord: inmate health care among the best



**Dr. Jon Miller, facility health service director at Coxsackie's Regional Medical Unit, examines an inmate. Commissioner Goord recently told the Assembly's health and corrections committees that inmate health care, provided by staff like Dr. Miller, affords inmates a level of treatment that meets or exceeds community standards.**

*Commissioner's Commentary*

# Attica brings prison history series to a close

### *New feature to spotlight employee jobs, highlighting work performed by units*

This month, with the publication of the history of the Attica prison, DOCS|TODAY completes an ambitious task begun roughly seven years ago: publishing the histories of each of the state's now 70 prisons.

It began in February 1998 with the state's first prison, Newgate, and ends, intentionally, with its most controversial.

In recent years, I had hoped the history of Attica could be published along side an article announcing the resolution of the concerns of the Forgotten Victims of Attica, thereby closing another chapter in the history of the 1971 riot and its aftermath.

That was not to be.

Each month, we have devoted several pages to the history of each prison. We could fill this month's 16 page-edition with Attica's past and admit we had only scratched the surface.

As a result, we have chosen to write the history of Attica using the same general format employed in writing the story of the state's other prisons.

We know some will say that this month's history gives the riot less than its due: but the more thoughtful reader will agree that every one of the dozens of movies or books on the same subject have received the same criticisms, even when they labeled themselves the "tell all" or "final" versions.

We acknowledge up front that our history is the overview of Attica, not an attempt to tell the story of the riot.

**New feature begins**

Next month, we'll inaugurate a new standard feature that succeeds the monthly histories.

It will revolve around the work performed by the thousands of employees of this Department.

For example, the first feature will highlight our Training Academy and the various forms of training offered each year.

I suspect it will be revealing to our civilian employees, most of whom have never set foot in-



**Commissioner Goord**

side the Academy, let alone attended its recruit classes and other training sessions.

For security personnel, it can be 5, 10, 15 or more years since some veteran officers passed through its training programs.

I suspect they may be as interested as they will be surprised to see how training of various types has changed over the years.

In upcoming editions we'll look at operations such as reception centers, personnel offices, health units, commissaries, business offices and how we interact with parole, EnCon and the Office of Mental Health, among others.

Our goal is to provide employees with an eyewitness view of the work performed by their colleagues, and to show your colleagues what your unit contributes to this agency.

We will continue to focus upon the labors of our employees in the field, the men and women whose professionalism, dedication and hard work make our prisons the best in the nation.

As we prepare to bring you this new feature each month, I'd like to remind each facility that they are welcome to submit story ideas and photos through their superintendents for consideration for publication in DOCS|TODAY.

Many of the stories you read in the *Facility Highlights* section are the result of employee suggestions. So we are always on the look out for a few more good story ideas.

We'll welcome yours. 📖

---

## This month's articles

- **DNA links 745 inmates to new crimes: Page 3.**

- **Commissioner testifies on inmate health care: Page 4.**

- **Facility profile: Attica concludes series: Page 6.**

- **McGregor staff starts Adopt-a-Soldier program: page 11.**

- **DOCS CO is part of state's senior K-9 team: 13.**

- **Employee Promotions, Transfers and Deaths: Page 14.**

- **Heating system repairs go above ground: Page 16**

---

**DOCS|TODAY** is published monthly by the New York State Department of Correctional Services: George E. Pataki, Governor of the State of New York; Glenn S. Goord, Commissioner of the Department of Correctional Services; James B. Flateau, Director of the Public Information Office; Linda M. Foglia and Nicholas J. Lyman, Assistant Public Information Officers.

ON THE COVER: The masthead brings DOCS|TODAY together with its past via "Copper John," the Colonial soldier who has stood atop the front gate of Auburn, the state's oldest prison, since 1821. The American flag was affixed to his bayonet in memory of those who lost their lives during the September 11, 2001, terrorist attacks upon the United States. The flag itself was taken from a photograph of it flying above Ground Zero.

CORRESPONDENCE: Should be sent to the Department of Correctional Services, Office of Public Information, Building Number Two, Room 203, 1220 Washington Avenue, Albany, NY 12226-2050, or to the Department's Internet address: http://www.docs.state.ny.us

PUBLICATION: DOCS|TODAY is prepared in-house via desktop composition. Camera-ready pages are sent to the Elmira Correctional Facility and published in the print shop operated by the Division of Industries (*Corcraft*). DOCS|TODAY is available on the Department website at docs.state.ny.us

# 745 inmates linked to new crimes among first 1,000 DNA 'hits'

### *Law expanded to include more crimes, Governor proposes further expansion*

Inmates had accounted for 745 "hits" linking offenders to unsolved crimes when the state's DNA data bank recorded its 1,000th match in May 2003.

That 74.5 percent match rate is consistent with inmate DNA samples making up 69 percent of the data bank at that time – 76,680 of the 110,527 samples on file at that time.

Nearly 200 convictions have resulted thus far from among those 745 matches, most of which involve crimes of sex and violence that are unrelated to the crime that sent the inmate to prison in the first place, according to statistics from the state Division of Criminal Justice (DCJS).

Those matches have included:

- Detectives collected blood samples from a murder scene where the victim had disturbed a burglary in progress. One of the samples returned a hit on a former inmate who had been paroled after serving time in a previous burglary. The offender was convicted of second-degree murder and sentenced to 25 years to life.

- Police were unaware of the connection in three sexual assaults – two involving young children, the other an elderly woman – until DNA linked the three crimes. Subsequently, that DNA was matched with a sample taken from an inmate convicted of attempted burglary. He was convicted of the assaults and sentenced to 25 years to life.

- Bloodstains that had been preserved from an old murder case were analyzed following the 1999 amendment of the law. The resulting DNA profile matched the profile of an inmate serving time for a crime that did not require DNA sampling prior to 1999. He was convicted of first degree manslaughter and sentenced to 14½ to 25 years in prison.

The law requiring DNA samples from inmates dates to 1994 and covered persons entering prison starting Jan. 1, 1996. Inmates convicted of assaults, homicide, sex offenses, incest, escape and absconding were required to provide samples to the state's DNA data bank.

Governor Pataki and the Legislature expanded the list of crimes in 1999 to include all violent felonies; burglary and attempted burglary, 1st through 3rd degree; criminal sale of a controlled substance, 1st through 5th; criminal possession of a controlled substance, 1st and 2nd, and grand larceny, 4th degree subsection 5). Anyone who committed such crimes on or after Dec. 1, 1999, was made eligible for DNA sampling. In addition, the law also specified anyone still serving a sentence, on probation or on parole on that date for any of the listed crimes



**New York State DNA Data Bank
A Breakdown of Investigations Aided
(First 1,000 Hits)**

- Assault 2%
- Burglary 13%
- Misc. 3%
- Murder/Att. Murder 7%
- Robbery 3%
- Sex Offense 72%

(except drug offenses and the grand larceny charge) would also have to provide a sample.

Governor Pataki wants to expand the state's DNA designated offenses by including all felonies, A and B misdemeanors and crimes committed by youthful offenders.

The busiest years for DOCS testing staff were 2000-01, since the law extended DNA sampling to nearly 40,000 inmates already in custody. A total of 59,870 inmates were tested.

Through 2003, the Department has tested 38,721 inmates serving sentences for eligible crimes before the law changed in 1999, plus 41,806 admissions since, for a total of 80,527 DNA samples.

"DOCS is by far the biggest contributor to the state DNA data base," said John Hicks, Director of Forensic Services for DCJS.

He said the state's total data bank now contains about 125,000 DNA profiles of convicted offenders and more than 11,000 crime scene DNA profiles. New York shares DNA information with other states through the FBI, which serves as the connection to the national DNA data bank. The state data bank is maintained at the New York State Police Forensic Investigation Center in Albany.

The data bank maintains DNA profiles of convicted offenders that can be used by law enforcement to identify a perpetrator of a crime when DNA evidence is retrieved from a crime scene.

A DNA profile can be developed from tiny amounts of biological material (e.g., saliva, skin oil). These profiles can now be submitted to the DNA data bank to determine whether a match exists against a convicted offender profile or against evidence from another unsolved sample.

DNA evidence is collected from a crime scene and analyzed by a forensic laboratory accredited in DNA testing. A scientist develops a DNA "profile" and uploads it to the data bank.

That profile is then run against the convicted-offender DNA profiles in the state data bank to determine if a match exists. In addition, profiles from other unsolved cases are compared against it to identify serial crimes.

All crime scene and offender profiles are uploaded to the Federal DNA Index System for comparison with DNA profiles from other states. DNA profiles remain in the federal data bank and are regularly searched against new profiles as they are added to the system.

Mr. Hicks said all states have laws requiring offenders to supply DNA samples. Like New York, most states that began with more limited sampling requirements have since expanded the list of eligible crimes. 📖

*Spending up 63% as population declines 9%*

# Commissioner cites record of improvement in inmate medical care

## *AIDS deaths drop 94%, TB cases by 88%*

*(Commissioner Goord testified on March 15 before a joint session of the Assembly's committees on health and corrections to discuss medical services for inmates. Here is his opening statement before the committees.)*

I thank both chairmen and your committee members for the opportunity to meet with you today.

This is the first time that I have been invited to appear before a joint meeting of these committees.

I appreciate this opportunity to go on the public record before the Assembly. I welcome this forum as a means to detail the hard work, professionalism and dedication of the 1,700 men and women who provide inmate medical care throughout the prison system.

Like them, I am very proud of our success in expanding and improving quality health care for the 65,000 inmates housed in 70 prisons across the state.

I read the committees' announcement publicizing today's hearing. It did not acknowledge the many program improvements and new initiatives affecting inmate medical care that we have implemented since George Pataki became Governor.

I'd like to enter them into the official record of this hearing. But we would be here all day if I were to enumerate all of them. So let me say that my list is representative and not intended to be all-inclusive. Our systemwide record includes:



**Commissioner Goord speaks with Assembly Corrections Chair Jeffrion Aubry (center) and Health Chair Richard Gottfried.**

- Increasing inmate health care spending by 63 percent since 1995 – while the inmate population has declined by 9 percent from its high point in 1999. That increase came even as our treatment policies allowed us to reduce inmate outside hospital days from 38,000 in 1995 down to 15,000 in 2002.

- Interviewing every incoming inmate – more than 26,000 last year alone. We record their medical histories while providing physical, dental and x-ray exams. Screening or lab work is completed as necessary for tuberculosis, Hepatitis B and C as well as for sexually-transmitted diseases.

- Exposing every inmate to educational and instructional materials about TB, HIV and other blood borne diseases. The material is targeted by gender and is offered in both English and Spanish.

- Providing inmates with one million primary care visits annually.

- Arranging nearly 113,000 medical specialty consultations each year. About 7,000 of these visits are with infectious disease specialists. Inmates have contact with nearly 1,000 specialty care providers around the state. These are the same providers who treat New Yorkers in the outside community.

- Reducing the number of AIDS deaths by 94 percent. There were 258 in 1995 but only 15 last year.

- Shipping more than one million pharmaceutical items last year and filling 78,000 prescriptions per month.

- Testing more than 15,000 inmates last year for their HIV status.

- Cutting the rate of active TB infection by 88 percent. It was 225 cases per 100,000 inmates in 1991 but only 28 per 100,000 last year. More than 66,000 inmates were tested for TB exposure in 2003.

- Ensuring all inmates who meet clinical guidelines established by the U.S. Centers for Disease Control and National Institutes of Health are receiving appropriate Hepatitis C treatment.

- Arranging thousands of hours of annual in-service training for our medical personnel. It is provided by outside sources such as medical centers and AIDS experts. Nearly 27,000 non-medical employees receive OSHA's mandated annual training regarding blood borne pathogens and TB.

- Requiring American Correctional Association accreditation of all health care units. That includes meeting "performance-based standards." It requires collection and use of "outcome measures" of the system and the care that we provide.

*Continued on facing page*

*Continued from facing page*

- Working with the Department of Health's AIDS Institute. We use the same quality improvement program reviews that it employs in outside communities. Our guidelines are consistent with theirs.

- Monitoring quality infection control by reviewing inmate medical records – 25,000 of them last year alone – to ensure compliance with CDC, state health department and our own guidelines for the treatment and prevention of such diseases.

I know one of the issues on your agenda is mandating Department of Health oversight of our medical facilities and staff. I believe our record shows we do an excellent job of providing medical care to inmates. I don't know of any state health department in the nation responsible for prison medical care. I don't believe it is required in New York, either. I also do not believe the state health department deems it necessary.

I don't see how it serves inmates to debate this one-house issue that has divided us for 20 years. I think the effort could be better spent advancing issues that we agree would actually improve health care.

I offer the same advice to those who disagree with our policy of limiting condoms to the Family Reunion Program. Once again, let me point out that the Department's policy has been consistent for at least the past two decades. And 48 other states agree with our position on condoms. Let me take just a few minutes on this issue: I want to explain why what some see as a medical issue is viewed as one of security by professionals in 49 state prison systems across the country.

Vermont is that one state in the nation that makes condoms available to all prison inmates. It has fewer than 2,000 inmates. It reports a consistent pool of 15-25 HIV-infected inmates among them.

I hope no one recommends that we blindly go where Vermont's prison policies lead. But if they do, I can save money by reducing the hours of operation in our inmate visiting rooms: Vermont limits inmate visitors to family members. Its stated goal is to reduce prison contraband, particularly drugs. Barring non-family visitors in New York prisons would reduce our inmate visits by several thousands each year.

Vermont makes no claim of scientific documentation that condom distribution reduces the spread of HIV. There is also no scientific documentation that the lack of systemwide distribution increases its spread among inmates in the 49 other state prison systems across the nation.

Since I am talking about one New England state, let me report to you on a drug bust two weeks ago in another. It was conducted by a multi-agency law enforcement task force in Maine. *The Associated Press* reported that police raided a heroin distribution center in Waterville. They seized $50,000 worth of heroin packaged in what they called "little balloons." The distributors said they were all to be smuggled into the visiting room of just one, nearby prison. The "little balloons" were to be passed by visitors to inmates while exchanging a kiss.

In our own system, my staff has been vigilant in its battle to keep drugs out of our facilities. We conducted nearly 93,000 inmate drug tests last year – with a positivity rate of less than 4 percent. I think that indicates how successful we have been in reducing illegal drug use among inmates. It also indicates our success in reducing the violence that can accompany drug trafficking in our prisons as well as on our streets. Our efforts contribute to the fact that our current rates of prison violence are the lowest since 1979.

But all is not perfect. Visitors are being caught with condoms and "little balloons" as they attempt to smuggle drugs into Great Meadow, Auburn, Elmira, Attica – and virtually most

*Continued on page 15*



**Those testifying included (from left) Dr. Bruce Agins, Medical Director of the AIDS Institute at the Department of Health (DOH); Wayne Osten, Director of the DOH Office of Health Systems Management; Dr. Guthrie Birkhead, Director of the AIDS Institute and the Center for Community Health; Commissioner Goord; Dr. Lester Wright, DOCS Chief Medical Officer, and DOCS Deputy Commissioner and Counsel Anthony Annucci.**



## *Writing a future mindful of its past*

# Attica

Attica was representative of how jurisdictions across the nation operated their maximum-security prisons during the turbulent '70s, long before the designations of medium- and minimum-security facilities entered the correctional lexicography. Then, a Sept. 9, 1971 dispute between an officer and an inmate mushroomed into the deadliest one-day encounter among Americans since the Civil War, leaving 11 staff and 32 inmates dead in its wake. While debates continue today as to the root causes and direct results of the riot, this much is clear: Attica's increased staff is now among the best trained in the nation, while inmates participate in a myriad of programs unheard of 33 years ago. Rates of violence inside its walls are at near-record low levels. The prison is today representative of the nation's best in correctional administration and operations.

Many of the criticisms leveled in the 1970s at the nation's penal system in general and Attica in particular have long since been addressed.

Security and civilian staffing have been considerably increased, inmate out of cell time has been expanded along with a myriad of rehabilitative programs to occupy inmates in a productive manner. The prison's operations and management have been accredited several times as meeting national standards.

Attica first made headlines when it opened in 1931. Hailed as "the last word in modern prison construction," with advanced security features and technological innovations.

Ironically, Attica would next make headlines in 1971, when a mechanical breakdown of the most primitive kind – a faulty weld on a gate – foiled that much ballyhooed technology and led to the most deadly riot in New York state prison history.

*Continued on facing page*

*Continued from previous page*

### Attica becomes fifth maximum-security facility

In 1926, more than 7,000 inmates were crammed into the 4,831 cells in the four state prisons, and prisoners were "doubled up" in tiny, primitive, unsanitary cells at Sing Sing, Auburn and Clinton. A wall was being built around Great Meadow to convert it to maximum-security.

Since those four prisons were located in the eastern and central areas of the state, the new institution was to be built out west, with the location chosen by a site selection committee.

With admissions exceeding releases by 500 a year, the Legislature in 1927 authorized a fifth prison, appropriating $3.5 million for the 697-acre plot and construction of Attica.

Contracts were let in September and ground was broken on October 15, 1929. The architect and contractors were equal to the "quicksand problem." The location of the wall and some of the buildings was shifted to avoid silt deposits; foundation pilings were driven to depths of 70 feet, and steel tubing was sunk in "soft spots" and then filled with concrete.



**Construction underway at Attica in the 1930's.**

William J. Beardsley of Poughkeepsie, designer of the Erie County Penitentiary (now DOCS' Wende facility), was engaged as architect. Beardsley produced a blueprint remarkable for its strength and simplicity. The architecture is marked by dignified symmetry, with repeating window and roof patterns but little in the way of ornamental flourishes. The principal structures are laid out in three nested rectangles: an inner quadrangle of adjoining cell-blocks ringed by an outer group of support buildings, all enclosed within the prison wall.

The nucleus of the prison is a rectangle of around 7½ grassy acres. Each side of the rectangle is a three-story cellblock. Within this innermost quadrangle, enclosed corridors connect the cellblocks in a plus-sign, intersecting at a point called "Times Square" – the geometric and symbolic center of the prison. The corridors divide the interior into four smaller recreation yards, with security observation towers overlooking each

Second, ringed around the cellblock quadrangle are administration, program, industry and support buildings, all located within the exterior wall of the prison.

Lastly comes the great, gray wall – a mile and a fifth long, 30 feet high and sunk 12 feet into the earth. Attica's wall created a stir when it was built. It cost $1,275,000 or more than three times what was appropriated in 1911 for the construction of the Great Meadow prison.

Unlike most prison walls constructed earlier, Attica's wall had a rounded top, so that it could not easily be conquered with

grappling hooks. The rounded top also meant that it could not be patrolled on foot. Instead, guard posts, with spired roofs, were built at the corners and other critical points. The front wall angles away from the cellblocks to provide distance before coming to a point, allowing an improved view for the wall tower officers while creating "breathing room" for the administration building behind it.

The cell-blocks, 600 feet long and three tiers high, are identical with one interesting difference. Three (designated as A-, B- and D-Blocks) were built on the Auburn design, with inside-cells back-to-back in the center of the building. But C-Block, on the north side, was built on the older outside-cell plan, with the cells against the outer walls and walkways down the center of each tier. Since each inmate had his own window at the rear of his cell, C-Block was considered preferred housing and was reserved for well-behaved inmates with farm, mess-hall and hospital work assignments. This continued until D-Block (on the south side of the quadrangle) was renovated as honor housing in the 1970's.

A-Block construction was completed two months early, in 1931. Some 120 "guards," then the official title of the custodial officers, were hired. William F. Hunt was appointed Attica's first warden, transferring from that post at Great Meadow.

### Locals refer to inmates as "fellow citizens"

The first 36 prisoners arrived from Sing Sing in June 1931, followed by 50 more from Elmira. Auburn inmates, who had earlier been transferred in to help with construction, departed their cantonment, which was then converted to a farm building.

The town welcomed the new prisoners. They referred to them as "fellow citizens" and brought books and magazines to the prison. "Amateur projectionists" went into the prison with reels of motion pictures to show the men. The town organized a "home guard" to assist tracking down escapees and be on hand in the event of a riot.

One Head Teacher was appointed in 1933. He supervised a crew of inmate instructors. In 1935, three more teachers (elementary, commercial and vocational subjects) were hired, assisted by some 35 inmate teachers providing classroom and cell study instruction in morning and afternoon sessions. Some inmates took correspondence courses. Altogether, between a quarter and a fifth of the population usually partook of some kind of formal education program.

Little was offered in the way of recreation. The prison chaplain was in charge of organizing diversions: movies on Satur-

*Continued on page 8*

*Continued from previous page*

day afternoons, musical performances by the prison band, orchestra and choir groups, and occasional shows by outside performers. There were baseball and football leagues, segregated by race. It was not until 1974 that a gymnasium was built.

Only one of the original structures is gone: the building holding the carpenter, tailor and shoe shops behind D-Block, destroyed in the 1971 riot.

Several buildings were added to the original construction. A fifth housing unit, E-Block, a two-story, cross-shaped building with 270 cells, was completed in 1966 The same year, a long, one-story structure was placed between the administration building and A-Block; this contains the guidance office, chaplains' offices and the visiting and package rooms. In 1973, a new commissary was snuggled in between the mess hall and the laundry/shower building, and a large storage building was placed behind the mess hall in 1976. In 1990, a long, low warehouse for Corcraft was built.

A gymnasium, part of the original plan, was at long last built in 1974. A new two-story vocational building was placed alongside the auditorium-chapel building in 1978, and a one-story school annex was placed next to the academic building in 1984. The three Family Reunion Program modular homes, where inmates are permitted extended visits with legal spouses and approved family members, were added in the late 1980's. The last major addition was the completion of a modern infirmary, located near the north wall, in 1995.

When Attica opened, it replaced Auburn as the receiving facility for prisoners sentenced out of courts in the western counties of the state. An ambitious "classification clinic" was set up in 1933, with the psychiatrist in charge assisted by a psychologist and clerical staff. Newly-received inmates were housed for several weeks in the reception building, where they would be examined and evaluated by the psychiatrist, physician, dentist, social worker, head teacher, industrial superintendent, chaplain and security officials.

The new Department of Correction had just recently established, in 1927, for the purpose of unifying New York's various prisons, mental hospitals and reformatories into a rational system. Riots at Clinton and Auburn in 1929 led to a reaffirmation of purpose with the report of the Lewisohn Commission, whose progressive vision of a professionally run, diversified system was enthusiastically embraced by the legislative and executive branches of government. The classification clinics were a core



**CO's Shawn McIntyre (left) and Shawn Kelly stand their posts during Attica's 2003 annual ceremony at the memorial in front of the prison.**

of the Lewisohn program, and steps toward diversification were taken with the opening of Wallkill, Coxsackie and Woodbourne in the early 1930's.

The depression and World War II ended the dream. Funding for the promised system of diversified institutions and professional staff was not forthcoming. Within a few years, the psychiatrist and psychologist positions went vacant; still vacant, they were transferred in 1945 to the new reception center at Elmira. Attica continued to receive inmates from the courts, but classification was largely reduced to a review of the probation pre-sentence report, an enemies check and an interview to determine gross physical or psychiatric problems.

When a service (guidance) unit opened in 1950, it assumed some of the classification functions, and an infusion of funds after the riot brought back professional classification staff. The classification unit closed in 1975 when the classification function was shifted elsewhere, first to Clinton and then to Downstate. Attica's designation as a receiving facility was finally discontinued when Wende opened in 1983.

### "Attica is every prison, every prison is Attica"

That quote is how Robert B. McKay summarized his 1972 tome entitled The Official Report of the New York State Special Commission on Attica.

It examined the September 9-13, 1971, riot that left 11 employees and 32 inmates dead. While 10 employees and 29 inmates were killed in the re-taking of the prison, it should also be remembered that one employee and three inmates were murdered during the stand-off by the inmates who incited the riot in the first place.

Attica was representative of penology across the nation in 1971; the riot made it the flashpoint for reform. It stands today as an example of the best the penological system has to offer in the new millennium.

The Attica riot spurred a reflection upon those issues not only at Attica, but throughout the Department as well as at prisons and among systems across the nation.

At Attica in particular, changes led to a safer institution, staffed by professionally-trained uniformed and non-uniformed personnel who provide the "best practices" developed since 1971 that are accepted today as national standards for prison operation and administration.

The facility has also been accredited triennially since 1989 by the American Correctional Association, which establishes

*Continued on facing page*

*Continued from previous page*

and then audits compliance with nationally-accepted standards for the administration and operation of correctional facilities.

DOCS has, over the past three decades, become a national and international leader in correctional policy. It is as much a symbol of penology today as it was the focus of national policies that existed in 1971.

The most significant changes are these key components designed to provide DOCS with the in-house capability of resolving inmate issues and prison incidents without the use of excessive or outside force:

- A statewide U.S. Justice Department-certified Inmate Grievance Program, wherein responsive supervisors provide a venue where complaints can be addressed and answered in a timely fashion.

- Inmate Liaison Committees at each prison, representing the population in regular meetings with the prison's administration.

- The Crisis Intervention Unit (CIU), formed in 1979, composed of security and civilian staff trained in negotiations and other techniques at every prison to defuse situations before the use of force.

- Correction Emergency Response Teams (CERTs) of Correction Officers and supervisors specially trained in 20 teams strategically located at facilities around the state which, since 1977, have used the least force required to quell disturbances within prison walls.



**Officer installs cell shield in Attica SHU.**

- CERT (with CIU after 1979) was used to resolve multiple hostage incidents without serious injury to staff or inmates during the four such incidents since 1971 – at Eastern in 1977 (14 hostages), at Sing Sing in 1983 (19 hostages), Coxsackie in 1988 (five hostages) and Southport in 1991 (five hostages).

- Ongoing monthly training for both of these specialized units demonstrates DOCS' continued commitment to providing unparalleled public safety, a safe, humane institutional environment, for both staff and inmates, and the ability to quickly respond to any emergency at a moment's notice. Attica has both a CERT and a CIU.

DOCS leads the nation in providing extensive, mandatory and state-of-the-art, in-service training for employees. Attica's 872 employees participated in more than 32,000 hours of training last year.

Most inmates will return to society. DOCS has, over the past 30 years, made a commitment, and has maintained that commitment, to provide meaningful rehabilitative programming for inmates who want to make use of them. While inmates spent 14 hours a day in their cells in 1971, today they have 16 hours out of their cells each day.

To accommodate that, security staff has been increased since 1971 by 45 percent and civilian staffing by a whopping 86 percent. The massive infusion of civilian staff was to provide services to inmates unheard of in prisons around the nation in 1971 – and in some other state systems even today.

Since 1971, a vocational school and a gymnasium have been constructed at Attica. There are currently 12 vocational shops, with State Education Department-certified instructors teaching printing, welding, building maintenance, floor covering, custodial maintenance, radio/TV repair, Office of Vocational Rehabilitation workshop, electrical trades, plumbing and heating, small engine repair, plus two general business programs.

Academic education employs 11 teachers, provides for instruction in Adult Basic Education, pre-high school equivalency, high school equivalency plus English as a Second Language.

A state-of-the-art computer lab provides computer-assisted instructional opportunities. All DOCS facilities make education mandatory, at least to the ninth grade level in reading and math.



**Attica's mess hall in 1978.**

*Continued on next page*

Continued from previous page

A Guidance Unit, comprised of three Senior Counselors and 17 Counselors, provides for transitional service programming plus group counseling in specialized areas such as Sex Offender Counseling and four Aggression Replacement Training Programs. In addition, several other counseling programs are offered, such as Anger and Violence workshops, anti-drug groups, "long-distance Dad" parenting training and domestic violence counseling.



Among those testifying during 2002 hearings by the Attica Task Force were (from left) Attica Sgt. Mark Cunningham, Wyoming CO John Cunningham and James Cunningham. Their father, Attica Sgt. Edward Cunningham, was killed in the 1971 riot.

Effective substance abuse treatment programs are often paramount to the success of an individual upon release. DOCS is a national leader in providing inmates with substance abuse treatment programs. At any one time, nearly 15,000 inmates within the Department are participating in substance abuse treatment programs, with more than 30,000 inmates participating in such programs annually.

Attica has an 86-bed Residential Substance Abuse Treatment (RSAT) program providing a six-month intensive therapeutic community-based treatment regimen. The RSAT program is staffed by certified alcohol and substance abuse treatment specialists. In addition, an Alcohol and Substance Abuse Treatment program accommodates 50 inmates in the afternoon and evening program modules. These programs are augmented by A.A. and other facility drug programs.

In partnership with the state Office of Mental Health (OMH), DOCS provides for an extensive array of mental health services at Attica. Attica was the first prison in the state to provide a Specialized Treatment Program (STP), a mental health group and individualized treatment program for those inmates whose disruptive behavior led to their long-term confinement in disciplinary Special Housing Units (SHUs). A new, state-of-the-art OMH satellite unit is being constructed at a cost of $5 million. It will open in August. Attica is in the national forefront in providing this type of treatment.

Attica in 1983 opened a 78-bed Intermediate Care Program (ICP), a physically-separate residential treatment program for inmates who, by virtue of a debilitating mental illness, are unable to function in the general prison population. Also provided is an OMH Satellite Unit dormitory and observation unit.

Attica provides a full array of medical services to the inmate population. In 1995, a 30-bed, $6.5 million infirmary was added at Attica. A full range of dental services is also provided to inmates.

The Family Reunion Program and extensive visiting programs allow inmates unparalleled access to and time with their spouses, children and all other family members.

Religious services and studies are provided by seven chaplains at Attica (three full-time and four part-time), assisted by over 200 registered volunteers. Religious services and studies in a large number of faiths are provided on a weekly basis to meet the varied spiritual needs of the population.

An extensively stocked, up-to-date law library, with inmate assistants trained to assist their peers, provides resources and access to the legal system. The general library offers inmates a variety of choices as well as access to periodicals of all types from virtually all sources.

One area that remains an on-going challenge to the Department is the recruitment of minority staff. By collective bargaining agreement, employees are free to choose the facilities at which they work based upon their seniority. State law and equal protection statutes prevent this Department from enticing minorities to work at Attica by offering them any incentives not available to all employees.

Those obstacles notwithstanding, the Department mounts intensive advertising and recruitment campaigns in minority communities whenever it plans to offer an Officer exam.

**Attica's legacy was to transform penology**

Tremendous change has taken place in Attica over the last three decades. DOCS is proud of the job that staff at Attica and 69 other prisons perform each day. They are representative of the best correction professionals in the country, providing the highest security in a humane, progressive environment.

Chairman McKay's observation about Attica in 1971 – that "Attica is every prison, every prison is Attica" – is still true today, but with an immense difference. Where Chairman McKay used Attica as a symbol of the neglect of correctional systems by governments across the nation, Attica today is a symbol of vast improvement over the course of three decades.

Attica is representative of prisons across New York but ahead of many around the nation. It offers a safe and secure environment for a professional, prepared and well-trained staff.

That environment also allows willing inmates to participate in full and productive rehabilitative programming, while meeting our obligations to meet or exceed constitutional minima in providing medical and mental health services, access to the courts and outside world, maintaining family ties and a host of other programs – offerings that increase prison safety while affording inmates the best chance of success upon their release.

Attica remains at the forefront in changing the face of penology. As we enter the new millennium, DOCS has recalled its past in order to write a better future.

The true legacy of Attica is that today's prison system in New York bears no resemblance to the one McKay examined in 1972. 📖

# Facility Highlights

## Adopt-a-Soldier program expands from Mt. McGregor beginnings

### *Volunteers come together to aid America's bravest*

Operation Adopt-a-Soldier, a program that began quietly with a couple of Mt. McGregor employees sending packages to their sons in the armed forces in the Middle East, has now grown dramatically.

Several hundred soldiers in combat zones have been "adopted" and the program has caught the attention of the community.

Steve Seguin, son of Mt. McGregor head cook Cliff Seguin, was ordered to Iraq in early 2003 with his Rutland, Vt.-based Army Reserve unit. "He was missing his mother's chocolate chip cookies," Mr. Seguin said, so he began shipping care packages overseas.

An idea took root and began to grow.

"I figured if I was going to send to him, I should send some to the other guys," Mr. Seguin reasoned.

So Operation Adopt-Soldier was launched around Valentine's Day last year to collect and ship needed items to the 368th Combat Engineer Battalion, his son's unit.

Meanwhile, Dominick Commisso, an alcohol and substance abuse counselor at Mt. McGregor, was lending similar stateside support to his two sons in the Army in the Middle East – Jason, then a sergeant in a signal battalion in Iraq (now stationed in Germany) and Michael, a specialist in the 1st Armored Division in Iraq.

"I was sending stuff over to my sons and fellows in their units. Cliff was doing the same for his son and the fellows in that unit," Mr. Commisso said. So they joined their efforts and the program really began to take off, spreading beyond Mt. McGregor to include other DOCS facilities and into the community at large.

While Mr. Seguin and Mr. Commisso are the co-chairmen of the program, they are also its chief foot soldiers. They have been arranging drop off locations for donations with area merchants and government offices, emptying collection boxes when they are full, packing the cases that will be mailed to sol-



Head Cook Cliff Seguin, co-chairman of Operation Adopt-a-Soldier, conducts a silent auction to raise funding for the group.

diers, hauling the packages to the post office, buying the postage, maintaining mailing lists of soldiers, appearing on television and radio, making speaking engagements and coordinating events to boost support for the program.

"The man-hours they commit, it's just unbelievable," said Mt. McGregor Superintendent Harold McKinney, a member of the Adopt-a-Soldier board.

While the program began with just the 368th Combat Engineer Battalion, it has since expanded to include soldiers from other units serving in Iraq, Afghanistan, Kosovo and Haiti. The mailing list now contains the names of about 350 soldiers who are sent packages and letters. As individuals leave the combat zones they are replaced on the list with new names supplied by returning soldiers, families and friends. Mr. Seguin said he hopes to expand the mailing list.

> "It may sound a little corny, but I connect the names of all the soldiers to my family, and they become like family." – Cliff Seguin

*Continued on next page*

DOCS TODAY

*Continued from previous page*

"We've gotten hundreds and hundreds of letters" from grateful soldiers, he said.

While the size of the operation has grown, so too has its base of support.

In addition to Mt. McGregor, DOCS employees at Summit, Coxsackie, Adirondack, Washington, Great Meadow and the Training Academy in Albany are pitching in to help. Local schools and businesses have also joined the effort.

At Mt. McGregor a drop box for inmates was established. "They took it upon themselves to ask the superintendent if they could contribute," Mr. Seguin said of the inmates there. "The inmates have been writing letters. Whatever they can give is good."

By mid-March, Operation Adopt-a-Soldier had sent more than 600 cases overseas and spent more than $3,500 just on packaging and mailing costs.

A rally and silent auction Feb. 29 at the Glens Falls Civic Center raised a much-needed $3,000.

A major rally is planned for Armed Forces Day, May 15, at Gavin Park in the Town of Wilton, Saratoga County.

There will be a parade, rally, silent auction, barbecue and military flyover. Expected to participate are Police and Fire Department teams, the VFW, American Legion, the DOCS Emerald Society pipe and drum band, military units and some 1,000 motorcyclists.

"We're trying to get events every three or four months to keep this in everyone's mind," said Mr. Commisso. "People are still dying."

The program's biggest need is for money to pay packaging and shipping costs. Contributions can be sent to Operation Adopt-a-Soldier, c/o Mt. McGregor Correctional Facility, 1000 Mountain Rd., Wilton, NY 12831.

Information about the program and a list of soldiers who would like to receive mail can be found at the CSEA Local 1000 website (Mr. Seguin is president of the local CSEA chapter.)

Both men said their work in the program will continue after their personal stake is over.

"It doesn't end with the sons coming home," said Mr. Commisso, who joined DOCS in 1989.

Mr. Seguin, a 19-year DOCS veteran whose son returned safely in March, agreed.

"It may sound a little corny, but I connect the names of all the soldiers to my family, and they become like family," he said. 📖



**A supporter of McGregor's Adopt-a-Soldier program (above) examines the offerings available to the public during a recent fund raiser. Below, co-chairman Cliff Seguin spreads the word by explaining the group's history and goals to a an Albany-based television reporter.**



*Employees at work*

# Veteran Officer says enjoyment offsets hardships of DOCS K-9 unit

**D**on't think CO David Rybak would be particularly amused by another joke about his life going to the dogs. Don't think another round of "Who let the dogs out" – an inmate favorite – would strike him as very clever.

He's heard all the jokes and the singing many times over.

After all, with 22 years of service in the DOCS canine unit, he's the most senior K-9 law enforcement officer in the state.

"I've had an exciting career. I've been called in on basically all the major stuff that's happened in the past 20-plus years," said CO Rybak, who joined the Department in 1978 and was accepted into the K-9 unit in 1982.

"I heard about it and I guess it was something different," he recalled. "I edged out probably 700 other guys to get the job." Even today, he said, he's not entirely sure why he was picked over others for the service, but he's happy he was. "It was like getting a lottery ticket."

The K-9 unit began in 1981 with three officers and their dogs. Over the years the unit has operated with as few as two teams and as many as five, its current strength. Handlers and their dogs are put through 26 weeks of training together by the State Police. CO Rybak's training was at Sydney, while the State Police now conduct the instruction at Cooperstown.

There the dogs are trained in the skills they will need to perform their jobs. They learn to obey hand and oral commands; to climb ladders and scale walls; to protect their handlers and others; to track with and without scents; to locate all kinds of drugs; to search buildings and to conduct mountain rescues.

"The bonding starts on Day One," said CO Rybak. "You're with the dog 24 hours a day, seven days a week, 365 days a year for the rest of his life." The dog becomes part of the family.

Every three or four months the animals are recertified by the State Police. If they cannot pass the test they are retired to their handlers.

The dogs are all male shepherds received from animal shelters or donated by private individuals. They are typically named for State Police officers who died in the line of duty.

For security reasons, CO Rybak prefers to identify his dog – the third he has handled – by its official title K9-15, designating the 15th shepherd to serve in the DOCS unit. Out of earshot of inmates he calls his dog by its name.

The K-9 unit is on call around the clock. Officers must be in

good physical shape and willing to relocate anywhere they are needed. Since the Department makes a significant investment in each team, candidates for the K-9 officer position must have at least five years of CO service (to ensure experience) but not more than 15 years of CO service (so they can be expected to continue in the position for several years).

Significant time away from home is also part of the K-9 CO's job description. CO Rybak said living out of a suitcase, missing birthdays and other events in his children's lives are a downside of his work, "but I wouldn't still be on the job if I didn't like it."

He said his family has been supportive of him from the beginning, when officers used their personal cars to transport the dogs.

"My wife had reservations when they pulled out the back seat and put in a platform," he related, "but she was behind me 100 percent."

![CO David Rybak kneeling beside a German Shepherd dog (K9-15) on a grassy field.]
**CO David Rybak with K9-15.**

Because of the dogs' unique ability to find drugs and other contraband, the K-9 teams play a key role in maintaining security throughout the Department's facilities. Last year the K-9 units discovered and confiscated a shopping list of contraband items, including weapons, drugs and drug equipment, clothing and road maps.

K-9 units check prison areas regularly, but with no set schedule. They also do sweeps when requested by a facility. CO Rybak said the element of surprise and unpredictability is an important tool in the team's work.

The units are also deployed to find inmates who have escaped from work crews or secure facilities. CO Rybak, whose first K-9 operation involved perimeter security at the Sing Sing riot in 1983, has worked on all the major escapes and most of the others since joining the unit.

Outside of their DOCS responsibilities, the K-9 teams are called upon to help the State Police search for missing persons, murder victims and cadavers.

Following the World Trade Center attacks, when so many resources were engaged in the rescue and recovery effort, DOCS teams were posted in Middletown. That was so they could move quickly to New York City if needed there (they were not) while still providing coverage to the rest of the state.

CO Rybak has also been on his share of searches for missing children. "Sometimes they have a happy ending," he said, choosing his words.

"Sometimes they don't."  📖



# Transitions

*March 2004*

| Name | Title | Location |
|------|-------|----------|

## Promotions

| | | |
|------|------|------|
| Michael D. Hickey | Plant Superintendent C. | Albion |
| Mary L. Walter | Secretary 2. | Albion |
| Patrick Townsend | Quality Control Supervisor | Albion |
| Joe Middleton, Jr. | Stores Clerk 2 | Bayview |
| Penny Jock. | Institution Steward | Chateaugay |
| Roger L. Martino | Plant Utilities Engineer 1 | Clinton |
| Thomas M. Scalia | Head Account Clerk | Elmira |
| Joy M. Comeau | Senior Mail & Supply Clerk | Fishkill |
| Joanne M. Hazen | Senior Mail & Supply Clerk | Franklin |
| James E. Tourville | Plant Utilities Engineer 3 | Franklin |
| Lori A. Montroy | Nurse Administrator 1 | Franklin |
| Russell S. Kellar | Head Account Clerk | Gouverneur |
| Emily Bessette | Ed Supervisor (General) | Greene |
| Robert Barbini | Plant Superintendent C. | Hudson |
| Melissa Trostle | Classification Analyst (SL) | Main Office |
| Margaret McRoberts | Coord. P&T Services | Main Office |
| Della M. Robarge. | Secretary 1. | Main Office |
| Daniel Kuhner | Tandem Tractor Trailer Op | Main Office |
| David Schott | Plant Superintendent B. | Main Office |
| John R. Huntington | Facilities Planner 3 | Main Office |
| Suzanne E. Halse | Production Control Supr | Main Office |
| Lucy Buther | Affirmative Action Admin 2 | Main Office |
| Diane M. Scott | Purchasing Assistant II | Main Office |
| Herbert O. Therrian. | Plant Utilities Engineer 1 | Moriah |
| Anthony F. Gurdo | Head Cook | Oneida |
| Obafemi A. Wright | Supr Volunteer Services | Queensboro |
| Debra Marciano | Supr Volunteer Services | Sing Sing |
| Debra A. Bowers | Secretary 2. | Sullivan |
| Maria B. Tirone | Dep Supt Programs 3 | Upstate |
| Roxanne L. Bruner | Health Info Administrator 1 | Wende |
| Judy A. Matuszak | Payroll Clerk 3 | Wende |
| Mary Elizabeth Clemens | Clinical Physician 3. | Wende |
| Barry F. Tripp. | Plant Utilities Engineer 2 | Willard |
| Penny L. Brown | Payroll Clerk 3 | Wyoming |
| Daniel Phelix | Correction Captain | Franklin |
| Jeffrey Case | Correction Lieutenant | Bayview |
| Michael Giambruno | Correction Sergeant | Arthur Kill |
| Raymond Abbott | Correction Sergeant | Fishkill |
| Patrick Anson | Correction Sergeant | Fishkill |
| Timothy Gerasimchik. | Correction Sergeant | Fishkill |
| Mark Ballachino | Correction Sergeant | Shawangunk |
| Robert Marinaccio | Correction Sergeant | Taconic |

## Retirements

| | | |
|------|------|------|
| Jacqueline M. Weichman. | Calculations Clerk 1 | Albion |
| Michael G. Parrott | Superintendent | Altona |
| Bruce D. Sergel | General Mechanic | Attica |
| Joseph S. Paxhia. | Dentist 3 | Auburn |
| Eileen Magno | Secretary 2. | Bedford Hills |
| Kathleen C. Prince | Principal Stores Clerk | Cayuga |
| Patrick T. Caetano, Sr. | General Mechanic | Collins |
| Elizabeth Dorsey. | Secretary 2. | Downstate |
| Patrick J. McGann | Dep Supt Administration 3 | Downstate |
| F. J. Tracy | Superintendent | Downstate |
| Richard T. Cerio | Dep Supt Programs 3 | Elmira |
| Edward Cygan | Head Cook | Gowanda |
| Margaret L. Drew. | Nurse 2. | Gowanda |
| W. E. Tyler | Plant Utilities Engineer 1 | Great Meadow |
| Diane L. Warner | Inmate Records Coord 2 | Greene |
| Veronica Keegan. | Member | Main Office |
| Linda Davis. | Principal Clerk | Main Office |
| Diane E. Jones. | Stores Clerk 1 | Marcy |
| Dana M. Smith | Superintendent | Ogdensburg |
| Alexander C. Melnick. | Plant Utilities Engineer 1 | Otisville |
| Phyllis Hollis | Counselor | Queensboro |
| Kenneth L. Cosky | Senior Counselor. | Sullivan |
| Ann M. Stark | Cook | Washington |
| Donna L. Streeter | Commissary Clerk 2 | Washington |
| Michael Morency. | Plant Utilities Engineer 2 | Washington |
| Herbert E. Blackmer, Jr. | Stores Clerk 1 | Washington |
| Gregory J. Janish | Electrician | Wende |
| Steven C. Roller | Correction Lieutenant | Cayuga |
| M. J. Gosselin | Correction Lieutenant | Great Meadow |
| G. L. Allen | Correction Lieutenant | Washington |
| Eugene Urban | Correction Sergeant | Camp Gabriels |
| Roy Warner | Correction Officer. | Adirondack |
| Thomas L. McIntyre | Correction Officer. | Attica |
| Thomas J. Darrah | Correction Officer. | Auburn |
| David J. Lamphere | Correction Officer. | Auburn |
| David H. Meyers | Correction Officer. | Auburn |
| Sharon Minde | Correction Officer. | Auburn |
| Fredrick Starkes | Correction Officer. | Bayview |
| Randall C. LaFreniere | Correction Officer. | Chateaugay |
| Douglas T. Monette | Correction Officer. | Chateaugay |
| Raymond F. Brokos | Correction Officer. | Clinton |
| Norman Peryea | Correction Officer. | Clinton |
| Nelson Montalvo | Correction Officer. | Downstate |

*Continued on facing page*

*Continued from facing page*

| | | |
|---|---|---|
| Andres Velez, Jr. | Correction Officer | Downstate |
| Eriberto Gonzalez | Correction Officer (SL) | Downstate |
| Charles H. Meyer | Correction Officer | Eastern |
| Daniel G. Waite, Jr. | Correction Officer | Elmira |
| Walter Sweeney | Correction Officer | Elmira |
| Ronald V. Sullo | Correction Officer | Fishkill |
| David A. Trumble | Correction Officer | Franklin |
| Lee P. Carter, Sr. | Correction Officer | Franklin |
| Charles M. Benton | Correction Officer | Greene |
| John Sluka | Correction Officer | Groveland |
| James B. Moulton | Correction Officer | Hudson |
| Dennis Tillery | Correction Officer | Mid-Orange |
| Francis T. Hanlon | Correction Officer | Mid-Orange |
| Vincent J. Monti | Correction Officer | Mid-Orange |
| Keithly C. Warner | Correction Officer | Queensboro |
| Donald Rivet | Correction Officer | Riverview |
| Gary Marion | Correction Officer | Shawangunk |
| Wayne Davenport | Correction Officer | Shawangunk |
| Anthony Gioielli | Correction Officer | Shawangunk |
| Jocelyn Huggins | Correction Officer | Taconic |
| Woodrow Wells | Correction Officer | Taconic |
| Michael Paterno | Correction Officer | Ulster |
| Donald E. Mead | Correction Officer | Washington |
| Edward Pilat | Correction Officer | Wende |
| Paul Lucyk | Correction Officer | Woodbourne |
| Gerald Scandore | Correction Officer | Woodbourne |
| Paul M. Baetzold | Correction Officer | Wyoming |

### *Deaths*

| | | |
|---|---|---|
| Patricia A. Barnick | Calculations Clerk 2 | Five Points |
| Donna J. Salvador | Licensed Practical Nurse | Mohawk |
| Patrick M. Dunn | Mail & Supply Clerk | Oneida |
| Candace A. Planty | Secretary 1 | Riverview |
| Robert L. Edge | Sr. Counselor ASAT | Taconic |
| Frank J. Zimmerman | Correction Lieutenant | Mid-Orange ⌨ |

---

# On the web ...

Readers with Internet access can obtain information on the world wide web from the offices of both Governor Pataki and Commissioner Goord. Their addresses:

Governor Pataki: http://www.state.ny.us

Commissioner Goord: http://www.docs.state.ny.us

Colorized editions of DOCS|TODAY, beginning with the January 2003 edition, now appear on the DOCS website. Editions are posted as PDFs when they are sent to the Elmira print shop for publication. ⌨

---

# Commissioner's testimony

*Continued from page 5*

other prisons you care to name. New York's suppliers of illegal drugs use more than oral cavities when attempting to smuggle drugs into our prisons. So do inmates, when they move drugs around inside. It is a credit to our staff that they detect as much contraband as they do.

The nation's highest court has ruled that my obligation as Commissioner includes taking the steps necessary to try to prevent crimes from occurring in prison. It also demands that I prosecute the crimes that are committed, despite out best efforts to prevent them.

We all know that rape and other sexual assaults are crimes of violence and control, not of sexual gratification. Giving inmates condoms would embolden some inmates to commit aggressive and predatory attacks on weaker inmates.

The attacker would know that use of a condom will reduce chances of leaving DNA evidence. Attackers would also know that chances of contracting HIV or other diseases from their victims will be decreased by the use of condoms.

Prison system policies banning condoms are also consistent with the federal Prison Rape Elimination Act of 2003. It requires that the states take the steps necessary to reduce the opportunity for, and incidence of, inmate sexual assault. If we don't, states face a loss of federal funding for prison-related programs. I'm not certain we should become the second state in the nation to distribute condoms in the face of that law.

I have summarized our success in improving inmate medical services over the past decade.

Each and every one of them flows from initiatives proposed by Governor Pataki.

Our views on oversight and condom distribution represent the almost unanimous positions of correctional health care and security professionals across the nation – many of whom also believe that New York offers inmates the best prison medical care in the country.

But I do not believe we have taken inmate health care as far as it can – or should – go.

As with health care on the outside, there is always room to improve, to expand and to fine-tune the medical care offered inside of prison.

We would welcome the Assembly majority if it now chooses to enter into a partnership with us. We invite your input on how to improve upon inmate health care.

But taking us further requires an understanding and acknowledgment of how far we have already come.

Thank you for the opportunity to make this opening statement. I welcome your questions. ⌨

---

# Above-ground systems replacing some subterranean heating units

The Department is more than halfway through a $50 million program to repair hot water heating systems at "cookie cutter" prisons built during the construction boom of the 1980-90s, improving the reliability of the heat plants and cutting their maintenance costs.

Where projects have been completed reliability concerns have disappeared and emergency repairs costing $1 million to $2 million a year have been eliminated.

The medium-security prisons were all designed with boilers, either on site or connected to a neighboring DOCS facility, to heat the buildings and to provide domestic hot water for cleaning, cooking and other uses. The systems used a loop of underground pipes to deliver the hot water from the boiler plant to facility structures and return cooled water to the plant. And in nearly every prison the pipes have sprung leaks over the years, said facilities planner Maynard Porter.

Problems developed from loose pipe insulation, corrosion and high water tables, causing leaks that interrupt service, are difficult to locate and expensive to repair. Complicating repairs is the fact that other utilities – water, waste water, electric lines and fire alarm systems – are next to the heat pipes.

"We tried in several facilities to put underground piping in conduits," he said, but that proved to be inadequate. Walk-through tunnels were another possibility, but that would have been too expensive. So the solution was to rebuild the pipe loop aboveground, retiring the old underground pipes in place.

"The guys in the power plants are pretty happy about it," Mr. Porter said. "They don't have to go looking for leaks in the dead of winter."

Gary Baker, plant superintendent at Riverview, agreed.

Repairs at Riverview were completed in late 2001 and the new system has performed without problems ever since. With the underground piping, he said, "We would spend half the winter digging up leaks" and the entire system would have to be shut down to make repairs. That's no minor inconvenience in places like Riverview, across the St. Lawrence River from Canada, where winter comes early, runs deep and stays late.

Mr. Baker said operators had expected the aboveground system might prove to be an eyesore. Instead, it blends in well with the environment.

"It's a proven system," he said. "It works well up here."

In addition to making the system much more accessible for maintenance and essentially free of corrosion, the aboveground pipes also add significant operating flexibility. If work needs to be performed, repair crews can open or close zones to isolate problems. That avoids or minimizes service interruptions.

Raising the pipes has created no new problems with exposure, either to the weather or to vandalism or accidents.

For security reasons, the main pipe coming from the heat plant, typically eight or 10 inches in diameter, crosses the facility perimeter underground. The system then rises above ground to deliver hot water to the facility's buildings. The pipes are wrapped in three inches of cellular glass insulation and coated with either polyvinyl chloride (PVC) polyester or a rubberized sheet membrane similar to materials used in roofing. Those materials, rather than metal, were chosen for the pipe covering as a security measure. They would be useless as weapons.



**Underground piping was replaced by this above ground system at Livingston.**

The height of the pipes is also a security feature. Anyone who wanted to damage them would need a ladder and would be in easy view of staff. And where the pipes cross roadways they are elevated above vehicle height to avoid accidents.

To date the Department has invested more than $25 million to replace the underground pipes at seven facilities. They include $4.1 million at Cape Vincent (which opened in 1993), $3.9 million at Riverview (1992), $3.7 million at Gouverneur (1990), $3.3 million at Orleans (1985), $4.3 million at Livingston (1991), $4.5 million at Cayuga (1988) and $1.4 for a portion of Mohawk (1989).

Projects in the design phase and their cost estimates include $7.2 million at Franklin (which opened in 1986), $6.1 million at Bare Hill (1988), $6.6 million at Wyoming (1984) and $3.2 million at Greene (1984), for a total of $23.1 million.

The boiler plants that serve all of the facilities are dual-fueled – natural gas or fuel oil – to protect against supply shortages and to allow operators to take advantage of competitive prices.

The Department's newest facilities, Upstate (which opened in 1999) and Five Points (2000), are maximum security prisons with corridors connecting all the buildings. The corridors serve as a conduit for the heating system piping at these facilities. 📖



Not Reported in F.Supp.2d, 1999 WL 608777 (S.D.N.Y.)

(Cite as: 1999 WL 608777 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Santos G. NEGRON, Plaintiff,
v.
Robert MACOMBER, Ivan Mikler, Neal Berton, &
Millie Rivera, Defendants.
No. 95 Civ. 4151(BSJ).

Aug. 11, 1999.
Memorandum and Order

JONES, J.

*1 Before this Court is the motion of defendants Robert Macomber ("Macomber"), Ivan Mikler ("Mikler"), Neal Bertron ("Bertron") and Millie Rivera ("Rivera") for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, defendants' motion is granted.

I. PROCEDURAL HISTORY

Plaintiff pro se, Santos Negron, ("Negron"), an inmate in the custody of the New York State Department of Correction Services ("DOCS"), initiated this action pursuant to 42 U.S.C. § 1983 by filing a pro se Complaint with a request to proceed *in forma pauperis* on March 22, 1995. In an Order dated June 7, 1995, Chief Judge Thomas P. Griesa granted plaintiff's request to proceed *in forma pauperis* and directed plaintiff to submit an Amended Complaint within 60 days of his order. The Court directed Negron to specifically allege how the staff of the Fishkill Correctional Facility ("Fishkill") was "deliberately indifferent" to his medical needs. The Court also ordered plaintiff to provide a statement of the relevant facts supporting his claim. Plaintiff Negron then filed an Amended Complaint, dated June 21, 1995. In the Amended Complaint, plaintiff alleges that the defendants violated his constitutional rights in two ways: 1) by depriving Negron of proper medical care, (*see* Am. Compl. at 1); and 2) by creating a hostile environment where prisoners are retaliated against for complaining

about their health care, (*see id.* at 1-2).[FN1] Plaintiff's claims arise from his treatment for back pain while he was incarcerated at Fishkill. (*See id.*)

> FN1. Plaintiff also requests that he "be given an examination by an outside physician to determine the extent of [his] ailments." (Am. Compl. at 2.) The Court deems this request moot. Since Negron's filing of his Amended Complaint on June 21, 1995, he has seen "outside physicians" on numerous occasions. It is undisputed that Negron has been treated for his ailments by Dr. Forese, Chief of Surgical Services at Helen Hayes Hospital in West Haverstraw, New York, a neurosurgeon at St. Agnes Hospital in White Plains, New York, the Vascular Surgery Department at the Albany Medical Center, and a neurosurgeon at the Albany Medical Center.

On January 29, 1998, this case was referred to Magistrate Judge Katz for general pre-trial supervision. Magistrate Judge Katz then set a discovery cut-off date of June 29, 1998. On November 20, 1998, plaintiff submitted another Amended Complaint. By memo endorsement, Magistrate Judge Katz noted that plaintiff's attempt to file another Amended Complaint was untimely as "pretrial discovery in this action was completed in July 1998." As a result, Magistrate Judge Katz ruled that plaintiff's second Amended Complaint was a "nullity ." Pending is the defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

II. FACTS

The following facts, taken from the plaintiff's Amended Complaint, the defendant's Answer, and affidavits submitted by both parties, are undisputed unless otherwise indicated. They are construed in the light most favorable to plaintiff with due consideration of plaintiff's pro se status. *See Papeskov v. Brown,* No. 97 Civ. 5351, 1998 WL 299892, at *2 (S.D.N.Y. June 8, 1998).

At the times relevant to the Amended Complaint, defendant Mikler, a physician, was employed as the Health Services Director by the DOCS at Fishkill. (*See*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 608777 (S.D.N.Y.)

(Cite as: 1999 WL 608777 (S.D.N.Y.))

Affidavit of Ivan Mikler, M.D. sworn to October 20, 1998, "Mikler Aff." ¶ 1.) Mikler's duties include, *inter alia,* making daily rounds on inpatient units Monday through Friday and occasionally on the weekends; supervising medical staff; consulting with medical staff, including physician's assistants; reviewing all consultation requests; and overseeing and ensuring that inmates were provided with proper medical care. (*See* id. ¶ 4.)

**\*2** Defendants Macomber and Bertron were employed at Fishkill as physician's assistants at all times relevant to the Amended Complaint. (*See* Affidavit of Robert Macomber, sworn to December 3, 1998, "Macomber Aff." ¶¶ 1,6; Affidavit of Neal Bertron, sworn to October 20, 1998, "Bertron Aff." ¶ 4.) Some of the common ailments treated by the physician's assistants include: orthopedic problems, respiratory problems, diabetic problems, backaches, colds, and injuries. (*See* Mikler Aff. ¶¶ 6-7, 9.) Macomber and Bertron both work under the physician's license of defendant Mikler and report to him for consultation on all difficult cases. (*See* Macomber Aff. ¶ 2; Bertron Aff. ¶ 4.) Defendant Rivera is a registered nurse licensed by the State of New York. (*See* Affidavit of Millie Rivera, sworn to October 20, 1998, "Rivera Aff." ¶¶ 1-2.)

Negron, a 68 year old male, claims to have fallen and injured his back on June 7, 1994. (*See* Am. Compl. at 1.) Plaintiff alleges that the defendants were deliberately indifferent to his medical needs even though they "were made aware of plaintiff's injury" when Negron was brought to the medical unit on a stretcher on June 7, 1994. (*See* Affidavit of Santos Negron in Opposition to Summary Judgment, sworn to on January 4, 1999, ("Negron Aff.") ¶ 11.) Plaintiff claims that an "elderly nurse examined the plaintiff but she had examined his leg not his back." (*Id.* ¶ 11) Negron alleges that from May 1994 through July 1995, defendants never informed him that back surgery "would be a consideration for most people." (*Id.* ¶ 7.) During this period, Negron states that he complained about back pain and other medical problems to the defendants on at least 24 occasions. (*See* Negron Aff. ¶ 4.) While admitting that he received medical treatment from the defendants, plaintiff alleges that defendants' care did not lessen his back pain. (*See id.* ¶ 8.)

According to the defendants' affidavits, they started treating plaintiff's back pain in May, 1994. Based on an x-ray taken on May 10, 1994, the defendants diagnosed Negron with osteoarthritis, or arthritis on the lumbar spine. (*See* Mikler Aff. ¶¶ 10, 12.) The defendants then informed plaintiff of his condition. (*See* Macomber Aff. ¶ 7.) Osteoarthritis is a noninflammatory joint disease associated with joint pain, stiffness, and limitation of motion. (*See* Mikler Aff. ¶ 10.) The defendants state that it is standard medical procedure to treat osteoarthritis with appropriate medications for six months to one year. (*See id.* ¶ 11.) If such medications do not work, the next possible course of treatment includes the taking of a CAT scan and/or MRI or a referral to a specialist. (*See id.*) The defendants then prescribed Motrin for plaintiff's back pain, beginning no later than May 31, 1994. (*See id.;* Macomber Aff. ¶ 7.) Macomber again treated plaintiff on June 20, 1994. At that time, Macomber increased plaintiff's prescribed dosage level of Motrin. (*See* Macomber Aff. ¶ 8.) On July 25, 1994, because Negron continued to suffer from back pain, Macomber also prescribed Flexeril, a muscle relaxant used to treat lower back pain. (*See id.* ¶ 10.)

**\*3** On September 20, 1994, plaintiff's attorney wrote a letter to Fishkill requesting that the defendants reevaluate plaintiff's back condition. (*See* Negron Aff. ¶ 9.) Defendant Bertron then discontinued plaintiff's Flexeril prescription and adjusted plaintiff's prescription of Motrin. (*See* Bertron Aff. ¶ 6.) On December 23, 1994, Bertron lowered plaintiff's prescription of Motrin. (*See id.* ¶ 7.) Negron visited defendant Bertron again on January 20, 1995 because plaintiff wanted a higher dosage of Motrin. (*See id.* ¶ 9.) Bertron denied plaintiff's request because he believed that a continual high dosage level of Motrin could impair the functions of plaintiff's stomach and liver. (*See id.*) Bertron ordered a series of blood tests to assess plaintiff's condition, and prescribed Advil to provide plaintiff with pain relief. (*See id.*)

On February 3, 1995, defendant Bertron did an extensive review of plaintiff's blood test results. The review indicated that Negron had a degenerative joint disease which could respond to Naprosyn, a strong analgesic. (*See id.* ¶ 11.) Plaintiff was thus placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 608777 (S.D.N.Y.)

(Cite as: 1999 WL 608777 (S.D.N.Y.))

Naprosyn. (*See id.* ¶ 10.) On March 23, 1995, plaintiff continued to complain of lower back and leg pain. (*See id.*) Defendant Bertron then referred plaintiff to an orthopedic specialist. Bertron also ordered an MRI and CAT Scan of plaintiff's back. (*See id.*) On May 10, 1995, plaintiff had an MRI taken which revealed a herniated disk. (*See* Mikler Aff. ¶ 13.) Bertron next referred plaintiff to Dr. Forese, Chief of Surgical Services at Helen Hayes Hospital in West Haverstraw, New York. (*See* Bertron Aff. ¶ 11; Mikler Aff. ¶ 14.)

On June 14, 1995, after examining Negron, Dr. Forese noted that plaintiff appeared to have spinal stenosis.[FN2] (*See* Mikler Aff. ¶ 14.) Dr. Forese recommended that another CAT scan be taken to determine the severity of the spinal stenosis. (*See id.*) The CAT scan, taken on June 20, 1995, revealed spinal stenosis most likely caused by a combination of large posterior bulging disks and osteoarthritis. (*See id.* ¶ 15; Defs.' Ex. B (6/30/95 Negron CAT Scan).)

> FN2. Spinal stenosis is a narrowing of the central spinal canal or the areas of the spine where the nerve roots exit. This narrowing is most often caused by arthritis. (*See* Mikler Aff. ¶¶ 16-17.)

On August 3, 1995, plaintiff saw a neurosurgeon at St. Agnes Hospital in White Plains, New York for his herniated disk. The neurosurgeon refused to operate on plaintiff's back because Negron's prior MRI had revealed an abdominal aortic aneurysm[FN3] about three centimeters long. (*See id.* ¶ 17.) A member of defendants' staff then called the Vascular Surgery Department at the Albany Medical Center ("Albany Medical") to schedule an aortogram, a type of X-ray study during which material is injected into the aorta and films are taken. (*See id.* ¶ 18.) Because of the small size of the aneurysm, plaintiff did not qualify for emergency care and was scheduled to have an aortogram at Albany Medical on January 15, 1996.[FN4] (*See id.*)

> FN3. An aneurysm is an abnormal widening or ballooning of a portion of an artery wall. (*See* Mikler Aff. ¶ 17.)

> FN4. Defendants aver that it is standard for

Albany Medical to give an appointment five months after a request is made for non-emergency situations. (*See id.*) During this five month period, defendants state that plaintiff's back did not require emergency care. (*See id.* ¶ 19.)

**\*4** On January 15, 1996, Albany Medical performed the aortogram and determined that plaintiff's aneurysm was not serious and did not itself require surgery. The physicians determined that back surgery would not place plaintiff's health at risk, and plaintiff was then scheduled for elective back surgery. The neurosurgeon originally slated to operate on plaintiff's back at St. Agnes Hospital in August of 1995, however, no longer worked there. (*See id.* ¶ 21.) As a result, the neurosurgeon available to operate on plaintiff resided at Albany Medical. (*See id.* ¶¶ 21-22.) Negron was transferred to the Coxsackie Regional Medical Unit ("Coxsackie") on February 27, 1996 so that he could have access to the neurosurgeon at Albany Medical. (*See id.* ¶ 21.) On July 1, 1996, plaintiff did indeed have successful back surgery, a lumbar decompression laminectomy at L3-L4 for his herniated disk, at Albany Medical. (*See id.* ¶ 22.) It is undisputed that Negron received the aforementioned care and treatment.

Based on these facts, plaintiff alleges that the defendants failed to provide adequate health care. Plaintiff also claims that defendants Macomber, Bertron, and Rivera did not allow him to see a physician. Moreover, plaintiff alleges that when an inmate makes a health "complaint he enters a very pervasively hostile environment of intimidation, and you get a disciplinary report written on you." (Am. Compl. at 2.)

Plaintiff also contends that defendants' motion for summary judgment is "premature" and "prior to plaintiff['s] opportunity for discovery." (*See* Negron Aff. ¶ 2.) Pursuant to Federal Rule Of Civil Procedure 56(f), Negron thus requests that the Court deny defendants' motion and order a continuance so that he may undertake additional discovery.

DISCUSSION

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 608777 (S.D.N.Y.)

(Cite as: 1999 WL 608777 (S.D.N.Y.))

## I. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden to show the absence of a genuine issue of material fact. Once the moving party has met this burden, the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986). The non-moving party does not meet this burden when merely some "metaphysical doubt as to the material facts" exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also* *Hogan v. 50 Sutton Place South Owners, Inc.,* 919 F.Supp 738, 742 (S.D.N.Y.1996) ("Speculative and conclusory allegations are insufficient to meet this burden." (quoting Allen v. Coughlin, 64 F.3d 77, 80 (2d Cir.1995))). Additionally, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211; *see also* *Zucker v. Katz,* 836 F.Supp. 137, 143-44 (S.D.N.Y.1993).

**\*5** Because the court must read the pleadings of a pro se plaintiff generously, *Haines v. Kerner,* 404 U.S. 519, 520 (per curiam), *reh'g denied,* 405 U.S. 948 (1972), all materials Negron has submitted have been considered as if alleged in his Amended Complaint.[FN5] *See* *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering pro se plaintiff's affidavit in opposition to defendant's motion to dismiss); *Lucas v. New York City,* 842 F.Supp. 101, 104 (S.D.N.Y.1994) (including pro se plaintiff's opposition papers as part of the Complaint). Indeed, not only should a pro se litigant's submissions be read liberally, but they also should be "interpret[ed] ... to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994)).

> FN5. In Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Negron requests

that his deposition transcript of June 24, 1998 be made a part of his Amended Complaint. (*See* Negron Aff. ¶ 12.) In light of the generous pleading standards afforded pro se plaintiffs, the Court will grant plaintiff's request and view the facts presented in Negron's affidavit and deposition as part of his Amended Complaint. Accordingly, even though plaintiff's Amended Complaint was filed on June 21, 1995, the Court will consider all of plaintiff's allegations, including those relating to defendants' conduct after the filing of the Amended Complaint.

## II. PLAINTIFF'S REQUEST FOR MORE DISCOVERY

Plaintiff contends that defendants' motion for summary judgment is "premature" and "prior to plaintiff['s] opportunity for discovery."[FN6] (*See* Negron Aff. ¶ 2.) Federal Rule of Civil Procedure 56(f) states that:

> FN6. Plaintiff does not cite to Federal Rule of Civil Procedure 56(f) in his opposition papers as grounds for extending the discovery period. The Court, however, will review plaintiff's request as one under Rule 56(f).

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

A four-part test is used to evaluate the sufficiency of a party's Rule 56(f) opposition. To avoid summary judgment through Rule 56(f), the non-moving party who seeks addition time for discovery must file an affidavit detailing: 1) the nature of the uncompleted discovery; 2) how the uncompleted discovery could reasonably be expected to create a genuine issue of material fact; 3) what efforts the affiant has made to obtain those facts; and 4) why those efforts were unsuccessful. *See* *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994); *Backman v. Hibernia Holdings, Inc.,* No. 96 Civ. 9590, 1998 WL 427675,\*3 (S.D.N.Y. July 28, 1998).

Negron has failed to satisfy any of these criteria.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 608777 (S.D.N.Y.)

(Cite as: 1999 WL 608777 (S.D.N.Y.))

Plaintiff's affidavit states that defendants' motion for summary judgment "is premature[ly] submitted prior to plaintiff['s] opportunity for discovery, and there are genuine issues of material facts for trial." (Negron Aff. ¶ 1.) Plaintiff does not specify the nature of any uncompleted discovery, why extending discovery might create a genuine issue of material fact, nor his efforts to obtain those facts. The Court notes that Negron filed this lawsuit over three years ago and that discovery closed on June 29, 1998. Plaintiff was also given advanced notice that the defendants were making a motion for summary judgment. Plaintiff cannot now defeat defendants' motion for summary judgment by stating in a bald, conclusory manner that he needs more discovery. Accordingly, plaintiff's unsupported request for additional discovery is denied.

III. PLAINTIFF'S 42 U.S.C. § 1983 CLAIM

*6 To state a claim under 42 U.S.C. § 1983, a plaintiff must allege conduct that deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States; and that the conduct complained of was committed by a person acting under the color of law. See Gomez v. Toledo, 446 U.S. 635, 640 (1980).

The Supreme Court has held that a prisoner's Eighth Amendment rights are violated whenever there is evidence of "deliberate indifference to the prisoner's serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); see Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994), cert. denied sub nom. Foote v. Hathaway, 513 U.S. 1154 (1995). Yet, "only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Thus, the medical condition for which plaintiff was denied treatment must be "sufficiently grave" to raise Eighth Amendment concerns. Wilson, 501 U.S. at 298.

To meet this burden, plaintiff must show that defendant made intentional efforts to delay access to medical care while plaintiff was in extreme pain or that the defendants acted with callous indifference to his safety. See Harding v. Kuhlmann, 588 F.Supp. 1315, 1316

(S.D.N.Y.1984). Deliberate indifference, however, is not an "inadvertent failure to provide adequate medical care." Helling v. McKinney, 509 U.S. 25, 32 (1993); Estelle, 429 U.S. at 103-04. Plaintiff must allege conduct that is repugnant to the conscience of mankind and contemplates a condition of urgency with a sufficiently culpable state of mind. See Estelle, 492 U.S. at 104-05. Deliberate indifference requires more than mere negligence, but less than actions undertaken for the purpose of causing harm. See Farmer v. Brennan, 511 U.S. 825, 837 (1994) (stating that a prison official does not act in a deliberately indifferent manner towards inmate unless he "knows of and disregards an excessive risk to inmate health or safety"). Moreover, a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim. See Estelle, 429 U.S. at 107. Nor does an allegation of "misdiagnosis or faulty judgment" state a claim. Tomarkin v. Ward, 534 F.Supp. 1224, 1230 (S.D.N.Y.1982).

Negron first contends that defendants' entire treatment evidences a pattern of deliberate indifference to his medical needs. Plaintiff's assertion is unsupported. Plaintiff does not dispute that he was examined, treated, and provided with medication on a regular basis by the health care providers at Fishkill. Defendants have submitted detailed affidavits explaining the progression of plaintiff's course of treatment. Furthermore, during the relevant period, plaintiff was given x-rays, an MRI, a CAT Scan, and was referred to both vascular and orthopedic specialists. Again, Negron does not dispute that he received the aforementioned outside medical care.

*7 Negron only responds to defendants' motion by maintaining that his complaints of back pain were not properly treated by the defendants. Such an allegation, even if true, would not by itself meet the Eighth Amendment standard, unless there were some evidence that the health care providers knowingly and intentionally rendered improper treatment. See Harding v. Kuhlmann, 588 F.Supp. 1315, 1316 (S.D.N.Y.1984) (citing cases). Negron's allegations do not demonstrate the necessary "hostile intent or deliberate indifference" on the part of defendants. See Tomarkin v. Ward, 534 F.Supp. 1224, 1231 (S.D.N.Y.1982). Taken in context, plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 608777 (S.D.N.Y.)

(Cite as: 1999 WL 608777 (S.D.N.Y.))

allegations amount to mere speculation and second-guessing of the course of treatment prescribed by the defendants. *See Tomarkin,* 534 F.Supp. at 1230 (finding that "a prisoner's disagreement with his prescribed treatment does not afford a basis for relief under § 1983.").

Plaintiff next argues that the defendants' unduly delayed his back surgery for two years. Plaintiff maintains that this two year delay supports a finding of deliberate indifference on the part of the defendants. The Court disagrees. Again, the defendants have submitted detailed affidavits evidencing an ongoing course of medical treatment for Negron's back injuries which plaintiff does not dispute. Defendants' affidavits also show that the delays in Negron's treatment were reasonable. First, defendants attempted to treat plaintiff's back pain with medication in order to avoid surgery. Second, plaintiff had an aneurysm which took priority over his ailing back and which needed to be examined by a specialist. Third, plaintiff had to await transfer to Coxsackie because the neurosurgeon available to perform the back surgery was at Albany Medical. These delays do not demonstrate deliberate indifference, but rather support a finding that Negron received continual medical care.[FN7] Accordingly, defendants' motion for summary judgment is granted as to plaintiff's claims that the defendants were deliberately indifferent to medical needs.

FN7. Plaintiff also makes the unsupported assertion that "nothing is being done about [his] clogged artery" which was found during a "CAT scan." (*See* Am. Compl. at 1.) The CAT scan that plaintiff relies on shows that the plaintiff has an abdominal aortic aneurysm, not a clogged artery. The defendants ensured that testing was done to determine the severity of Negron's ailment. Indeed, an aortogram was taken on January 15, 1996. Based on the results of the aortogram, the aneurysm was deemed not serious by the Vascular Surgery Department of Albany Medical. (*See* Mikler Aff. ¶¶ 17-18.) Plaintiff does not dispute that the defendants diagnosed his aortic aneurysm and performed an aortogram to determine its severity.

IV. RETALIATION CLAIM

It is unclear from plaintiff's submissions what legal claim he is asserting. Plaintiff alleges in his Amended Complaint that at Fishkill "when an inmate goes to sick-call he enters a very pervasively hostile atmosphere of intimidation." (Am Compl. at 2.) To state a claim, however, Negron must allege retaliation for his exercise of a constitutionally protected right. Assuming that this is Negron's claim, to avoid summary judgment, Negron must demonstrate: (1) that the disciplined conduct was constitutionally protected, and (2) that the conduct was a substantial or motivating factor for the prison official's action against the plaintiff. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Here, regardless of whether plaintiff engaged in a constitutionally protected activity, plaintiff fails to establish any resulting action taken by a prison official against him.[FN8] The undisputed factual record demonstrates that the defendants provided Negron, even if he complained or was afraid to complain to prison officials, with sustained medical care for his health problems. Moreover, during his deposition testimony, plaintiff admitted that the defendants never disciplined him. When plaintiff was asked if he ever received a misbehavior report, plaintiff stated "No." (Negron Dep. at 48.) Accordingly, as Negron has failed to allege that prison official's took action against him, defendants' motion for summary judgment is granted as to plaintiff's retaliation claims.

FN8. Plaintiff's may or may not have complained to prison officials about his medical care. Plaintiff first states in his deposition testimony that he sat "in the corner and [kept his] mouth shut" because if you complain to officials "that officer there is going to write you a misbehavior report." (Negron Dep. at 48.) Plaintiff, however, was then asked "[s]o you didn't really complain about how you were feeling; is that correct?" (Id. at 49.) Negron states "I complained a lot," but "I don't argue with them." (*Id.*)

CONCLUSION

**\*8** For the foregoing reasons, defendants' motion for summary judgment is granted as to all of plaintiff's claims. The plaintiff may not appeal this order to the Court of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 608777 (S.D.N.Y.)

(Cite as: 1999 WL 608777 (S.D.N.Y.))

Appeals unless "a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1). A certificate will be granted "only if the applicant has made a showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see generally United States v. Perez,* 129 F.3d 255, 259-60 (2d Cir.1997) (discussing the standard for issuing a certificate of appealability). This Court finds that plaintiff will not be able to sustain this burden. Thus, this Court declines to issue a certificate of appealability. Further, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444 (1962). The Clerk of Court is directed to close this case.

    SO ORDERED:

S.D.N.Y.,1999.

Negron v. Macomber
Not Reported in F.Supp.2d, 1999 WL 608777 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Norris J. McLAURIN, Plaintiff,
v.
David A. PATERSON, Governor of New York State, et
al., Defendants.
No. 07 Civ 3482(PAC)(FM).

Aug. 11, 2008.
*ORDER*

Honorable PAUL A. CROTTY, District Judge.

**\*1** In this action brought pursuant to 42 U.S.C. §
1983, *pro se* Plaintiff Norris J. McLaurin alleges that, by
denying him parole, Defendants [FN1] violated his
constitutional rights under the Due Process and Equal
Protection Clauses of the Fourteenth Amendment and the
Ex Post Facto Clause of Article I of the United States
Constitution. The motion was referred to Magistrate Judge
Frank Maas, who issued a 35-page Report and
Recommendation ("R & R") dated June 12, 2008 in which
he recommended that the Court grant Defendants' motion
to dismiss. McLaurin filed timely objections. Upon careful
consideration, the Court adopts the R & R-noting one
non-dispositive correction-and grants Defendants' motion
to dismiss.

> FN1. The Amended Complaint names as
> Defendants: former Governors of New York
> George E. Pataki and Eliot Spitzer; the New
> York State Division of Parole and its former and
> current Chairmen, Robert Dennison and George
> Alexander, respectively; and twelve individuals
> alleged to be Parole Commissioners or Parole
> Officers. McLaurin sued Pataki, Spitzer, and
> Dennison solely in their official capacities.
> (Am.Compl.¶¶ 7, 9.) Per Federal Rule of Civil
> Procedure 25(d)(1), David A. Paterson, the
> current governor of New York, is substituted for
> Pataki and Spitzer, and Alexander is substituted
> for Dennison.

**The Magistrate Judge's Report and Recommendation**

In his R & R, Magistrate Judge Maas provided a
comprehensive summary of the factual and procedural
history bearing on McLaurin's claims, including an
exhaustive analysis of his various parole hearings. It need
not be repeated here.

Magistrate Judge Maas specifically found the
following:

(1) that any claims that accrued before March 12, 2004,
including those related to McLaurin's 2001 and 2003
parole hearings, are time-barred (R & R 16);

(2) that claims against the Division of Parole must be
dismissed because it does not qualify as a "person"
under Section 1983 (R & R 17);

(3) that the Parole Board denied McLaurin parole in
2006 and 2007 in an appropriate and legitimate exercise
of its discretion and upon due consideration of
McLaurin's criminal record, his institutional adjustment,
his future plans, and the recommendation of the
sentencing judge (R & R 20-25);

(4) that the Amended Complaint does not plausibly
allege an unofficial statewide policy of denying parole
for prisoners sentenced under recidivist statutes on the
basis of their criminal history (R & R 25-28);

(5) that the State has a rational basis for distinguishing
between persistent and non-persistent offenders in
making parole determinations (R & R 28-29);

(6) that McLaurin cannot challenge a hypothesized
unofficial State policy by which the Parole Board
automatically denies parole for violent felony offenders
because the challenged policy is not a "law" within the
scope of the Ex Post Facto Clause (R & R 30-32); and

(7) that, insofar as McLaurin challenges the application
of provisions of the Sexual Offender Registration Act
("SORA"), N.Y. Correct. Law § 168 *et seq.* as a
violation of the Ex Post Facto Clause, his claim is not
ripe for review (R & R 33).

**Applicable Law**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

In evaluating the report and recommendation of a magistrate judge, the district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). When a timely objection has been made to the magistrate judge's recommendations, the court is required to review the contested portions *de novo*. *See Pizarro v. Bartlett* 776 F.Supp. 815, 817 (S.D.N.Y.1991). For uncontested portions of the report and recommendation, the court need only review the face of the record for clear error. *See Wilds v. United Parcel Serv., Inc.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003).

**McLaurin's Objections**

*2 By his letter to the Court dated June 23, 2008, McLaurin interposed objections "to each and every part" of Magistrate Judge Maas's R & R. (Plaintiff's Objections to the Magistrate's Report and Recommendation ("Obj.") 1). He supplemented these objections in a June 30, 2008 letter styled "Plaintiff's Addendum to Objections" ("Addendum"). McLaurin specifically objects that:

1. as a general matter, Magistrate Judge Maas improperly considered and relied on evidentiary materials beyond the scope of the complaint and failed to construe the allegations in light most favorable to McLaurin (Obj.1-2);

2. the R & R mistakenly states that his 1979 conviction for attempted possession of prison contraband was a felony (Obj.2-3);

3. the R & R improperly finds that the Parole Board could consider separately his three offenses for robbery in 1979, even though they constituted a single conviction for sentencing purposes (Obj.3-5);

4. Magistrate Judge Maas improperly glossed over Defendants' failure to consider the sentencing judge's statements and the inaccuracies regarding those statements contained in his Inmate Status Report (Obj.5-6);

5. his Ex Post Facto claims pertaining to the application of SORA requirements are ripe for review (Obj.6-8);

6. Magistrate Judge Maas improperly denied him an opportunity to depose a former parole commissioner whose testimony might have been relevant to his failure to train claim (Obj.8-9);

7. the R & R improperly categorizes his deliberate indifference allegations as a *Monell* claim (Obi.9-11);

8. the Parole Board committed procedural errors resulting in a deprivation of due process (Obj.11-13);

9. he should be allowed to submit evidence to support his claim that parole is foreclosed by an unofficial state policy barring discretionary parole decisions (Obj.13-16);

10. he has properly alleged a viable equal protection claim (Obj.16);

11. the R & R failed to address his claim that he was labeled a discretionary sex offender in violation of his due process rights (Addendum 2-4); and

12. Magistrate Judge Maas refused to permit further discovery of his claims despite his express statement to the contrary in a telephonic conference on May 29, 2008 (Addendum 4-5).

Where objections to an R & R simply reiterate the same arguments in the original pleadings, a district court need only review for clear error. *Edwards v. Fischer,* 414 F.Supp.2d 342, 346-47 (S.D.N.Y.2006) (citing *Vega v. Artuz,* No. 97 Civ. 3775(LTS)(JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). McLaurin's objections numbered 4, 5, 8, and 10 above are merely a replay of old arguments heard and decided by Magistrate Judge Maas. With respect to these objections, the Court reviews the recommendations of the Magistrate Judge for clear error. Having found no clear error, the Court adopts the Magistrate Judge's recommendations in full in regard to these claims.

This Court reviews the remaining objections *de novo.*

**Objections 1 & 12:**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

**\*3** Magistrate Judge Maas evaluated whether to convert Defendants' motion to a motion for summary judgment. (R & R 13 n. 7.) In the end, he concluded that the additional materials submitted for his consideration-McLaurin's Parole Board decisions, Inmate Status Reports related to his Parole Board appearances, and transcripts of his interviews-were either incorporated by reference in McLaurin's Amended Complaint or integral thereto. (R & R at 13-14 n. 7.) In light of these findings, Magistrate Judge Maas did not err in barring additional discovery, regardless of his representations of May 29, 2008.

**Objections 2 & 3:**

The Court notes one correction to the R & R: McLaurin's 1979 conviction for attempted possession of prison contraband was a misdemeanor rather than a felony. (*See* R & R 22 & n. 10). Thus, McLaurin has been convicted of seven, not eight, felonies. However, this correction does not change the analysis, because Magistrate Judge Maas allowed for the possibility that the Parole Board made procedural errors. (R & R at 23 ("[E]ven if the Court were to assume that the Defendants committed one or more of the proceedural errors alleged in the Amended Complaint, ... [the] decisions regarding McLaurin were not made in an arbitrary manner or for impermissible reasons.))

McLaurin's next objection-that his three 1979 robbery offenses should qualify as a single conviction for parole purposes-is also unpersuasive. While, pursuant to N.Y. Penal Law § 70.08, these offenses were considered a single conviction at the time of sentencing, *see McLaurin v. Kelly,* No. 94 Civ. 1560(RSP)(GJD), 1998 WL 146282, at \*1 (N.D.N.Y. Mar. 27, 1998) (approving Report & Rec. of DiBianco, Mag. J.), the statutory scheme is not addressed to parole procedures and is therefore irrelevant to the present discussion. (*See* R & R 22 n. 10.)

**Objection 6:**

The R & R refers to the comments of a Commissioner Manley, regarding his lack of training and the general practices of the Parole Board. (R & R 23 n. 11.) Magistrate Judge Maas denied McLaurin an opportunity to depose Manley, however, noting that Manley did not participate in McLaurin's 2006 or 2007 hearings. (R & R 23 n. 11.) McLaurin now objects that, as Manley did

preside over his 2005 hearing, his testimony might be relevant to the alleged lack of supervision and training at that hearing. (Obj.9.) However, McLaurin already received a *de novo* hearing in 2006 based on the improper procedures undertaken by the Parole Board in 2005. (*See* R & R 5, 21.) McLaurin does not indicate any other relief to which he might be entitled to redress rights violated in the 2005 hearing. Accordingly, Magistrate Judge Maas did not err in refusing to allow Manley's deposition.

**Objections 7 & 9:**

Insofar as the Court agrees with Magistrate Judge Maas that the Parole Board appropriately applied its discretion and evaluated all relevant considerations in assessing McLaurin's requests for parole, McLaurin's other objections to the dismissal of his due process claims-i.e., the failure to train and/or supervise board members, the deliberate indifference of specific Division of Parole employees, and the existence of an unofficial statewide policy barring the Parole Board's exercise of discretion-are foreclosed.

**Objection 11:**

**\*4** Finally, Magistrate Judge Maas did not err in failing to construe McLaurin's allegations concerning the application of SORA requirements (Am.Compl.¶ 19(g)) as raising a due process claim. In his memorandum opposing the motion to dismiss, McLaurin addresses his SORA-based claims under the heading "The Amended Complaint States Viable Ex Post Facto Claims" (Pl.'s Mem. 22-24), which is set off entirely from his discussion of due process claims (Pl.'s Mem. 12-21). Moreover, the same logic applies whether McLaurin's claim is addressed to ex post facto or due process concerns: the claim is not ripe for review because the SORA conditions have not been applied to McLaurin. (*See* R & R 33.)

**Conclusion**

For the foregoing reasons, the R & R issued by Magistrate Judge Maas is adopted in full, allowing for the single correction addressed above. McLaurin's objections to the R & R are DENIED. Defendants' motion to dismiss the Amended Complaint in its entirety is GRANTED. The Clerk of the Court is directed to terminate the present motion and close this case.

SO ORDERED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

NORRIS J. MCLAURIN,

Plaintiff,

-against-

GEORGE PATAKI, former Governor of New York State, *et al.,*

Defendants.

### *REPORT AND RECOMMENDATION TO THE HONORABLE PAUL A. CROTTY*

FRANK MAAS, United States Magistrate Judge.

I. *Introduction*

In this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, plaintiff Norris J. McLaurin ("McLaurin"), an inmate at the Mid-Orange Correctional Facility, claims that the denial of his requests for parole violated his constitutional rights. As a consequence, he seeks declaratory and injunctive relief against George E. Pataki ("Pataki") and Eliot S. Spitzer ("Spitzer"), two former Governors of the State of New York;[FN1] Robert Dennision ("Dennison"), the former Chairman of the New York State Division of Parole ("Division of Parole" or "Division"); George Alexander ("Alexander"), the current Chairman of the Division; twelve individuals alleged to be Parole Commissioners or Parole Officers ("Parole Board" or "Board"); and the Division of Parole (collectively, the "Defendants").

> FN1. Spitzer was named as the "Governor of New York." Since he was sued in his official capacity, David A. Paterson ("Paterson"), the current Governor, must be substituted as the defendant pursuant to Fed.R.Civ.P. 25(d).

The Defendants have now moved to dismiss the amended complaint ("Amended Complaint" or "Am. Compl.") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, I recommend that this motion be granted.

II. *Background*

A. *Facts*

Construing McLaurin's Amended Complaint and his other papers in the light most favorable to him, the relevant facts may be summarized as follows:

1. *Underlying Crime and Sentence*

On October 16, 1991, McLaurin robbed a bank in Binghamton, New York, threatening the tellers and customers with what appeared to be a firearm. (Ex. F at 2).[FN2] During the course of the incident, McLaurin herded his victims into the teller area and directed them to get on the ground; he also assaulted one of the tellers. (Exs. A at 1-2, C at 5). The police apprehended McLaurin shortly after he exited the bank and found a toy cap gun on his person. (Ex. F at 2). On April 2, 1992, he pleaded guilty to the Class D Felony of Attempted Robbery in the Second Degree before Broome County Court Judge Patrick Mathews, who subsequently sentenced him, as a persistent violent felony offender, to a prison term often years to life. (Am.Compl.¶ 20).

> FN2. "Ex. ___" refers to the exhibits annexed to the Declaration of Assistant Attorney General Neil Shevlin, dated Nov. 19, 2007.

**\*5** After the Appellate Division, Third Department, upheld his sentence, McLaurin filed a federal habeas corpus proceeding in the United States District Court for the Northern District of New York. On March 27, 1998, the Honorable Rosemary S. Pooler, then a District Judge, held that because McLaurin was sentenced simultaneously for three 1979 robbery convictions, they could be counted as only one conviction for purposes of determining whether he was a persistent violent felony offender. *McLaurin v. Kelly,* No. 93 Civ. 1560(RSP)(GJD), 1998 WL 146282, at *1, 7 (N.D.N.Y. Mar. 27, 1998) (approving Report & Rec. of DiBianco, Mag. J.). Judge Pooler therefore directed that McLaurin be resentenced, but observed that nothing would preclude the state court from considering "McLaurin's prior conviction for first degree sexual abuse" as a basis for adhering to its prior determination that he was a persistent violent felony offender.[FN3] *Id.* at*2.

> FN3. In addition to his three "simultaneous" robbery convictions in 1979, McLaurin had prior felony convictions for sexual abuse in the first

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

degree, attempted possession of prison contraband in the first degree, robbery in the third degree, and conspiracy in the fourth degree. (Ex. A at 3-4). He also had been adjudicated a youthful offender in connection with an attempted robbery in 1972. (*Id.* at 3).

Perhaps not surprisingly, when Judge Mathews resentenced McLaurin, he again found that McLaurin was a persistent violent felony offender, and sentenced him to the term often years to life in prison that he previously imposed. (Am.Compl.¶ 23). Significantly, during the resentencing proceeding, Judge Mathews addressed the issue of McLaurin's parole eligibility, stating:

I think it's a shame. I've had a lot of time to interact with you over the years and if one thing steps forward, it's clearly that you're an intelligent man, very intelligent, and unquestionably you wasted so many years of your life. I have the hope that you will, when you are released, turn to productive legal endeavors, and I believe you can make it.... Notwith-standing the convictions in this particular case, [or] the nature of the crimes, I still am willing to state on the record that *I think that you should be considered by parole at the earliest possible release date* because I think that you have learned your lesson.

(Am. Compl. Attach, at 4-5) (emphasis added).

2. *Parole Hearings and Other Proceedings from 2001 to 2005*

McLaurin first became eligible for parole in August 2001, at which time the Board denied his request for release without considering Judge Mathews' sentencing recommendation. (Am.Compl.¶ 25). In August 2003, McLaurin again was denied release by the Board. (*Id.* ¶ 26). He challenged this determination by filing an Article 78 proceeding in Supreme Court, Orange County, in which he argued that the Parole Board had violated New York law by failing to consider Judge Mathews' recommendation. (*Id.* ¶ 29). On October 28, 2004, that court held that McLaurin was entitled to a *de novo* parole hearing because of the Parole Board's failure to take into account the resentencing minutes. (*Id.* ¶ 30). The Board

appealed this determination. (*Id.* ¶ 31).

While the Board's appeal was pending, McLaurin had another parole hearing on August 16, 2005, at which time McLaurin's request for release on parole was once again denied without any consideration of the resentencing minutes. (*Id.* ¶¶ 33-34). Thereafter, on March 14, 2006, the Appellate Division, Second Department, affirmed the decision granting McLaurin's Article 78 petition. As the Appellate Division explained, Judge Mathews' statement constituted a "sentencing recommendation" which the Parole Board was "required to obtain and consider" prior to making its parole determination. *McLaurin v. N.Y. State Bd. of Parole,* 27 A.D.3d 565, 566 (2d Dep't 2006). The Division of Parole therefore was directed to retrieve McLaurin's resentencing minutes and conduct a *de novo* hearing. *Id.* at 565.

3. *2006 De Novo Parole Hearing*

**\*6** On October 17, 2006, McLaurin made a fourth appearance before three parole commissioners for the *de novo* hearing directed by the Appellate Division. (Am.Compl.¶ 39). Although the Board had obtained the resentencing minutes containing Judge Mathews' recommendation and placed them in McLaurin's file in advance of the hearing, (Ex. D), the Inmate Status Report (a cover sheet furnished to the commissioners) still indicated inaccurately that there was no official statement from the sentencing judge. (Am.Compl.¶ 38). Despite this error, Commissioner Ferguson expressly noted during the hearing that the sentencing minutes were part of McLaurin's folder and that "even the resentencing judge indicated he noticed [McLaurin's] level of intelligence." (Ex. E at 5, 9). The Board nevertheless denied McLaurin's request for parole, explaining that:

After a review of the record, interview, and sentencing minutes, the panel has determined that if released at this time there is a reasonable probability that you would not live and remain at liberty without again violating the law and your release would be incompatable with the welfare of society and would so deprecate the serious nature of the crime as to undermine respect for the law. This decision is based on the following factors: Your instant offense is attempted robbery 2nd in which you entered a bank and displayed what appeared to be a firearm during the robbery. Your criminal history is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

extensive and dates back to a 1972 youthful offender, includes sex abuse, eight felonies, five of which are robberies, multiple prior prison terms and community supervision. Note is made of your programming, sincere remorse and eight years of clean disciplinary record. While the Board notes your markedly improved attitude you have clearly led the life [of] a violent career criminal. You pose a risk to society. Parole is denied.

(*Id.* at 2).

McLaurin appealed this decision to the Division of Parole Appeals Unit, which apparently failed to render any decision. (Am.Compl.¶ 41).

4. *2007 Parole Hearing*

On August 22, 2007, McLaurin made his fifth appearance before the Board. (*Id.* ¶ 44). This time, the Inmate Status Report provided to the Board had been corrected to indicate that the resentencing minutes were in McLaurin's file (although it still incorrectly noted that there had been no official statement from a judge); indeed, the Report quoted the portion of the resentencing minutes in which Judge Mathews had stated, "I think that you should be considered by parole at the earliest possible date because I think that you have learned your lesson." (Ex. F at 1-2). The Report further observed that if McLaurin were to be released, his parole should be subject to two mandatory special conditions for sex offenders. (*Id.* at 3).

At the hearing, Commissioner Smith indicated that the panel had been afforded an opportunity to review the resentencing minutes and noted Judge Mathews' statements about considering McLaurin for parole at the earliest possible date. (Ex. G at 5-6). However, the Board nevertheless denied parole once again, stating:

**\*7** After a personal interview, record review, and deliberation, this panel finds your release is incompatible with the public safety and welfare. Your instant offense of attempted robbery 2 involved a bank robbery where you displayed what appeared to be a handgun. At the time you were on parole. You have multiple prior revocations of parole. Consideration has been given to your demonstrated pattern of robbery related crime. Your much improved behavior, program

accomplishments, and community support are noted. However due to your lengthy record of crime, and poor supervision record, your release at this time is denied. There is a reasonable probability you would not live and remain at liberty without violating the law. During the interview you displayed little remorse for the victim of your criminal activities.[FN4]

> **FN4.** Although the Board indicated that McLaurin had shown "little remorse" during the hearing, in its decision less than one year earlier, it had noted his "sincere remorse." (*See* Exs. E at 2, G at 2).

(Ex. G at 2).

5. *Institutional Record*

During his time in prison, McLaurin has earned a Masters of Professional Studies degree from the New York Theological Seminary. (Am.Compl.¶ 4). He also has completed programs relating to Aggression Replacement Training, Alternatives to Violence, and Alcohol and Substance Abuse Treatment. His positive institutional adjustment is further demonstrated by the fact that he has not received any disciplinary infractions over the past ten years. (*Id* .¶ 3).

B. *Pleadings*

McLaurin's original complaint in this action is dated March 12, 2007; his Amended Complaint is dated August 31, 2007. (Docket Nos. 1, 14). In the Amended Complaint, McLaurin alleges that the Defendants' denial of his requests for parole violated his constitutional rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Ex Post Facto Clause of Article I of the United States Constitution.

More specifically, McLaurin contends that his procedural due process rights were violated because the Defendants: (1) failed to consider Judge Mathews' remarks as a recommendation under New York Executive Law Section 259-i and refused to acknowledge that Judge Mathews had expressly recommended that McLaurin be paroled after ten years; (2) relied on erroneous information indicating that McLaurin had seven or eight felony convictions; (3) incorrectly referred to McLaurin's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

youthful offender adjudication as a felony conviction; (4) mischaracterized information contained in a Victim Impact Statement by noting incorrectly that the victims of his crime had sustained physical injuries; and (5) failed adequately to train and supervise the parole commissioners and staff.[FN5] (Am.Compl.¶¶ 47, 59-62). McLaurin also contends that the Defendants violated his due process, equal protection, and Ex Post Facto Clause rights by maintaining an unofficial policy of denying parole on the basis of an inmate's criminal history, without meaningful consideration of the other statutory factors. (*Id.* ¶¶ 48-58). Finally, he alleges that the Defendants violated his Ex Post Facto Clause rights by improperly requiring that his release conditions comply with the New York Sexual Offender Registration Act ("SORA"), N.Y. Correct. Law § 168, *et seq.* (*Id.* ¶ 47).

> FN5. McLaurin frames the failure-to-train claim in his Amended Complaint as a "deliberate indifference" claim, (Am.Compl.¶¶ 59-62), evidently hoping to extend liability to the current Governor and Chairman of the Division of Parole, neither of whom had any personal involvement in the denial of his parole. To the extent that McLaurin seeks to bring this claim as a *Monell* claim, *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978), he faces the obstacle that no municipality is involved in this action. *See* id. at 691 n. 54 (noting that local governments may be sued under Section 1983 because, unlike states, they do not have Eleventh Amendment immunity); *see also City of Canton v. Harris,* 489 U.S. 378, 388 (1989) (municipalities maybe be held liable for damages under *Monell* arising out of a failure to train their personnel where it amounts to deliberate indifference).

**\*8** McLaurin seeks declaratory and injunctive relief to prevent these alleged violations from recurring. Specifically, he seeks (1) an order declaring that the Defendants violated his constitutional rights and (2) an injunction requiring the Parole Board to (a) stop making parole release determinations solely on the basis of his prior criminal history, (b) expunge all inaccurate information in his parole file, and (c) provide him with an

immediate *de novo* parole hearing at which the Defendants acknowledge that Judge Mathews' remarks constitute a recommendation that McLaurin be released after ten years' imprisonment. (*Id.* ¶¶ 63-72).

C. *Motion to Dismiss*

On November 19, 2007, the Defendants moved to dismiss the Amended Complaint, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that (1) McLaurin's claims against Pataki and Dennison are moot, (2) certain of his claims are barred by the statute of limitations, (3) McLaurin has failed to allege sufficient personal involvement on the part of Spitzer and Alexander with respect to certain alleged constitutional violations, and (4) the Amended Complaint fails to state a claim upon which relief can be granted.[FN6] (Docket No. 19).

> FN6. The Defendants withdrew additional arguments regarding qualified immunity and the Eleventh Amendment because McLaurin is not seeking monetary damages. (Defs.' Reply Mem. at 1 n. 1).

McLaurin has filed a memorandum of law and affidavit in opposition to the motion to dismiss which (despite his *pro se* status) are polished and well-reasoned. (Docket Nos. 33-34). The Defendants, in turn, have filed a reply memorandum. (Docket No. 35). Accordingly, the motion is fully submitted.

III. *Discussion*

A. *Standard of Review*

Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed if the court lacks subject matter jurisdiction over the claim. Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint if it fails to state a claim for which relief can be granted. Although the same standard of review applies to both motions, *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.2003); *Alster v. Goord,* No. 05 Civ. 10883(WHP), 2008 WL 506406, at \*2 (S.D.N.Y. Feb. 26, 2008), a court "must decide the 'jurisdictional question first because a disposition of a Rule 12(b) (6) motion is a decision on the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

merits, and therefore, an exercise of jurisdiction.' " *Tirone v. N.Y. Stock Exch., Inc.,* No. 05 Civ. 8703(WHP), 2007 WL 2164064, at *3 (S.D.N.Y. July 27, 2007) (quoting *Magee v. Nassau County Med. Ctr.,* 27 F.Supp.2d 154, 158 (E.D.N.Y.1998)).

In connection with both motions, the court must accept the material factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993); *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). As the Supreme Court has explained, the issue that must be decided under Rule 12(b)(6) is whether the plaintiff's claims are "plausible." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1965-66 & n. 5 (2007). This requires the Court to apply a "flexible" standard, pursuant to which a pleader must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis omitted).

**\*9** Because McLaurin is a *pro se* litigant, the Court may rely on both his amended complaint and his motion papers in assessing the legal sufficiency of his claims. *See, e.g., Milano v. Astrue,* No. 05 Civ. 6527(KMW)(DF), 2007 WL 2668511, at *2 (S.D.N.Y. Sept. 7, 2007); *Burgess v. Goord,* No. 98 Civ.2077(SAS), 1999 WL 33458, at *1 n. 1 (S.D.N.Y. Jan. 26, 1999); *Gadson v. Goord,* No. 96 Civ. 7544(SS), 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997). The Court may also consider any documents referenced in his pleadings or which are properly the subject of judicial notice. *See Tarshis v. Riese Org.,* 211 F.3d 30, 39 (2d Cir.2000), *abrogated on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991). Indeed, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect.' " *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir.2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam)); *see Munno v. Town of Orangetown,* 391 F.Supp.2d 263, 268 (S.D.N.Y.2005)

(where "plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint, the court may consider the documents" in connection with a Rule 12(b)(6) motion) (internal quotation marks omitted); *Thomas v. Westchester County Health Care Corp.,* 232 F.Supp.2d 273, 275 (S.D.N.Y.2002) ("Documents that are integral to plaintiff's claims may also be considered, despite plaintiff's failure to attach them to the complaint.").

Additionally, because McLaurin is proceeding *pro se,* the Court must read his papers "liberally, and ... interpret them to raise the strongest arguments that they suggest." *Sloane v. Mazzuca,* No. 04 Civ. 8266(KMK), 2006 WL 3096031, at *3 (S.D.N.Y. Oct. 31, 2006) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)) (ellipsis in original); *see also Davis v. Kelly,* 160 F.3d 917, 922 (2d Cir.1998) ("Though a court need not act as an advocate for *pro se* litigants, in *pro se* cases there is a greater burden and a correlative greater responsibility upon the district court to insure that constitutional deprivations are redressed and that justice is done.") (internal quotation marks and citation omitted). This principle applies with particular force here because McLaurin is alleging a civil rights violation. *See, e.g., Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993); *Contes v. City of N.Y.,* No. 99 Civ. 1597(SAS), 1999 WL 500140, at *2 (S.D.N.Y. July 14, 1999).[FN7]

FN7. During a telephone conference on May 29, 2008, I considered whether the Defendants' motion should be converted into a motion for summary judgment. The Defendants previously had warned McLaurin of this possibility by serving a notice of motion containing the cautionary information required by Local Civil Rule 12.1. (*See* Docket No. 20). Ultimately, I concluded that there was no need to treat the Defendants' motion as a motion for summary judgment because the exhibits attached to the Defendants' papers (McLaurin's Parole Board decisions, Inmate Status Reports related to his Parole Board appearances, and transcripts of his Parole Board interviews) are either incorporated by reference in McLaurin's Amended Complaint or are integral thereto. (*Compare* Am. Compl. ¶¶

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

25-46, *with* Exs. A-G). Accordingly, they can be considered without treating the Defendants' motion as a summary judgment motion.

B. *Rule 12(b)(1)*

In their motion papers, the Defendants contend that this Court lacks jurisdiction over defendants Pataki and Dennison because McLaurin's claims against them are moot. (Defs.' Mem. at 5). A case is moot when "the problem sought to be remedied has ceased, and where there is 'no reasonable expectation that the wrong will be repeated.' " *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (quoting *Preiser v. Newkirk,* 422 U.S. 395, 402 (1975)). If the case is moot, the court lacks subject matter jurisdiction. *Fox v. Bd. of Trs. of State Univ. of N.Y.,* 42 F.3d 135, 140 (2d Cir.1994).

**\*10** In this action, McLaurin has sued Pataki and Dennison solely in their official capacities. (Am.Compl.¶¶ 7, 9). Under *Rule 25(d) of the Federal Rules of Civil Procedure*, when a "public officer who is a party in an official capacity ... ceases to hold office while the action is pending ... [t]he officer's successor is automatically substituted as a party." This rule is "designed to prevent suits involving public officers from becoming moot due to personnel changes." *Karcher v. May,* 484 U.S. 72, 83 (1987). Accordingly, Paterson and Alexander, the current Governor of New York and Chairman of the Division of Parole, respectively, have been substituted for Pataki and Dennison. *See supra* note 1. Whether McLaurin's claims against Pataki and Dennison technically are moot is therefore irrelevant because other parties have been substituted for them.

In response to McLaurin's opposition papers, the Defendants also have advanced the argument that *all* claims against the Defendants arising out of events during the Pataki administration are now moot. (*See* Defs.' Reply Mem. at 2 n. 3). In that regard, McLaurin alleges in his Amended Complaint that the Pataki administration adopted an unconstitutional policy that has been continued by the current administration. (Am.Compl.¶ 16). If so, the wrongs that he alleges have not been remedied, and there is a reasonable possibility that they might be repeated. McLaurin's claims against the Defendants consequently are not moot. *See Graziano v. Pataki,* No. 06 Civ.

480(CLB), 2007 WL 4302483, at \*1 (S.D.N.Y. Dec. 5, 2007).

C. *Rule 12(b)(6)*

1. *Statute of Limitations*

The statute of limitations for *Section 1983* actions arising out of constitutional wrongs in New York is three years. *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994). In calculating this period, courts assume, pursuant to the "prison mailbox" rule, that a pleading is filed when it is given to prison officials. *See Houston v. Lack,* 487 U.S. 266, 275-76 (1988); *Nobel v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001). In this case, McLaurin's original complaint is dated March 12, 2007, and was mailed to the Court by prison officials on March 23, 2007. His papers are silent, however, as to the date that the complaint was tendered to prison officials for mailing.

On the assumption that McLaurin tendered his complaint to prison officials on the date that he signed it, any claims that accrued before March 12, 2004, would be time barred. To the extent that McLaurin seeks relief in connection with alleged violations of his rights during the 2001 and 2003 parole hearings, his Amended Complaint therefore must be dismissed. McLaurin apparently does not disagree with this analysis. Indeed, in his opposition papers, McLaurin explains that the list of parole commissioners named in his Amended Complaint intentionally excluded those who had participated only in the denial of his parole in 2001 and 2003. (Pl.'s Mem. at 10; Aff. of Norris J. McLaurin, sworn to on Nov. 30, 2007 ("Pl.'s Aff."), ¶ 2).

2. *Failure to State a Claim Under Section 1983*

**\*11** *Section 1983* provides a means by which a person alleging a constitutional deprivation may bring a claim, but does not itself create any substantive rights. *Sykes,* 13 F.3d at 519. Consequently, to state a claim under *Section 1983*, a plaintiff must allege that a "person" acting under color of state law has deprived him of a right, privilege, or immunity guaranteed by the United States Constitution. *See 42 U.S.C. § 1983; Fox v. City of N.Y.,* No. 03 Civ. 2268(FM), 2004 WL 856299, at \*4 (S.D.N.Y. Apr. 20,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

2004). Here, as noted above, McLaurin alleges that the Defendants, while acting under the color of state law, violated his Fourteenth Amendment and Ex Post Facto Clause rights.

a. *State Agencies Are Not "Persons"*

A state agency does not qualify as a "person" under Section 1983. *Harris v. N.Y. State Dep't of Health,* 202 F.Supp.2d 143, 178 (S.D.N.Y.2002) (citing *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 64 (1989)). Accordingly, McLaurin's claims against the Division of Parole must be dismissed because it is a New York state agency. *Rios v. N.Y. Exec. Dep't Div. of Parole,* No. 07 Civ. 3598(DLI), 2008 WL 150209, at *3 (E.D.N.Y. Jan. 14,2008).

b. *Lack of Personal Involvement*

The Defendants contend that all claims other than those related to the 2007 parole hearing should be dismissed as against defendants Spitzer and Alexander because they were not personally involved in any earlier hearings. (Defs.' Mem. at 6). The Defendants presumably would also extend that argument to include Paterson, who has now been substituted for Spitzer as a defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Personal involvement in an alleged constitutional deprivation is, of course, a "prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006). In his Amended Complaint, however, McLaurin seeks only injunctive and declaratory relief. Personal involvement of a defendant is *not* required in such circumstances. *See, e.g., Voorhees v. Goord,* No. 05 Civ. 1407(KMW)(HBP), 2006 WL 1888638, at *6 n.l (S.D.N.Y. Feb. 24, 2006); *Lyerly v. Phillips,* 04 Civ. 3904(PKC), 2005 WL 1802972, at *4 (S.D.N.Y. July 29, 2005). The claims against the Governor and the Chairman of the Division of Parole in their official capacities therefore should not be dismissed on this ground.

c. *Due Process*

McLaurin advances two distinct due process claims. First, he contends that the specific manner in which the Parole Board conducted his parole hearings violated his due process rights. Second, he contends that the

Defendants' unofficial policy of denying parole to all inmates solely on the basis of their criminal histories, without any meaningful consideration of the other statutory factors, gives rise to a due process violation.

At the outset, it is clear that there is no constitutional right to parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 7 (1979). Accordingly, for a state prisoner to have an interest in parole that is protected by the Due Process Clause, "he must have a legitimate expectancy of release that is grounded in the state's statutory scheme." *Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001). The New York parole system, however, does not give any inmate a legitimate expectation that he will be released on parole. *Marvin v. Goord,* 255 F.3d 40, 44 (2d Cir.2001); *Barna,* 239 F.3d at 171. For this reason, alleged violations of the procedural requirements of the New York parole scheme are generally matters for the state courts. *Mathie v. Dennison,* No. 06 Civ. 3184(GEL), 2007 WL 2351072, at *6 (S.D.N.Y. Aug. 16, 2007). The Due Process Clause nevertheless may be violated if parole is denied for arbitrary or impermissible reasons, such as reliance upon a protected characteristic or an irrational distinction. *See, e.g ., id.* at *6; *Cartagena v. Connelly,* No. 06 Civ.2047(LTS) (GWG), 2006 WL 2627567, at *7 (S.D.N.Y. Sept. 14, 2006); *Siao-Pao v. Mazzuca,* 442 F.Supp.2d 148, 154 (S.D.N.Y.2006); *Morel v. Thomas,* No. 02 Civ. 9622(HB), 2003 WL 21488017, at *4 (S.D.N.Y. June 26, 2003).

**\*12** Under New York law, parole is not a reward for good conduct in prison; rather, it is granted only when there is a "reasonable probability" that the inmate will not violate the law upon his release, his release is not inconsistent with societal welfare, and it "will not so deprecate the seriousness of his crime as to undermine respect for law." N.Y. Exec. Law § 259-i(2)(c)(A). In making its decision with respect to a request for parole, the Board may consider, among other factors, the offender's background, his criminal history, the severity of his offense and any prior offenses, and the manner in which he has adjusted to any prior release on probation or parole. [FN8] *Id.*

> FN8. More specifically, Executive Law Section 259-i provides that the Parole Board must consider:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

(i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interpersonal relationships with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the federal government ...; and (v) any statement made to the board by the crime victim or the victim's representative ....

N.Y. Exec. Law § 259-i(2)(c)(A). Additionally, if the court has set a minimum period of incarceration, the Board must consider:

(i) the seriousness of the offense with due consideration to the type of sentence, length of sentence and *recommendations of the sentencing court,* the district attorney, the attorney for the inmate, the pre-sentence probation report as well as consideration of any mitigating and aggravating factors, and activities following arrest and prior to confinement; and (ii) *prior criminal record,* including the nature and pattern of offenses, adjustment to any previous probation or parole supervision and institutional confinement.

*Id.* § 259-i(l)(a) (emphases added).

i. *McLaurin's Hearings*

McLaurin's first due process claim is that his rights were violated as a consequence of various procedural errors that arose during his parole hearings. According to McLaurin, the Defendants: (a) failed to treat Judge Mathews' remarks as a sentencing recommendation and refused to acknowledge that the judge had expressly recommended that McLaurin be paroled after ten years; (b) relied on erroneous information that McLaurin had seven or eight felony convictions; (c) incorrectly referred

to McLaurin's youthful offender adjudication as a felony conviction; (d) mischaracterized information contained in the Victim Impact Statement by noting incorrectly that the victims sustained physical injuries; and (e) failed adequately to train and supervise parole commissioners and staff. (Am.Compl.¶¶ 47, 59-62).

McLaurin previously prevailed in state court on his claim that the Parole Board failed to consider the resentencing minutes during the 2005 hearing. *See McLaurin,* 27 A.D.3d at 565-66. Indeed, the court's ruling in that case resulted in the Parole Board's *de novo* hearing in 2006. The transcripts of that hearing and the subsequent hearing in 2007 establish, however, that the Parole Board did take into account the recommendation by Judge Mathews that McLaurin "be considered by parole at the earliest possible release date." (Am. Compl. Attach. at 5). For example, the Parole Board's explanation of its parole denial in 2006 expressly states that it "review[ed the] sentencing minutes." (Ex. E at 2). Similarly, in 2007, the Inmate Status Report provided to the Board noted that McLaurin's sentencing and resentencing minutes were in the file. Although the Inmate Status Report incorrectly indicates that the judge did not make an "official statement," it accurately quotes the statement by Judge Mathews regarding early consideration for parole upon which McLaurin relies. (Ex. F at 1-2). Furthermore, the transcripts of both the 2006 and 2007 hearings confirm that the Board considered the state court's sentencing recommendation in reaching its decisions to deny McLaurin's request for parole. (*See* Exs. E at 5 ("both sentencing minutes are now present inside your folder"), 8 ("even the resentencing judge indicated he noticed your level of intelligence"), G at 5-6 ("We have a copy of [the sentencing minutes] which we've had a chance to review" in which the judge said you should be "considered by the Parole Board a [t] the earliest possible release date.").[FN9] In light of this undisputed record, McLaurin cannot prevail on his claim that the Board failed to consider Judge Mathews' recommendation in the course of denying his requests for parole.

FN9. In its written decision in 2007, the Board did not expressly refer to the resentencing minutes but previously had acknowledged reviewing them during the hearing. The omission from the decision is not dispositive. *See Morel,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

2003 WL 21488017, at *4 (parole board "need not expressly discuss each of the reasons in its determination").

*13 McLaurin's other claims regarding the conduct of his hearings are equally baseless. First, notwithstanding his assertions to the contrary, (see Pl.'s Aff. ¶ 9), McLaurin does have eight felony convictions-one for sexual abuse in 1973, three for robbery in 1979, one for attempted possession of prison contraband in 1979, one for robbery in 1983, one for conspiracy in 1988, and one for robbery in 1992.FN10 (Ex. A at 3-4). Second, the Parole Board never referred to McLaurin's youthful offender adjudication as a felony conviction; it instead only noted (correctly) that McLaurin's criminal history "dates back to a 1972 youthful offender." (Ex. E at 2). Third, the Inmate Status Reports prepared for the Board did not indicate that the victims incurred physical injuries, but, rather, that McLaurin's robbery involved "force/physical injury." This statement is accurate because McLaurin displayed what appeared to be a firearm during the course of the bank robbery, ordered all of the tellers and customers to get "down on the fucking floor," and threw one of the witnesses to the ground. (Exs. A at 2, C at 1). Finally, the hearing transcripts confirm that the Board interviewed McLaurin at some length during his appearances in 2006 and 2007 and considered the appropriate statutory factors in denying his release on parole. It follows that there is no basis for his claim that he was denied due process because the Board members who conducted those parole hearings were inadequately trained.FN11

FN10. Although McLaurin's three robbery convictions in 1979 may have constituted a single conviction for sentencing purposes, see McLaurin, 1998 WL 146282, at *1, he undeniably was convicted of three separate crimes. Moreover, there is no basis for his claim that his attempted possession of prison contraband conviction in 1979 was a misdemeanor. That crime is in fact a felony. See N.Y. Penal Law § 205.25; (Ex. A at 4; Pl.'s Aff. Ex. 2).

FN11. McLaurin attaches to his affidavit comments made by Commissioner Manley

("Manley") in the course of a panel discussion at the Association of the Bar of the City of New York. (Pl.'s Aff. Ex. 9). Those comments, which relate to Manley's lack of training and the general practices of the Parole Board, are disturbing. However, Manley did not participate in McLaurin's 2006 or 2007 parole hearings. The comments also relate to the Parole Board in general; they do not support the proposition that the Defendants violated McLaurin's due process rights during his parole hearings. (See Exs. E at 4, G at 4).

Furthermore, even if the Court were to assume that the Defendants committed one or more of the procedural errors alleged in the Amended Complaint, the 2005, 2006, and 2007 hearing transcripts establish that the Parole Board's decisions regarding McLaurin were not made in an arbitrary manner or for impermissible reasons. Indeed, the Board considered the circumstances leading to McLaurin's conviction, his prior criminal record, his institutional adjustment, and his future plans. In 2006 and 2007, the Board also took into account the sentencing judge's recommendation. The transcript of the 2007 hearing further indicates that the Board took notice of McLaurin's "improved behavior, program accomplishments, and community support." (Ex. G at 2). Ultimately, however, the Parole Board concluded that McLaurin's "lengthy record of crime, and poor supervision record" outweighed his positive adjustment in determining his fitness for parole. (Id.). This is precisely the sort of weighing of factors that the Board is statutorily empowered to undertake. See Manley v. Thomas, 255 F.Supp.2d 263, 267 (S.D.N.Y.2003); Brown v. Thomas, No. 02 Civ. 9257(GEL), 2003 WL 941940, at *2 (S.D.N.Y. Mar. 10, 2003).

Consequently, even if there were minor irregularities in the Board's proceedings-such as the failure to update the Inmate Status Report prior to the 2006 de novo parole hearing or the ministerial failure to indicate on the 2007 Inmate Status Report that the sentencing judge had made an official statement-McLaurin was afforded all the process that the United States Constitution requires. See Boddie v. N.Y. State Div. of Parole, 285 F.Supp.2d 421, 429-30 (S.D.N.Y.2003) (use of uncorrected pre-sentence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

report and statement of incorrect facts in parole decision does not violate due process). It follows that any further relief to which McLaurin may be entitled must be sought in state court. *See Standley v. Dennison,* No. 9:05 Civ. 1033(GLS)(GHL), 2007 WL 2406909, at *9 (N.D.N.Y. Aug. 21, 2007); *Mathie,* 2007 WL 2351072, at *6.

**\*14** I note that in a recent letter McLaurin has asked the Court to consider *South v. New York State Division of Parole,* N.Y.L.J., Apr. 23, 2008, at 26 (Sup.Ct., N.Y.County, Apr. 8, 2008), in making its determination regarding his due process claims. (Letter from McLaurin to the Court, dated Apr. 21, 2008 ("Pl.'s Letter"), at 1-2). In that case, Justice Goodman held that an inmate was entitled to a *de novo* parole hearing. Justice Goodman's decision, however, was based on state law and a concession by the Attorney General that the petitioner's hearing did not meet the requirements of state law. The case therefore has no bearing on whether McLaurin's federal constitutional rights were violated; if anything, it confirms that any relief to which McLaurin may be entitled rests with the state court.

ii. *Alleged Policy*

McLaurin's other due process claim is that the Defendants have maintained an unofficial policy of denying parole to almost all prisoners sentenced under the recidivist statutes on the basis of their criminal history, "without any meaningful consideration ... of any other ... statutorily mandated factor [.]" (Am.Compl.¶ 49). Several judges have considered similar allegations concerning the alleged parole policies of the Pataki administration. At least four of those judges have concluded that such a policy-if shown to exist-would not violate the Due Process Clause. *See Tatta v. Brown,* No. 06 Civ. 2852, 2007 WL 4298709, at *1-2 (E.D.N.Y. Dec. 6, 2007) (Block, J.) (basing parole decision on two statutory factors, the nature of the prisoner's crime and his criminal history, does not violate procedural or substantive due process); *Schwartz v. Dennison,* 518 F.Supp.2d 560, 574 (S.D.N.Y.2007) (Holwell, J.) ("a BOP policy of denying parole to sex offenders would not violate the Due Process Clause"); *Mathie,* 2007 WL 2351072, at *6-7 (Lynch, J.) ("A policy that requires the Board to look first and foremost at the severity of the crime ... is neither arbitrary nor

capricious.");   *Cartagena,* 2006 WL 2627567, at *9 (Gorenstein, Mag. J.) (policy of denying parole to serious offenders would be proper because Board may give statutory factors whatever weight it deems appropriate and need not cite each factor in its decision).

In *Mathie,* for example, Judge Lynch assumed the existence of a policy to deny parole automatically to all violent felons, but held that such a policy did not violate the Due Process Clause. *Mathie,* 2007 WL 2351072, at *6-7. This decision rested principally on three grounds. First, under New York law the Board may "give whatever weight it deems appropriate to the statutory factors." *Id.* at *6 (quoting *Romer v. Travis,* No. 03 Civ. 1670(KMW)(AJP), 2003 WL 21744079, at *6 (S.D.N.Y. July 29, 2003)). Judge Lynch noted that the policy merely required the Parole Board to "overvalue[ ] the severity of the crime, at the expense of other statutory considerations." *Id.* In his view, this did not violate the Due Process Clause because due process required only that the Board not act arbitrarily or impermissibly. Second, Judge Lynch observed that even if New York adopted the policy as law, it would not violate an inmate's due process rights because the "federal system has abolished parole altogether for all inmates, including both violent and non-violent felons." *Id.* at *7. As he reasoned, "[i]f the federal government can abolish parole altogether without violating the Constitution, then New York State surely acts within constitutional confines if it decides to restrict parole to only non-violent felons, whom the State could rationally find pose a greater risk to public safety and therefore are not proper candidates for early release." *Id.* Finally, as Judge Lynch explained, even if the Board enacted its policy in violation of state law, the proper venue for such a claim would be state court .[FN12] *Id.*

> [FN12]. In an unpublished opinion, however, the Second Circuit has stated that it is an open question whether a prisoner has a "liberty or property interest in having the Parole Board comply with its own statutory and regulatory guidelines in determining whether to grant or deny parole." *See Rodriguez v. Greenfield,* 7 Fed. App'x 42, 43 (2d Cir.2001).

**\*15** The sole authority suggesting that a policy of uniformly denying parole to violent or persistent violent

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

felons would violate due process is Judge Brieant's decision in *Graziano,* 2006 WL 2023082, at *6-9. In that case, Judge Brieant denied a motion to dismiss, and later granted certification of a class action, because the plaintiffs-A-1 felons who were denied parole-made what he considered a nonfrivolous statistical case that the Parole Board, rather than exercising its discretion in a misguided fashion, was failing to exercise its discretion at all. Ironically, the plaintiffs in that action suggested that the Board was not handcuffed by any alleged policy with respect to non-A-1 felons, *i .e.,* persons convicted of crimes other than murder, such as McLaurin.[FN13] *See id.* at *1-2, 8.

> FN13. In his April 21 letter, McLaurin asks the Court to address his status in the *Graziano* class action. (Pl.'s Letter at 2). That issue is not properly before this Court. In any event, the *Graziano* class includes only those prisoners "convicted of A-1 felony offenses." (*See* Docket No. 98 in *Graziano,* No. 06 Civ. 480). McLaurin concedes that he has not been convicted of such an offense. (Letter from McLaurin to the Court, dated May 1, 2008, at 2).

Here, as in *Mathie,* McLaurin's contention, at its core, is that the Defendants are relying almost exclusively on the criminal history of a prisoner in determining whether to grant parole release, at the expense of the other statutory factors. The Parole Board is entitled, however, to determine that a prisoner's criminal history outweighs any of the other statutory factors. *Siao-Pau,* 442 F.Supp.2d at 154 (placing heavy emphasis on a prisoner's criminal history is "entirely consistent with the criteria laid down by the legislature") (quoting *Morel,* 2003 WL 21488017, at *5). Accordingly, even if McLaurin was denied parole as a matter of Board policy, this does not raise any due process concerns.

**d. Equal Protection**

McLaurin next claims that he was denied his rights under the Equal Protection Clause because the Defendants treated persistent felony offenders and persistent violent felony offenders differently than non-persistent felony offenders. (Am.Compl.¶ 57). Assuming that this is true, it

does not constitute an impermissible ground for the denial of parole. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Nevertheless, because prisoners are not a suspect class, *Lee v. Governor of N.Y.,* 87 F.3d 55, 60 (2d Cir.1996), the policy is "presumed constitutional and need only be rationally related to a legitimate state interest." *Mathie,* 2007 WL 2351072, at *8 (quoting *Salahuddin v. Unger,* No. 04 Civ. 2180(JG), 2005 WL 2122594, at *7 (E.D.N.Y. Sept. 2, 2005)).

The state clearly has a rational basis for drawing a distinction in parole determinations between persistent offenders and non-persistent offenders, which is to "prevent[ ] the early release of potentially violent inmates" or those who are more likely to recidivate. *See Salahuddin,* 2005 WL 2122594, at *7. Moreover, as Judge Baer has observed,

> the motive and animus that [McLaurin] contends is impermissible-namely the Board's decision to get tough on violent [or persistent] offenders because of public and political pressure-in fact seems entirely permissible, as it closely relates to the statutory factor of whether "release is not incompatible with the welfare of society and will not so deprecate the seriousness of the offense as to undermine respect for law."

**\*16** *Morel,* 2003 WL 21488017, at *5. McLaurin's equal protection claim consequently fails as a matter of law.

**e. Ex Post Facto**

Finally, McLaurin contends that the Defendants violated his Ex Post Facto Clause rights by adopting its alleged policy and by incorporating into his release conditions terms required by SORA. (Pl.'s Mem. at 22-24). Under the Ex Post Facto Clause, states are prohibited from passing legislation that imposes punishment for an act not punishable at the time it was committed or which is in addition to that then prescribed. U.S. Const. art. I, § 10, cl. 1; *Burgess v. Salmon,* 97 U.S. 381, 384 (1878). The focus is on whether the change "alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *Cal. Dep't of*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

*Corr. v. Morales,* 514 U.S. 499, 506 n. 3 (1995). Changes in the law governing parole decisions that "create [ ] a significant risk of prolonging [the plaintiff's] incarceration" consequently may violate the Ex Post Facto Clause. *Garner v. Jones,* 529 U.S. 244, 251 (2000). On the other hand, a "law that is merely procedural and does not increase a prisoner's punishment cannot violate the Ex Post Facto Clause even when applied retrospectively." *Barna,* 239 F.3d at 171.
i. *Policy*

McLaurin alleges that the Defendants' adoption of a policy pursuant to which they automatically denied parole to inmates with a prior criminal history violates the Ex Post Facto Clause. The Ex Post Facto Clause, however, applies only to *laws.* U.S. Const. art. I, § 10, cl. 1. In *Garner,* the Supreme Court determined that state parole regulations are such laws. *See Garner,* 529 U.S. at 247, 257. Although the Supreme Court also explained that a parole board's policy statements and practices could be considered in determining whether a statute or regulation violates the Ex Post Facto Clause, *id.* at 256-57, the Court did not address whether parole board policies or guidelines constitute "laws" subject to ex post facto analysis. *See Anderson-El v. U.S. Parole Comm'n,* No. 05 Civ. 2697(JSR), 2006 WL 2604723, at *5 n. 2 (S.D.N.Y. Sept. 11, 2006) (Report & Rec. of Katz, Mag. J.).

Prior to *Garner,* the weight of authority favored the view that the Ex Post Facto Clause was inapplicable to nonmandatory guidelines used to guide the discretion of a parole board. *See, e .g., DiNapoli v. Ne. Reg'l Parole Comm'n,* 764 F.2d 143, 147 (2d Cir.1985) ("parole guidelines as applied here are not 'laws' within the meaning of the ex post facto clause"); *Pindle v. Poteat,* 360 F.Supp.2d 17, 20 (D.D.C.2003) ("Most courts of appeals addressing the question have held that Parole Commission guidelines, which simply provide guides for the exercise of discretion, cannot be considered 'laws' for purpose of the Ex Post Facto Clause."); *see also Portley v. Grossman,* 444 U.S. 1311, 1312 (1980) (because "guidelines operate only to provide a framework for the Commission's exercise of its statutory discretion[, a] change in guidelines assisting the Commission in the exercise of its discretion is ... a [permissible] procedural change"). Since *Garner,* however, the circuit courts have split on this issue. *Compare Glascoe v. Bezy,* 421 F.3d

543, 548 (7th Cir.2005) ("discretionary *guidelines,* unlike statutes or the 'rules' addressed in *Garner,* are not within the ambit of the Ex Post Facto Clause"), *and Warren v. Baskerville,* 233 F.3d 204, 207-08 (4th Cir.2000) (administrative policies are not subject to Ex Post Facto Clause), *with Michael v. Ghee,* 498 F.3d 372, 384 (6th Cir.2007) (guidelines are subject to Ex Post Facto analysis), *and Fletcher v. Dist. of Columbia,* 391 F.3d 250, 251 (D.C.Cir.2004) (*Garner* "foreclosed [the] categorical distinction between a measure with the force of law and guidelines") (internal quotation marks omitted).

**\*17** Although the Second Circuit has not specifically addressed *Garner,* in its subsequent decision in *Barna v. Travis,* the court held that discretionary parole guidelines are not subject to the Ex Post Facto Clause. *Barna,* 239 F.3d at 171. In that case, the plaintiffs alleged that New York State had a policy pursuant to which prisoners convicted of violent crimes were systematically denied parole. *Id.* at 170. The Second Circuit rejected the plaintiffs' Ex Post Facto claim, noting that the New York State parole guidelines do not create mandatory rules for release but seek only to guide the Parole Board's discretion. *Id.* at 171. The court therefore held that the guidelines were "not 'laws' within the meaning of" the Ex Post Facto Clause. *Id.*

McLaurin does not allege that the legislature amended the statute governing parole release, Executive Law Section 259-i, or that a state agency adopted a formal regulation that would bind the Board's discretion. He argues instead that the Defendants' policy encouraged the Board to deny parole solely on the basis of criminal history, without meaningful consideration of the other statutory factors. Stated slightly differently, McLaurin's argument is essentially a claim that the policy permitted the Board to place significantly more emphasis on the statutory factors relating to a prisoner's criminal history at the expense of such other important factors as the prisoner's institutional record and release plans. *See* N.Y. Exec. Law § 259-i(l)(a), (2)(c)(A). If so, the alleged policy was, at best, a guideline used by the Parole Board in balancing the statutory factors. Although the policy sought to guide the Board in the exercise of its discretion, it was not a mandatory rule binding the Board. This Court therefore is bound by *Barna* and must hold that the Ex

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)

(Cite as: 2008 WL 3402304 (S.D.N.Y.))

Post Facto Clause is inapplicable to the Defendants' alleged policy. *See Farid v. Bouey,* No. 05 Civ. 1540, 2008 WL 2127460, at *16 (N.D.N.Y. May 20, 2008) (Report & Rec. of Peebles, Mag. J.) (Pataki parole policy is not "law" subject to Ex Post Facto Clause); *Salahuddin,* 2005 WL 2122594, at *8 (same); *Parks v. Edwards,* No. 03 Civ. 5588(JG), 2004 WL 377658, at *4 (E.D.N.Y. Mar. 1, 2004) (same); *see also Mathie,* 2007 WL 2351072, at *13 (upholding the Pataki policy despite the plaintiff's ex post facto claim). *But see Graziano,* 2006 WL 2023082, at *10-11 (parole board policy subject to Ex Post Facto Clause).

ii. *Sexual Offender Registration Act*

McLaurin also contends that the Defendants violated his rights under the Ex Post Facto Clause by improperly applying SORA to his release conditions. SORA, which was enacted well after McLaurin's conviction for sexual abuse, imposes certain obligations on those convicted of specified sex offenses. *See Doe v. Pataki,* 120 F.3d 1263, 1266 (2d Cir.1997). In *Doe v. Pataki,* the Second Circuit concluded that the "application of the registration and notification provisions of ... SORA to persons who committed their offenses prior to the January 21, 1996, effective date of the Act does not violate the Ex Post Facto Clause." *Id.* at 1285. This holding does not necessarily control McLaurin's claim because the conditions that the Inmate Status Reports recommended be attached to his parole release do not relate to notification or registration, but rather to his use of medication and participation in a polygraph program. (*See* Ex. F at 3).

**\*18** The Court need not decide whether retroactive application of those conditions violates the Ex Post Facto Clause, however, because those conditions have not been applied to McLaurin. Indeed, the conditions are recommended for imposition only when McLaurin is granted parole release, an event which has yet to occur. McLaurin's claim therefore is not ripe for review. *See United States v. Balon,* 384 F.3d 38, 46 (2d Cir.2004) (ripeness doctrine prevents "a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur") (internal quotation marks omitted).

IV. *Conclusion*

For the foregoing reasons, the Court should grant the Defendants' motion to dismiss McLaurin's Amended Complaint. (Docket No. 21).

V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties shall have ten (10) days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

S.D.N.Y.,2008.

McLaurin v. Paterson
Not Reported in F.Supp.2d, 2008 WL 3402304 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.)))

C

This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,

Second Circuit.
Pawel CZERNICKI, Plaintiff-Appellant,
v.
UNITED STATES DEPARTMENT OF JUSTICE,
Defendant-Appellee.
Docket No. 04-4058-CV.

June 24, 2005.

**Background:** Federal prisoner brought tort claim against government under Federal Tort Claims Act (FTCA). The United States District Court for the Eastern District of New York, John Gleeson, J., dismissed complaint for lack of subject matter jurisdiction. Prisoner appealed.

**Holding:** The Court of Appeals held that prisoner did not show extraordinary circumstances to entitle him to equitable tolling of two-year limitations period on presenting claim to federal agency.

Affirmed.

West Headnotes

**[1] United States 393** ⇌ 113

393 United States

    393VIII Claims Against United States
        393k113 k. Presentation, Allowance, and Adjustment. Most Cited Cases
    Federal prisoner was not entitled to equitable tolling of two-year limitations period in which to file administrative claim with federal agency under Federal Tort Claims Act (FTCA) absent showing that extraordinary circumstances prevented his timely filing. 28

U.S.C.A. § 2401(b).

**[2] Federal Courts 170B** ⇌ 752

170B Federal Courts

    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk752 k. Matters or Evidence Considered. Most Cited Cases
    New evidence presented by federal prisoner for first time on appeal would not be considered in reviewing dismissal of his Federal Tort Claims Act (FTCA) complaint. 28 U.S.C.A. §§ 1346, 2671 et seq.

**\*410** Pawel Czernicki, Brooklyn, New York, for the Appellant, pro se.

Warshawsky, Steven M., Assistant United States Attorney, Eastern District of New York (Steven Kim, Assistant United States Attorney, Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, on the brief), Brooklyn, New York, for the Appellee, of counsel.

Present: MINER, STRAUB, Circuit Judges, and KEENAN,[FN*] District Judge.

    FN* The Honorable John F. Keenan, United States District Judge, Southern District of New York, sitting by designation.

**SUMMARY ORDER**

**\*\*1** AFTER ARGUMENT AND UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court be, and it hereby is, AFFIRMED.

Plaintiff-Appellant Pawel Czernicki ("Czernicki") appeals from the November 18, 2003 judgment of the United States District Court for the Eastern District of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.)))

New York (John Gleeson, *Judge*), which granted Defendant-Appellee's motion to dismiss the amended complaint for lack of subject matter jurisdiction. We assume the parties' familiarity with the facts of this case, its procedural posture, and the decision below.

When reviewing a district court's dismissal for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), this Court reviews factual findings for clear error and legal conclusions *de novo. Close v. New York,* 125 F.3d 31, 35-36 (2d Cir.1997) (citations omitted). Under the Federal Tort Claims Act ("FTCA"), "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues ...," 28 U.S.C. § 2401(b), and we have explained that, "[u]nless a plaintiff complies with that requirement, a district court lacks subject matter jurisdiction over a plaintiff's FTCA claim," *Johnson v. Smithsonian Inst.,* 189 F.3d 180, 189 (2d Cir.1999). For substantially the same reasons provided by the District Court, we hold that Czernicki has failed to demonstrate that he filed an administrative claim within the two-year statute of limitations under the FTCA.

[1][2] Moreover, we agree with the District Court's finding that the doctrine of equitable tolling should not apply in this case. We have applied the doctrine of equitable tolling in "rare and exceptional circumstances," where we found that "extraordinary circumstances" prevented a party from timely performing a required act and that party "acted with reasonable diligence throughout the period he [sought] to toll." *Doe v. Menefee,* 391 F.3d 147, 159-60 (2d Cir.2004). In *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Supreme Court explained that the doctrine of equitable tolling can apply to cases filed against the United States, and that it is within the discretion of the district court to equitably toll the statute of limitations "where the claimant has actively pursued his judicial remedies by filing a defective **411 pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." In *Kronisch v. United States,* 150 F.3d 112, 123 (2d Cir.1998), we explained that the FTCA's limitations period "will be

equitably tolled so long as defendants' concealment of their wrongdoing prevented plaintiff from becoming aware of, or discovering through the exercise of reasonable diligence, his cause of action." The record clearly indicates that Czernicki failed to file a timely administrative claim, and he presented no evidence to the District Court demonstrating that extraordinary circumstances warrant the tolling of the statutory period. FN1

FN1. For the first time, Czernicki submits in his appeal the declaration of fellow inmate Ron Reale, which suggests that Czernicki was dissuaded by prison officials from filing an FTCA claim. The Government subsequently moved to strike the declaration as new evidence that was not first presented to the District Court. We grant the Government's motion and decline to consider this evidence for the first time on appeal. *See Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.,* 54 F.3d 69, 72-73 (2d Cir.1995) (declining to consider appellant's argument not raised in district court absent a showing of manifest injustice or extraordinary need).

**2 We have considered all of Czernicki's claims on this appeal and find that each of them is unavailing. Accordingly, the Government's motion to strike Mr. Reale's declaration is GRANTED and the District Court's order dismissing the amended complaint for lack of subject matter jurisdiction is AFFIRMED.

C.A.2 (N.Y.),2005.

Czernicki v. U.S. Dept. of Justice
137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.))
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id*. at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id*. at 26.

FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id*.

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id*. at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id*.

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id*. Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id*. Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id*. Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id*. Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id*.

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> **FN2.** A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**\*7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." FN3 *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

> FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A) (3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> **FN4.** The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at \*4, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill, 380 F.3d at 686* (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

### C. Eighth Amendment Conditions of Confinement

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson*

*v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

### D. Due Process

#### 1. *Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty

interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies *"could*

cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

> FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

> FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

> FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

> FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

> FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be **GRANTED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary**Civil Rights 78** ☞ 1358

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310** ☞ 203

310 Prisons

    310II Prisoners and Inmates

        310II(D) Health and Medical Care

            310k203 k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H** ☞ 1546

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

            350Hk1546 k. Medical care and treatment. Most Cited Cases

   A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

*1 Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

## II. BACKGROUND[FN2]

FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008

WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"* ). Some of the facts recounted here are drawn from the prior opinion.

### A. Facts

#### 1. Parties

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

FN4. *See id.* ¶ 2.

FN5. *See id.* ¶ 3.

FN6. *See id.*

#### 2. Bellamy's Surgery

In August 2004, while in DOCS custody at Sing Sing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. See Bellamy I, 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. See Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. See 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See Bellamy I, 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. See id. While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. See 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. See, e.g., Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. See 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. See Moorjani Aff. ¶¶ 4-5.

FN12. See Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). See also Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

> FN13. *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

> FN14. *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

> FN15. *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

> FN16. *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate. [FN20] The concerns are then investigated and addressed by

the regional staff.[FN21]

> FN17. *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

> FN18. *See id.*

> FN19. *See id.* ¶ 13.

> FN20. *See id.* ¶ 14.

> FN21. *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

> FN22. *See id.* ¶ 15.

> FN23. *See id.*

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff."[FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy

specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution."[FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN35] An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [FN36] A fact is material when it " 'might affect the outcome of the suit under the governing law.' " [FN37] "It is the movant's burden to show that no genuine factual dispute exists." [FN38]

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248.)

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. [FN39] "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

**\*3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. [FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. See *Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment . [FN49] Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or her] attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

> FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

> FN48. *Burgos,* 14 F.3d at 790.

> FN49. *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

> FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to

court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules-in order to suffice. [FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

> FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); Booth v. Churner, 532 U.S. 732, 739 (2001).

> FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

> FN53. *Id.*

> FN54. *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. FN56

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." FN57 "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " FN58

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." FN59 "A state's Eleventh Amendment protection from suit extends to its agencies and departments." FN60 "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." FN61 To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." FN62 State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. FN63

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [FN64] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. [FN65] "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." [FN66] Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." [FN67]

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " [FN68] Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." [FN69] In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [FN70] However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." [FN71] The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." [FN72] Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." [FN73] For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." [FN74]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. See *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). See also *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment."[FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' "[FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Accord *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. See *Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). Accord *Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.*, No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009)* (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

*6 This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

### B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

> FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

> FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved in the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

## D. Preliminary and Permanent Injunction

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

**\*7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis.[FN91]

> FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

> FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ.

9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**H**

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan
Vallely, in his individual capacity, Thomas
D'Amicantonio, in his individual capacity, James Giglio,
in his individual capacity, Michael Moffett, in his
individual capacity, Paul Nadel, in his individual
capacity, Jennifer Treacy, in her individual capacity,
Kenneth Post, in his individual capacity, and Timothy
Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement
investigator brought action against another investigator
and other narcotics enforcement officials, alleging
malicious prosecution, false arrest, unlawful detention, and
other constitutional violations against arrestee, and First
Amendment retaliation against investigator. Defendant
investigator counterclaimed, alleging defamation by
plaintiff investigator. Defendants moved to dismiss for
failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of
supervisory liability against officials;

(2) law enforcement officers lacked even arguable
probable cause to make arrest;

(3) investigator's statements were not protected by First
Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 &#9756;    1358**

78 Civil Rights

   78III Federal Remedies in General

       78k1353 Liability of Public Officials

           78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

   Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78    1395(6)**

78 Civil Rights

   78III Federal Remedies in General

     78k1392 Pleading

     78k1395 Particular Causes of Action

       78k1395(4) Criminal Law Enforcement; Police and Prosecutors

        78k1395(6) k. Arrest, search, and detention. Most Cited Cases

Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35    63.4(2)**

35 Arrest

35II On Criminal Charges

   35k63 Officers and Assistants, Arrest Without Warrant

     35k63.4 Probable or Reasonable Cause

       35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78    1376(6)**

78 Civil Rights

   78III Federal Remedies in General

     78k1372 Privilege or Immunity; Good Faith and Probable Cause

      78k1376 Government Agencies and Officers

       78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78    1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

           78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[6] Arrest 35 ⬤⟞ 63.4(8)

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

           35k63.4 Probable or Reasonable Cause

                35k63.4(7) Information from Others

                    35k63.4(8) k. Reliability of informer. Most Cited Cases

Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

[7] Constitutional Law 92 ⬤⟞ 1941

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

           92k1941 k. Discipline or reprimand. Most Cited Cases

A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

[8] Constitutional Law 92 ⬤⟞ 1955

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

           92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**Municipal Corporations 268 ⚷ 185(1)**

268 Municipal Corporations

    268V Officers, Agents, and Employees

        268V(B) Municipal Departments and Officers Thereof

           268k179 Police

               268k185 Suspension and Removal of Policemen

                   268k185(1) k. Grounds for removal or suspension. Most Cited Cases

Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237 ⚷ 28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

           237k28 k. By others in general. Most Cited Cases

It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237 ⚷ 28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

           237k28 k. By others in general. Most Cited Cases

Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

*342 James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 **\*343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

> FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

> FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When **\*344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point

threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly*, 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

> FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC **345** ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

> FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake*, 376 F.Supp.2d 528,

534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of **\*346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

subjected to harsh confinement conditions substantially on these discriminatory bases. *129 S.Ct. at 1951.* The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General or FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id. at 1948; see also id. at 1949* ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the **347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id. at 1948.* Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id. at 1949.*

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Wren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/ *348 pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is *349 committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.*' " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases,

*United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus **350 driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf. J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose

reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous **\*351** reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. **\*352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned

as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation *353 mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

[U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment, and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals **354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen."[FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id.* at 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see Sousa, 578 F.3d at 170,* and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001).*

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be **\*355** cured by repleading. *Cf. Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252-53 (2d Cir.1991).* The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law. § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12,

2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 59 (2d Cir.2002). Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g., Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963). The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Even accepting as true Crisafi's non-conclusory factual allegations, including **356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here,

the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close **357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional Facility Delores Thornton; Deputy Superintendent for Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against corrections officials regarding injuries suffered by the inmate at the hands of a corrections officer alleged to have sexually assaulted the inmate. Superintendent and deputy superintendent for security moved to dismiss claims that they were deliberately indifferent to the inmate's personal safety.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

(1) inmate stated a claim against the movants for Eighth and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

[1] Civil Rights 78 ⊙— 1358

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

Constitutional Law 92 ⊙— 4825

92 Constitutional Law

    92XXVII Due Process

        92XXVII(H) Criminal Law

            92XXVII(H)11 Imprisonment and Incidents Thereof

                92k4825 k. Use of Force; Protection from Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**Prisons 310** ☜ **234**

310 Prisons

    310II Prisoners and Inmates

        310II(E) Place or Mode of Confinement

            310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H** ☜ **1537**

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

            350Hk1537 k. Protection from Violence. Most Cited Cases

Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78** ☜ **1335**

78 Civil Rights

    78III Federal Remedies in General

        78k1334 Persons Liable in General

            78k1335 k. In General. Most Cited Cases

Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Civil Rights 78** ☜ **1355**

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

**[4] Sentencing and Punishment 350H** ☜ **1532**

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

       350HVII(H) Conditions of Confinement

        350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

       350HVII(H) Conditions of Confinement

        350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 ☞ 1376(7)**

78 Civil Rights

    78III Federal Remedies in General

       78k1372 Privilege or Immunity; Good Faith and Probable Cause

        78k1376 Government Agencies and Officers

         78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞ 1376(2)**

78 Civil Rights

    78III Federal Remedies in General

       78k1372 Privilege or Immunity; Good Faith and Probable Cause

        78k1376 Government Agencies and Officers

         78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

*OPINION & ORDER*

SIDNEY H. STEIN, District Judge.

**\*1** Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

## I. BACKGROUND

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27.) Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

**\*2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping her and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

## II. DISCUSSION

A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 129 S.Ct. at 1949* (quoting *Twombly, 550 U.S. at 556, 127 S.Ct. 1955).*

B. *Supervisory Liability Post-Iqbal*

*3 [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).* Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

(1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were

occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at *5, 2009 U.S. Dist. LEXIS 7709, at *17-18 (S.D.N.Y. Jan. 30, 2009).* Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at *4-6, 2010 U.S. Dist. LEXIS 59563, at *14-18 (S.D.N.Y. June 15, 2010),* in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at *1-2, 2009 U.S. Dist. LEXIS 54141, at *6 (S.D.N.Y. June 26, 2009);* see also *Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009)* ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.");* *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at *15, 2009 U.S. Dist. LEXIS 96952, at *42-43 (S.D.N.Y. Oct. 8, 2009)* ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

*4 [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.*; *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

**C. *Colon Categories***

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**\*5** Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

**III. CONCLUSION**

*6 Because plaintiff has alleged enough facts to raise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

> FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Raymond GONZALES, Plaintiff,
v.
Dr. Lester WRIGHT, et al.,, Defendants.
No. 9:06-CV-1424 (JMH).

Feb. 23, 2010.
West KeySummary**Civil Rights 78** 🔑 **1358**

78 Civil Rights

78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
Prison officials' motion for summary judgment was
properly granted in prisoner's § 1983 action where
prisoner failed to demonstrate they were involved in any
alleged constitutional violation. Prisoner failed to
demonstrate prison superintendent and deputy were
personally involved in any alleged constitutional violation
for denial of medical care and his claims against them
were properly dismissed. Additionally, prisoner failed to
allege any conduct by medical director or facility health
director regarding his treatment, but merely named them
in their official capacity and for "responsibility of medical
care of inmates," but the fact that they held positions of
medical director and facility health administrator was
insufficient to provide requisite personal involvement to
state a constitutional claim. 42 U.S.C.A. § 1983.

Raymond Gonzales, Romulus, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany,
NY, for Defendants.

**DECISION and ORDER**

HOOD, District Judge.

**\*1** Raymond Gonzales complains in this action
brought pursuant to 42 U.S.C. § 1983 that, while he was
incarcerated at the Upstate Correctional Facility
("Upstate"), Defendants, various New York penal officers
and employees, denied him the protections of the Fourth,
Eighth and Fourteenth Amendments to the United States
Constitution.FN1 The matter is before the Court on
Defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56. (Dkt. No. 81). Plaintiff having responded
to the motion *sub judice* (Dkt. No. 88), it is ripe for
review.

FN1. The Eleventh Amendment recognizes the
fundamental principle of sovereign immunity.
Thus, the Eleventh Amendment bars any suit in
federal court against a state by citizens of another
state. Further, the Supreme Court has held that
the amendment also bars a citizen from bringing
a suit against his or her own state in federal
court. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct.
504, 33 L.Ed. 842 (1890). Sovereign immunity
under the Eleventh Amendment protects state
agencies and department sas well as the state
itself. As the Supreme Court has noted: "It is
clear, of course, that in the absence of consent a
suit in which the State or one of its agencies or
departments is named as the Defendant is
proscribed by the Eleventh Amendment.... This
jurisdictional bar applies regardless of the relief
sought." *Pennhurst State School & Hospital v.
Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79
L.Ed.2d 67 (1984). Moreover, "[o]bviously, state
officials literally are persons. But a suit against a
state official in his official capacity is not a suit
against the official but rather is a suit against the
official's office. As such, it is no different from a
suit against the State itself." *Will v. Michigan
Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct.
2304, 105 L.Ed.2d 45 (1989).

As Plaintiff is suing Defendants only in their
official capacities, the action would be subject
to dismissal on this ground alone. However,
Plaintiff's failure to seek relief against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

Defendants in their individual capacities could be remedied through amendment.

**Plaintiff's Allegations**

Plaintiff claims that beginning shortly after his arrival on July 3, 2006, in Building 10 SHU at Upstate Correctional Facility, some unidentified "infections harmful chemical substance" came out of the ventilation system. Although Defendants John Finazzo and Gerald Caron looked for the substance, they claimed not to see anything and mocked him. (Dkt. No. 1, ¶¶ 38, 39). In response to his ongoing complaints, Plaintiff claims that Defendants James Spinner, Sheen Pombrio, Brian Grant, Michael Riley, Scott Dumas, Jonathan Price, Jeffrey Hyde, William Brown, and Lynn Furnace looked for the substance, but claimed that they did not see nor find anything. (Dkt. No. 1, ¶¶ 41, 42).

Plaintiff also claims that all the above-named Defendants, along with Defendants Steven Salls, Jeffrey Bezio, Ricky Colton, N. Guerin, Dean Sauther, Brian Bogardus, Michael Welch, Michael Albert, and non-movant D. Ravelle [FN2], made comments and placed "infections harmful chemical substance" in the ventilation system in retaliation for filing lawsuits at other facilities and that Defendants Robert Woods and Norman Bezio directed this conspiracy. (Dkt. No. 1, ¶¶ 45-50). Defendant Bogardus is alleged to have gestured and looked with satisfaction and gladness towards the ventilation system while delivering mail. (Dkt. No. 1, ¶ 55). Plaintiff also states that the above-named Defendants tried to poison his food with an unknown "infectious chemical substance." (Dkt. No. 1, ¶¶ 108-110) [FN3].

> **FN2.** Although named as a Defendant, D. Ravelle has never been served with process or appeared in this action. By separate order, Plaintiff will be required to show cause why this action should not be dismissed as to this Defendant pursuant to Fed.R.Civ.P. 4(m).

> **FN3.** Additionally, though not in his complaint, Plaintiff also alleges that as a part of this conspiracy laser beams were shot at him through the lights in his cell. (Dkt. No. 81-3, Ex. A, 14.)

Plaintiff further alleges that the above Defendants denied him access to the courts by denying him a pen needed to complete his 45 page, 177 paragraph complaint as well as legal work related to his other pending lawsuits. (Dkt. No. 1, ¶¶ 162-67). Plaintiff claims that he requested a pen from the correctional officers as supplies were given out and was repeatedly denied one. (Dkt. No. 1, ¶¶ 127, 129, 132, 162-67, 170-71).

Additionally, Plaintiff alleges that after his food was supposedly tainted he refused to return his food tray (Dkt. No. 1, ¶¶ 130, 168-69) which prompted a search of Plaintiffs' cell. (Dkt. No. 1, ¶¶ 126, 134-41). Plaintiff further alleges that during the cell search, the officers damaged his legal documents in retaliation for his other lawsuits against DOCS employees at other correctional facilities. (Dkt. No. 1, ¶¶ 142-43). Plaintiff further alleges that the cell search was unlawful because he said he returned all the pieces of the broken food tray. Therefore, the officers had no right to conduct the search, and did it for the sole purpose of retaliation. (Dkt. No. 1, ¶¶ 142-43).

**\*2** Plaintiff alleges that due to the "infectious harmful chemicals," his face, chest, and other body parts became infected. (Dkt. No. 1, ¶ 43). Due to Plaintiff's alleged "infections, he made several sick call requests, requesting medical attention for his "infections." (Dkt. No. 1, ¶¶ 44, 74, 85). Plaintiff also wrote letters to Facility Health Service Director Wiessman requesting medical care. (Dkt. No. 1, ¶ 74). Plaintiff also wrote Lester Wright, the Associate Commissioner of Health Services/Chief Medical Officer of New York State Department of Correctional Services at Albany, asking Wright to order Defendant Louise Tichenor to provide Plaintiff with medical care. (Dkt. No. 1, ¶ 78). Plaintiff claims that, although seen by Defendant Tichenor on July 14, 2006, he did not receive proper medical care. (Dkt. No. 1, ¶ 77). Thus, Plaintiff alleges that Defendant Evelyn Wiessman, failed to properly supervise Plaintiff's medical providers. (Dkt. No. 1, ¶ 7A).

Plaintiff also alleges that Defendant Tichenor failed to adequately examine him during his medical call out on July 14, 2006, asking with intrigue what had happened to Plaintiff's skin, but failing to properly examine Plaintiff's chest, back, shoulders, testicles and penis. (Dkt. No. 1, ¶¶ 64, 66). Plaintiff also states that Defendant Tichenor

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

prescribed him Loratadine, which Plaintiff refused to take because Plaintiff knew that he was given the medicine only to conceal and hide the evidence of the damage caused to him by the "infectious substances." (Dkt. No. 1, ¶¶ 68-69, 72). Plaintiff then states that he was given a prescription cream for his skin problem, but not enough of it. (Dkt. No. 1, ¶¶ 73, 75).

Plaintiff also alleges that Defendant Tichenor wrongfully discontinued and denied Plaintiff the nutritional supplement, Ensure, although Plaintiff acknowledges that he failed to comply with facility procedure by refusing to drink the Ensure in front of the Nurses. (Dkt. No. 1, ¶¶ 145-60).

Finally, Plaintiff alleges that nurses J. Chesbrough, R. Holmes, and Walsh failed to provide Plaintiff with non-prescription medication even though Plaintiff completed all required sick call procedures. (Dkt. No. 1, ¶¶ 85, 89-106). Plaintiff contends that all these Defendants were deliberately indifferent to his medical needs.

### Defendants' Statement of Material Facts

Defendants have provided a different view of what happened while Plaintiff was confined at Upstate, as detailed in their statement of material facts. Although quite lengthy, they are recounted in detail below to provide a better understanding of Defendants' position in the matter:

1. Plaintiff Raymond Gonzalez was seen on a nearly daily basis from his arrival at Upstate on or about July 3, 2006. Weissman Declaration, Exhibit 1.

2. On July 5, 2006, Plaintiff demanded that he be given skin cream and became very agitated when he was told that he had to wait until he was examined by the PA in order to receive the cream. Weissman Declaration, Exhibit 2.

*3 3. Plaintiff also received an orientation on sick call procedure on July 5, 2006. Weissman Declaration, Exhibit 3.

4. On July 6, 2006, Plaintiff refused to drink his Ensure in the presence of the nurse and became very vulgar and abusive. As a result, Plaintiff received a misbehavior report. Weissman Declaration, Exhibit 4.

5. On July 6, 2006, it was once again explained to Plaintiff that medical procedure required that Plaintiff consume the Ensure in view of the nurse to insure that it was properly consumed. Id.

6. Plaintiff was also informed that Ensure and skin cream would be withheld pending an examination by the PA. Id.

7. Plaintiff was again seen on July 8, 2006 and July 10, 2006 and requested skin cream and indigestion aids. Plaintiff did not exhibit any symptoms and continued to be very demanding. Weissman Declaration, Exhibit 5.

8. On July 12, 2006, Plaintiff demanded Ensure, ibuprofen and hemorrhoid cream and refused hepatitis B vaccination. Weissman Declaration, Exhibit 6.

9. On July 14, 2006, Plaintiff was examined by the PA. Weissman Declaration, Exhibit 8.

10. On July 15, 2006, Plaintiff demanded the medication ordered by the PA. Weissman Declaration, Exhibit 7.

11. On July 17, 2006, Plaintiff refused to be weighed and refused medication for allergies. Id.

12. On July 19, 20, and 21, 2006 Plaintiff refused treatment, demanded to see Dr. Weissman and was vulgar and loud indicating he did not want further treatment from the PA. Weissman Declaration, Exhibit 9.

13. On July 24, 2006, Plaintiff refused to be examined and became verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 10.

14. On July 25, 2006, the refusals and tirades were repeated and Plaintiff refused treatment. Id.

15. On July 26, 2006, Plaintiff once again refused to cooperate in his examination and treatment could not be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

provided. Once again, Plaintiff began to be verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 11.

16. On July 27, 2006, Plaintiff rejected his medication by throwing it on the floor and indicating that he did not want to be examined or treated by the PA. *Id.*

17. On July 28, 2007, Plaintiff refused treatment yet again. Additionally, Plaintiff continued to express that he did not want what was being prescribed. Weissman Declaration, Exhibit 12.

18. On July 29, 2006, Plaintiff once again refused to be examined and insisted that he be given medication without examination. Plaintiff also persisted in his abusive and vulgar language until he was given a misbehavior report. Weissman Declaration, Exhibit 13.

19. On July 30, 2006, Plaintiff continued to refuse examination, making treatment impossible. Plaintiff also refused to consume Ensure as directed and treated the nurse to more vulgarity. *Id.*

20. On July 31, 2006, Plaintiff was again seen and reminded that he was required to consume the Ensure in the presence of the nurse or it would be discontinued. Examination revealed that Plaintiff's face was clear and had no redness, however, Plaintiff continued to insist that his face was real bad, dry and itching. Weissman Declaration, Exhibit 14.

**\*4** 21. On August 1, 2006, Plaintiff once again refused to consume Ensure in the presence of the nurse and was warned again that non-compliance would cause the Ensure to be stopped. Plaintiff continued to refuse to comply and the Ensure was ordered stopped. Weissman Declaration, Exhibits 15-16.

22. On August 2, 2006, Plaintiff again refused to be examined and became vulgar and abusive. An attempt to talk with Plaintiff about taking Ensure was met with more abuse and vulgarity. Plaintiff was finally given a misbehavior report when he began to threaten staff. Weissman Declaration, Exhibit 17.

23. On August 4, 2006, Plaintiff again refused to be examined and refused treatment. Once more the nurse was treated to a vulgar and threat filled tirade. *Id.*

24. On August 5, 2006, Plaintiff was non-compliant with sick call procedure. *Id.*

25. On August 6, 2006, Plaintiff again refused to be examined and refused treatment. Once more the nurse was treated to a vulgar and threat filled tirade. Weissman Declaration, Exhibit 18.

26. On August 7, 2006, Plaintiff's medicine was renewed and once again he was uncooperative and vulgar and received another misbehavior report. Weissman Declaration, Exhibit 19.

27. On August 9, 2006, the PA examined Plaintiff and Plaintiff was once more instructed that he must talk to and cooperate with the nurse in order to be treated. *Id.*

28. On August 8, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. Weissman Declaration, Exhibit 20.

29. On August 10, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. When told that he must cooperate, Plaintiff once more became enraged and vulgar and refused treatment. *Id.*

30. On August 12, 2006, Plaintiff failed to comply with sick call procedures. Weissman Declaration, Exhibit 21.

31. On August 13, 2006, Plaintiff failed to comply with sick call procedures and instead exposed himself and stood silently as the nurse tried to examine and find out symptoms. *Id.*

32. On August 14 and 16, 2006, once more Plaintiff refused to speak and held up a piece of paper when asked what he needed. The session was ended with a vulgar threat. Weissman Declaration, Exhibits 21 and 22.

33. On August 17, 2006, Plaintiff was treated for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

indigestion and allergies. Weissman Declaration, Exhibit 22.

34. On August 18 and 19, 2006, Plaintiff refused to speak to the nurse doing sick call[,] thus, refusing to be evaluated and instead held up a piece of paper. Weissman Declaration, Exhibits 22 and 23.

35. On August 21, 2006, Plaintiff allowed an evaluation and was found to be without nasal congestion and a minor rash for which he was given medication. It was noted that his face was clear of any rash. Weissman Declaration, Exhibit 24.

36. On August 22, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. *Id.*

*5 37. On August 23, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. Medications were reordered in spite of Plaintiff's lack of cooperation. Weissman Declaration, Exhibit 25.

38. On August 24, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. *Id.*

39. On August 25 and 27, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibits 26 and 27.

40. On August 28, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. Weissman Declaration, Exhibit 27.

41. On August 31, 2006 and September 1, 2006, Plaintiff was once again non-compliant, vulgar and abusive rendering any attempt to examine and treat him as impossible. Weissman Declaration, Exhibits 27-28.

42. On September 4, 2006, Plaintiff complained that he had a rash on his face, chest and back. Plaintiff was examined and no rash was seen. *Id.*

43. On September 5, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and no tenderness or redness was noted in his throat. Weissman Declaration, Exhibit 29.

44. On September 8, 2006, Plaintiff complained of gas and a rash on his testicles. Plaintiff was examined and irritation was noted and Plaintiff advised to keep clean and dry. *Id.*

45. On September 12, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and given fluids and dispensed medications. Weissman Declaration, Exhibit 30.

46. On September 13, 2006, Plaintiff requested sinus medication and antacid. Plaintiff was examined and given antacid and sinus medication. Weissman Declaration, Exhibit 31.

47. On September 15, 2006, Plaintiff complained of a sore on his penis. Plaintiff was examined and irritation was noted but there was no evidence of a fungal infection or broken skin. Plaintiff was given bacitracin ointment to apply. *Id.*

48. On September 17, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

49. On September 18, 2006, Plaintiff requested ibuprofen and hemorrhoid treatment. Plaintiff was examined and give ibuprofen and hemorrhoid medication. Weissman Declaration, Exhibit 32.

50. On September 20, 2006, Plaintiff requested ibuprofen and antacid. Plaintiff was examined and treated with ibuprofen, antacid and warm compresses to his back. Weissman Declaration, Exhibit 33.

51. On September 20, 2006, Plaintiff refused to go to the infirmary for examination of possible tuberculosis infection. Plaintiff became abusive and vulgar and received a misbehavior report. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

52. On September 21, 2006, Plaintiff again refused to be tested or evaluated. Weissman Declaration, Exhibit 34.

53. On September 28 and 30, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 35.

**\*6** 54. On October 3, 2006, Plaintiff complained of a headache, upset stomach and infected skin. Plaintiff was examined and given ibuprofen and antacid. Weissman Declaration, Exhibit 36.

55. On October 4, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given ibuprofen and antacid. *Id.*

56. On October 6, 2006, Plaintiff's medications were renewed. *Id.*

57. On October 9, 2006, Plaintiff complained of a headache, cold sore and gas. Plaintiff was examined and given ibuprofen, cold sore medication and antacid. Weissman Declaration, Exhibit 37.

58. On October 10, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given Tylenol and antacid. *Id.*

59. On October 11, 2006, Plaintiff complained of a headache, rash and gas. Plaintiff was examined and it was noted that his penis was irritated. Plaintiff was given ibuprofen, bacitracin ointment and antacid. *Id.*

60. On October 23, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted. The skin appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. Weissman Declaration, Exhibit 38.

61. On October 24, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted, although a small patch of dryness was noted on Plaintiff's thigh. The skin

appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. *Id.*

62. On October 25, 2006, Plaintiff complained of an infected penis. Plaintiff was examined and there was no evidence of sores or breaks in the skin. Weissman Declaration, Exhibit 39.

63. October 26, 2006, Plaintiff refused to cooperate with lab tests and with a consultation. Plaintiff also complained of an infected groin, face chest and head. Plaintiff was examined and no infection was seen. Weissman Declaration, Exhibit 40.

64. On October 30, 2006, Plaintiff once again refused laboratory tests. *Id.*

65. On November 3, 2006, Plaintiff complained of gas and a lip injury. Plaintiff was examined and give[n] antacid and antibiotic cream for his lip. *Id.*

66. On November 4, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 41.

67. On November 5, 2006, Plaintiff complained of gas and a split lip. Plaintiff was examined and given antacid and bacitracin for his lip. *Id.*

68. On November 6, 2006, Plaintiff complained of gas and infected skin. Plaintiff's wrist, face, head, chest and back were examined but no infection could be found. Plaintiff was given antacid for his gas. Plaintiff continued to request Ensure but it was not ordered. Weissman Declaration, Exhibit 42.

69. On November 8, 2006, Plaintiff complained of gas and a split lip. After examination Plaintiff was given triple antibiotic cream for his lip and antacid. *Id.*

**\*7** 70. On November 9, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

71. On November 10, 2006, Plaintiff received his quarterly review and examination. Three issues were

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

discussed. Plaintiff's lip was treated with bacitracin and antacids were given for his gas problem. It was determined that Ensure would not be restarted due to non-compliance with medical protocol. Weissman Declaration, Exhibit 43.

72. On November 11, 2006, Plaintiff reported stomach problems and requested lip cream. Following an examination it was determined that Plaintiff did not require additional lip cream and was give[n] Tylenol and antacid. Id.

73. On November 14, 2006, Plaintiff again requested antacid and lip cream. Following an examination, it was determined that Plaintiff did not require any treatment other than antacid. Weissman Declaration, Exhibit 44.

74. On November 15, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Id.

75. On November 17, 2006, Plaintiff reported stomach upset and general body aches. Following examination, Plaintiff was given antacid and analgesics for body pain. Id.

76. On November 18, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 45.

77. On November 19 and 21, 2006, Plaintiff requested antacids and ibuprofen. Plaintiff was examined and given antacid and Tylenol. Weissman Declaration, Exhibits 45 and 46.

78. On November 22, 2006, Plaintiff requested antacids and Tylenol. Plaintiff was examined and given antacids and Tylenol. Weissman Declaration, Exhibit 46.

79. On November 24, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 47.

80. On November 27, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Id.

81. On November 30, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 48.

82. Defendants Tichenor, Wash, Holmes and Chesbrough saw the Plaintiff for his sick call and also prescribed him medication which the Plaintiff refused. Complaint ¶ 72.

83. Plaintiff admits that every time he submitted a sick call, at the very least, the nurses would examine him. Dep. Pg. 30, ¶¶ 8-10.

84. Any lack of examination or treatment was due to Plaintiff's actions, either not responding to the nurse or creating a situation where evaluation and treatment was not possible. Weissman Declaration.

*8 85. While Plaintiff claimed various needs, including a rash, examination failed to confirm any medical condition existed, thus rendering treatment unnecessary. Weissman Declaration.

86. Any deprivation that Plaintiff suffered was due to his own conduct. Weissman Declaration.

87. Plaintiff was not given Ensure due to his unwillingness to consume the Ensure as directed by staff. Weissman Declaration.

88. No reasonable health care professional, on the above record, would believe that any conduct by the staff involved, violated any right enjoyed by Plaintiff. Weissman Declaration.

89. On the contrary, all personnel involved exhibited

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

extraordinary restraint and professionalism in the face of vile, uncooperative and potentially dangerous conduct by Plaintiff. Weissman Declaration.

90. Plaintiff never saw Superintendent Woods throw the chemicals on him, rather he imagined Woods did. Deposition at pg. 22, ¶¶ 14-17.

91. Plaintiff admits he did not see Deputy Superintendent Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 18-20.

92. Plaintiff admits that he did not see Sergeant J. Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 21-23.

93. Plaintiff admits that he did not see Sergeant Pombrio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 24-25; pg.23, ¶ 2.

94. Plaintiff admits that he did not see Sergeant Salls ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 3-5.

95. Plaintiff admits that he did not see Sergeant Spinner ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 6-8.

96. Plaintiff never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the defendants use. Deposition at pg. 23,¶¶ 9-17.

97. [Plaintiff] does not know who was throwing the beige substance at him but imagines it was Defendants, because they worked at Upstate. Deposition at pg. 24, ¶¶ 12-15.

98. Plaintiff has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. Deposition at pg. 24, ¶¶ 16-19.

99. Plaintiff never saw anyone throw chemical agents at him, and that he doesn't know who (if anyone) was throwing them, but that he assumes it is Defendants

because they work at the facility. Deposition at pg. 24, ¶¶ 20-25.

100. Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman as Facility Health Director and Defendant Wright as Medical Director and for "responsibility of medical care of inmates". Complaint ¶¶ 4, 7A, 62; ¶¶ 78, 79; ¶¶ 82, 83.

101. Plaintiff never saw any defendant place anything in his food. Dep. Pg 34, ¶¶ 18-20; Dep. Pg. 35, ¶¶ 7-8.

102. Cell searches of Plaintiff's cell were made necessary by Plaintiff's behavior. Specifically, Plaintiff refused to return his tray after meals on several occasions and broke them into pieces. Dumas Declaration.

*9 103. The broken pieces then had to be recovered and the tray reassembled to insure that all pieces were accounted for and out of the cell. Dumas Declaration.

104. The broken pieces present a safety and security issue. Dumas Declaration.

105. At no time did the staff involved enter the cell with the purpose of destroying Plaintiff's possessions but Plaintiff's own behavior required that the searches be made. Dumas Declaration.

106. Searches of his cell, delay in getting a pen and alleged destruction of his papers delayed Plaintiff's legal work, but it had no lasting impact, because any deadlines he missed, he got extended and Plaintiff was able to submit his legal papers to the court. Dep. Pg. 46, ¶¶ 3-15.

(Dkt. No. 88-1, ¶¶ 1-106).

Although Plaintiff has contested some of the facts asserted by Defendants in the motion now before the Court (Dkt. No. 88-2), his conclusory assertions do not preclude summary judgment.[FN4] The standard for granting summary judgment is well-known.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

**FN4.** Had this matter been before the Court on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the teachings of *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), would guide this Court. There, the Supreme Court wrote:

We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an u n a d o r n e d , t h e - d e f e n d a n t - u n l a w f u l l y - h a r m e d - m e accusation. *Id.,* at 555, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely

consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (brackets omitted).

*Id.* at 1949.

The undersigned strongly believes that Plaintiff's complaint would not survive under this standard either.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, this Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. Furthermore, the evidence and all facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**Personal Involvement**

To allege a constitutional violation under 42 U.S.C. § 1983, a pleading must state facts sufficient to support a finding that the defendant was personally involved in the alleged violation. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006). For this reason, liability of a state official cannot be established under the doctrine of *respondeat superior. Iqbal,* 129 S.Ct. at 1948.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001). Moreover, a plaintiff must allege personal acts of wrong on behalf of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

each Defendant he names in the complaint. *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999).

In the present complaint, Plaintiff solely brings suit against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS, alleging supervisory liability. Under 42 U.S.C. § 1983 liability cannot be imposed on a supervisory official on the theory of *respondeat superior. Id.* In order for a supervisory official to be involved in a constitutional violation, he or she must have (1) directly participated in the alleged constitutional violation; (2) learned of the violation through a report or appeal and failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (4) been grossly negligent in supervising subordinates who committed the wrongful act; or (5) exhibited deliberate indifference to inmates' rights by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**\*10** In the instant case, Plaintiff has merely alleged *respondeat superior* liability against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS. The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate. *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) ("One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given particular prisoners...."). Concomitantly, the Second Circuit has also explicitly held the denial of a grievance on medical matter is insufficient to demonstrate personal involvement on behalf of a prison Superintendent. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Similarly, the mere receipt of letters from an inmate by a facility Superintendent regarding a medical claim is insufficient to constitute personal liability. *Swindell v. Supple,* 2005 WL 267725, at *11 (S.D.N.Y.2005); *Burgess v. Morse,* 259 F.Supp.2d 240, 250 (W.D.N.Y.2003). Therefore, Plaintiff cannot

demonstrate that Superintendent Woods and Deputy Bezio were personally involved in any alleged constitutional violation for denial of medical care and his claims against them must be dismissed.

Plaintiff also names as Defendants Dr. Evelyn Weissman, Facility Health Director and Dr. Lester Wright, the Medical Director for the Department. Once again, Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman, Facility Health Director, and Defendant Wright, Medical Director, and for "responsibility of medical care of inmates." The mere fact that Defendant Dr. Wright held the position of Medical Director and Defendant Dr. Weissman the title of Facility Health Administrator is insufficient to provide the requisite personal involvement to state an Eighth Amendment claim. *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003); *Swindell,* 2005 WL 267725, at *9-10. Based on the above, the motion for summary judgment should be granted as to Defendants Dr. Evelyn Weissman, Dr. Lester Wright, Robert Woods, and Norman Bezio.

**Medical Indifference**

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court recognized that the government has an obligation to provide medical care for those it incarcerates, because they are unable to obtain such care on their own, and held that a prisoner may have a claim for failure to do so under the Eighth Amendment. To prevail on an Eighth Amendment claim involving prison medical care, an inmate must establish that the Defendant acted with deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 294-95, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *West v. Atkins,* 487 U.S. 42, 46, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). This indifference may be manifested by prison doctors in their response to a prisoner's needs, or by officers in intentionally denying or delaying access to medical care or treatment. *Estelle,* 429 U.S. at 104. The inmate must prove both the subjective and objective elements of a claim: (1) deliberate indifference, and (2) a serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). In the instant case, Plaintiff fails to satisfy either of these elements.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

**\*11** A review of the record pertaining to Plaintiff's complaints to prison medical personnel reveals that he complained frequently of a rash or infection on various parts of his body including his face, around his testicles, and on his penis. There is nothing which would indicate that the rash was "a condition of urgency, one that may produce death, degeneration, or extreme pain." _Hathaway v. Coughlin,_ 37 F.3d 63, 66 (2d Cir.1994). Throughout Plaintiff's complaint, he describes his rash, but never does he state that the rash caused him pain, much less extreme pain, that it was spreading anywhere else, besides the areas he already claimed, or that it was likely to produce death.

Even if the rash is a serious medical condition, the subjective element of the test is not met. To meet the subjective element, a prisoner must satisfy _Farmer v. Brennan's_ test for deliberate indifference-the Defendant must know of and disregard an excessive risk to inmate health. A Defendant need not expressly intend to inflict pain-but Plaintiff must establish at least that a Defendant acted with the criminal recklessness discussed in _Farmer v. Brennan. See Hathaway v.Coughlin,_ 99 F.3d 550, 553 (2d Cir.1996); _Morales v. Mackalm,_ 278 F.3d 126, 132 (2d. Cir.2002).

Turning to the deliberate indifference element, the record is replete with evidence that Defendant medical personnel examined Plaintiff (when they were allowed to) and prescribed appropriate topical and/or allergy medicines. Although Plaintiff may have desired some other type of medicine, that desire would have, at the very best, demonstrated negligence, not deliberate indifference.

The above analysis would apply with equal force to each medical condition reported. The medical personnel treated or attempted to treat every condition despite abusive conduct on Plaintiff's part. No Eighth Amendment violation on the part of the prison medical personnel is perceived.

## Powders and Lasers

Defendants J. Finazzo and G. Caron were called and requested by the Plaintiff to look into his room for substances coming from the ventilator and the roof of his cell. Both J. Finazzo and G. Caron are accused of reacting "in the shape of mockery" and said or showed to Plaintiff that they did not see the substance. Also at Plaintiff's request, Defendants J. Spinner, S. Pombrio, B. Grant, M. Riley, S. Dumas, J. Price, J. Hyde, W. Brown, and L Furnace, looked into the cell at the ventilator and the roof and "almost made the same gesture (as J. Finazzo and G. Caron)" and told the Plaintiff they did not see any substance. Plaintiff alleges that Defendant B. Bogardus, would, while collecting or delivering the mail, looked towards the ventilator and roof of Plaintiff's cell and made a "gesturing of satisfaction and gladness." Even if true, the above allegations by Plaintiff fail to state a claim with regard to looks and smirks. Looks and smirks are not actionable.

Plaintiff alleges that Defendants S. Salls, J. Hyde, J. Bezio, S. Pombrio, J. Spinner, R. Colton, N. Guerin, D. Sauther, G. Caron, M. Riley, B. Grant, S. Dumas, B. Bogardus, M. Welch, J. Price, M. Albert, D. Ravelle, L. Furnace, J. Finazzo and W. Brown allegedly threw infectious harmful chemicals upon the Plaintiff via ventilator and the roof of his cell with a machine-like system that was allegedly placed in the room above his cell. Plaintiff alleges that all these actions were taken in retaliation for Plaintiff's other lawsuits against other DOC's employees, yet Plaintiff concedes in his deposition that he has no proof or evidence that any named Upstate employees had any knowledge of his other lawsuits. (Dkt. No. 81-3, Ex. A at 25, ¶¶ 2-10). Tellingly, all Defendants deny knowledge of any lawsuits brought by Plaintiff at other facilities.

**\*12** Equally demonstrative of the frivolous nature of the complaint, during his deposition, Plaintiff stated that he never saw Superintendent Woods throw the chemicals on him; rather he imagined Woods did. (Dkt. No. 81-3, Ex. A. at 22, ¶¶ 14-17). Additionally, Plaintiff admits he did not see Defendants Deputy Superintendent Bezio, Sergeant J. Bezio, Sergeant Pombrio, Sergeant Salls, Sergeant Spinner, ever throw any infectious chemical on him. (Dkt. No. 81-3, Ex. A at 22 ¶¶ 1-20,21-23, 24-25; 23, 2, 3-5, 6-8). In fact, Plaintiff admits that he never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the Defendants use. (Dkt. No. 81-3, Ex. A at 23, ¶¶ 9-17). Plaintiff further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

admits that he does not know who was throwing the beige substance at him but imagines it was them, because they work there. (Dkt. No. 81-3, Ex. A.24, ¶¶ 12-15). Plaintiff also admitted under oath that he has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. (Dkt. No. 81-3, Ex. A.24,¶¶ 16-19). Plaintiff testified that he never saw anyone throw chemical agents at him, and that he doesn't know who was throwing them, but that he assumes it is Defendants because they work at the facility. (Dkt. No. 81-3, Ex. A.24, ¶¶ 20-25). Similarly, while Plaintiff alleges that Defendants, M. Riley and B. Grant, on August 14th, placed "a strange harmful substance" in his lunch, he stated in his deposition that he never saw either Defendant place anything in his food on the day in question or on any other day for that matter. (Dkt. No. 81-3, Ex. A. 34, ¶¶ 18-20; 35, ¶¶ 7-8).

As the Second Circuit and New York District Courts have steadily recognized, it is utterly unjust to haul people into federal court to defend against, and disprove, delusions. *See, e.g.* *Pillay v. INS,* 45 F.3d 14, 17 (2nd Cir.1995); *Lewis v. New York,* 547 F.2d 4, 6 (2nd Cir.1976); *Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y.1993) (*sua sponte* dismissing complaint alleging conspiracy to enslave and oppress), *aff'd* 41 F.3d 1500 (2nd Cir.1994). A victimization fantasy, with no existence beyond Plaintiff's insistence, cannot be allowed to pass review under Fed.R.Civ.P. 56(b). "Genuine issue of material fact" must mean substantially more. Plaintiff admitted under oath that he has no facts nor evidence which states the involvement of any Defendants in somehow infecting him with "infectious harmful chemicals," or laser beams. Plaintiff's complaints are mere surmise and consist of conclusory statements that contain no specific allegations of fact indicating a deprivation of rights. Accordingly, the motion for summary judgment should be granted on this issue.

**Retaliation**

Plaintiff has charged that Defendants' actions were in retaliation for him bring lawsuits against other prison employees elsewhere in the New York penal system. The use of "buzz words" such as retaliation do not cure a pleading defect such as the one herein. *See* *Barr v. Abrams,* 810 F.2d 358, 362 (2d Cir.1986) (the Second

Circuit has repeatedly held, "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning"); *see also, e.g., Boddiev. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("unsupported, speculative, and conclusory" allegations should be dismissed); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[c]laims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (where allegations of retaliation and conspiracy are "wholly conclusory," the complaint "can be dismissed on the pleadings alone"); *Justice v. Coughlin,* 941 F.Supp. 1312, 1316 (N.D.N.Y.1996) ("In recognition of the reality that retaliation claims can be fabricated easily, [inmates] bear a somewhat heightened burden of proof, and dismissal can be granted if the claim appears insubstantial"). Therefore, Plaintiff's claims based on some retaliatory animus shall be dismissed. *See* *Iqbal,* 129 S.Ct. at 1948-49.

**Cell Search**

**\*13** Plaintiff further alleges that Defendants B. Grant, M. Riley, and M. Welch, under orders from N. Guerin, during a cell search to look for any remaining pieces of a tray broken by the Plaintiff, "did mess up, crush, spoil, destroy" legal documents and scattered shampoo on them as well. On September 8, 2006, Plaintiff alleges he asked Defendants D. Ravelle, Riley, Grant, S. Dumas and Albert for a pen throughout the day. Plaintiff alleges that no one gave Plaintiff a pen in retaliation for Plaintiff's refusal to hand in his empty food tray and, as a consequence, he broke it into pieces. Following Plaintiff's admitted refusal to give back the food tray, Defendant G. Caron and M. Albert asked Plaintiff to exit cell for a cell search. Plaintiff refused. Following his initial refusal, Defendants J. Hyde, G. Caron, S. Dumas, and M. Albert, requested that Plaintiff leave his cell for a cell search, but Plaintiff again admittedly refused. Following the second refusal to exit the cell, M. Tirone and J. Irvin came and asked Plaintiff to exit his cell for a cell search. Plaintiff agreed to do so.

During the ensuing cell search, Plaintiff alleges that Defendants G. Caron, S. Dumas, M. Albert, and an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 681323 (N.D.N.Y.)

(Cite as: 2010 WL 681323 (N.D.N.Y.))

unknown officer, "did mess up, crush, spoil, destroy, and mix" Plaintiff's legal documents, with the consent of J. Hyde.

This aspect of the complaint has two aspects. The first, the legitimacy of the cell search, will not take long to address. Prison officials have every right to search a cell to retrieve broken pieces of a food tray, pieces which could easily be made into some form of a weapon. Plaintiff in this instance was simply removed from his cell while the search ensued.

"The Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)." No constitutional violation is perceived.

The second aspect of the cell search which must be addressed is Plaintiff's claim regarding the destruction of his legal papers. This claim will not delay the Court long either.

Although Plaintiff claims that the destruction of his papers delayed his legal work, he admits that it had no lasting impact as any deadlines he missed he was able to get extended and was able to submit his legal papers to the court. Hence, as he had no actual injury even if the events as he saw them occurred, he is not entitled to relief on this aspect either. *See Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

### Conclusion

Accordingly,
**IT IS ORDERED** Defendants' motion for summary judgment be, and the same here by is, **GRANTED.**

This the 22nd day of February, 2010.

N.D.N.Y.,2010.

Gonzales v. Wright

Slip Copy, 2010 WL 681323 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Amin B. BOOKER, Plaintiff,
v.
John DOE (Medical Provider # 261); John Doe
(Medical Provider # 123); Dr. Pang L. Kooi; Virginia
Androsko; Bill Robertson; Lester Wright, Defendants.
No. 9:06-CV-73 (GLS).

Sept. 30, 2008.

Amin B. Booker, pro se.

Adrienne J. Kerwin, for Defendants.

**MEMORANDUM DECISION AND ORDER**

GARY L. SHARPE, District Judge.

*1 In this civil rights complaint, plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), alleges that employees of DOCS were deliberately indifferent to his serious medical need for treatment for his left shoulder. Complaint (Compl.) (Dkt. No. 1). Plaintiff seeks substantial monetary relief.

Presently before the court [FN1] is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 39). Plaintiff opposes defendants' motion. (Dkt. No. 43). For the following reasons, this court will grant defendants' motion, and will dismiss the action *sua sponte* as to the two John Doe defendants and defendant Robertson.

> FN1. The parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded for purposes of this motion, and as such, any appeal taken rom this order will be to the Court of Appeals for the Second Circuit.

**DISCUSSION**

**1.** *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

**2.** *Facts*

Plaintiff is currently incarcerated at Green Haven Correctional Facility. Plaintiff testified at his deposition [FN2] that his shoulder problems began in 1994 while he was incarcerated at Greene Correctional Facility. Def. Ex. A (Deposition Transcript (T.) at 7-8) (Dkt.No.39). Plaintiff stated that he fell out of a window, and tried to break his fall with his arm. (T. at 8). Plaintiff testified that he did not begin seeking medical treatment for his shoulder until 1998.[FN3] (T. at 10-11).

> FN2. Plaintiff was deposed on October 12, 2007. Def. Ex. A.

> FN3. Although not relevant to this decision

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

because plaintiff has not named any medical personnel that examined him prior to 2002, the court notes that plaintiff first testified at his deposition that between the time of his injury in 1994 and 1998, he did not ask anyone to look at his shoulder, but then stated that he requested treatment for the pain, but the medical personnel never gave him anything. (T. 10-12). Plaintiff also testified that he was incarcerated throughout this time. (T. 11). The court notes, however, that it appears that plaintiff was *not* incarcerated between February 23, 1996 when he was released on parole from his 1994 incarceration until October 28, 1998, when he was returned on a parole violation which included four new criminal charges. Plaintiff's current DIN number is 98-A-6245, which would indicate that he was received into DOCS in 1998. Thus, In order for him to have been incarcerated in 1994, there would have had to have been a prior incarceration. The DOCS website confirms this. http://www.docs.state.ny.us Plaintiff's prior DIN number was 94-R-8535. Unless there is another Amin Booker with the same birth date, these two records appear to be the same individual. Thus, it is unclear why plaintiff testified that he was incarcerated for the entire time between 1994 and 1998.

Plaintiff states that on January 25, 2002 and on February 4, 2002, while he was incarcerated at Attica Correctional Facility in Attica, New York, he was examined by two defendant "John Doe" medical providers.[FN4] Compl. ¶¶ 14-18. Plaintiff states that on each of these dates, he complained about his shoulder. Plaintiff claims that the first John Doe asked plaintiff to raise his arm, and when plaintiff complied, told him that the shoulder was not dislocated. Compl. ¶ 15. The second "John Doe" allegedly ordered an x-ray of plaintiff's shoulder, but told plaintiff there was nothing wrong. Compl. ¶ 17. Plaintiff claims that when he asked if there was any way to stop the problem that he was having with his shoulder, John Doe # 2 told plaintiff that he would get back to him if there was anything that could be done. Compl. ¶ 18. Plaintiff claims that John Doe # 2 also told plaintiff not to sign up for sick call about "this" or he

would be issued a misbehavior report. *Id.*

FN4. Plaintiff identifies these "John Doe" defendants by their Provider Numbers, # 261 and # 123. Compl. ¶¶ 14, 16. At his deposition on October 12, 2007, plaintiff testified that in the time since he prepared the complaint, he learned the names of Medical Providers 261 and 123. (T. at 16-17). Plaintiff states that Medical Provider 261 is Norman Dworzeck and Medical Provider 123 is Jose Deprivio. *Id.* Plaintiff has never sought leave to amend his complaint, and the two "John Does" remain as unnamed defendants. As will be discussed below, the complaint may be dismissed as against these individuals in any event, thus, plaintiff's failure to amend his complaint is irrelevant.

*2 Defendants have submitted excerpts from plaintiff's Ambulatory Health Record [FN5] ("AHR"). Def. Ex. B. The AHR entry for January 25, 2002 shows that plaintiff complained to a medical professional that plaintiff dislocated his shoulder the week before. (AHR at Jan. 25, 2002). The notation by the examiner states that plaintiff complained that he had been unable to "pick up [his] arm," but that he eventually "worked it back into place." *Id.* Plaintiff also told the examiner that this had been happening for a long time. *Id.*

FN5. Plaintiff's Ambulatory Health Record, submitted by defendants, is located at Docket Number 39, Exhibit B. Defendants have "traditionally" filed plaintiff's health records, including a number of documents and forms that are not Ambulatory Health Record forms that are interspersed within the actual Ambulatory Health Records. All of the documents are in reverse chronological order, with the most recent documents appearing first. Where the court can cite to a dated entry in the Ambulatory Health Record, the court will use the form "AHR at [date]". The court has additionally hand-numbered the 67 pages of Exhibit B so that it may cite to the numerous documents interspersed within the Ambulatory Health Records. In those instances, the court will use the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

form "Defs. Ex. B at [page]".

> In addition to the traditionally filed motion, defendants provided the court with a compact disc that stores electronic versions of all of the documents related to the summary judgment motion. The electronic version of the documents did not include page numbers for Exhibit B..

The examiner's note states that he observed that plaintiff could move his left arm freely, and could lift his arm over his head. *Id.* The January 25, 2002 note states that plaintiff's shoulders were "symmetrical," and that plaintiff was not in pain at the time of the visit. *Id.* The note states "DR callout." *Id.* The examiner's handwriting is unclear with respect to his [FN6] name and provider number. *Id.*

> [FN6.] Plaintiff has implied by calling these individuals "John" Doe, that they were both male.

On February 4, 2002, the AHR shows that plaintiff complained of pain in his shoulder, and stated that he had a history of dislocation. (AHR at Feb. 4, 2002). The examiner's handwriting is unclear for most of the entry. *Id.* It appears that plaintiff was still experiencing some tenderness at the time of the medical visit. *Id.* The examiner wrote "-xray left shoulder". *Id.*

On February 4, 2002, Wyoming Valley Radiologists, P.C. performed an x-ray on plaintiff's left shoulder. A "Report for Department of Correctional Services-Attica Facility" by C.J. Riggio, M.D. states "[f]ilms of the left shoulder with internal and external rotation show a one centimeter calcification in soft tissues just inferior to the region of the surgical neck of the humerus. The bony architecture otherwise appears normal." Def. Ex. B at p. 66.

The medical records do not contain any other complaints about, or treatments for plaintiff's left shoulder until August 2003. Between February 2002 and August 2003, plaintiff's medical records show that plaintiff was moved to two other DOCS facilities. Plaintiff testified at

his deposition that he arrived at Auburn sometime in March or April of 2003. (T. at 20). An AHR entry dated March 6, 2003, shows "Upstate" in the box where the current facility is entered, but has a stamp with the word "incoming" circled and a handwritten notation "Auburn chart." (AHR at Mar. 6, 2003).

The AHR shows that plaintiff's first complaint after arriving at Auburn Correctional Facility regarding his left shoulder occurred on August 11, 2003. (AHR at Aug. 11, 2003). On August 11, 2003, Registered Nurse ("RN") A. Vega wrote that plaintiff requested a doctor's appointment because his ears were plugged and he had pain in his left rotator cuff. RN Vega wrote that she scheduled an appointment with Dr. Kooi. On August 22, 2003, the AHR shows that plaintiff again complained about pain in his left rotator cuff and "clicking." (AHR at Aug. 22, 2003). RN S. Lennox noted "appt already scheduled with Dr. Kooi." *Id.*

**\*3** The AHR shows that plaintiff's next complaint about his shoulder was on September 5, 2003 when he complained of "L shoulder-rotator cuff." (AHR at Sept. 5, 2003). RN Lennox wrote that plaintiff "[h]as appt [with] Dr. Kooi scheduled". *Id.* On September 6, 2003, the AHR shows that plaintiff was in a fight and had a "Head to toe assessment. (AHR at Sept. 6, 2003). RN D. Cayle noted that "No injury" was present. *Id.* Plaintiff was admitted to the Special Housing Unit ("SHU") on September 11, 2003, and the AHR shows that plaintiff did not have any health complaints at that time. (AHR at Sept. 11, 2003). Plaintiff was seen six times between September 11, 2003 and November 20, 2003, when he next complained about his left shoulder. (*See* AHR at Sept. 12, 15, 19, and Oct. 6, 19, 18, 2003).

Although plaintiff includes the above information in his complaint, he does not name as defendants any of the individuals who examined him at Auburn between August 11, 2003 and November 20, 2003, when he was examined by defendant Androsko. Compl. ¶¶ 19-22. The AHR shows that on November 20, 2003, plaintiff complained that his left shoulder "slips out of joint" and requested to see a doctor. (AHR at Nov. 20, 2003). Defendant RN Androsko stated that this was an "old problem per inmate." *Id.* It appears that this was plaintiff's first

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

interaction with RN Androsko. Plaintiff also complained about some acne. *Id.* RN Androsko noted "PA Laux list." *Id.*

In the complaint, plaintiff claims that on December 3, 2003, Dr. Kooi told plaintiff that his shoulder "looked alright, he just needed to exercise more." Compl. ¶ 27. Plaintiff also claims that Dr. Kooi looked at plaintiff's February 4, 2002 x-rays and told plaintiff that he just had a slight "tissue calcification." Compl. ¶ 28. Plaintiff claims that Dr. Kooi finally agreed to "take another x-ray" after plaintiff continued to complain. Compl. ¶ 29.

Plaintiff's AHR shows that defendant Dr. Kooi examined plaintiff's left shoulder on December 3, 2003. (AHR at Dec. 3, 2003). The entry states that plaintiff told Dr. Kooi that his left shoulder "comes out." *Id.* In the "objective" section of the AHR form, Dr. Kooi wrote "ROM N." *Id.* In his s declaration, Dr. Kooi states that this notation indicates that he found plaintiff's range of motion was normal. Kooi Decl. ¶ 10. Dr. Kooi states that "[e]ven though plaintiff's physical examination was negative for dislocation, I ordered an x-ray of the plaintiff's left shoulder and directed the plaintiff [to] perform exercises designed to strengthen his shoulder." *Id.*

Plaintiff alleges in the complaint that he was examined by defendant Androsko on December 23, 2003, and that when he complained that his shoulder had dislocated several times and that he was in "excruciating pain," she called him a "Big Baby," and told him that no one wanted to hear about his shoulder. Compl. ¶¶ 30-32. Plaintiff claims that defendant Androsko was rude to him and stated that if he wanted "luxury treatment, he shouldn't be in jail," and that she would personally see to it that it would be another month before he would get his x-ray. Compl. ¶¶ 30-34.

**\*4** RN Androsko's entry in the AHR for December 23, 2003 states that plaintiff asked when the x-rays would be performed. (AHR at Dec. 23, 2003). RN Androsko wrote "Inmate wants x-ray done immediately-also claims hasn't seen MD-saw MD 12/3." *Id.* RN Androsko also wrote that she told plaintiff that the x-ray order was written, and the "x-ray will be done when tech has it scheduled." *Id.*

In his complaint, plaintiff alleges that on January 2, 2004, he told defendant Androsko that he was in excruciating pain, but that she "taunted" plaintiff about his "whining." Compl. ¶ 37. However, plaintiff states that defendant Androsko put plaintiff on the list to see the doctor. Compl. ¶ 38. The AHR entry for January 2, 2004, states that plaintiff complained of shoulder pain, and stated that his shoulder kept "dislocating & re-locating by itself." (AHR at Jan. 2, 2004). Defendant Androsko's entry states that plaintiff requested to see a doctor, and defendant Androsko put plaintiff on the list for "Dr. K." *Id.*

Plaintiff states that his shoulder was x-rayed on January 20, 2004, however, no treatment was prescribed. Compl. ¶ 39. The plaintiff's medical records show that on January 20, 2004, St. Lawrence Radiology, P.C. performed an x-ray of plaintiff's left shoulder. Defs. Ex. B at p. 44. The radiologist's report stated

Benign appearing bone density seen projecting in the soft tissue consistent with a chronic origin. No other significant bony pathology is seen. The bone density projects just medial and posterior to the humeral neck.

*Id.*

Although plaintiff claims in the complaint not to have seen Dr. Kooi again until May 3, 2004, the records show that plaintiff saw Dr. Kooi on February 2, 2004. (AHR at Feb. 2, 2004). Plaintiff told Dr. Kooi that plaintiff's shoulder had dislocated on many occasions. *Id.* Dr. Kooi examined plaintiff and found a normal range of motion with no laxity. (AHR at Feb. 2, 2004; Dkt. No. 39, Kooi Decl. at ¶ 12). Dr. Kooi ordered shoulder exercises and a follow up appointment in three months "to evaluate the outcome of the exercise regime." Kooi Decl at ¶ 12; AHR at Feb. 2, 2004.

In the complaint, plaintiff alleges that on March 16, 2004, a nurse named "Greg" examined plaintiff and read his "February 4, 2002" x-ray results. Compl. ¶¶ 40-41. Plaintiff claims that "Greg" told plaintiff that he would need an MRI to identify why his shoulder was dislocating. Compl. ¶ 41. Plaintiff states that "Greg" put plaintiff on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

the list to see Dr. Kooi on March 16 and later on March 30, 2004. Compl. ¶¶ 43, 45.

The AHR also shows, however, that plaintiff was examined on March 3, 2004, when he complained about his left shoulder. (AHR at Mar. 3, 2004). The nurse noted that plaintiff "Has appt on 5/3 but req to move up." *Id.* Plaintiff again complained to the same nurse about his shoulder on March 16 and March 30, 2004. (AHR at Mar. 16 & 30, 2004). Plaintiff complained about pain in his shoulder to RN Vega on April 12, 2004 and again on April 27, 2004. (AHR April 12 & 27, 2004). On April 12, 2004, plaintiff requested an appointment with an orthopedist. (AHR at Apr. 12, 2004). On April 27, 2004, RN Vega wrote that she explained the procedure about waiting lists for doctors. (AHR at Apr. 27, 2004).

**\*5** Plaintiff states that he saw Dr. Kooi May 4, 2004. Compl. ¶ 46. The AHR indicates that the appointment was actually on May 3, 2004. (AHR at May 4, 2004). In the complaint, plaintiff alleges that Dr. Kooi asked plaintiff to raise his left arm, and when he "complied," Dr. Kooi told plaintiff that there was nothing that he could do for him. Compl. ¶ 47. Plaintiff states that he told Dr. Kooi that "several" registered nurses had explained to plaintiff that it was "their professional judgment" that plaintiff should have an MRI and see a specialist. Compl. ¶¶ 48.

Plaintiff also claims that Dr. Kooi never looked at the x-rays, he merely stated that the nurses did not know what they were talking about and refused to order an MRI and a consultation by an orthopedic specialist. Compl. ¶¶ 49-51. Instead, plaintiff claims that Dr. Kooi told plaintiff that he would give plaintiff some pills that would "cure" him. Compl. ¶ 52. The AHR note for May 4, 2004 is short and difficult to read, however, Dr. Kooi states in his declaration that plaintiff "indicated that he had experienced pain in his left shoulder off and on for approximately eight years. On examination, plaintiff had normal range of motion in his left shoulder. I ordered the plaintiff a prescription for Motrin." Kooi Decl. at ¶ 13.

Plaintiff claims that on May 5, 2004, his shoulder dislocated again, and he filed a grievance. Compl. ¶ 53. Plaintiff states that in his grievance, he asked to be assigned a different doctor and that Dr. Kooi be

"investigated and penalized for his actions." Compl. ¶ 54. Plaintiff states that after a hearing on his grievance, he was told that nurses do not order or interpret x-rays, and that the committee could not instruct the medical department on specific courses of treatment. Compl. ¶ 56.

Plaintiff states that he was told that he needed to write to Dr. Kooi to request a different medical provider and that plaintiff could address his complaints to Dr. Lester Wright, Associate Commissioner of Health Services. Compl. ¶ 57. Plaintiff states that he wrote to Dr. Wright on May 18, 2004, detailing the problems with plaintiff's shoulder and asking Dr. Wright to "address the problem professionally." Compl. ¶ 58. Plaintiff claims that he also wrote to defendant Kooi again. Compl. ¶ 59. Plaintiff also alleges that he complained to Nurse Administrator defendant William Robertson, who promised to speak with Dr. Kooi, but never followed through. Compl. ¶ 60. Plaintiff claims that Dr. Wright never responded to plaintiff's letter. Compl. ¶ 62.

Even though plaintiff claims that his shoulder dislocated on May 5, 2004, the AHR shows that plaintiff next complained about his shoulder on July 12, 2004. (AHR at July 2, 2004). Plaintiff does not cite the July 12, 2004 visit, instead, he alleges that he went to the Auburn Medical Unit on August 16, 2004, and a nurse scheduled him for an appointment to see Dr. Kooi. Compl. ¶ 63. The AHR for July 12, 2004 indicates that a follow up appointment was scheduled with Dr. Kooi. *Id.* In his complaint, plaintiff states that "[a]t sometime before plaintiff was seen again by Dr. Kooi, plaintiff somehow arranged to see another doctor at Auburn ... named Graceffo, who put plaintiff on a list to see an orthopedic doctor ...." Compl. ¶ 64. A document titled "Request and Report of Consultation" shows that Dr. Anthony Graceffo referred plaintiff to an orthopedist on July 12, 2004. Defs. Ex. B at p. 39.

**\*6** Dr. Kooi examined plaintiff again on August 30, 2004. (AHR at Aug. 30, 2004). Plaintiff complained of "stiffness in his left shoulder from an old injury." Kooi Decl. at ¶ 14; (AHR at Aug. 30, 2004). Dr. Kooi noted that plaintiff had already been referred to see an orthopedic specialist. *Id.* In his Declaration, Dr. Kooi states

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

[b]ased on the negative findings of dislocation or separation on plaintiff's x-ray, together with his normal range of motion on each physical examination by me, and plaintiff's ability to raise his arm above his head, it was my reasoned judgment and opinion that the plaintiff was not suffering from a dislocation or separation injury and, instead, was experiencing pain due to weakness in his left shoulder. I therefore prescribed strengthening exercises for the plaintiff and followed the plaintiff's condition.

Kooi Decl. at ¶ 15.

Plaintiff claims that on August 30, 2004, Dr. Kooi simply told plaintiff to "do some exercise." Compl. ¶¶ 66-68. On September 1, 2004, plaintiff was examined by a doctor at "Walsh RMU ." Defs. Ex. B at p. 36. After an orthopedic examination, the doctor prescribed physical therapy three times a week for six weeks. *Id.* Plaintiff participated in physical therapy at Five Points Correctional Facility beginning September 24, 2004 until November 1, 2004. Defs. Ex. B at 26-35. Plaintiff states that the physical therapy did not work. Compl. ¶ 69.

It is unclear when plaintiff next complained about his left shoulder. The AHR shows a visit to the medical department on November 15, 2004. (AHR at Nov. 15, 2004). The entry does not indicate that plaintiff complained about his shoulder. *Id.* The first two lines of the entry are mostly illegible except for the word "Theraband." *Id.* In his deposition, plaintiff described Therabands as "strong elastic band[s]" that were used in his physical therapy sessions. (T. at 62). Dr. Dwight Webster examined plaintiff on December 7, 2004, and on that date, plaintiff consented to surgery for the purpose repairing his "dislocating L shoulder." Defs. Ex. B at 19-20. The medical records show that plaintiff had surgery on his left shoulder on February 2, 2005. Defs. Ex. B at 6-7.

Plaintiff's complaint contains four causes of action. All the causes of action allege violations of plaintiff's right to be free from cruel and unusual punishment, caused by the defendants' deliberate indifference to plaintiff's serious medical needs. Compl. at pp. 13-14. Plaintiff's third and

fourth causes of action also allege equal protection and due process violations. [FN7]

FN7. Although plaintiff's causes of action raise "equal protection" and "due process" violations, it is unclear to what plaintiff is referring. In order to state an equal protection violation plaintiff would have to be claiming that he was treated differently than other similarly situated individuals. Plaintiff makes no such claim, thus, any equal protection claim may be dismissed. Plaintiff may be referring to "substantive due process" in the nature of his Eighth and Fourteenth Amendment claims for denial of constitutionally adequate medical care.

**3. *Personal Involvement***

It is well-settled that in order to be held liable for damages in a section 1983 action a defendant must have been personally involved in the alleged violation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). The doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973), *cert. denied,* 414 U.S. 1033 (1973).

*7 In *Williams v. Smith,* the Second Circuit detailed the various ways in which a defendant can be personally involved, and thus be subject to individual liability, in a constitutional deprivation. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants argue that defendant Dr. Lester Wright

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

was not personally involved in plaintiff's alleged violations. Defs, Mem. of Law at 8 (Dkt. No. 39). Dr. Wright was the Deputy Commissioner and Chief Medical Officer of DOCS. Wright Decl. ¶ 1. Plaintiff's only claim against Dr. Wright is that Dr. Wright failed to respond to plaintiff's letter and failed to rectify the allegedly inadequate care plaintiff received at Auburn Correctional Facility. Compl. at ¶ 62. Plaintiff cites no other involvement by this defendant.

In his declaration, Dr. Wright states that his office's normal business practice is to assign the investigation of alleged violations to a member of his staff. Wright Decl. at ¶ 6 (Dkt. No. 39). "A member of my staff learned that plaintiff had filed a grievance in connection with the issues discussed in his May 30, 2004 letter to me, and that the plaintiff had been examined by a physician at his facility ... The matter was then closed in my office" Id. at ¶ 7-8. Defendant Wright states that he did not see plaintiff's letter. Wright Decl. ¶ 6.

Defendants' Exhibit D is a form-note from Dr. Wright to "Hally" [FN8] in which Dr. Wright requested this individual to "[i]nvestigate and respond on my behalf." The note indicates that the matter was "[i]nvestigated and closed .... " Defs. Ex. D. The comments state that the "inmate has filed a grievance-he has been evaluated by Dr. Kooi." Id. It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement. *Smart v. Goord, 441 F.Supp.2d 631, 642-643 (S.D.N.Y.2006).* The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation. *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y.2007).*

FN8. The name on this note is difficult to read. The person's name to whom the investigation as referred could be "Hally" or "Holly."

Dr. Wright was not directly involved in plaintiff's care and did not examine plaintiff. It is clear that plaintiff's letter was referred to a subordinate for investigation. Clearly, plaintiff had also filed a grievance that was also being investigated. Thus, the investigation by defendant

Wright's subordinate was closed. This does not constitute personal involvement by defendant Wright, and the case may be dismissed as to this defendant.

### 4. *Medical Care*

**\*8** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble, 429 U.S. 97, 106 (1976).* There are two elements to the deliberate indifference standard. *Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir.2003).* The first element is *objective* and measures the severity of the deprivation, while the second element is *subjective* and ensures that the defendant acted with a sufficiently culpable state of mind. *Id. at 184* (citing *inter alia Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)*).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian, 503 U.S. 1, 9 (1992).* A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996).* The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services, 151 F.Supp.2d 303, 310 (S.D.N.Y.2001)* (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir.2000)*).

In this case, defendants argue that plaintiff's shoulder injury does not constitute a serious medical need. Defs. Mem. of Law at 3-6 (Dkt. No. 39). There is, however, no "metric guide" for the court to determine whether a plaintiff has a sufficiently serious medical condition. *Brock v. Wright, 315 F.3d 158, 162 (2d Cir.2003).* In *Chance v. Armstrong, 143 F.3d 698, 702-703 (2d Cir.1998),* the Second Circuit set forth some guidelines for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

this determination. *Id*. (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir.1992)). These considerations include (1) whether a reasonable doctor or patient would perceive the medical need in question as "important or worthy of comment or treatment," (2) whether the medical condition significantly affects daily activities, and (3) "the existence of chronic and substantial pain". *Id*.

This court is hesitant to hold as a matter of law that a shoulder injury is simply not a serious medical need, particularly based upon the third consideration listed above, the existence of chronic and substantial pain. It has been held that allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need. *Sereika v. Patel*, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006). In *Guarneri v. Bates, et al.,* this court adopted Magistrate Judge David Homer's recommendation, finding sufficient issues of material fact as to the actual pain and severity of the plaintiff's shoulder injury. *Guarneri v. Bates, et al.,* 9:05-CV-444 (GLS/DRH), 2008 U.S. Dist. LEXIS 18281, *3-4 (N.D.N.Y. March 10, 2008).

**\*9** In *Guarneri,* the plaintiff's shoulder was injured during an arrest, and the plaintiff complained for approximately one year about severe pain in his shoulder and an inability to move his arm before he was seen by an orthopedic specialist. *Guarneri v. Bates, et al.,* 9:05-CV-444 (Report-Recommendation) at 2-3 (Dkt. No. 86). Even though the plaintiff in *Guarneri* was able to continue the activities of daily living, including playing "rough basketball" and "punching lights and walls with his injured arm," Judge Homer found sufficient issues of material fact as to the actual pain and severity of the plaintiff's shoulder injury. *Id*. at 11.

In *Benjamin v. Galeno,* 415 F.Supp.2d 254, 259 (S.D.N.Y.2005),[FN9] the court held that although there was no proof in the record that the plaintiff's rotator cuff injury was a serious medical condition, plaintiff's claim that he was suffering extreme pain was sufficient to raise a question of fact, "albeit a tenuous one," as to the objective prong of the Eighth Amendment analysis. A careful reading of these cases shows that generally, the court will bypass the difficult determination of whether a plaintiff has a serious medical need, and will instead consider the

second prong of the analysis to determine whether the defendants have shown "deliberate indifference." *See e.g. Sereika v. Patel*, 411 F.Supp.2d at 407-409 (dismissing the inadequate treatment claim after finding that plaintiff had demonstrated a serious medical need); *Guarneri v. Bates,* 9:05-CV-444 (Report-Rec. at 11) (finding no evidence of deliberate indifference to shoulder injury, even though there was a question of fact regarding the seriousness of the injury).

> FN9. This case, together with other related cases, was affirmed by the Second Circuit. *enjamin v. Koeningsman,* 204 Fed. Appx. 979 (2d Cir.2006).

In this case, plaintiff injured his shoulder long before the defendants were ever involved in his care, and years went by before he began requesting medical care for his injury. Plaintiff testified that his injury occurred in 1994. (T. at 7-8). According to plaintiff, between 1994 and 1998, his shoulder dislocated as often as once a year. (T. at 11-12). Plaintiff claims that from 1998 until plaintiff sought treatment in Attica Correctional Facility in 2002, plaintiff's shoulder dislocated another three or four times. (T. at 12-13). Plaintiff states that during the time that the shoulder was actually dislocated, the pain was "excruciating, like real throbbing. It hurt, real severe." (T. at 9). Plaintiff testified that the shoulder always relocated itself, and that it took a few minutes for the shoulder to move back to the proper position. (T. at 14).

Oddly enough, the medical records show that plaintiff complained about his shoulder to the two John Doe defendants in Attica in January and February of 2002. However, plaintiff **never** mentioned his shoulder again despite many medical examinations between 2002 and 2003. In fact, the records show that when plaintiff was transferred to Upstate Correctional Facility in June of 2002, plaintiff denied any "chronic medical problems" and had no "current medical complaints." Defs. Ex. B at pp. 57-59.

**\*10** Plaintiff does claim, however, that when the shoulder dislocated, the pain was "excruciating." Additionally, the records show that beginning in 2003, plaintiff did complain about his shoulder regularly. Thus,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

for purposes of this order, the court will find that there is a question of fact regarding the seriousness of plaintiff's medical condition, but will proceed to consider the second element of the standard.

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F .3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

Disagreement with prescribed treatment does *not* rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id .* (citations omitted). An inmate does *not* have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does *not* become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff argues that his eventual surgery

on his left shoulder in February 2005 shows that he had a serious medical need, and that medical professionals were indifferent to that serious medical need up until the point that the surgery was ordered. (Dkt. No. 43, 3). None of the defendants in this case came into contact with plaintiff until 2002, and the named defendants at Auburn Correctional facility never met the plaintiff until late 2003.

The medical records show that after plaintiff began experiencing problems with his shoulder in 2003, and he was being examined in the Medical Department at Auburn, the providers never noticed any dislocation. *See, generally* Defs. Ex. B. By the time plaintiff was examined, there was no dislocation, and plaintiff was observed to have the full range of motion. (AHR at Dec. 3, 2003; Feb. 2, 2004; May 4, 2004; Nov. 30, 2004).

**\*11** In the months from plaintiff's transfer to Auburn Correctional Facility in March or April 2003 and the surgery in February 2005, plaintiff was given medication, assigned strengthening exercises, and prescribed physical therapy. Plaintiff visited the Medical Department on many occasions in 2003 and 2004 when he did not complain about his shoulder at all. Plaintiff names two defendants who actually participated in his medical care: Nurse Androsko and Dr. Kooi.

Plaintiff's complaint about Nurse Androsko basically is that she was rude and verbally abusive to him, and called him a "baby." (T. at 28). Plaintiff states that he first saw defendant Androsko on November 20, 2003. At plaintiff's deposition he stated that when he first saw Nurse Androsko, plaintiff already had an appointment to see Dr. Kooi. (T. at 36). Plaintiff told defendant Androsko about his shoulder, but was also complaining of acne. (AHR Nov. 20, 2003). It is unclear what plaintiff claims that Nurse Androsko should have done at this time. Plaintiff conceded at his deposition that his shoulder was *not* dislocated when he saw defendant Androsko. (T. at 29). Plaintiff saw the doctor on December 3, 2003. (AHR Dec. 3, 2003).

Plaintiff saw defendant Androsko again on December 23, 2003 and January 2, 2004. Compl. ¶¶ 30-38. The AHR confirms these dates. Although again, plaintiff states that this defendant was rude to him, he also stated that his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

shoulder was **not** dislocated when he saw her. (T. at 35-36). During the deposition, plaintiff stated that defendant Androsko told him that she was not going to rush to get him x-rays (T. at 35), however, the AHR indicates that plaintiff wanted the x-rays done "immediately," and that defendant Androsko told plaintiff that the x-rays were ordered, and that they would be done "when the tech has it scheduled." (AHR Dec. 23, 2003). On January 2, 4004, plaintiff saw defendant Androsko and asked to see the doctor. (AHR Jan. 2, 2004). Defendant put plaintiff on the doctor's list. *Id.* Plaintiff also claims that she refused to give him pain medication, telling him to ask Dr. Kooi. (T. at 37). These are the only allegations against this defendant. Plaintiff had his x-rays on January 20, 2004. Def. Ex. B at p. 44.

Plaintiff complains that Dr. Kooi did not treat plaintiff properly, and told plaintiff that he should exercise more. Plaintiff claims that the exercises that Dr. Kooi gave him did not work. In his complaint, plaintiff alleges that "several registered nurses" interpreted the x-rays and told plaintiff that in "their professional judgment," he needed an MRI. Compl. ¶ 48. At his deposition, plaintiff admitted that it may have been **one** nurse that mentioned an MRI, and that plaintiff had "embellished" in the complaint. (T. at 48). The fact that plaintiff disagrees with the defendants' manner, medical judgments, or choices about treatment does not rise to the level of a constitutional violation. As stated above, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F.Supp.2d at 312 (citing *Estelle*, 429 U.S. at 107). Dr. Kooi did suggest that plaintiff exercise more, however, Dr. Webster also told plaintiff that he had to strengthen his muscles. (T. at 61). In fact, after plaintiff was referred to specialists, they did not initially discuss surgery with plaintiff. (T. at 61). Plaintiff was initially prescribed physical therapy. (T. at 62). Plaintiff participated in physical therapy two to three times per week for two to three months. (T. at 62). It was only after the physical therapy did not work, that Dr. Webster told plaintiff that the decision to have surgery was "up to him." (T. 64-65).

**\*12** Even if Dr. Kooi's and Nurse Androsko's examinations and treatment of plaintiff's shoulder amounted to negligence or malpractice, malpractice does **not** become a constitutional violation simply because the plaintiff is an inmate. *Sonds, supra. See also Daniels*, 474 U.S. at 332. The fact that surgery was ordered on plaintiff's shoulder at some later date simply does not show that the care that plaintiff received until then was constitutionally inadequate. Plaintiff also testified at his deposition that while he was at Auburn, he never had problems obtaining sick-call visits, and he was always able to see "somebody ." (T. at 72-73). As was the alleged "quality" of the care that plaintiff did not like. Plaintiff's allegations, even if they amount to malpractice do not rise to the level of a constitutional violation. Even assuming that plaintiff had a serious medical need, plaintiff's multiple visits to and treatments given by the Medical Department at Auburn Correctional Facility do not constitute deliberate indifference to his serious medical needs.

The motion for summary judgment will be granted, and the complaint dismissed as to defendants Nurse Androsko and Dr. Kooi.

**5. *Service of Process***

Rule 4 of the Federal Rules of Civil Procedure requires that service of process be made within 120 days after the complaint is filed. FED. R. CIV. P. 4(m). If service is not effected, the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." *Id.* When plaintiff is proceeding *pro se* and *in forma pauperis*, he is entitled to rely on the U.S. Marshal to serve process. *Romandette v. Weetabix*, 807 F.2d 309 (2d Cir.1986). *See also* 28 U.S.C. § 1915(d); LOCAL RULES N.D.N.Y. 5.1(g).

Plaintiff filed this action in January 2006, and was notified by order of this court that he should "take reasonable steps to identify the John Doe defendants, including discovery requests served on the named defendants in accordance with the Federal Rules of Civil Procedure." (Dkt. No. 6). In his complaint, plaintiff described both John Does as medical personnel at Attica Correctional Facility. Compl. at ¶¶ 6-7. At plaintiff's deposition in October 2007, plaintiff testified that he had identified both John Does. (T. at 16-17). However,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

plaintiff has made no effort to request service on these individuals, and the 120 days has long since passed.

Generally, the court would dismiss the action without prejudice for failure to serve, however, a review of the claims against these individuals, together with the dates of their alleged actions shows that the complaint should be dismissed with prejudice against these defendants. In his complaint, plaintiff alleges that he saw John Doe # 1 at Attica [FN10] Correctional Facility on January 25, 2002, and he saw John Doe # 2 at Attica Correctional Facility on February 4, 2002. Compl. ¶¶ 14-18. The only allegations against these individuals are that John Doe # 1 told plaintiff that his shoulder was not dislocated after making plaintiff raise his arm, and John Doe # 2 told plaintiff that there was nothing wrong with his shoulder, but that John Doe would "get back to" plaintiff if there was anything he could do. *Id.*

> FN10. Attica is in the Western District of New York. This could raise some venue issues that re not necessary for this court to discuss.

**\*13** Plaintiff did not see these individuals again or complain about his shoulder until August of *2003.* The complaint does not state a claim as against these two individuals. To the extent that plaintiff alleges that they did not treat him properly, he does not state a claim for deliberate indifference. [FN11] This is particularly so because the court has found that plaintiff's Eighth Amendment claims must fail as against all of the defendants, based on plaintiff's medical records and his own testimony. Thus, the court will dismiss this action with prejudice as against the John Doe defendants. [FN12]

> FN11. The court would also point out that there is also a possible statute of limitations issue. The Attica John Does examined plaintiff in January and February of 2002. Plaintiff filed this action on January 18, 2006 (the date the complaint was postmarked) (Dkt. No. 1). The statute of limitations for section 1983 actions is *three* years in New York State. *Weir v. City of New York,* 05 Civ. 9268, 2008 U.S. Dist. LEXIS 61542, *27 (S.D.N.Y. Aug. 11, 2008) (citing *inter alia Owens v. Okure,* 488 U.S. 235, 249-50 (1989);

N.Y. CIV. PRAC. L. & R. § 214(5); *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002)). The accrual of a cause of action is governed by federal law, which provides that a claim accrues when the plaintiff knows or has reason to know of the harm upon which his action is based. *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994). Although this court will not engage in a lengthy analysis of the statute of limitations in this case, the court would simply point out that in addition to plaintiff's lack of a claim for deliberate indifference, there would also be a statute of limitations issue.

> FN12. When a plaintiff is proceeding *in forma pauperis,* the court may dismiss the claim or claims at any time that the court determines *inter alia* that plaintiff does not state a claim for relief. 28 U.S.C. § 1915(e)(2)(B)(2).

Nurse Administrator Robertson has also not been served in this action. On July 20, 2006, the U.S. Marshal filed a "Process Receipt and Return" form indicating that defendant Robertson had not been served because he was no longer employed by DOCS. (Dkt. No. 10). Plaintiff was apparently aware that defendant Robertson no longer worked for DOCS because on the same form, in a section titled "Special Instructions or Other Information that Will Assist in Expediting Service," plaintiff stated that he was "told" that defendant Robertson no longer worked at Auburn. *Id.* Plaintiff then stated that the defendant's "previous employer" at Auburn would have defendant Robertson's forwarding address. *Id.* The docket sheet in this action does not show any further attempts at serving defendant Robertson. Again, normally, the court would either dismiss the action without prejudice or give plaintiff some extra time to serve this defendant, however, as with the John Doe defendants, this court finds that plaintiff does not state a claim against defendant Robertson.

Defendant Robertson was the Nurse Administrator at Auburn Correctional Facility. The only claims that plaintiff makes against this defendant is that plaintiff complained to defendant Robertson "on numerous occasions" when he saw this defendant in the Medical Unit. Compl. ¶ 60. Plaintiff claims that defendant

Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)

(Cite as: 2008 WL 4527601 (N.D.N.Y.))

Robertson told plaintiff that he would speak with Dr. Kooi, but Robertson never spoke to Dr. Kooi or assisted plaintiff in solving his problem. Compl. ¶ 61.

Nurse Administrator Robertson is a supervisory official, and like defendant Wright, would not be responsible for failing to investigate plaintiff's problems. *Smart v. Goord,* 441 F.Supp.2d at 642-43. Plaintiff does not claim that defendant Robertson was his medical provider or that he had any other involvement with plaintiff's medical care. The fact that plaintiff saw the Nurse Administrator a few times in the medical unit and mentioned his problems is not a sufficient statement of the personal involvement of this defendant. Thus, the court will dismiss the action with prejudice as against Nurse Administrator Robertson for failure to serve and under 28 U.S.C. § 1915(e)(2)(B)(ii).

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED,** that defendants' motion for summary judgment (Dkt. No. 39) is **GRANTED,** and it is further

**\*14 ORDERED,** that the case against **JOHN DOE # 1, JOHN DOE # 2 and DEFENDANT N.A. ROBERTSON** is **DISMISSED WITH PREJUDICE** for failure to serve and pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), and the complaint is **DISMISSED IN ITS ENTIRETY.**

**It is so ordered.**

N.D.N.Y.,2008.

Booker v. Doe
Not Reported in F.Supp.2d, 2008 WL 4527601 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charles WOODS, Plaintiff,
v.
Glenn S. GOORD, Commissioner Docs; Dr. Lester N. Wright, M.D., Mph Associate Commissioner Chief Medical Officer; Charles G. Greiner, Superintendent of Green Haven Corr. Fac.; Dr. Norman Salwin, Acting Health Service Director Green Haven Corr. Fac.; Dr. Carl J. Koenigsmann, Green Haven Corr. Fac. Health Service Director; Lawrence Zwillinger, Regional Health Servens Administrator; Dr. Charles John Bendheim, Medical Doctor; Dr. Lester S. Silver, U.P.D. Medical Provider; Dr. Steven Weinstent, U.P.D. Physiatrist; Barbara Whitney, Medical Records Clerk; Dr. John Galeno; M. Jones, Correctional Officer; Correction Physician Services, Inc. (CPS),[FN1] Defendants.

> FN1. Plaintiff refers to Charles Greiner as "Grenier" at times, Greiner at other times, and occasionally just "Charles," but is sufficiently precise such that the Superintendent of Green Haven, Charles Greiner, can be identified. The correct spelling of "Salwin" appears to be Norman Selwin. *See* Defendants' (Goord et al.) Memorandum in Support of Motion to Dismiss ("Goord Def. Mem .") at 1. While defense counsel uses the name Weinstent, *see* Galeno Defendants' Memorandum in Support of Motion to Dismiss ("Galeno Def. Mem.") at 1, the correct spelling appears to be Weinstein.

No. 01 CIV. 3255(SAS).

April 23, 2002.

Charles Woods # 82-A-5434, Unit for the Physically Disabled, Green Haven Correctional Facility, Stormville, for Plaintiff (Pro Se).

Melinda Chester-Spitzer, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, for Defendants Goord, Wright, Greiner, Selwin, Koenigsmann, Zwillinger, Bendheim, Silver and Whitney.

Tracy M. Larocque, Esq., Pennock & Breedlove LLP, Clifton Park, for Defendants Weinstein, Galeno and CPS.

OPINION AND ORDER

SCHEINDLIN, D.J.

**\*1** Charles Woods, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983 against the New York Department of Corrections ("DOCS") and its officials, and various supervisors, health care providers and employees of Green Haven Correctional Facility ("Green Haven"), for failing to provide him with medical care in violation of the Eighth Amendment. Woods also brings claims under Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, for discrimination on the basis of disability. He seeks monetary damages and injunctive relief.

Defendants Glenn Goord, Lester Wright, Charles Greiner, Norman Selwin, Carl Koenigsmann, Lawrence Zwillinger, Charles John Bendheim, Lester Silver, and Barbara Whitney (collectively, the "Goord defendants") now move to dismiss the Complaint and Amended Complaint pursuant to Rule 12(b)(6). Defendants Steven Weinstein, John Galeno and Correction Physician Services ("CPS") (the "Galeno defendants") move to dismiss all claims pursuant to Rule 12(c). For the reasons below, the motions are granted in part and denied in part. The claims against the remaining defendants are dismissed.[FN2]

> FN2. There are five additional defendants. "M. Jones" is named in the caption of the Amended Complaint, but apparently has not been served. Additional defendants are mentioned in the body of the Amended Complaint: "Selim Ace," "Mar[ ]y Kate Moddox Williams," "Randy Duprey," and DOCS. *See* 6/18/01 Amended Complaint ("Am.Compl.") ¶¶ (F); (O)-(P); (T). Although these individuals and this entity are not listed in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

the caption, I will treat them as if they were named defendants. In addition, I will construe the plaintiff's opposition papers to contain factual allegations to the extent that they are consistent with the allegations in the Amended Complaint. *See Burgess v. Goord,* No. 98 Civ.2077, 1999 WL 33458, at *1 n. 1 (S.D.N.Y. Jan. 26, 1999) ("In general, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.") (citing cases); *see also Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (stating that courts should include in their analysis of motions to dismiss "not only the assertions made within the four corners of the Complaint itself, but also those contained in the documents attached to the pleadings or in documents incorporated by reference.").

I. BACKGROUND

The following allegations are drawn from the Amended Complaint and Woods's opposition papers.
A. The Parties

Charles Woods is a 63-year-old prisoner currently incarcerated at Green Haven Correctional Facility ("Green Haven") in Stormville, New York. *See* Am. Compl. ¶ (D) at 2; 1/11/02 Plaintiff's Opposition to Defendants' Motion ("Pl.Opp.2d") at 10.[FN3] Defendant Glenn Goord is the Commissioner of DOCS. *See* Am. Compl. ¶ (G) at 2. Defendants Lester Wright, M.D., and Lawrence Zwillinger, are DOCS's Chief Medical Officer and Regional Health Administrator, respectively. *See id.* ¶¶ (I), (L) at 3. Defendant Charles Greiner is the Superintendent of Green Haven. *See id.* ¶ (H) at 2. Defendants Norman Selwin and Carl J. Koenigsmann are Green Haven's Medical Director and Health Services Director, respectively. *See id.* ¶¶ (J), (K) at 3. Dr. Lester S. Silver is the Medical Director for Green Haven's Unit for the Physically Disabled ("UPD"), where plaintiff resides. *See id.* ¶ (N) at 3.

FN3. Plaintiff submitted a first opposition brief on December 6, 2001. *See* 12/6/01 Objection to

Motion and Conference Hearing.

Plaintiff has also sued the following health care professionals. Doctors Charles J. Bendheim, Steven Weinstein and John Galeno each treated plaintiff directly. Dr. Bendheim was the primary care physician for plaintiff and other physically disabled inmates at the time of most of the alleged events. *See id.* ¶ (M) at 3. Defendant Selim Ace is a physical therapist employed by DOCS, and defendant Mary Kate Moddox Williams is his assistant. *See id.* ¶¶ (O)-(P) at 4.

B. Summary of Woods's Medical History at Green Haven

Woods was first incarcerated at Green Haven in December 1995. *See id.* ¶ 1. In early 1996, Woods asked to see a doctor after he began experiencing pain in his hands, knees, elbows, hips and back. *See id.* ¶ 3. He was seen by Dr. Bendheim, who referred him to Dr. Helen Feng, a rheumatologist at Albany Medical Center ("AMC"). *See id.* Dr. Feng examined Woods on May 31, 1996, the first of many such visits. *See id.* Feng and other specialists have since determined that Woods suffers from Rheumatoid Arthritis, Degenerative Joint Disease and leukemia. *See id.* ¶¶ 2, 20. From 1996 to the present, plaintiff has thus required extensive care, including chemotherapy.

*2 Woods alleges that from 1996 to 1999, Dr. Bendheim delayed or did not schedule many specialist-ordered appointments. He alleges that, following surgery on Woods's elbow in 1999, Dr. Weinstein denied him physical therapy in 2000 and 2001. Plaintiff also alleges that from 1996 to the present he has requested, but has been denied, surgery to replace his knees, hips, and elbows with prostheses. In addition, since 1996, Woods has consistently requested a lightweight wheelchair due to the extreme pain he experiences in trying to operate his current, heavy wheelchair. These allegations are fully discussed in Part IV, *infra.*

On April 19, 2001, after years spent exhausting prison grievance procedures, *see infra* note 16, plaintiff filed his original Complaint. *See* 4/19/01 Complaint ("Compl."). On June 21, 2001, plaintiff filed an Amended Complaint. Plaintiff seeks $250,000 in compensatory damages from each defendant for a total of $5,000,000. *See id.* ¶¶ 34,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

(A)-(C).[FN4]

> **FN4.** Plaintiff does not address the fact that $250,000 multiplied by the number of defendants (17) does not equal $5,000,000.

## II. LEGAL STANDARD

A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000) (quotation marks and citation omitted).[FN5] "At the Rule 12(b)(6) stage, [t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (citation, quotation omitted).[FN6] The task of the court in ruling on a Rule 12(b)(6) motion is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Id.* (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "take as true all of the allegations contained in plaintiff's complaint and draw all inferences in favor of plaintiff." *Weinstein v. Albright,* 261 F.3d 127, 131 (2d Cir.2001).

> **FN5.** Plaintiff opposes *summary judgment* in his 40-page brief, to which nearly one hundred pages of exhibits are attached. *See* Pl. Opp.2d. But because defendants moved to dismiss for failure to state a claim, they need not comply with Local Rules 3(g) or 56.1, or any other rule pertaining to summary judgment, as plaintiff argues.

> **FN6.** The same standard applies to Rule 12(c) motions to dismiss. *Fed.R.Civ.P. 12(c); see Simpri v. New York City Agency for Children's Servs.,* No. 99 Civ. 6712, 2001 WL 1661910, at *2 (S.D.N .Y. Dec. 28, 2001) (citing *Irish Lesbian and Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998)).

Because "most pro se plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency." *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 140 (2d Cir.2000) (citing *Hughes v. Rowe,* 449 U.S. 5, 9-10 (1980), and *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)). Courts must remain particularly "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." *Gregory,* 243 F.3d at 691. "Complaints based on civil rights statutes must include specific allegations of facts showing a violation of rights instead of a litany of general conclusions that shock but have no meaning." *Burgess,* 1999 WL 33458, at *2 (citing, *inter alia, Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987)). "However, assertions must truly be bare for dismissal to be appropriate." *Id.* (citing *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 672 (2d Cir.1995)).

## III. ELEVENTH AMENDMENT IMMUNITY

**\*3** Plaintiff brings both federal and state claims against all defendants, including state agencies DOCS and CPS, in their official as well as individual capacities. *See* Am. Compl. ¶¶ (D)-(V) ("The Parties"), 32-33.
A. Federal Claims

The Eleventh Amendment bars suit in federal court by a citizen of a state against a state or its agencies, unless the state has waived immunity to suit, *see Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100-01 (1984), or Congress has abrogated the state's immunity, *see Quern v. Jordan,* 440 U.S. 332, 343-44 (1979). *See also Farricelli v. Holbrook,* 215 F.3d 241, 244-45 (2d Cir.2000); *Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). Because New York has not waived its immunity, *see Oyague v. State,* No. 98 Civ. 6721, 2000 WL 1231406, at *5 (S.D.N.Y. Aug. 31, 2000), and 42 U.S.C. § 1983 was not intended to abrogate states' immunity, *see Quern,* 440 U.S. at 343-44, the Eleventh Amendment bars plaintiff's claims against both DOCS and CPS because they are state agencies.[FN7]

> **FN7.** Woods's claims against DOCS and CPS in their individual capacities are dismissed for failure to state a claim.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

A state official is also entitled to invoke Eleventh Amendment immunity to the extent that she is sued in her official capacity, because such suit is deemed to be one against the state itself. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998). In addition, suits for monetary damages from the state treasury are barred. *See Edelman v.. Jordan,* 415 U.S. 651, 677 (1974). Thus, plaintiff's claims for money damages against the defendants in their official capacities are dismissed for failure to state a claim on which relief may be granted. *See Spencer,* 139 F.3d at 111; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993).

B. State Law Claims

Plaintiff alleges negligence and violations of New York State Corrections Law against all defendants. *See* Am. Compl. ¶¶ 32-33. Absent a waiver by the state, however, the Eleventh Amendment also bars *state law* claims against state officials in their official capacity. *See Pennhurst,* 465 U.S. at 99-101. New York has made no such waiver. To the contrary, New York explicitly bars state law claims brought by state prisoners against state law correction personnel in federal court, *see* N.Y. Corr. Law § 24, and the federal courts are bound by this provision, *see Ierardi v. Sisco,* 119 F.3d 183, 186 (2d Cir.1997). Plaintiff's state claims are dismissed in their entirety.

IV. EIGHTH AMENDMENT CLAIMS (PURSUANT TO 42 U.S.C. § 1983)

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that defendants, while acting under color of state law, denied plaintiff a constitutional or federal statutory right. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Ruggiero v. Krzeminski,* 928 F.2d 558, 562-63 (2d Cir.1991). The Eighth Amendment's prohibition against cruel and unusual punishment of prison inmates has been construed to include the denial of adequate medical care. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Estelle v. Gamble,* 439 U.S. 97, 104 (1976) (holding that such behavior amounts to an "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment); *Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at *7 (S.D.N.Y. Mar. 7, 2002) ("A person who is

incarcerated is entitled to receive adequate medical care."). Prison officials violate this right when they are deliberately indifferent to an inmate's serious medical needs. *See Estelle,* 429 U.S. at 104; *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001).

**\*4** The Second Circuit has interpreted *Estelle* to consist of objective and subjective elements: *First,* a court must determine whether, objectively speaking, plaintiff's condition is such that the alleged deprivation of medical assistance is " 'sufficiently serious." ' *Hathaway v. Coughlin,* 37 F.3d 63, 66-67 (2d Cir.1994) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). This "standard contemplates a 'condition of urgency, one that may produce death, degeneration, or extreme pain." ' *Id.* (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). A serious medical need arises where " 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)). *See, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 332, 337 (S.D.N .Y.2000) (pain and facial swelling, migraines and burning in eyes gave rise to serious medical need); *Arce v. Banks,* 913 F.Supp. 307, 309 (S.D.N.Y.1996) (failure to treat small cyst on forehead not sufficiently serious).

*Second,* a court must consider whether the official " 'kn[ew] that an inmate face[d] a substantial risk of serious harm, and disregarded that risk by failing to take proper measures to abate it ." ' *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (quoting *Farmer,* 511 U.S. at 837). The failure to render proper care must result from a "sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson v. Seiter,* 501 U.S. at 298). "[T]he subjective element of deliberate indifference entails something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin II,* 99 F .3d 550, 553 (2d Cir.1996) (citing *Farmer,* 511 U.S. at 835). While mere medical malpractice is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to that level. *See id.* (citing *Farmer,* 511 U.S. at 847).

Here, it is largely undisputed that plaintiff's medical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

needs were serious. *See* Galeno Def. Mem. at 5. The key questions in this case turn on whether plaintiff has pleaded facts which show that each defendant was deliberately indifferent to those needs. As stated earlier, Woods's allegations must be assumed true for purposes of this discussion.

A. Dr. Bendheim

Beginning in early 1996, Dr. Bendheim established a pattern of sending plaintiff to specialists, and then ignoring their orders for monthly follow-up visits and blood work. Courts have held that a prison official's delay in scheduling appointments and failure to follow orders of a doctor constitutes denial of adequate medical care. *See, e.g., Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) ("Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors."); *Brown v. Coughlin,* 758 F.Supp. 876, 882-83 (S.D.N.Y.1991). Moreover, a pattern "might be taken to show that the described incidents were not accidents, inadvertent failures, or random occurrences of medical malpractice." *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 182 (N.D.N.Y.1996) (quotation omitted).

*\*5* At plaintiff's first appointment with Dr. Feng at AMC on May 31, 1996, he was ordered to return one month later. Yet Dr. Bendheim waited until January 31, 1997, *seven* months later, to send plaintiff for a follow-up visit.[FN8] *See* Am. Compl. ¶¶ 3-4. He then failed to have plaintiff's blood work done in advance of the visit, as ordered. *See id.* ¶ 4. Subsequently, rather than schedule plaintiff for an appointment one month from January 31, Dr. Bendheim did not do so until June 10, 1997, *six* months later. *See id.* ¶ 6. Again, Bendheim failed to take the necessary steps to have plaintiff's blood work done. *See id.*

FN8. This claim is not time-barred because the last such act occurred less than three years before plaintiff filed his Complaint. "When a plaintiff challenges a policy that gives rise over time to a series of allegedly unlawful acts, it will often be the case that plaintiff might bring his claim after the first such act, and yet the law may render timely a claim brought prior to the expiration of the statute of limitations on the last such act."

*Connolly v. McCall,* 254 F.3d 36, 40 (2d Cir.2001). *See also id.* (New York statute of limitations of three years for personal injury actions applies to Eighth Amendment claims brought pursuant to section 1983 in New York).

After this appointment, plaintiff saw Dr. Feng in July 1997 and September 1997. *See id.* Yet the pattern of delayed visits continued. In January of 1998, Bendheim failed to schedule a follow-up visit with a hematologist as ordered by a "Dr. Scroggion" in late 1997. *Id.* ¶ 17. In August 1999, Dr. Bendheim ignored orders issued by St. Agnes Hospital-where plaintiff had undergone elbow surgery in the Fall of 1999-to schedule appointments with a hematologist and a rheumatologist. *See* Pl. Opp.2d at 39.[FN9] As a result of Dr. Bendheim's actions, plaintiff's weight dropped dramatically and his white blood cell count became unstable. *See* Am. Compl. ¶ 4.

FN9. Plaintiff does not mention any defendant in connection with this last omission, but liberally construing his pleadings which elsewhere tie Bendheim to a failure to schedule such appointments, I conclude that plaintiff intended to name Bendheim here.

Bendheim thus repeatedly flouted the orders of trained specialists over several years.[FN10] Further, he never rescheduled plaintiff's knee surgery that was put off in June 1996 due to a shortage of beds.[FN11] *See id.* ¶ 17. Although the proof may show otherwise, these allegations state a claim of deliberate indifference to plaintiff's serious medical needs. Defendants' motion is denied with respect to plaintiff's Eighth Amendment claims against Dr. Bendheim.

FN10. Bendheim does not contend that his opinion differed from that of Dr. Feng or any other specialist with respect to plaintiff's allegations regarding the need for follow up visits. *See Amaker v. Goord,* No. 98 Civ. 3634, 2002 WL 523371, at \*6 (S.D.N.Y. Mar. 29, 2002) (citing *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

employed by medical personnel does not itself give rise to an Eighth Amendment claim."), and _Muhammad v. Francis,_ No. 94 Civ. 2244, 1996 WL 657922, at *6 (S.D.N.Y. Nov. 13, 1996) ("It is well established that mere differences in opinion regarding medical treatment do not give rise to an Eighth Amendment violation.")).

FN11. Bendheim's argument, that plaintiff does not state a claim because he received plenty of care, is unavailing. _See Hathaway,_ 37 F.3d at 68 (defendant doctor's frequent examinations of plaintiff did not preclude finding of deliberate indifference because "course of treatment was largely ineffective, and [he] declined to do anything more to improve [plaintiff's] situation."); _Ruffin v. Deperio,_ 97 F.Supp.2d 346, 353 (W.D.N.Y.2000) (stating that deliberate indifference could be pleaded despite frequent treatment by prisoner's doctors where treatment was "cursory" or evidenced "apathy").

**B. Dr. Weinstein**

Following plaintiff's elbow surgery in Fall 1999, Dr. Weinstein refused to carry out plaintiff's surgeon's orders-on seven different occasions in late 2000 and early 2001-by denying plaintiff's requests for physical therapy. _See_ Pl. Opp.2d at 38. Instead, Dr. Weinstein prescribed "home treatment" or "self-exercise," despite the fact that plaintiff could not use his arms to do anything including such basic functions as washing or dressing himself. Pl. Opp.2d at 38. I must draw the reasonable inference that, at times, no one was available to assist plaintiff in doing those things.

While plaintiff may not be able to prove his case against Dr. Weinstein, that is not the test here. By alleging that Dr. Weinstein intentionally refused to provide the treatment ordered by a specialist, such that plaintiff was virtually incapacitated, plaintiff has successfully pleaded that Dr. Weinstein was deliberately indifferent to his serious medical needs.

**C. Dr. Silver**

On September 16, 2000, Dr. Silver examined

plaintiff's elbow, which was dripping fluid and causing him "excruciating pain." Pl. Opp.2d at 22-3. Plaintiff requested surgery and a bone scan; Silver's response was "soap it." _Id._ at 22. While a medical doctor's determination is presumed correct, in certain instances a physician may be deliberately indifferent if he consciously chooses "an easier and less efficacious" treatment plan. _Chance,_ 143 F .3d at 703. _See also Williams v. Vincent,_ 508 F.2d 541, 544 (2d Cir.1974); _Waldrop v. Evans,_ 871 F.2d 1030, 1035 (11th Cir.1989). Because plaintiff may not be able to prove that such was the case here, this claim cannot be dismissed against Dr. Silver. In addition, on February 8, 2001, plaintiff was taken to St. Agnes Hospital for surgery on his elbow, but was turned away because "the facility failed to properly arrange this trip." Pl. Opp.2d at 23. When he arrived back at Green Haven, he asked Dr. Silver to reschedule the surgery but Dr. Silver refused. _See id._ Once again, allegations that a prison doctor failed to follow the orders of specialists or schedule surgery where the plaintiff's condition is admittedly grave, states a claim of deliberate indifference. Defendants' motion with respect to Dr. Silver is denied.

**D. Dr. Galeno**

*6 On August 17, 1999, Dr. Galeno performed surgery on plaintiff's elbow, then "failed to order antibiotics" despite "s[eeing] plaintiff's... infection." Am. Compl. ¶ 12. Instead, Dr. Galeno prescribed "Noprxen" for plaintiff's pain. Pl. Opp.2d at 39. As a result, plaintiff's elbow was infected for three days. _See_ Am. Compl. ¶ 12.

While plaintiff alleges that Galeno was aware of some risk to plaintiff, his case against Galeno fails on both prongs. _First,_ the alleged deprivation of care caused a localized infection that lasted for three days, which is not a condition approaching urgency, degeneration or great pain. _See Hathaway,_ 37 F.3d at 66. _Second,_ there was "no delay" in prescribing _some_ treatment, and "the fact that plaintiff felt something more should have been done ... [is] not a sufficient basis for a deliberate indifference claim." _Brown v. McElroy,_ 160 F.Supp.2d 699, 704 (S.D.N.Y.2001). The allegations against Dr. Galeno state, at most, a claim for one instance of medical malpractice, and therefore must be dismissed. _See Estelle,_ 439 U.S. at 104; _Pritchett v. Artuz,_ No. 99 Civ. 3957, 2000 WL 4157, at *3 (S.D.N.Y. Jan. 3, 2000).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

**E. Supervisory Defendants: Goord, Greiner, Wright, Selwin, Koenigsmann, and Zwillinger**

Plaintiff claims that Goord, Greiner and Wright "failed to remedy a constitutional deprivation and are personally involved." Pl. Opp.2d at 12. He asserts that all of the supervisors named in this lawsuit, Goord, Greiner, Wright, Selwin, Koenigsmann and Zwillinger, had "authority and ability" to address his problems but did not. *Id.* at 34.

It is well established that personal liability cannot be imposed on a state official under a theory of *respondeat superior. See Black v. Coughlin II,* 76 F.3d 72, 74 (2d Cir.1996); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).* "The plaintiff must plead ... that the defendant had some direct [or personal] involvement in or responsibility for the misconduct." *Thompson v. State of New York,* No. 99 Civ. 9875, 2001 WL 636432, at *6 (S.D.N.Y. Mar. 15, 2001) (citing *Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir.1997)). A supervisory official may be personally involved in a section 1983 violation where the official: (1) directly participated in the infraction or ordered that the action be taken; (2) failed to remedy a wrong after learning of the violation; (3) created or allowed the policy or custom under which the incident occurred; (4) was grossly negligent in managing subordinates who caused the incident; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). To succeed on a claim under section 1983 a plaintiff must allege personal involvement by each defendant in the alleged constitutional deprivation. *See Keyes v. Strack,* No. 95 Civ. 2367, 1997 WL 187368, at *3 (S.D.N.Y. Apr. 16, 1997).

***7** The *alleged constitutional deprivations,* upon which supervisory liability may be predicated, are: (1) Bendheim's pattern, from 1996 to 1999, of delaying the scheduling of appointments with specialists and not carrying out their orders. and his failure to reschedule knee surgery; (2) Weinstein's failure to follow a specialist's orders regarding physical therapy; and (3) Silver's opting for the easiest course of treatment for

plaintiff's elbow, and failure to reschedule elbow surgery in February 2001.[FN12] Plaintiff argues that the grievances he filed and the letters he wrote to these supervisors, *see* Am. Compl. ¶¶ 4, 5, 8, 13, establish their personal involvement in these alleged constitutional deprivations, *see* Pl. Opp.2d at 12-15, 19-22.

FN12. *See Poe v. Leonard,* 282 F.3d 123, 126 (2d Cir.2002) (holding that in order for a supervisor to be held liable under section 1983, a subordinate must have violated the law). Plaintiff argues that the supervisory defendants were personally involved in two additional claims. First, plaintiff argues that he was unconstitutionally denied a lightweight wheelchair. *See* Pl. Opp.2d at 18-19, 25, 32-33. Plaintiff does not allege, however, that any individual defendant or defendants are responsible for this deprivation. Therefore, this claim must be dismissed. In July 1999, plaintiff's elbow required immediate attention, but surgery was delayed for three months. *See* Am. Compl. ¶ 21. Here, too, plaintiff fails to implicate any defendant and thus the claim must be dismissed.

The test for personal involvement of supervisory officials implies some alleged violation of a federal right. *See Poe,* 282 F.3d at 126. Where, as here, plaintiff does not successfully allege any violation, *supervisory* liability is not adequately pleaded, either. Personal involvement in an alleged violation cannot exist where there is no alleged violation.

**1. Commissioner Goord and Superintendent Greiner**

Plaintiff alleges that Goord and Greiner "ignored *all* [of his] grievances and appeals, [and] also failed to act on direct information indicating that [the *Milburn* decree is not being enforced]." Pl. Opp.2d at 13 (emphasis added).[FN13] Even construed liberally, however, "direct information" does not refer to anything other than the letters plaintiff wrote to Goord and Greiner, because no other specific facts are alleged with respect to these defendants. *See id.* at 13-14, 19-20, 22. Receipt of letters

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

or grievances, however, is insufficient to impute personal involvement. *See Thompson, 2001 WL 636432, at *7; Rivera, 119 F.Supp.2d at 344; Pritchett, 2000 WL 4157, at *6; Thomas v. Coombe, No. 95 Civ. 10342, 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998).*[FN14] "Were it otherwise, virtually every prison inmate who sues for constitutional torts by [prison officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor]." *Thompson, 2001 WL 636432, at *7.* Greiner "passed upon" several of plaintiff's letters by referring them to Lester Wright. *See, e.g.,* 12/10/99 Letter from Wright to Goord, Ex. 6 to Am. Compl. (stating that Commissioner Goord had forwarded plaintiff's September 13, 1999 letter to him). Referring medical complaint letters to lower-ranked prison supervisors, however, does not constitute personal involvement. *See Ramos v. Artuz, No. 00 Civ. 149, 2001 WL 840131, at *8 (S.D.N.Y. July 25, 2001).* Because there are no further allegations regarding Goord or Greiner, plaintiff's case is dismissed as against them.

FN13. In 1980, Judge Robert Ward of this Court certified a class of present and future Green Haven inmates challenging the constitutionality of Green Haven's provision of health care services. *See Shariff v. Artuz, No. 99 Civ. 321, 2000 WL 1219381, at *4 n .5 (S.D.N.Y. Aug. 28, 2000)* (referring to "*Milburn v. Coughlin,* No. 79 Civ. 5077 (S.D.N.Y.)"). The parties entered into a series of agreements culminating in the 1991 modified consent decree, requiring Green Haven to create and maintain an ADA and Rehabilitation Act-compliant unit for the physically disabled-the UPD-and establishing certain guidelines for adequate medical care. *See id.; see also McKenna v. Wright, No. 01 Civ. 6571, 2002 WL 338375, at *7 n. 9 (S.D.N.Y. Mar. 4, 2002)* (recognizing Milburn consent decree); *Green v. Bauvi, 792 F.Supp. 928, 936 n. 12 (S.D .N.Y.1992)* (same). To the extent that plaintiff is alleging a violation of the *Milburn* decree, his action is not properly before this Court and thus cannot be considered. *See McKenna, 2002 WL 338375, at *7 n. 9* (holding that plaintiff must refile with Judge Ward who

retains supervision over enforcement of the Milburn decree); *Kaminsky v. Rosenblum, 737 F.Supp. 1309, 1317 n. 6 (S.D.N.Y.1990)* ("[Issue of whether Milburn decree was violated] is not, and cannot be, before this Court. Violations of the *Milburn* decree can be remedied only by bringing the alleged violations to the attention of the able District Judge [Ward] who retains supervision over that decree."). Thus, plaintiff's claims to enforce the *Milburn* decree are denied.

FN14. In *Burgess,* I stated that "courts have found personal involvement of a supervisory official where a plaintiff has sent letters or orally informed the official of an ongoing constitutional violation." *1999 WL 33458, at *5* (quoting *Heron v. Dalsheim, No. 95 Civ. 2625, 1999 WL 2871, at *5 (S.D.N.Y. Jan. 4, 1999)*). I note, however, that this statement of law is now against the weight of authority. In any event, plaintiff in *Burgess* alleged that a supervisor said to him "something to the effect that he saw no reason why plaintiff could not take the stairs one day out of the week." *Id.* at *1, *5. This allegation evinced a level of personal involvement outside of the official's receipt of plaintiff's complaints. *See id.* at *5.

2. Associate Commissioner Wright and Health Services Director Koenigsmann

Wright and Koenigsmann, on the other hand, did not merely receive plaintiff's letters, but also responded to them. *See* Pl. Opp.2d at 22. On December 10, 1999, Wright wrote to plaintiff, explaining that plaintiff's letter to Goord had been forwarded to him. *See* 12/10/99 Letter from Wright to Woods ("12/10/99 Wright Ltr."), Ex. 6 to Am. Compl. Wright allegedly gave the following explanation in response to plaintiff's complaint that he was not seeing the rheumatologist often enough:

**\*8** You have been examined by a rheumatologist on May 6 and July 22 of this year; received a prosthetic elbow brace on July 28, 1999, been evaluated by the orthopedic surgeon on August 18, September 10, September 27 and November 8 of this year, and had surgery on your right elbow on November 12, 1999. On

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

August 24, 1999 your white blood cell count was 116,000 and this test was repeated at St. Agnes Hospital the same day with a result of 95.5. On September 3 it was 80.8; on September 24 it was 76.4 and on November 4, is was 74.7. You were scheduled to see the hematologist in follow-up at Westchester Medical Center on October 4, but you refused. You had a decompressive laminectomy of your neck on April 27[,] 1999. Your left shoulder triplearthrodesis was postponed to accommodate your neck surgery; as have your bunion surgery and left foot triplearthrodesis....

12/10/99 Wright Ltr. Plaintiff alleges that Wright responded on two other occasions with similarly informative, thorough letters. *See* 10/18/00 Letter from Wright to Goord, Ex. 22 to Am. Compl.; 1/24/01 Letter from Wright to Goord, Ex. 6 to Am. Compl. In response to his complaint regarding the alleged denial of physical therapy, plaintiff alleges that Koenigsmann wrote on May 4, 2000:

I have investigated the allegations made in your letter and discussed your case at length with the Physical Therapy department as well as reviewed the documentation involved in the event. On 5/1/00 you began therapy for your right elbow. The recommendation for Physical Therapy was made both by Physiatry and the Orthopedic Surgeon as well as the types of therapy I.e. [sic] active range of motion and strengthening exercises. When you arrived in Physical Therapy you were instructed to begin active range of motion exercises, you declined to participate in this program and insisted on Passive range of motion. This was not indicated or recommended for your treatment. With that you stated that you would do that in your cell on your own and refused therapy. To be clear, the Physical Therapy personnel were fully prepared to have you participate in the program but the type of therapy must be per the recommendations of the Physicians and Physical Therapists. To refuse care because they will not comply with the program that you want but do not need is potentially hindering maximum recovery from the surgery. I urge you to agree to return to Physical Therapy and follow the program that was arranged for you.

5/4/00 Letter from Koenigsmann to Woods, Ex. 20 to

Am. Compl. Plaintiff argues that Wright and Koenigsmann thus had actual knowledge of these wrongs committed by their subordinates but did not attempt to remedy them except to respond to his complaints.

One court has held that where a supervisor's "involvement went beyond merely the receipt of complaint letters," to "responding, explaining the treatment and defending the institution," personal involvement was established. *Ramos,* 2001 WL 840131, at *8 (Pitman, J.). *See also* *Rashid v. Hussain,* No. 95 Civ. 676, 1997 WL 642549, at *2-*3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.) (detailed responses to prisoner's letter establish personal involvement). This is by no means the majority rule, however. *See, e.g., Joyner v. Greiner,* No. 01 Civ. 7399, 2002 WL 550092, at *5 (S.D.N.Y. Mar. 28, 2002) (McMahon, J.) (holding that prison doctor's response to plaintiff's letter did not plead personal involvement); *Ramsey v. Coughlin,* 1 F.Supp.2d 198, 204 (W.D.N.Y.1998) (holding that plaintiff's claim that supervisor responded to his letters is not sufficient to establish personal involvement).

*9 Wright and Koenigsmann's provision of information and advice based on diagnoses from their staff does not appear to constitute "fail[ure] to remedy a wrong." *Colon,* 58 F.3d at 873. Supervisors are entitled to rely on and adopt the recommendations of prison doctors without incurring a charge of personal involvement. *See* *Thompson,* 2001 WL 636432, at *7; *Keyes,* 1997 WL 187368, at *3. Moreover, it may be said here: "Far from establishing deliberate indifference, [the medical supervisor's] response demonstrates appropriate attention to plaintiff's circumstances." *Joyner,* 2002 WL 550092, at *5. On the other hand, plaintiff alleges that Wright and Koenigsmann responded to his complaints in a detailed, specific manner, a factor not present in *Joyner. See also* *Rashid,* 1997 WL 642549, at *3 (stating that where defendant merely responded to plaintiff's letter, no personal involvement would be established, but opposite is true where defendant responded in such a way as to suggest notice of the "duration and extent of [plaintiff]'s condition"). Because the depth of their responses indicates full awareness of plaintiff's situation, Wright and Koenigsmann may actually have failed to remedy a wrong by, for instance, not intervening to schedule a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

rheumatology appointment or ensuring that physical therapy treatment was provided. The motions to dismiss are denied with respect to Wright and Koenigsmann.

3. Acting Health Service Director Selwin

Woods alleges that Norman Selwin "constantly ... denied [plaintiff] medical treatment for his neck, shoulder, wrist, elbows, knees, rheumatoid arthritis monthly appointments, MRI and x-ray consults." Pl. Opp.2d at 20. Beyond this conclusory allegation which provides no dates or time frame, there is no other allegation of Selwin's personal involvement, as defined in *Colon v. Coughlin,* with respect to any of the established allegations of deprivation. The Complaint and Amended Complaint are thus dismissed with respect to Selwin for failure to state a claim.

4. Regional Health Administrator Zwillinger

Plaintiff does allege sufficient facts to state a claim against Zwillinger. FN15 In 1998, Zwillinger was "constantly contacted by Dr. Robert Cohen M.D. (Medical Auditor assigned by Judge Ward U.S.D.J.) and Margaret K. Loftus from Prisoner's Rights Project regarding plaintiff's constitutional deprivation of adequate medical care and the violation of the burn v. Coughlin stipulation." Pl. Opp.2d at 15. Both Cohen and Loftus specifically requested that Zwillinger remedy the lack of regularly scheduled rheumatology appointments. *See* 9/25/98 Letter from Loftus to Zwillinger, Ex. 11 to Am. Compl. ("Mr. Woods ... has not been to see his Rheumatoid Arthritis specialist in over four months."); 8/21/98 Letter from Cohen to Zwillinger, Ex. 10 to Am. Compl. ("Could you please review the care of Mr. Woods with [respect to] ..: 1. Lack of access to specialty care, specifically rheumatology consultation. Mr. Woods needs to be seen regularly by a rheumatologist and is being denied access to necessary consultation.").

FN15. Several allegations against Zwillinger are dismissed for failure to state a claim. Plaintiff alleges that in January 1996 and as late as March 19, 1996, Zwillinger, Koenigsmann, and Selwin "[led] [the medical team] to believe plaintiff had a reconstruct[ive] should[er] operation at St. Agnes, where in fact plaintiff never had reconstructive surgery, plaintiff had arthroscopic

surgery." Am. Compl. ¶ 16. Plaintiff claims that the effort to mislead the medical team as to the type of surgery he had in 1996 at St. Agnes continues to this day, as does his suffering because of it. *See id.* These allegations are wholly inexplicable and as such, fail to state a claim for which relief can be granted.

**\*10** Thus, Zwillinger had knowledge, beyond receipt of letters or grievances from plaintiff, of alleged unconstitutional deprivation. *See Poe v. Pearl,* No. 94 Civ.2058, 1997 WL 76576, at \*6 (D.Conn. Jan. 29, 1997) ("A supervisor acts with deliberate indifference if he has actual or constructive knowledge of unconstitutional practices and fails to act on the basis of information available to him."). Outside health and legal professionals appealed directly to Zwillinger on behalf of Woods, and he did nothing. *See Ramos,* 2001 WL 840131, at \*9-\*10 (holding that prison official's receipt of direct and detailed pleas from the Legal Aid Society regarding plaintiff's deprivation of treatment, and failure to respond appropriately, constituted deliberate indifference). Zwillinger thus exhibited deliberate indifference to Woods's serious medical needs by failing to act on Cohen's or Loftus's pleas. *See Colon,* 58 F.3d at 873. Defendants' motion is denied as to Zwillinger.

F. Defendants Ace, Williams and Duprey

Plaintiff does not allege any facts, in either complaint or in his opposition papers, with respect to Selim Ace, Mary Kate Moddox Williams or Randy Duprey. "The courts have consistently held that, where the complaint names a defendant in the caption but no allegations indicating exactly how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to th[ose] defendant[s] should be granted." *Marable v. Kurtz,* No. 99 Civ. 1387, 2000 WL 1279763, at \*4 (S.D.N.Y. Sept. 11, 2000) (citation omitted). The Complaint and Amended Complaint are dismissed as to Ace, Williams and Duprey.

V. QUALIFIED IMMUNITY

Defendants argue that, in the event that the Court rules that plaintiff has stated a claim against any defendant, such defendant's actions were objectively

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

reasonable and therefore entitled to qualified immunity.

The defense of qualified immunity "shields public officials from liability for their discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hathaway,* 37 F.3d at 67 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The court in *Hathaway,* referring to the unconstitutional deprivation of a prisoner's right under the Eighth Amendment to adequate medical care, stated that "[e]ven where, as here, a plaintiff's federal rights are well-established, qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

"Although qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss. The motion will be granted if the complaint fails to allege the violation of a clearly established constitutional right." *Hardy v. Jefferson Community Coll.,* 260 F.3d 671, 677 (6th Cir.2001) (citation omitted). An immunity defense usually depends on the facts of the case, however, making dismissal at the pleading stage inappropriate. *See Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir.2001); *King v. Simpson,* 189 F.3d 284, 289 (2d Cir.1999) (reversing district court's dismissal on ground of absolute immunity because factual showing was necessary where plaintiff alleged constitutional violation). Thus, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds. *See Alvarado,* 267 F.3d at 651 (citing *Jacobs v. City of Chicago,* 215 F.3d 758, 765 n. 3 (7th Cir.2000)). Here, plaintiff *has* successfully alleged a constitutional violation against Bendheim, Weinstein, and Silver, and personal involvement in at least one of those violations by Zwillinger. A determination as to whether these defendants' actions were "objectively reasonable" is necessarily fact-based. Thus, defendants' qualified immunity defense must be rejected at this stage.

VI. CLAIM AGAINST BARBARA WHITNEY

**\*11** Woods claims that defendant Barbara Whitney copied plaintiff's medical records and released them to the Attorney General's office "without getting an Authorized

medical release form, which is a violation of ... plaintiff's confidentiality." Pl. Opp.2d at 27-28. Woods does not specify when this was done.

It is settled law that release of an inmate's medical records in defense of litigation does not violate any right of the inmate when he has filed suit against prison officials. *See, e.g., Gill v. Gilder,* No. 95 Civ. 7933, 1997 WL 419983, at \*2 (S.D.N.Y. July 28, 1997) (citing *Crawford v. Manion,* No. 96 Civ. 1236, 1997 WL 148066, at \*1 (S.D.N.Y. Mar. 31, 1997) (Mukasey, J.)). Plaintiff thus waived all rights to privacy in his medical records when he put his medical condition in issue in a lawsuit. In the absence of any allegation that Barbara Whitney's action occurred before suit was instituted or was for some purpose other than the defense of litigation, this claim is dismissed.

VII. DISCRIMINATION CLAIMS AND ADMINISTRATIVE EXHAUSTION

Plaintiff also claims that defendants have violated his rights under Title II of the ADA and section 504 of the Rehabilitation Act (1) by denying him a lightweight wheelchair; and (2) because in 1998, defendant Jones, a corrections officer, forced plaintiff to stand up so that he could be frisked, causing him to fall. *See* Pl. Opp.2d at 18-19, 25, 32-33; Am. Compl. ¶ 18. To state a claim under Title II of the ADA, a prisoner must show "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity that provides the service, program or activity is a public entity." *Shariff,* 2000 WL 1219381, at \*4 (quoting *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)). *See also* 42 U.S.C. § 12132. To state a claim under section 504 of the Rehabilitation Act, a prisoner must allege facts showing that "(1) he is a 'qualified individual with a disability'; (2) he is 'otherwise qualified' to participate in the offered activity or program or to enjoy the services or benefits being offered; (3) he is being excluded from participation or enjoyment solely by reason of his disability; and (4) the entity denying the inmate participation or enjoyment receives federal financial assistance." *Shariff,* 2000 WL 1219381, at \*4 (quoting *Clarkson,* 898 F.Supp. at 1036). *See also* 29 U.S.C. § 794(a).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)

(Cite as: 2002 WL 731691 (S.D.N.Y.))

Before reaching the merits of these claims, it is necessary to examine whether plaintiff has exhausted prison remedies for these complaints. The Prison Litigation Reform Act of 1980 requires that prisoners pursue available administrative remedies before bringing any federal claim in federal court. *See* 42 U.S.C. § 1997e.FN16 Recently, the Supreme Court clarified the parameters of this requirement. *See Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988 (2002). "All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy [or] effective." *Id.* Dismissal on the basis of failure to exhaust is now mandatory, whereas it was once within the discretion of the district court. *See id.* (citing *Booth v. Churner,* 532 U.S. 731, 739 (2001)).

> FN16. Woods has exhausted administrative remedies for his Eighth Amendment claims. *See* Am. Compl. ¶ 13. Woods's voluminous attachment to his opposition papers shows, *inter alia,* that he has filed grievances regarding (1) Dr. Bendheim's delay in scheduling follow-up visits with Dr. Feng; (2) denial of physical therapy; and (3) lack of treatment of elbow and denial of knee surgery. Further, defendants do not argue that Woods has failed to exhaust available remedies for these claims.

**\*12** Woods does not allege nor offer any evidence that he followed prison grievance procedures for his disability discrimination claims. Thus, they must be dismissed without prejudice.

VIII. INJUNCTIVE RELIEF

The Eleventh Amendment is not a bar to suits in equity against state officials. *See Keyes,* 1997 WL 187368, at *4 (citing *Dube v. State Univ. of New York,* 900 F.2d 587, 595 (2d Cir.1990)). "A state official acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar." *Dube,* 900 F.2d at 595. Plaintiff seeks an order from the Court requiring "the defendants [to] provide for the plaintiff appropriate [ ] medical treatment in the future." Am. Compl. ¶ (D). Plaintiff does not further specify the nature

of the injunctive relief he requests.

The *Milburn* decree "governs the provision of health care services at Green Haven." *McKenna,* 2002 WL 338375, at *7 n. 9. *See also supra* note 13. In light of Judge Ward's exclusive supervision of the *Milburn* decree, *see Kaminsky,* 737 F.Supp. at 1317 n. 6, it is not within this Court's jurisdiction to order the broad injunctive relief that Woods requests. Woods's request that appropriate medical care be provided to him in the future is tantamount to a suit to enforce the *Milburn* decree and, as such, must be refiled with Judge Ward. *See McKenna,* 2002 WL 338375, at *7 n. 9; *Kaminsky,* 737 F.Supp. at 1317 n. 6; *supra* note 13. This portion of the Complaint and Amended Complaint is dismissed.

IX. CONCLUSION

For the foregoing reasons, the Complaint and Amended Complaint are dismissed to the extent that they assert (1) monetary claims against defendants in their official capacities; and (2) state law claims against defendants in any capacity. Plaintiff's claims brought under the ADA and Rehabilitation Act are dismissed for failure to exhaust administrative remedies. Plaintiff's claim for injunctive relief is denied.

Defendants' motions to dismiss are granted with respect to defendants DOCS, CPS, Goord, Greiner, Selwin, Duprey, Jones, and Whitney, and additional defendants Ace, Moddox Williams and Duprey. The motions are denied in part, and granted in part, as to defendants Wright, Koenigsmann, Zwillinger, Bendheim, Weinstein, and Silver. The claims that have been dismissed against these individuals are listed at notes 12 and 15, *supra.* A conference is scheduled for May 10, 2002 at 4:30 p.m.

SO ORDERED:

S.D.N.Y.,2002.

Woods v. Goord
Not Reported in F.Supp.2d, 2002 WL 731691 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Candido BAEZ, Plaintiff,
v.
J. HARRIS, Deputy Superintendent, Shawangunk
Correctional Facility; Donald Selsky, Director Special
Housing Unit Program; and Quartarone, Nurse,
Shawangunk Correctional Facility, Defendants.
No. 9:01-CV-807.

Feb. 7, 2007.
Candido Baez, Ossining, NY, Plaintiff Pro Se.

Andrew M. Cuomo, Attorney General for the State of New
York, Maria Moran, Esq., Assistant Attorney General,
Syracuse, NY, Attorney for Defendants.

### MEMORANDUM-DECISION AND ORDER

NORMAN A. MORDUE, Chief U.S. District Judge.
### INTRODUCTION
*1 Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services, brought this
action under 42 U.S.C. § 1983. The amended complaint
(Dkt. No. 49) claims that defendants violated his
constitutional rights under the Eighth and Fourteenth
Amendments.

Defendants' motion for summary judgment (Dkt. No.
75) was referred to United States Magistrate Judge David
R. Homer for a report and recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate
Judge Homer's Report and Recommendation (Dkt. No. 81)
recommends that defendants' motion be granted in part and
denied in part.

Plaintiff has submitted an objection (Dkt. No. 82) to
the Report and Recommendation. Pursuant to 28 U.S.C. §
636(b)(1)(C), this Court conducts a *de novo* review of
those parts of a magistrate judge's report and

recommendation to which a party specifically objects.
Where only general objections are filed, the Court reviews
for clear error. *See* Brown v. Peters, 1997 WL
599355,*2-*3 (N.D .N.Y.), *af'd without op.,* 175 F.3d
1007 (2d Cir.1999). Failure to object to any portion of a
report and recommendation waives further judicial review
of the matters therein. *See* Roldan v. Racette, 984 F.2d 85,
89 (2d Cir.1993).

### DISCUSSION

Plaintiff objects to Magistrate Judge Homer's Report
and Recommendation insofar as it recommends: (1) that
all claims against Selsky be dismissed; and (2) that all
Eighth Amendment claims be dismissed.
**(1) Claims against Selsky**

Plaintiff asserts Eighth and Fourteenth Amendment
claims against Selsky. Plaintiff objects to Magistrate Judge
Homer's recommendation that they be dismissed.

The Court first addresses plaintiff's Eighth
Amendment claims against Selsky. Plaintiff's amended
complaint may be read to assert a claim against Selsky
based on the allegedly premature removal of plaintiff's
bandages after hernia surgery. In a Memorandum-Decision
and Order entered on September 29, 2003 (Dkt. No. 29)
the Court adopted Magistrate Judge Homer's
recommendation (Dkt. No. 27) to dismiss without
prejudice plaintiff's claims based on premature removal of
the bandages because plaintiff had failed to exhaust this
claim. Plaintiff then filed a grievance raising this issue.
The grievance was rejected as untimely, and that rejection
was affirmed on administrative appeal. Accordingly, the
claim remains unexhausted. Plaintiff objects to dismissal
of this claim, arguing that he attempted to exhaust it. The
fact that plaintiff was foreclosed from exhausting the claim
due to the passage of time does not, without more, excuse
him from the administrative exhaustion requirement. *See*
Williams v. Comstock, 425 F.3d 175, 176 (2d Cir .2005);
Baez v. Kahanowicz, 2007 WL 102871, *7 (S.D.N.Y.).
Thus, the Court agrees with Magistrate Judge Homer that
plaintiff's Eighth Amendment claim based on removal of
his bandages must be dismissed for failure to exhaust his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

administrative remedies. Further, the Court agrees with Magistrate Judge Homer that, in any event, the claim lacks merit. Accordingly, to the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

**\*2** Plaintiff also appears to assert an Eighth Amendment claim against Selsky stemming from plaintiff's allegedly premature removal from the hospital and subjection to a lengthy bus trip when he needed immediate medical attention. However, there is no basis to find that Selsky was personally involved in these events. To the extent that plaintiff asserts an Eighth Amendment claim against Selsky based on this allegation, it is dismissed.

To the extent that plaintiff bases an Eighth Amendment claim on the conditions he experienced in SHU, this Court agrees with Magistrate Judge Homer that as a matter of law plaintiff's allegations fail to state such a claim. *See generally Branch v. Goord,* 2006 WL 2807168, \*5 (S.D.N.Y.). Thus, all Eighth Amendment claims against Selsky are dismissed.

With respect to plaintiff's Fourteenth Amendment claims against Selsky, plaintiff's objections state: "Defendant Selsky could have release[d] plaintiff sooner from SHU, but instead waited until I submitted a C.P.L.R. Article 78 [petition] to change his decision and release me. Defendant Selsky was put on notice sooner with my administration *[sic]* appeal to release me from SHU but chose not to." Essentially, plaintiff asserts Fourteenth Amendment liability against Selsky stemming from the disciplinary hearing conducted by defendant Harris and Selsky's handling of plaintiff's appeal from Harris' determination. [FN1]

FN1. In his objection, plaintiff also states: "My father addressed a letter to Mr. Selsky documenting the violations of my rights. Therefore, [Selsky] is personally involve[d] because he was aware of the violation and never release[d] me from SHU[.]" The receipt of a letter does not, however, constitute sufficient personal involvement to generate supervisory liability. *See Sealey v. Giltner,* 116 F.3d 47, 51

(2d Cir.1997); *Garvin v. Goord,* 212 F .Supp.2d 123, 126 (S.D.N.Y.2002).

Selsky's affidavit in support of summary judgment states that he is the Director of the Special Housing/Inmate Disciplinary Program, and that he personally responds, as the Commissioner's authorized designee, to all Tier III appeals taken by inmates. Under the circumstances of this case, the record is sufficient to withstand summary judgment on the issue of personal involvement. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of a violation through a report or an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."). Likewise, defendants are not entitled to dismissal of plaintiff's claim against Selsky based on plaintiff's confinement in SHU for one year. *See generally Sandin v. Connor,* 515 U.S. 472, 483-84 (1995).

**(2) Claims against Quartarone**

Plaintiff objects to Magistrate Judge Homer's recommendation that the Court dismiss plaintiff's Eighth Amendment claim against defendant Quartarone. Insofar as this claim is based on Quartarone's allegedly premature removal of plaintiff's bandages after his hernia repair surgery, it is unexhausted as discussed above.

Plaintiff's other Eighth Amendment claims, based on his allegedly premature removal from the hospital and bus transfer, do not allege any involvement on the part of Quartarone. The sole named defendant allegedly involved in these events is Forte; however, all claims against him have been dismissed (Dkt. No. 79). Accordingly, all claims against Quartarone are dismissed.

**CONCLUSION**

**\*3** It is therefore

ORDERED the Court accepts and adopts the Report and Recommendation (Dkt. No. 81) of United States Magistrate Judge David R. Homer, except insofar as it recommends dismissal of the Fourteenth Amendment claims as against Selsky; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 75) is granted in part and denied in part; and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

ORDERED that dismissal of all claims against defendant Quartarone is granted; and it is further

ORDERED that dismissal of plaintiff's Eighth Amendment claims against defendant Donald Selsky is granted; and it is further

ORDERED that dismissal of plaintiff's Fourteenth Amendment claims against Donald Selsky is denied; and it is further

ORDERED that dismissal of plaintiff's claims against J. Harris is denied.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> **FN1.** This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Candido Baez ("Baez"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] three DOCS employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. Am. Compl. (Docket No. 49) at ¶¶ 50-53. Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 75. Baez opposes the motion. Docket No. 76. For the reasons which follow, it is recommended that defendants' motion be granted in part and denied in part.

> **FN2.** Harris, Selsky, and Quartarone. Defs. Mem. of Law (Docket No. 75) at 2. The remaining defendant, Doctor Forte, was dismissed following his death in 2004. Docket No. 79.

## I. Background

The facts are set forth in the light most favorable to Baez as the non-movant. See Section II(A) *infra*.

### A. Disciplinary Hearing

At all relevant times, Baez was incarcerated at Shawangunk Correctional Facility ("Shawangunk"). Am. Compl. at ¶ 1. On November 8, 1999, while in the A yard, Baez swung a five-pound weight and hit inmate Garbez on the left side of his head. Moran Aff. (Docket No. 75), Ex. A at 1. Another inmate, Valdez, began to fight with Baez and both ignored orders from corrections officer Riopelle to stop. *Id.* A response team was able to separate Valdez and Baez, removed them from the yard, and brought both inmates to the infirmary. *Id.* Baez was issued a misbehavior report for assault on an inmate, fighting, refusing a direct order, and having a weapon. *Id.* On the same day, corrections officers searched Baez's cell and confiscated a bottle of expired medication, a broken ruler, and a hard plastic plate. *Id.* at 2. Baez received another misbehavior report for possessing unauthorized medication, contraband, property in unauthorized area, and an altered item. *Id.*

On November 10, 1999, the commencement of Baez's Tier III disciplinary hearing [FN3] was adjourned to November 16, 1999 because the hearing officer, Deputy Superintendent of Programs J. Harris, was unavailable. Docket No. 24, Ex. C; Hrg. Tr. at 1. Baez's assistant for the hearing, Boyham,[FN4] first met with Baez on November 10, 1999 and completed his assistance on November 12, 1999. Hrg. Tr. at 2. On November 16, 1999, Baez's disciplinary hearing commenced. Hrg. Tr. at 1. On November 23, 1999, Harris found Baez guilty of assault, fighting, possessing a weapon, refusing a direct order, and having an altered item and found him not guilty of unauthorized medication, having property in an unauthorized area, and possessing contraband. Moran Aff., Ex. A at 3-4. Baez was sentenced to twenty-four months in the Special Housing Unit ("SHU"),[FN5] loss of packages, commissary, and telephone privileges, and the recommended loss of twenty-four months of good time credit. *Id.* Additionally, Baez lost his inmate grade-pay and program assignment. Compl. (Docket No. 1) at ¶ 17.

> **FN3.** DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendents' hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. &

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

Regs. tit. 7, §§ 253.7(iii), 270.3(a) (2006).

FN4. Boyham, an original defendant in this matter, was dismissed from the case on a motion for summary judgment on September 29, 2003. Docket No. 29.

FN5. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2006). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

**\*4** Baez appealed Harris's determination. Docket No. 24, Ex. H. On March 21, 2000, Baez filed a petition pursuant to N.Y. C.P.L.R. Art. 78.[FN6] Moran Aff., Ex. C. The defendants received three extensions of time to answer Baez's petition. Am. Compl. at ¶ 10. On May 17, 2000, Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, modified Baez's punishment from twenty-four months to twelve months. Moran Aff., Ex. B at 1-2. On October 26, 2000, Baez's petition was transferred from Ulster County Supreme Court to the Appellate Division, Third Department. Moran Aff., Ex. C at 3. On March 12, 2001, Selsky administratively reversed the disciplinary determination because the hearing officer considered medical evidence not on the record. Moran Aff., Ex. B at 4. On June 14, 2001, Baez's Article 78 petition was denied as moot. Moran Aff., Ex. C at 3-4.

FN6. N.Y. C.P.L.R. Art. 78 (McKinney 1994 & Supp.2006) establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

**B. Medical Treatment**

On December 14, 1999, Baez had hernia repair surgery at Albany Medical Center. Am. Compl. at ¶ 33. Baez was to remain on bed rest in the hospital for three days. Id. On December 16, 1999, Baez was discharged from the hospital. Id. Baez was instructed to keep the

dressing dry and intact for two days and then remove the outer dressing and resume showering. Davidson Decl. (Docket No. 75), Ex. 1. Baez was not allowed to engage in lifting, strenuous work, straining or reaching for six weeks and was allowed to return to work or school. Id. A follow-up examination at the prison clinic was also required. Id. Quartarone removed Baez's bandages and padding from the incision area against doctor's orders. Am. Compl. at ¶ 33.

On the day of Baez's discharge, he was ordered to board a bus for transfer to Downstate Correctional Facility. Id. Baez was taken on a bus trip which included stops at Shawangunk and Wallkill Correctional Facility where Baez began to vomit and experience severe pain. Am. Compl. at ¶ 34. Baez's requests to be taken to the infirmary were ignored. Id. This action followed.

**C. Procedural History**

Baez commenced this action by filing a complaint on May 25, 2001. See Compl. Defendants filed a motion for summary judgment on December 13, 2002. Docket Nos. 21-23. As a result of that motion, several claims and defendants were dismissed. Docket No. 27. That decision was modified on November 18, 2004 and required Baez to file an amended complaint within thirty days of the order. Docket No. 47. Baez complied and filed his amended complaint on December 17, 2004. Docket No. 49. This motion for summary judgment of the remaining defendants followed. Docket No. 75.

**II. Discussion**

Baez asserts three causes of action in his amended complaint. The first alleges that defendant Selsky failed to correct behavior that violated Baez's Eighth and Fourteenth Amendment rights. The second alleges that defendants Harris and Selsky deprived him of his due process rights in connection with a prison disciplinary hearing. The third alleges that defendant Quartarone was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[FN7] Am. Compl. at ¶¶ 50-53. Defendants seek judgment on all claims.

FN7. Any claims against Dr. Forte have been dismissed and are not being considered on this motion. See note 2 supra.

**A. Standard**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the nonmovant special solicitude.[FN8] *Id.; Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 2006 WL 3499975, at \*5 (2d Cir. Dec. 5, 2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

FN8. Baez has, however, filed at least seven other actions in the federal courts of New York since 1990. *U.S. Party/Case Index* (visited Jan. 8, 2007) <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl>.

### B. Eighth Amendment

### 1. Defendant Quartarone

In his third cause of action, Baez contends that "less than forty (40) hours after the [hernia] surgery, defendant Quartarone ... removed the bandages and padding from the incision area of [his] operation," thereby acting with deliberate indifference to his medical needs. Am. Compl. at ¶ 33. Defendants contend that Baez has failed to exhaust his administrative remedies on this claim and, in the alternative, the claim is without merit.

### a. Failure to Exhaust

Defendants contend that Baez has not exhausted his administrative remedies with regard to the claim that his Eighth Amendment rights were violated by defendant Quartarone. This assertion is based on the fact that Baez did not raise the issue of his surgery dressings being removed prematurely in his Grievance No. UST-2681-00. Defs. Mem. of Law at 10; *see also* Moran Aff., Ex. E.

Issues that have previously been determined become the law of the case. *In re Lynch,* 430 F.3d 600, 604 (2d Cir.2005) (citing *Quern v. Jordan,* 440 U.S. 332, 348 n. 18 (1979)). A district court may reconsider its own decision if the law has since changed, new evidence becomes available, to correct an error, or if a "manifest injustice would otherwise ensue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber,* 407 F.3d 34, 44 (2d Cir.2005).

**\*6** Here, this Court has already decided that Baez did not exhaust his claim regarding removal of the bandages because he never filed a grievance regarding it. Docket No. 27. The Report-Recommendation and Order containing that finding was adopted in full by the district court on September 29, 2003. Docket No. 29. In response to this Court's decisions, Baez filed a grievance on October 3, 2003 where he raised the issue of the early bandage removal. Am. Compl., Ex. A. That grievance was rejected as untimely in the absence of any reason provided for the delay. *Id.* Baez appealed the decision to reject his late grievance, but that decision was affirmed. *Id.* Although Baez attempted to remedy his failure to exhaust, filing an untimely grievance does not amount to an exhaustion of remedies. *Williams v. Comstock,* 425 F.3d 175, 176 (2d Cir.2005). Further, since this Court finds no reason to reconsider its previous decisions, Baez has not exhausted his claim for removal of the bandages.

### b. Medical Treatment

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

A serious medical need is " 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Cameros v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995) (quoting *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir.1991)). An impairment that a reasonable doctor or patient would find important and worthy to treat, a medical condition that affects the daily activities of an individual, or the existence of chronic and substantial pain are all factors that are relevant in the consideration of whether a medical condition was serious. *Chance,* 143 F.3d at 702-03.

Deliberate indifference requires the prisoner to prove that the prison official knew of and disregarded the prisoner's serious medical needs. *Id.* at 702. Mere disagreement over proper treatment does not create a constitutional claim as long as the treatment was adequate. *Id.* at 703. Allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**\*7** Even assuming that hernia repair surgery is a serious medical need, Baez failed to raise a question of material fact with regard to the alleged deliberate indifference of Quartarone in removing his bandages. The

bandages were removed on the second post-operative day, which was within the instructed time period recommended by Baez's surgeon. Davidson Decl. at ¶¶ 3-4. Therefore, it is recommended in the alternative that defendants' motion for summary judgment on this ground be granted.

**2. Defendant Selsky**

Baez alleges that Selsky "contributed to and proximately caused the ... violation of [his] Eighth and Fourteenth Amendment Rights." Am. Compl. at ¶ 50. Summary judgment in favor of all defendants, including Selsky, with regard to Baez's Eighth Amendment claim resulting from his disciplinary hearing has already been granted. Docket No. 27 at 16. As such, Baez's claim against Selsky for a violation of his Fourteenth Amendment due process rights in connection with his prison disciplinary hearing is dismissed. Baez's claim against Selsky for his alleged involvement in Baez's Eighth Amendment claims relative to his medical care remain at issue.

**a. Personal Involvement**

Defendants contend that Baez cannot demonstrate the personal involvement of Selsky in any Eighth Amendment violation.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). The doctrine of respondeat superior is not a substitute for personal involvement. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved," however, if they participated in the conspiracy, learned of the violation but failed to remedy the wrong, created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue, or were grossly negligent in managing subordinates who caused the violation. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted).

In his amended complaint, Baez's only allegation as to the personal involvement of Selsky is that he and his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

father wrote Selsky a letter documenting the violations of Baez's rights. Am. Compl. at ¶ 42. However, "receiving a letter from an inmate does not constitute sufficient personal involvement to generate supervisory liability." *Petty v. Goord,* No. Civ. 00-803(MBM), 2002 WL 31458240, at *8 (S.D.N.Y. Nov. 4, 2002). Further, there is no evidence that Selsky participated here in the alleged violations or created a policy which allowed constitutional violations to continue.

Therefore, it is recommended that defendants' motion for summary judgment as to Selsky be granted on this ground.

### C. Fourteenth Amendment

**\*8** Defendants Harris and Selsky contend that Baez's due process claim should be dismissed and that qualified immunity bars Baez's claim.

#### 1. Liberty Interest

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the confinement was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, this Court has already decided that Baez has raised a question of fact as to whether twelve months spent in SHU establishes a protected liberty interest. Docket Nos. 27, 29, & 47; *see also Colon v. Howard,* 215 F.3d 227 (2d Cir.2000) (holding that 305 days spent in normal SHU conditions was sufficient to raise a question of significant hardship). Defendants' motion on this ground should, therefore, be denied.

#### 2. Process Provided

At a prison disciplinary proceeding, an inmate is entitled to (1) advance written notice of the charges, (2) an opportunity to call witnesses if it conforms with prison security, (3) a statement of evidence and reasons for the disposition, and (4) a fair and impartial hearing officer. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974)). Additionally, the finding of guilt must be supported by some evidence in the record to comport with due process. *Massachusetts Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985); *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001).

Again, this Court has already determined that there is a question of fact as to the fourth prong of Wolff. Docket No. 27 at 12;.*see also In re Lynch,* 430 F.3d at 604 (quoting *Quern,* 440 U.S. at 348 n. 18)). As such, it is recommended that defendants' motion for summary judgment on this ground be denied.

### C. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y .2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the issue of defendants entitlement to qualified immunity has already been decided in Baez's favor. Docket Nos. 27, 29, & 47.

**\*9** Therefore, it is recommended that defendants' motion for summary judgment on this ground be denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Docket No. 75)

1. **GRANTED** as to Quartarone and Selsky in all respects; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)

(Cite as: 2007 WL 446015 (N.D.N.Y.))

2. **DENIED** as to Harris as to the due process claim.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.

Baez v. Harris
Not Reported in F.Supp.2d, 2007 WL 446015 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Zayd Abdur RASHID, f/k/a Aundre Singh, Plaintiff,
v.
Syed HUSSAIN, Dr., D.D.S., Eastern Correctional
Facility; Dr. Korfman, Regional Director; Robert
Mitchell; Superintendent Eastern Correctional Facility;
Frank Tracy, Deputy Superintendent Eastern
Correctional Facility; Robert McArdle, D.D.S., Director
of Correctional Dental Services, Defendants.
No. 95-CV-676 (RSP/DS).

Oct. 15, 1997.
Zayd Abdur Rashid, Sullivan Correctional Facility,
Fallsburg, New York, plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, The Capitol, Albany, New York, for
defendants, Lisa Renee Harris, Asst. Attorney General, of
Counsel.

**MEMORANDUM DECISION AND ORDER**

POOLER, J.
   *1 This matter comes to me following a
report-recommendation by Magistrate Judge Daniel
Scanlon, duly filed on the 9th of September, 1997.
Following ten days from service thereof, the Clerk has sent
me the entire file, including any and all objections filed by
the parties herein.

   Plaintiff, Zayd Abdur Rashid, has been incarcerated
by the New York State Department of Corrections since
1983 and was incarcerated at Eastern Correctional Facility
from November 11, 1988, until December 2, 1993.
Compl., Dkt. No. 1, ¶ 11; McArdle Aff., Dkt. No. 19, ¶
93. Rashid brings this action pursuant to 42 U.S.C. §
1983, alleging that defendants violated his Eighth
Amendment rights through their deliberate indifference to
his serious dental needs. Compl., ¶¶ 16-25. Specifically,
Rashid claims that on May 26, 1989, he saw a

periodontist, who recommended that Rashid have
periodontal surgery as soon as possible. Id., Exh. B.
Rashid claims that despite his repeated complaints
regarding the condition of his mouth during his
incarceration at Eastern, defendants failed to provide a
periodontal consultation or the recommended surgery.
Rashid eventually saw a periodontist on January 5, 1993,
McArdle Aff., Dkt. No. 19, ¶ 79, but did not have the
recommended surgery. On April 15, 1993, after his
transfer to Clinton Correctional Facility (CCF), plaintiff
had a consultation with Dr. Kenneth Palm, a general
dentist at CCF. Id., ¶¶ 82-83. Dr. Palm noted that plaintiff
had generalized bone loss and chronic periodontitis,
moderate to advanced, and recommended a course of
treatment which included extraction of all of Rashid's
upper teeth. Id., ¶¶ 84-86. Rashid's upper teeth were
extracted by May 11, 1994. Id., ¶¶ 96. Rashid claims
defendants' failure to attend to his dental needs resulted in
the deterioration of his condition and the ultimate loss of
his upper teeth. Compl., ¶¶ 23, 24.

   Defendants moved for summary judgment, Dkt. No.
19, arguing that they have been attentive to plaintiff's
dental needs and that, in any event, he has failed to allege
conduct sufficient to state a constitutional claim, Dkt. No.
20. Defendants also argued that plaintiff had failed to
allege personal involvement on the part of defendants
Tracy, McArdle, and Mitchell as required under Section
1983. In a report-recommendation filed on September 9,
1997, Magistrate Judge Scanlon concluded that plaintiff's
claims against defendants in their official capacities were
barred by the Eleventh Amendment. Dkt. No. 37 at 6. The
magistrate judge also recommended that I(1) grant the
motions for summary judgment as to defendants Tracy and
McArdle, on the ground that plaintiff had not alleged their
personal involvement in his dental care, id. at 15-17; and
(2) deny the motion for summary judgment as to
defendants Hussain and Korfman, on the ground that
questions of fact exist as to whether plaintiff had
established a serious dental need and whether defendants
had exhibited deliberate indifference to same, id. at 8-13.
Finally, the magistrate judge concluded that because there
is no evidence that service of the complaint was ever

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

perfected on defendant Mitchell, the court lacked jurisdiction over him and would not consider the claims against him. *Id.* at 15. At plaintiff's request, the time for filing his objections was extended to October 10, 1997. Dkt. No. 39. Plaintiff filed objections to the report-recommendation on October 14, 1997. Dkt. No. 42.

**\*2** I consider *de novo* those portions of the report-recommendation to which Rashid objects. 28 U.S.C. § 636(b)(1). Initially, Rashid objects to the magistrate judge's conclusion that the court lacks jurisdiction over defendant Mitchell because Mitchell was never served with the summons and complaint. Dkt. No. 42, at 2-4. Specifically, Rashid argues that although the United States Marshall attempted to serve the summons and complaint on Mitchell on July 9, 1995, Rashid was not advised that service was not completed until April 11, 1997. He claims that immediately thereafter he sought an order of the magistrate judge directing the United States Marshall to serve the complaint on Mitchell. In response to his request, Rashid received a letter dated May 13, 1997, from the Deputy Clerk of the Court which stated that the Assistant Attorney General had advised the court that she represented all of the defendants, including Mitchell, and that the Attorney General's office filed an answer to plaintiff's complaint and a motion for summary judgment on behalf of all of the defendants. The Clerk advised Rashid that his request for service on Mitchell was therefore moot.

Defendants' answer, filed on August 8, 1995, raised no affirmative defenses concerning service or personal jurisdiction. Dkt. No. 13. Moreover, in their motion for summary judgment, defendants made no jurisdictional arguments with regard to defendant Mitchell, arguing instead that the complaint against him should be dismissed for his lack of personal involvement in the conduct alleged. Dkt. No. 20 at 2-4. In any event, the statements of Assistant Attorney General Harris confirm that defendants raised no jurisdictional defenses regarding Mitchell. Accordingly, I disagree with the magistrate judge's conclusion that the court lacks jurisdiction over Mitchell. The question remaining is whether Mitchell is entitled to summary judgment on the ground that he was not personally involved in the alleged violations of plaintiff's constitutional rights.

It is well settled that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). In a suit for monetary damages under Section 1983, the doctrine of *respondeat superior* does not suffice, and a showing of some personal responsibility of the defendant is required. *Id.* (citing *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). A defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutional rights in several ways: (1) the defendant may have directly participated in the infraction; (2) a supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong; (3) a supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; or (4) a supervisory official may bear personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

**\*3** In opposition to defendants' motion for summary judgment, Rashid produced numerous pieces of correspondence in support of his position that Mitchell had notice of Rashid's need for surgery and his continuing pain. Specifically, Rashid produced, among other things, (1) a memorandum dated November 25, 1991, which he sent to defendant Hussain and copied to Mitchell, in which Rashid detailed his ongoing condition and the periodontist's May 26, 1989, recommendation that he have oral surgery; (2) a memorandum to Hussain dated June 2, 1992, copied to Mitchell, in which Rashid again advised Hussain of the recommendation for surgery, his continually deteriorating condition and fear that he would lose his teeth, and his belief that defendants' handling of the situation "constitute[d] a deliberate, depraved indifference to [his] dental needs"; and (3) a letter dated June 9, 1992, from Attorney Penny Shane to Mitchell, in which Shane advised Mitchell that Rashid was "suffering from severe dental problems that cause him to live in pain," and reminding Mitchell of the earlier recommendation that Rashid have surgery. Dkt. No. 31,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

Exh. 6. The record contains evidence that Rashid complained to Mitchell five times concerning the condition of his teeth during the period from November 25, 1991, to July 3, 1993. *Id.* Through these documents, Rashid has presented sufficient evidence to demonstrate the existence of genuine issues of material fact concerning Mitchell's personal involvement in the alleged deprivation of Rashid's rights. Accordingly, I conclude that summary judgment is inappropriate as to Mitchell.

Rashid also objects to the magistrate judge's finding that Rashid failed to allege personal involvement by Tracy and McArdle in the alleged constitutional violations and the recommendation that I grant summary judgment on that basis. Dkt. No. 42 at 3-12. Rashid argues that there is sufficient evidence in the record to establish these defendants' personal involvement or, at that very least, that there are disputed issues of fact in this regard which preclude summary judgment. *Id.* at 5, 11. I conclude that Rashid presented sufficient evidence to raise genuine issues of material facts concerning personal involvement by Tracy and McArdle in the alleged deprivations, such that summary judgment is inappropriate.

Specifically, Rashid produced evidence that Tracy read and responded to at least one of the letters Rashid wrote to Mitchell and received a response from Rashid dated July 3, 1992, detailing Rashid's condition, the history of his treatment, and his complaints regarding his care at Eastern. Dkt. No 31, Exh. 7. I agree with the magistrate judge that the mere fact that Tracy responded to a letter complaining about Rashid's dental treatment would not, by itself, subject Tracy to liability. *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 183 (N.D.N.Y.,1996). However, Rashid has presented evidence which suggests Tracy had notice of the extent and duration of Rashid's condition. Without passing judgment on the merits of Rashid's case, I conclude that "it is not beyond doubt that plaintiff could prove no set of facts under one of the *Williams* tests to support his claim of [Tracy's] personal involvement" in the alleged deprivation." *Horne v. Coughlin,* 795 F.Supp. 72, 76 (N.D.N.Y.1991).

**\*4** As to McArdle, I note initially that defendants have made no argument that McArdle was not personally

involved in the alleged deprivations. Dkt. No. 20 at 2-3. Moreover, in response to Rashid's grievance concerning his medical treatment, Mitchell notified Rashid that the "Dental Department advises they have been in contact with the Chief Dentist, who is attempting to make arrangements for grievant to see a periodontal specialist." Dkt. No. 31, Exh. 8. Drawing all inferences in Rashid's favor, as I must on this motion for summary judgment, *id.* at 73, I conclude that Rashid has presented evidence sufficient to raise a question of fact concerning McArdle's personal involvement, either because he knew of a problem and failed to remedy it or because, as dental director, he was grossly negligent in managing subordinates who caused a deprivation to occur, *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

In conclusion, after careful review of all of the papers herein, including the magistrate judge's report-recommendation and Rashid's objections thereto, I approve that part of the report-recommendation which denied defendants' summary judgment motions as to defendants Hussain and Korfman. However, for the reasons stated above, I decline to adopt that part of the report-recommendation which granted defendants' motion and dismissed the complaint as to Tracy and McArdle, and I deny the motion as to those defendants. In addition, I decline to adopt the magistrate judge's conclusions as to defendant Mitchell and deny the summary judgment as to Mitchell as well.

IT IS SO ORDERED.

DANIEL SCANLON, Jr., Magistrate J.

**ORDER and REPORT-RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Plaintiff, an inmate, alleges in this 42 U.S.C. § 1983 action that defendants violated his Eighth Amendment rights through their deliberate indifferent to his serious dental need. Defendants counter that they have been attentive to plaintiff's dental needs, and that plaintiff's suit sounds of dental malpractice-which would not be actionable under § 1983. Defendants have motioned for summary judgment (dkt.19), and plaintiff opposes the motion (dkt.29) For the following reasons, the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

records that defendants Dr. McArdle and Tracy be granted summary judgment; that defendants Dr. Korfman and Dr. Hussain be denied summary judgment; and that because the Court lacks jurisdiction over defendant Mitchell, it cannot examine the claims against him. The Court also orders parties to produce affidavits addressing the discrepancies appearing in the records submitted to it.

## BACKGROUND

Plaintiff has been incarcerated by the New York Department of Corrections ("DOCS")since 1983. His DOCS dental records, though not always legible, reflect that from the onset of his incarceration he has required a good deal of dental care. The misconduct that plaintiff alleges stems from his periodontal condition and its treatment. In December 1987, while he was an inmate at the Green Haven Correctional Facility, he was referred to a periodontist for an examination.[FN1] In May 1988, plaintiff was examined by Dr. Andrew Benjamin, a periodontist, who found that plaintiff's level of periodontoclasia was "moderate" (as opposed to "incipient" or "severe"), are recommended that plaintiff receive "ul curettage followed by minimal flap surgery to eliminate ul pocketing."[FN2] Dr. Benjamin estimated that plaintiff would require two to three appointments to complete the recommended treatment. He also noted that plaintiff evidenced "good" oral hygiene. Compl. at ¶¶ 9, 10; Ex. A; McCardle Aff. at ¶¶ 34-38. As of December 5, 1988, plaintiff had not received the recommended surgery. Now incarcerated at the Eastern Correctional Facility ("Eastern"), plaintiff was examined on that date by Dr. Harold Yellin, D.D.S., who likewise recommended that he see a periodontist. There was some delay in obtaining a periodontist, as Dr. Yellin notes in an April 24, 1989 memorandum to plaintiff, "not for a lack of trying" but because "[t]he consultant was simply unavailable." Walter Aff. at Ex. 1 (dkt.32). Dr. Benjamin examined plaintiff on May 26, 1989. He reported that plaintiff:

> FN1. Periodontics is the branch of dentistry concerned with the study and treatment of diseases of periodontal tissue and structures, such as gum disease.

> FN2. According to *The Mount Sinai Medical Center Family Guide to Dental Care,* to which the Court will refer to in this matter to explain dental terms, periodontal disease progresses in

four stages. The first stage is gingivitis, which essentially is an inflammation of the gums and is readily treatable. The second stage is early periodontitis, which in addition to including a swelling of the gums is marked by the formation of pockets (*e.g.,* spaces) forming between the gum and root. Treatment typically requires that plaque and calculus be removed from the diseased area and inflamed, severely damaged tissue is removed via curettage.

Stage three of periodontal disease is moderate periodontitis, which is characterized by swollen, inflamed gums and deep pockets. Treatment of this stage includes a scraping of the each affected tooth surface and curettage of the affected gum. Tooth decay may be planed, in addition to be scraped, to provide a smooth surface to which the regenerating gum may attach. More severe cases of moderate periodontitis may require surgery, such as flap surgery. The last stage of periodontal disease is tooth mobility and loss, which requires periodontal surgery as treatment. At this point, even surgery may not be enough to save the affected tooth or teeth. *See generally,* Jack Klatell, D.D.S., et al., *The Mount Sinai Medical Center Family Guide to Dental Care* 71-81 (1991).

**\*5** needs flap surg. for ul after 2-3 visits of scaling-no surg. was done after last year's scaling. Rec. oper. tx be done asap, then perio surg. to follow.... No hopeless t., but molars very quest. Rec. rubber tip e NaHCO3 + 3 pt. needs prophies + scaling q. 3 months e hygienist, if possible.

Compl. at ¶¶ 11-13, Ex. B.

In December 1989, plaintiff began treating under defendant Dr. Syed Hussain, D.D.S. Plaintiff's dental records reflect that Dr. Hussain saw plaintiff twenty-five times from December 11, 1989 to October 13, 1992. During that interim, plaintiff also was treated twice by Defendant Dr. Martin Korfman, D.D.S. Walter Aff. at Ex. 4. Plaintiff alleges that he visited Dr. Hussain so many times due to "repeated infections, inflammations, and a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

steady deterioration of his gums." He claims that despite the "signs that he was living in pain as a result of his periodontal condition, no effort was made by [defendants] to ensure that [he] receive the recommended surgery for his serious medical need"-despite the fact that he complained in writing to defendants regarding his condition on several occasions. Compl. at ¶¶ 16, 17. *See* Walter Aff. at Ex. 1.

On July 10, 1990, Dr. Hussain did recommended that plaintiff see a periodontist for "re-evaluation." Compl. at ¶ 15; McArdle Aff. at ¶ 59, Ex. J. No action was taken on this recommendation until January 4, 1993, when Dr. Hussain requested that plaintiff's "perio condition" be evaluated. The following day periodontist Dr. Monroe Weinstein examined plaintiff. He found that plaintiff suffered from "severe pockets on maxilla"; had "severe bone loss" at teeth "# 3 & 7", and that teeth "# 8, 9 12, & 14 are questionable." [FN3] Dr. Weinstein recommended a full mouth curettage and extraction of "# 3 & 7." McCardle Aff. at ¶ 79.

> FN3. The "maxilla" is the upper jaw. In dental nomenclature, teeth are given individual numbers. The teeth on the maxilla are numbered from right to left as one through sixteen, starting with number one as the right wisdom tooth and finishing with number sixteen as the left wisdom tooth. All of the teeth discussed in Dr. Weinstein's report, therefore, belong to plaintiff's upper jaw.

> The lower jaw, or "mandible," features the teeth numbered seventeen through thirty-two.

Dr. Hussain performed the curettage but did not perform the recommended extractions that day. McCardle Aff. at ¶ 80. Plaintiff was transferred from Eastern to Clinton Correctional Facility in April 1993, where Dr. Kenneth Palm, D.D.S. examined him. Dr. Palm diagnosed plaintiff as suffering generalized bone loss and chronic periodontitis, and he recommended that all of plaintiff's upper teeth be extracted. McCardle Aff. at ¶¶ 84, 86. All of plaintiff's upper teeth eventually were extracted and he was fitted with a full upper denture. Compl. at ¶ 24; McCardle Aff. at ¶¶ 92, 96.

Plaintiff contends that defendants violated his constitutional rights, wherefore he seeks compensatory, punitive and declaratory relief.

## DISCUSSION

I. Standard for Summary Judgment.

Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A motion for summary judgment may be granted when the moving party carries its burden of showing that no triable issues of fact exist. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Id.; United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam* ). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party" *Anderson,* 477 U.S., at 248, 106 S.Ct., at 2510. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Id.,* at 250-251, 106 S.Ct., at 2511.

II. Official Capacity Claims.

**\*6** Plaintiff brings this suit against defendants in both their official and individual capacity. To the extent plaintiff asserts claims for monetary damages against defendants in their official capacities, these claims must be dismissed. Claims against employees of the New York State Department of Corrections for actions taken in their official capacity are suits against the State. Absent the State's waiver or consent, neither of which have been given here, the Eleventh Amendments bars all 42 U.S.C. § 1983 suits for legal or equitable relief brought by citizens against the State and its agencies. *See, e.g., Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam), *Eng v. Coughlin,* 858

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

F.2d 889, 896-97 (2d Cir.1988). Plaintiff's claim for monetary damages from defendants in their official capacities is barred under the Eleventh Amendment.

The Court, therefore, turns to plaintiff's claims asserted against defendants in their individual capacities. *See generally* Hafer v. Melo, 502 U.S. 21, 30-31, 112 S.Ct. 358, 364, 116 L.Ed.2d 301 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal' liability on state officials under § 1983").

III. 42 U.S.C. § 1983 and Eighth Amendment Claim.

Plaintiff has brought his complaint pursuant to 42 U.S.C. § 1983, which permits suit against those individuals, acting under color of state law, who caused him to be "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Defendants acted in this matter pursuant to their authority as prison officials under color of New York state law. The only unresolved question is whether they acted in a manner that deprived plaintiff of any "rights, privileges or immunities secured by the United States Constitution." 42 U.S.C. § 1983.

In arguing that defendants have violated his "constitutional rights," the Court infers that plaintiff refers to his Eighth Amendment rights. Plaintiff is *pro se* and we read his complaint liberally. *See* Bass v. Jackson, 790 F.2d 260, 262 (2d Cir.1986) ("*Pro se* complaints ... are held 'to less stringent standards than formal pleadings drafted by lawyers.' "); Soto v. Walker, 44 F.3d 169, 173 (2d Cir.1995). The Eight Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment upon prison inmates. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994); Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir .1994), *cert. denied sub nom.* Foote v. Hathaway, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that deliberate indifference to an inmate's serious medical needs fell within the scope of the Eighth Amendment's prohibition. Id., at 104, 97 S.Ct., at 291. Under *Estelle,* prison officials violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious medical needs by denying or delaying his

access to medical care or by intentionally interfering with his treatment. Id. at 104-05, 97 S.Ct. at 291-92; *see also* Wilson v. Seiter, 501 U.S. 294, 298, 302-03, 111 S.Ct. 2321, 2324, 2326-27, 115 L.Ed.2d 271 (1991). A state's medical care obligations applies to dental care as well. Chapman v. Rhodes, 434 F.Supp. 1007, 1020 (S.D.Ohio 1977), *aff'd,* 624 F.2d 1099 (6th Cir.1980), *rev. in other part,* 452 U.S. 337, 344, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981); Shaffer v. McWilliams, 570 F.Supp. 1422 (W.D.N.Y.1983).

**\*7** The determination of whether a defendant acts with deliberate indifference to a plaintiff's serious medical needs involves both objective and subjective components. Hathaway, 37 F.3d at 66. The objective component requires a determination of whether there has been a sufficiently serious deprivation of a plaintiff's constitutional rights, whereas the subjective component requires an examination of a defendant's state of mind. Id. at 66. The Second Circuit noted:

[d]eliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.... More specifically, a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'

*Id.* at 66-67 (*quoting* Farmer, 511 U.S., at 837, 114 S.Ct., at 1979).

To establish an unconstitutional denial of medical care, therefore, plaintiff must meet both prongs of a two part test: first, he must demonstrate that the deprivation alleged is "sufficiently serious"; and second, he must show that defendants acted with "deliberate indifference" to his health or safety. Farmer, 511 U.S., at 834, 114 S.Ct., at 1977; Hathaway, 37 F.3d at 66.

A. Serious Medical Need.

A serious medical need entails a deprivation that is " 'sufficiently serious' in the sense that 'a condition of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

urgency, one that may produce death, degeneration, or extreme pain" exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted); *see also Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Hathaway,* 37 F.3d at 66. This standard prescribes not only the denials of medical treatment that result in "torture or lingering death," but also those denials of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 181 (citing *Estelle,* 429 U.S., at 103, 97 S.Ct., at 290); *see also Koehl,* 85 F.3d at 88 (suggesting it is not necessary for medical deprivation to cause pain as long as deprivation prolongs suffering).

There exist genuine and disputed issues of material fact regarding whether plaintiff's medical condition was "sufficiently serious" that cannot be resolved as a matter of law on a motion for summary judgment. It has been held that "increased tooth sensitivity and attendant pain experienced over an extended period of time identif[ies] a medical need which a reasonable person would consider to be serious." *Reynolds v. Ternullo,* No. 82 Civ. 4018(CSH), 1985 WL 2153, *2 (S.D.N.Y. July 26, 1985); *but see Tyler v. Rapone,* 603 F.Supp. 268 (E.D.Pa.1984) (holding toothache not a serious medical need). Plaintiff alleges his deteriorating periodontal condition caused him considerable pain and suffering, and that defendants prolonged this pain and suffering by delaying and ignoring the treatment recommended by Dr. benjamin. Plaintiff cites the numerous visits he made to Dr. Hussain between December 1989 and October 1992 as evidence of his pain and suffering, and defendants have not presented evidence to undermine this claim. Pain associated with the need for corrective surgery may support a finding of a "serious medical need." *See generally Hathaway,* 37 F.3d 63; *see also Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977) (medical conditions that cause or perpetuate pain constitute serious medical needs).

B. Deliberate Indifference.

**\*8** Defendants contend that regardless of whether plaintiff has demonstrated that he had a serious medical need, he has not presented any evidence that defendants were deliberately indifferent to this need because at most plaintiff has alleged that defendants were negligent. To state a claim of deliberate indifference, plaintiff must show that prison officials intentionally denied, delayed access to or interfered with prescribed treatment. *Estelle,* 429 U.S., at 104-05, 97 S.Ct., at 291. Defendants are absolutely correct in stating that a claim for medical (or dental) malpractice is not actionable under § 1983. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.,* 429 U.S., at 106, 97 S.Ct., at 292. Summary judgment is appropriate if plaintiff's allegations constitute at most malpractice. *Bryant v. Maffucci,* 923 F.2d 979, 984 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (*citing Estelle* ). Nor would plaintiff's claim survive under § 1983 if it amounted to mere disagreement with defendants' medical judgment. *Williams v. Coughlin,* 650 F.Supp. 955, 957 (S.D.N.Y.1987). Summary judgment is not available however, if plaintiff presents evidence that would permit a trier of fact to conclude that the disputed medical treatment-or lack thereof-constituted deliberate indifference. *See Abdush-Shahid,* 933 F.Supp. at 181 (*citing Bryant,* 923 F.2d at 984; *Liscio v. Warren,* 901 F.2d 274, 276 (2d Cir.1990); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1317 (S.D.N.Y.1990), *appeal dismissed,* 929 F.2d 922 (2d Cir.1991)). Plaintiff's allegations clearly transcend a claim for dental malpractice or a disagreement in medical judgment.

Prisoners are not entitled to a "perfect plan for dental care," *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986), but a significant, unexplained delay in dental care may amount to deliberate indifference. *See, e.g., Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) ("A three week delay in dental care, coupled with knowledge of the inmate patient's suffering, can support a finding of an Eighth Amendment violation under section 1983") (citation omitted); *Fields v. Gander,* 734 F.2d 1313 (8th Cir.1984) (claim stated where plaintiff alleged defendants knew of pain resulting from infected tooth but delayed in providing dental care for three weeks); *Hunt v. Dental Dep't,* 865 F.2d 198, 201 (9th Cir.1989) (claim stated where plaintiff alleged that loss of dentures caused severe pain, bleeding gums, and breaking teeth, yet defendants took no action to provide pain relief or prescribe a soft-food diet and delayed three months in obtaining replacement dentures); *cf. Dean v. Coughlin,* 623 F.Supp.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

392, 401 (S.D.N.Y.1985) (deliberate indifference may be manifested by a physician's refusal of treatment); *Hathaway,* 37 F.3d at 66 (allegations that prison physician knew prisoner had two broken pins in hip and yet delayed surgery for over two years sufficient to meet both components of deliberate indifference claim and withstand motion to dismiss).

**\*9** Deliberate indifference requires a showing that defendants may have acted with a sufficiently culpable state of mind. *Hathaway,* 37 F.3d at 66. As the Second Circuit explained:

[t]he subjective element requires a state of mind that is the equivalent of criminal recklessness; namely, when the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Hathaway, 99 F.3d at 553* (citations omitted). Plaintiff has plead facts sufficient to survive summary judgment with respect to the deliberate indifference of Dr. Hussain: namely that based upon the evidence, a trier of fact might conclude that Dr. Hussain knew of and disregarded the risk to plaintiff's health.

Dr. Benjamin's May 1988 recommendation suggested that plaintiff receive flap surgery; and when Dr. Benjamin examined plaintiff in May 1989, he recommended that the surgery "be done asap, then perio surg. to follow." Dr. Hussain saw plaintiff twenty-five times from December 11, 1989 to October 13, 1992. Plaintiff alleges that "repeated infections, inflammations, and a steady deterioration of his gums" were the reasons for his numerous visits, and claims that despite the "signs that he was living in pain," Dr. Hussain made no effort to ensure he received the dental surgery Dr. Benjamin had recommended. In July 1990, Dr. Hussain did recommend that plaintiff see a periodontist, but the recommendation was never acted upon. McArdle Aff. at ¶ 56.[FN4] Plaintiff's dental records, which include five grievances and letters written to Dr. Hussain, demonstrate that the question of that defendant's deliberate indifference to his serious medical need is a genuine question of material fact.[FN5] A

reasonable trier of fact might conclude that Dr. Hussain intentionally denied, delayed access to or interfered with plaintiff's prescribed treatment.

FN4. The timing of Dr. Hussain's periodontal recommendation is peculiar. On June 21, 1990, roughly three weeks prior to the recommendation, "Dr. Hussain [had] re-evaluated plaintiff's periodontal condition and noted that it was 'o.k.' " McArdle Aff. at ¶ 58. Even more peculiar is Dr. Hussain's noting that plaintiff's periodontal condition was "o.k." in light of his deposition testimony in plaintiff's collateral state proceeding, in which he admitted that he was not capable of treating plaintiff's periodontal condition. *See* Plf's Aff. at Ex. 4, pgs. 63 and 89 (dkt.30).

FN5. These letters, dated November 25, 1991 through March 15, 1993 complain of pain and suffering, and remind Dr. Hussain of Dr. Benjamin's May 1988 and May 1989 recommendations for flap surgery. *See* Plf's Memo. at Exs. 6, 10 (dkt.31).

Summary judgment should not be available for Dr. Korfman, either. Plaintiff has demonstrated sufficient evidence exists to allow a reasonable trier of fact to conclude that Dr. Korfman was deliberately indifferent to plaintiff's serious medical need. Plaintiff's dental records indicate that Dr. Korfman saw plaintiff three times-once in 1989 and twice in 1991-subsequent to Dr. Benjamin's recommendations that plaintiff should receive flap surgery. During the latter two visits, made on November 15 and December 4, 1991, Dr. Korfman advised plaintiff that he had suffered from bone loss.[FN6] In deposition testimony given for plaintiff's collateral state proceeding, Dr. Korfman agrees that "bone loss suggest[s] ... that [plaintiff] continues to suffer from a periodontal condition." Korfman Depo. at 46:4-6 (dkt.30, Ex. 3). When asked next why he did not have plaintiff treated by a periodontist, Dr. Korfman answers that "[i]n order for him to have any success ... he would have to have had an oral condition that was amenable to healing." Korfman Depo. at 46:7-13. The implication is that plaintiff's oral condition was not curable. Yet, when asked later whether

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

he ever reached a decision that plaintiff's "perio condition was not curable," Dr. Korfman responded that he "never made that conclusion"-with the exception of plaintiff's tooth number ten. Korfman Depo. at 63:22-24; 64:22-65:3. Dr. Korfman further testifies that even though it was "not advisable" that plaintiff should "wait more than a year for periodontal evaluation," he had "no choice" because he "couldn't get a guy to see the patient." [FN7] Korfman Depo. at 67:8-17. In fact by Dr. Korfman's own admission, plaintiff did not see a periodontist until January 5, 1993. Korfman Depo. at 40:9-15. This date was almost two and a half years after Dr. Hussain had recommended that a periodontist "re-evaluate" plaintiff and four and a half years after Dr. Benjamin's initial recommendation that plaintiff receive flap surgery. On March 27, 1989, plaintiff requested that Dr. Yellin, who was then treating him, inform him of the status of his overdue November 1988 periodontist appointment. Dr. Yellin, apologizing that the matter had taken "such a long time," was able to obtain the appointment for plaintiff in May 1989. He explained to plaintiff that the "delay was not for lack of trying on our part"; rather, "[t]he consultant was simply unavailable." Walter Aff. at Ex. 1. Any inferences to be drawn from the facts must be viewed in the light most favorable to plaintiff as the non-moving party. *Thompson, 896 F.2d at 720.* Whether Dr. Korfman could not obtain a periodontist for more than two and a half years is a question of fact.

> FN6. Dr. Korfman's November 15, 1991 notes in plaintiff's dental records read, in pertinent part, "[e]xplained to patient about bone loss & possibility of losing # 10." His notes for plaintiff's December 12, 1991 visit read in part "[a]dvised again of removal of 6-8 mm bone loss." McArdle Aff. at Ex. M.

> FN7. Dr. Korfman states that Dr. Hussain "probably [could] not" schedule plaintiff to see a periodontist without his approval, thus the inference is that Dr. Korfman is largely responsible for securing a periodontist.

*10 Defendants' argument that as a matter of law plaintiff's dental records demonstrate a concerted and continual effort to treat plaintiff's various dental maladies, and that plaintiff ultimately lost the teeth in his upper jaw for reasons beyond their control, is unavailing. They note that from November 1983 to March 1996-the date of their summary judgment motion-plaintiff had been treated by thirteen DOCS dentists, three DOCS hygienists and two outside periodontists, and that he had received two full thickness flap surgeries and fifteen dental prophylaxes. McArdle Aff. at ¶¶ 98, 103. Yet, as plaintiff counters, the fact that he was seen a number of times by different dental personnel does not invalidate his claim of deliberate indifference. The gravamen of his complaint is that defendants' deliberate indifference stems from their alleged denial and interference with his course of recommended treatment-e .g., the 1988 and 1989 recommendations for surgery-and not that he was denied dental care in general. Though defendants' claims that plaintiff's loss of his upper teeth was attributable to his own actions may ultimately prove correct, plaintiff clearly has furnished evidence that makes their conclusion a genuine question of material fact.

C. Personal Involvement.

The Second Circuit requires that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991); see also Johnson v. Glick, 481 F.2d 1028, 1034 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)* ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required .")

Plaintiff names defendants McArdle, Mitchell and Tracy as supervisors who violated his Eighth Amendment rights. There is no indication whatsoever that service was perfected on defendant Mitchell, therefore, as the Court has no jurisdiction over the claims against him, it cannot consider the claims against him.[FN8] As to the remaining supervisory defendants, although it is undisputed that they had direct or indirect supervisory authority over the dental staff, in and of itself this fact is not sufficient to hold them personally liable for damages for constitutional violations alleged under § 1983. *Abdush-Shahid, 933 F.Supp. at 182 (citing Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996)).* Prison supervisors may be held liable only if they

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

personally are involved in actions that deprive an inmate of his constitutional rights. *Id.* This circuit defines "personal involvement" as: (1) direct participation; (2) failure to remedy an alleged wrong after learning of it; (3) creation of a policy or custom under which unconstitutional practices occurred; or (4) gross negligence in managing subordinates. *Black,* 76 F.3d at 74; *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

FN8. The summons sent to Mitchell was returned unexecuted. *See* dkt. 36.

**\*11** Plaintiff has not furnished evidence that supports his claim that the McArdle and Tracy were "personally involved" in the alleged violation of his Eighth Amendment rights. Tracy, plaintiff argues, was on notice of the "two recommendations for surgery and that [plaintiff] was suffering as a result of not receiving the surgery." Plf's Memo. at 2. The record indicates that Tracy, the Deputy Superintendent of Administration at Eastern, exchanged several correspondences with plaintiff from January 31 to July 13, 1992. In his January 31, 1992 memorandum to plaintiff, Tracy states that he discussed plaintiff's treatment with Dr. Hussain and was told that it was "appropriate." Plf's Memo. at Ex. 7. In a June 9, 1992 letter to Penny Shane, Esq., of Prisoners' Legal Service, Tracy, responding on behalf of Superintendent Mitchell, writes that it "is the opinion of both Dr. Korfman and Dr. Hussein (sic) that [plaintiff] can cerive only limited benefit from a consultation with an outside periodontist, [but] Dr. Hussein (sic) nevertheless agreed to arrange for this consultation." He cautions, however, that "consultations with private periodontists generally take some time to be scheduled and that emergency cases naturally take precedence." *Id.* In his July 13, 1992 memorandum to plaintiff, Tracy explains that "Medical Unit staff are making every effort to obtain a periodontal consultation for you." *Id.*

Prison supervisors are not deemed "personally involved" on the sole allegation that they responded to a plaintiff's letter complaining about his medical treatment. *Abdush-Shahid,* 933 F.Supp. at 182 (*citing Garrido v. Coughlin,* 716 F.Supp. 98 (S.D.N.Y.1989); *Eng v. Coughlin,* 684 F.Supp. 56, 66 (S.D.N.Y.1988)). It is also true that supervisory officials generally are entitled to

delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment. *Id.* (*citing Smiley v. Westby,* No. 87 Civ. 6047, 1994 WI. 519973, at *8 (S.D.N.Y. Sept. 22, 1994) ("[A] warden who receives assurances from his medical staff that an inmate is receiving appropriate care will ordinarily be insulated from § 1983 liability")). In this instance, it appears Tracy acted appropriately when the plaintiff complained to him about his dental treatment. Tracy spoke with the dentist who had been treating plaintiff and was assured that plaintiff's treatment was correct. There is no indication that Tracy was "personally involved" in the alleged deprivation of plaintiff's Eighth Amendment rights; and indeed, it arguably appears that Tracy may have facilitated plaintiff's January 5, 1993 periodontist consultation. Tracy should be granted summary judgment in this matter.

Summary judgment should be granted for Dr. McArdle as well. By plaintiff's own admission, Dr. McArdle, the Director of Correctional Dental Services, never saw or treated him. Plf's Memo. at 13. Nor is there anything in the record that supports a claim of personal involvement as defined in *Black, supra,* by this defendant. *Black,* 76 F.3d at 74.

Discrepancies in the Record.

**\*12** Plaintiff informs the Court that there is a significant discrepancy in the dental records before it. According to plaintiff, during his collateral state action, which he commenced in 1995, he was given copies of his dental records ("collateral records") to prosecute that case. He supplies these records as an exhibit attached to the affidavit of Lanny E. Walter, Esq., who represented him in his state court claim. *See* Walter Aff. at Ex. 1 (dkt.32). These records are the same records that are being used by parties as evidence in this case. Plaintiff points out, however, that several notations appear in exhibits attached to Dr. McArdle's affidavit that do not appear in the collateral records, though clearly there should be no such discrepancy between these exhibits and the collateral records.

Defendants' exhibits differ from plaintiff's collateral records in a significant manner: they feature notes, all appearing to be of the same handwriting, dating back to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)

(Cite as: 1997 WL 642549 (N.D.N.Y.))

November 23, 1983 that read "oral hygiene instr."-or some very similar variation thereof. These notes appear in the margins of the following dates of plaintiff's treatment records: November 23, 1983 (*See* McArdle Aff., Ex. A (dkt.19)); January 9, 1985 (*Id.,* Ex. C); January 9, 1990 (*Id.,* Ex. I); February 21 and October 1, 1991 (*Id.,* Ex. K); and February 11, April 27, June 8 and October 13, 1992 (*Id.,* Ex. N). The inference, which obviously is beneficial to defendants, is that plaintiff was consistently given oral hygiene instructions because he was deficient in his personal dental care.

There appears to be a significant fabrication of the records before the Court, which the Court cannot and will not tolerate. Defendants have provided no explanation for this discrepancy. By Order of the Court, they will. Parties are ordered to provide affidavits explaining the discrepancy in plaintiff's dental records by October 1, 1997. Upon review of the affidavits, the Court will decide whether any actions, including sanctions, are appropriate in this instance. Parties are forewarned that failure to provide affidavits by October 1, 1997 may result in sanctions.

### CONCLUSION

WHEREFORE, based upon the foregoing, it is hereby ORDERED, that parties provide affidavits by October 1, 1997 that explain why there is a discrepancy in plaintiff's dental records that defendants have used as an exhibit in this matter (dkt.19) and the dental records that plaintiff used in his collateral state proceeding (dkt.32). Upon review of the affidavits, the Court will decide whether any actions, including sanctions, are appropriate in this instance. Parties are forewarned that failure to provide affidavits by October 1, 1997 may result in sanctions; and it is further

RECOMMENDED, that defendants' motion for summary judgment (dkt.19) be DENIED as to defendants Dr. Hussain and Dr. Korfman; and it is further

RECOMMENDED, that defendants' motion for summary judgment (dkt.19) be GRANTED as to defendants Tracy and Dr. McArdle; and it is further

**\*13** RECOMMENDED, that because the Court has no jurisdiction over defendant Mitchell, it cannot examine the claims against him.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (*citing Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

**SO ORDERED.**

N.D.N.Y.,1997.

Rashid v. Hussain
Not Reported in F.Supp., 1997 WL 642549 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

c

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Harold CHARLES, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.

No. 9:07-CV-1274.

March 31, 2009.

West KeySummary**Civil Rights 78** ⚖ **1358**

**78** Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal Law Enforcement; Prisons.

Most Cited Cases

**Civil Rights 78** ⚖ **1395(7)**

**78** Civil Rights

    78III Federal Remedies in General

        78k1392 Pleading

            78k1395 Particular Causes of Action

                78k1395(7) k. Prisons and Jails; Probation
and Parole. Most Cited Cases

   Prisoner's Americans with Disabilities Act (ADA)
complaint could continue because it was only suing prison
officials in their "official capacity." Prisoner brought a
claim against prison officials for not allowing him to have
his motorized wheelchair in prison. Prison officials argued
that a claim could not be brought against them in their
"individual capacity." However, the complaint was being
brought against prison officials in their "official capacity"
not in their "individual capacity." Americans with
Disabilities Act of 1990, § 201(1)(A), 42 U.S.C.A. §
12131(1)(A).

Troutman, Sanders Law Firm-NY Office, Aaron H.
Mendelsohn, Esq., Amanda R. Gaynor, Esq., of Counsel,

New York, NY.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Adrienne J. Kerwin, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

   **\*1** Plaintiff brought this civil rights action pursuant to
42 U.S.C. § 1983. On March 9, 2009, the Honorable
Gustave J. DiBianco, United States Magistrate Judge,
advised, by Report-Recommendation, that defendants'
motion to dismiss be granted in part and denied in part. No
objections to the Report-Recommendation were filed.

   Based upon a careful review of entire file and the
recommendations of the Magistrate Judge, the
Report-Recommendation is accepted in whole. See 28
U.S.C. 636(b)(1). Accordingly, it is

   ORDERED that

   1. Defendants' motion to dismiss is GRANTED only
to the extent that the complaint can be read to allege an
ADA or RA claim in defendants' "individual capacities;"

   2. Defendants' motion to dismiss is DENIED in all
other respects; and

   3. Defendants file and serve an Answer to the
Complaint on or before April 14, 2009.

   IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate
Judge.

   This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rules N.D.N.Y. 72.3(c).

   In this amended civil rights complaint, plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

alleges that defendants violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the Rehabilitation Act (RA), 29 U.S.C. § 794, and the Eighth and Fourteenth Amendments of the Unites States Constitution when they refused to allow him to use his personal, medically prescribed, motorized wheelchair during his incarceration at Mohawk Correctional Facility (Mohawk). Amended Complaint (AC) (Dkt. No. 10). Plaintiff seeks declaratory, injunctive and monetary relief.

Presently before the court is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). (Dkt. No. 11). Plaintiff has opposed defendants' motion. (Dkt. No. 14). For the following reasons, this court will recommend granting defendants' motion in part and denying the motion in part.

**DISCUSSION**

**1.** *Motion to Dismiss*

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir.2008) (quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007)). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir.2007)). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citations omitted).

**2.** *Facts*

Plaintiff is a paraplegic inmate, who also has an injury to his left wrist, a "Stage IV sacral decubitus ulcer on his coccyx," and severe ulcers on his left hip. AC ¶ 19. Plaintiff states that because of his disabilities, he is dependent on a motorized wheelchair and must frequently shift his weight to relieve pressure from sores on his lower body. *Id.* Plaintiff alleges that this condition causes him considerable pain. *Id.* Plaintiff states that he personally owns a specially constructed, motorized wheelchair that

was prescribed for him in 2004 by his physician, prior to plaintiff's incarceration. AC ¶ 21. The wheelchair was prescribed for plaintiff based both on his inability to walk as well as his other severe conditions. *Id.* These conditions prevent plaintiff from operating a manual wheelchair without "extreme discomfort and pain." *Id.* Plaintiff states that his motorized wheelchair also contains special lumbar cushioning to support his spine and enable him to shift his weight to relieve the pressure from his decubitus ulcer. *Id.*

**\*2** Plaintiff states that when he was first incarcerated in the New York State Department of Corrections (DOCS) in April of 2004, he brought his motorized wheelchair with him and was allowed to use it from 2004 until 2006, while he was incarcerated at Rikers Island Correctional Facility. AC ¶¶ 22-23. In May of 2006, plaintiff was transferred to Mohawk and was forced to leave his wheelchair behind. AC ¶ 23. Plaintiff states that he has told defendants that he is experiencing a great deal of pain because he is unable to operate a manual wheelchair, and the defendants have refused to provide plaintiff with "an accommodation" for his disability. AC ¶¶ 27-28.

In April of 2007, plaintiff requested permission to bring his motorized wheelchair to Mohawk. AC ¶ 29. Defendants Dr. Berdick and Richard Harding, the Deputy Superintendent of Programs at Mohawk acknowledged that plaintiff needed a wheelchair, but instead of allowing him to obtain his motorized chair, they told him that someone at the facility would assist him if he could not operate the manual wheelchair. *Id.* Plaintiff claims that in April of 2007, he "alerted" defendants Berdick, Sharma, Harding, Payant, Rabideau, Wright, Raymond, and the Mohawk Reasonable Accommodation Committee that plaintiff wished to obtain his wheelchair, but these individuals and the Committee notified plaintiff that he would not be allowed to do so. AC ¶ 30.

Plaintiff states that he has been provided with a "standard" wheelchair in lieu of allowing him to bring his own wheelchair to Mohawk. AC ¶ 32. Plaintiff states that the wheelchair must be operated manually, and he cannot do so because of his injured wrist. *Id.* Additionally, it is difficult for plaintiff to maneuver his body and to adjust and reposition his body in the standard wheelchair. *Id.* He must perform these movements in order to relieve the pressure from his sacral decubitus ulcer and bedsores. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

Because he has been unable to obtain his motorized wheelchair, and the standard wheelchair causes him extreme pain, he has been unable to participate in many prison programs, and he has suffered pain on many occasions. AC ¶ 33.

Plaintiff states that Mohawk personnel, including defendants Payant, Harding, Rabideau, Antonsen, Sharma, and Berdick, have failed to reasonably accommodate plaintiff's disability. AC ¶ 37. Plaintiff states that on many occasions, he has been unable to go to the cafeteria, the visiting room, the commissary, the general library, and the law library in the manual wheelchair. Plaintiff alleges that his requests for assistance in pushing the manual wheelchair have been denied, and thus, he had been denied access to programs and facilities that are available to non-disabled inmates.

Plaintiff states that since April of 2007, he has filed multiple complaints with defendants Annucci, Wright, Diaz, Raymond, Payant, Harding, Rabideau, Sharma, and Berdick regarding his pain and lack of medical treatment. AC ¶ 38. In May of 2007, defendant Rabideau denied plaintiff the authorization to use his medically prescribed wheelchair. AC ¶ 39. Plaintiff states that in a May 2007 memorandum, defendant Rabideau "misled" other officials by informing them that "personal motorized wheelchairs were not allowed at Mohawk." AC ¶ 35. Plaintiff states, however, that other inmates have been allowed to use motorized wheelchairs. Id. In June of 2007, plaintiff sent a "reasonable accommodation" request to defendant Harding, who instructed facility personnel to conduct a hearing. AC ¶ 40. Plaintiff states that he believes that defendants and other Mohawk personnel held a reasonable accommodation hearing regarding plaintiff's requests, but denied his request for the motorized wheelchair, despite plaintiff's complaints of "extreme pain and suffering." AC ¶ 41.

*3 The amended complaint then discusses letters and complaints that plaintiff states he has written to various defendants. AC ¶¶ 42-47. Plaintiff states that between August and November 2007, he wrote letters to, or received letters from, defendants Payant, Annucci, Antonsen, Sharma, Raymond, and Wright. Id. Plaintiff states that on August 31, 2007, defendant Payant wrote to

plaintiff, advising him to tell his doctor about the pain plaintiff was experiencing from using the manual wheelchair. AC ¶ 42. On August 27, 2007, defendant Annucci wrote to plaintiff, telling him that he had been assigned an assistant to push the manual wheelchair, however, on September 26, 2007, defendant Annucci told plaintiff that his complaints were "outside of the jurisdiction of [Annucci's] office." AC ¶ 43. On October 4, 2007, defendant Annucci told plaintiff that his "needs were being met." Id.

On September 20, 2007, defendant Antonsen wrote to plaintiff stating that she had investigated plaintiff's complaint, and he should discuss his problems with his doctor "because the nursing staff denied any wrongdoing." AC ¶ 44. Although plaintiff states that he asked for reconsideration of Antonsen's findings, she did not respond. Id. Plaintiff states that in October and November, he wrote to defendant Sharma, who responded by telling plaintiff that he had abused his privileges and "recommended that he direct his concerns to his healthcare provider." AC ¶ 45. On October 1, 2007, defendant Raymond wrote to plaintiff telling him that Raymond could not help. AC ¶ 46. In September of 2007, plaintiff wrote to defendant Wright, however, defendant Diaz responded to the letter, stating that defendant Wright, the facility physician, and the medical director had investigated the matter and determined that the motorized wheelchair was not a necessity. AC ¶ 47.

Plaintiff claims that he was barred from participation in programs because of animus or ill will toward his disabilities. AC ¶ 49. Plaintiff claims that the defendants displayed marked hostility and medically inappropriate behavior toward plaintiff in his efforts to obtain and use his motorized wheelchair. AC ¶ 53. Plaintiff also claims that the defendants failed to properly investigate his allegations, despite their awareness of the constitutional violations.

Plaintiff's amended complaint contains two causes of action. The first cause of action is under the ADA and the RA against defendants DOCS; Payant; [FN1] Rabideau; [FN2] Harding; [FN3] Wright; [FN4] Sharma; [FN5] Antonsen; [FN6] Anthony Annucci; [FN7] Diaz; [FN8] and Raymond. [FN9] AC ¶¶ 56-61. Plaintiff's second cause of action alleges that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

defendants Payant; Rabideau; Harding; Wright; Sharma; Antonsen; Annucci; Diaz; and Raymond violated plaintiff's right to constitutionally adequate medical care by being deliberately indifferent to plaintiff's serious medical needs.[FN10] AC ¶¶ 62-64.

FN1. Leo E. Payant, Superintendent of Mohawk Correctional Facility

FN2. Ann Rabideau, Deputy Superintendent of Health at Mohawk.

FN3. Richard H. Harding, Deputy Superintendent for Programs at Mohawk.

FN4. Lester Wright, Deputy Commissioner and Chief Medical Officer of DOCS.

FN5. Yogemdra D. Sharma, Facility Health Services Director.

FN6. Judi Antonsen, Director of Nursing at Mohawk.

FN7. Anthony Annucci, Deputy Commissioner and Counsel of DOCS.

FN8. Pedro Diaz, Regional Health Services Administrator of DOCS.

FN9. Robert Raymond, ADA Coordinator of DOCS.

FN10. The court notes that neither Cause of Action mentions defendant Dr. Berdick. He is apparently a physician at Mohawk, although his first name is unknown. He is mentioned in the amended complaint along with Dr. Sharma. *See e.g.* AC ¶¶ 34, 36-38. Defense counsel has clearly appeared on Dr. Berdick's behalf.

### 3. *ADA and Rehabilitation Act*

**\*4** The ADA and section 504 of the Rehabilitation Act are applicable to inmates in state correctional facilities. *Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005). In order to state a claim under section 504 of the Rehabilitation Act, the plaintiff must show that he (1) has a disability for purposes of the Act; (2) that he was "otherwise qualified" for a benefit that he was denied; (3) that he was denied the benefit solely because of his disability; and (4) that the benefit is part of a program or activity that receives federal financial assistance. *Romano v. SLS Residential, Inc.,* 246 F.R.D. 432, 440 (S.D.N.Y.2007).

Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord,* 405 F.Supp.2d at 274. The standards for determining whether plaintiff states a claim under the ADA and the RA are almost identical. The only difference in the statutes is that the RA applies to entities receiving federal financial assistance, and Title II of the ADA applies to all public entities. *Messier v. Southbury Training Sch. ..,* 562 F.Supp.2d 294, 320 & n. 13 (D.Conn.2008).

In this case, defendants concede that the statutes apply. However, defendants' first argument is that the individual defendants must be dismissed from the ADA and RA claims because individuals may not be sued under these statutes. Plaintiff argues that the individuals are being sued in their "official capacities" and thus, may be maintained in the case as named. It appears that both sides are making the same argument, but the court will clarify the issue.

The State of New York is a "public entity" within the meaning of the ADA. 42 U.S.C. § 12131(1)(A). Naming a state defendant in his or her "official capacity" is tantamount to naming the State. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 288 (2d Cir.2003), *cert. denied,* 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004). In *Henrietta D.,* the Second Circuit held that a valid ADA claim may be stated against a state official in his or her official capacity. *Id.* at 288-89. The ADA does ***not,*** however, provide for "individual capacity" suits against state officials. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

In this case, in plaintiff's response to defendants' motion to dismiss the "individual capacity" suit against the defendants, plaintiff spends a great deal of the memorandum citing *Henrietta* and arguing that the "individuals" may be sued in their "official capacity." Plaintiff's argument is correct, but defendants are arguing that to the extent that plaintiff is suing the defendants in their "individual capacity," not as individuals in their "official capacity," the ADA and RA claims may be dismissed. Defendants' argument is also correct. Thus, both sides are correct, and it appears that plaintiff is only suing the individual officers in their "official capacity." As such, the ADA and RA claims may continue. To the extent that the amended complaint could be interpreted as suing these DOCS officials in their "individual capacity," any ADA or RA claims should be dismissed. However, the ADA and RA claims may proceed as against the State and the individuals in their "official capacity."

**4. *Personal Involvement***

**\*5** In contrast, plaintiff also has a 42 U.S.C. § 1983 claim against the defendants in their "individual capacities" for Eighth and Fourteenth Amendment violations regarding plaintiff's medical care. The state itself cannot be sued under section 1983, *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Thus, the individual defendants may only be sued for money damages under section 1983 in their "individual capacities." *See Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (discussing the distinction between "individual" or "personal" capacity actions and "official" capacity actions).

However, in order to hold an individual liable for damages in a section 1983 action, plaintiff must allege that the individual was "personally involved" in the constitutional violation of which he complains. *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). In *Williams,* the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. 781 F.2d at 323-24. A supervisory official is said to have been personally involved if that official

directly participated in the infraction. *Id.* Personal involvement may be shown if, after learning of a violation through a report or appeal, the supervisory official failed to remedy the wrong. *Id.* Personal involvement may exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

In *Farrell,* however, the Second Circuit specifically stated that personal involvement is a generally a question of fact. 449 F.3d at 484. As stated above, in a motion to dismiss, all the facts alleged in the complaint are accepted as true. *Erickson v. Pardus,* 127 S.Ct. at 2200. The plaintiff must satisfy a "flexible plausibility standard," and once a plaintiff has stated his claim adequately, then it may be supported by any set of facts that are consistent with the allegations in the complaint. *Bell Atlantic v. Twombly,* 550 U.S. at 563. Thus the court will consider whether plaintiff has adequately stated the personal involvement of the individual defendants.

**A. Defendants Annucci; Raymond; Diaz; Wright; Payant; and Antonsen**

Defendants argue that plaintiff has not alleged sufficient personal responsibility of these five defendants because plaintiff claims only that he wrote them various letters and received "some brief letters in response." Def. Mem. at 3. (Dkt. No. 11). The issue of personal involvement relates only to the section 1983 claim that defendants were deliberately indifferent to plaintiff's serious medical needs.[FN11] Generally, the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Smart v. Goord,* 441 F.Supp.2d 631, 642-643 (S.D.N.Y.2006). *Sealey* does not, however, stand for the proposition that a letter or letters to a supervisory official is insufficient as a matter of law to create personal responsibility. The court in *Sealey* was considering a motion for ***summary judgment*** and had the opportunity to see the content and character of the letters that were sent to the supervisor. *Id.*

FN11. This is true because the ADA claim is against defendants in their official capacities, not

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

in their individual capacities.

**\*6** Additionally, simply affirming the denial of a grievance is generally insufficient to confer personal responsibility on a defendant. *Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007) (finding no personal involvement where plaintiff alleged only that the defendant denied his grievance). However, courts in this circuit have held that when a supervisory official *receives and acts on* a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated. *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citing cases).

In *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), the court found that the plaintiff's statements regarding a letter of complaint were insufficient to raise an issue of fact, however, the court made this finding on *summary judgment* and after stating that because contents of the letter were not specified, the court could not tell whether it would have prompted the superior officer to investigate. *Id.* In *McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004), the court held that when allegations of denied medical care come to the attention of the supervisor of a medical program, his adjudicating role in denying a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his responsibility.

Basically, the cases make clear that the determination of personal involvement based on a letter of complaint to a supervisor or based on a grievance handled by a supervisory official often depends upon the contents of the letter and whether the supervisor referred the letter to a subordinate officer or whether the supervisory official investigated and decided the issue him or herself. *See also Rivera v. Pataki,* 04 Civ. 1286, 2005 U.S. Dist. LEXIS 2747, \*79-81 (S.D.N.Y. Feb. 4, 2005) (discussing situations in which personal involvement may be found based on letters of complaint). Defendants in this case cite *Rivera* for the proposition that writing to a supervisory official does not create personal involvement, however, *Rivera* also stands for the proposition that the contents of the letter and the action of the supervisor may be the determining factor in this analysis. *Id.*

Finally, although the motion in *Rivera* was initially one to dismiss, the parties submitted exhibits, and the court considered the motion as one for summary judgment. *Id.* at \*1-2. The court was given the opportunity to see the letters that plaintiff wrote to the supervisory officials and make the appropriate determination. *Id.* at \* 80. Thus, with this standard in mind, the court may turn to the allegations in this amended complaint to determine whether plaintiff has stated a claim as against the supervisory officials.

The amended complaint states that plaintiff wrote to defendant Annucci, and this defendant responded by stating that plaintiff had been "assigned an assistant to push his manual chair because of his disabilities." AC ¶ 43. Although plaintiff states that one letter from defendant Annucci informed plaintiff that plaintiff's complaints were "outside his jurisdiction," plaintiff claims that in another letter defendant Annucci told plaintiff that "his needs were being met." *Id.* Based on the fact that the court does not know the contents of the letters, this court cannot say that plaintiff has failed to show personal involvement of this defendant. The amended complaint states that this defendant actually investigated the complaint and responded based on that investigation. Without more information, this court cannot recommend dismissal against defendant Annucci on that basis.

**\*7** The claim against defendant Raymond also states that she wrote to plaintiff, telling him that she "had investigated his complaint." AC ¶ 44. Plaintiff also states that he wrote to defendant Raymond in September of 2007, and she responded by stating that she "could not help [plaintiff]." AC ¶ 46. Plaintiff claims that he has filed "multiple complaints" with defendants regarding his continuing pain, suffering and inadequate medical treatment. AC ¶ 38. Plaintiff alleges that in September of 2007, plaintiff sent several complaints to defendant Antonsen, regarding the nursing staff refusing to help plaintiff move his wheelchair and complaining about the pain he was experiencing. AC ¶ 44. Plaintiff claims that defendant Antonsen responded by stating that *she* had investigated the issue, and that plaintiff should discuss the problem with his doctor because "the nursing staff denied any wrongdoing." *Id.* The court makes no findings regarding the merits of plaintiff's allegations, however, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

this stage of the proceedings, the court finds that it cannot recommend dismissal of the constitutional claims as against defendants Annucci, Raymond, or Antonsen based upon a lack of personal responsibility.

Plaintiff claims that in response to a letter to defendant Wright, plaintiff received a letter from defendant Diaz. AC ¶ 47. Plaintiff claims that the letter from defendant Diaz "stated that defendant Wright, along with the facility physician and medical director, had investigated the matter and had determined that his wheelchair was not a necessity." *Id.* In their argument, defendants mix personal involvement with deliberate indifference in stating that a medical judgment regarding necessity of the wheelchair does not constitute deliberate indifference. Def. Mem. at 5. The plaintiff, however, alleged that the letter from Diaz, specifically states that defendant Wright and others investigated the plaintiff's complaint. Regardless of whether the ultimate decision results in liability for deliberate indifference, the allegation that defendant Wright was personally involved in the investigation is sufficient at this stage to allege personal involvement by both defendants Diaz and Wright.

Plaintiff states that he filed grievances regarding the denial of his wheelchair, and the grievances were denied by defendants, including defendant Payant. AC ¶ 31. As stated above, without the ability to see what the extent of the supervisory official's involvement was in the investigation or denial of the grievance, the court cannot make a proper decision with respect to personal involvement. In a footnote, plaintiff argues that the pleadings sufficiently show that defendant Payant was aware of the discriminatory treatment because of the grievances filed by plaintiff. Pl. Mem. at 12 n. 5. (Dkt. No. 14). In the same footnote, plaintiff states that, at a later point in the litigation, a review of those grievances and complaints will illustrate defendant Payant's awareness of plaintiff's complaints and his actions regarding those complaints. *Id.* On a motion to dismiss, the court must accept the statements made by plaintiff in the complaint as true. *Erickson v. Pardus, supra.* Thus, the court will not recommend dismissing the action against defendant Payant for failure to allege the requisite personal involvement.

**B. Defendant Rabideau**

**\*8** Defendant Rabideau is the Deputy Superintendent of Health at Mohawk Correctional Facility. Plaintiff claims that defendant Rabideau answered plaintiff's letter by stating that Mohawk did not authorize the use of motorized wheelchairs for "safety and security reasons." AC ¶ 55. Plaintiff also alleges that in May of 2007 defendant Rabideau specifically denied plaintiff the use of his wheelchair. AC ¶ 39. Defendants argue that this involvement is insufficient. This court disagrees. Based on the facts as alleged by plaintiff, it appears that defendant Rabideau is expressing a "policy" that does not allow motorized wheelchairs under any circumstances since the letter refers to "safety and security." Plaintiff also claims that other individuals have been allowed to use motorized wheelchairs at Mohawk. AC ¶ 35. If this ultimately is found to be an unconstitutional policy,[FN12] defendant Rabideau's endorsement of that policy is sufficient personal involvement in plaintiff's claim. *Wright, supra* (discussing personal involvement based on the supervisor allowing a policy under which constitutional violations are allowed to occur).

> [FN12.] This court must emphasize again that it makes no findings regarding the ultimate merits of plaintiff's complaint, merely, that plaintiff has alleged sufficient personal involvement in his complaint.

**C. Defendant Harding**

Defendant Harding is the Superintendent of Programs at Mohawk. Plaintiff claims that he sent letters of complaint as well as a reasonable accommodation request to defendant Harding. AC ¶¶ 34, 40. It is unclear what the "complaint" letters contained, and plaintiff alleges that in response to the "reasonable accommodation" request, defendant Harding merely instructed SCC Hulihan to conduct a hearing regarding plaintiff's request. The fact that defendant Harding ordered a subordinate to hold a hearing regarding reasonable accommodation, in itself would be insufficient to allege the requisite personal involvement, but since plaintiff claims that there were other letters of complaint, and the court cannot determine what was in those letters or whether they would have alerted defendant Harding to the need for some sort of action, this court cannot recommend dismissal based on lack of personal involvement.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

**E. Defendants Sharma and Berdick**

Defendant Sharma is the Facility Health Services Director at Mohawk. Dr. Berdick is a physician at Mohawk. Plaintiff states that defendant Sharma personally denied plaintiff's wheelchair request and further refused to adequately respond to plaintiff's complaints. Pl. Mem. at 15. *See e.g.* AC ¶ 36. Plaintiff states that Dr. Sharma and defendant Berdick specifically denied plaintiff the permission to bring his wheelchair to the facility. Thus, plaintiff has stated sufficient personal involvement to survive a motion to dismiss. A review of the defendants' arguments, however, show that instead of arguing that they were not personally involved in plaintiff's claims, they argue that they were not "deliberately indifferent" to his serious medical needs and that the amended complaint should be dismissed on this basis. [FN13] Def. Mem. at 4-5.

> FN13. This is true, notwithstanding the fact that this argument is contained in a section of defendants' memorandum of law that is dedicated to "personal involvement." Defendants' memorandum of law contains two arguments, one relates to the ADA and RA and the second to "personal involvement." It is unclear where the argument on the merits fits into a lack of personal involvement, however, this court has addressed the Eighth and Fourteenth Amendment issue in any event.

*9 Again, defendants are confusing lack of personal involvement with the ultimate question of whether someone who was personally involved with plaintiff should be held liable for deliberate indifference. In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

It is also true that disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1086). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

While it may be true in the end, that the two doctors in this case, made a medical decision that did not amount to deliberate indifference, this court cannot make that determination in this case based on the pleadings alone. Thus, this court finds that defendants' motion to dismiss based on lack of personal involvement should be denied.

**5. *Qualified Immunity***

Defendants also allege that they are entitled to qualified immunity. Although defendants do not specify the claim to which this immunity would apply, it is clear that this defense would apply ***only*** to the section 1983 claim because it is a "personal" defense that may only be asserted by the official who is being sued in his "individual capacity." *See Kentucky v. Graham,* 473 U.S. at 166-67. The first step in determining whether an defendant is entitle to qualified immunity is to determine whether the defendant violated plaintiff's constitutional rights, and if so, whether that right was clearly established at the time. *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007). A defendant will be entitled to qualified immunity if his or her actions did not violate clearly established law or if it was "objectively reasonable" for the defendant to believe that his or her actions did not violate clearly established law. *Id.* (citing *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 250 (2d Cir.2001)).

*10 Although a defendant may assert the defense of qualified immunity in a motion to dismiss, the Second Circuit has held that it is very difficult for such a defense to succeed at the pleading stage. *McKenna v. Wright,* 386

Slip Copy, 2009 WL 890548 (N.D.N.Y.)

(Cite as: 2009 WL 890548 (N.D.N.Y.))

F.3d at 436-37. The defense must be based on facts appearing on the face of the complaint. *Bezman v. Whitman,* 523 F.3d 119, 125 (2d Cir.2008). Defendants in this case have not really made an argument regarding the Eighth Amendment claim, and instead focused their motion to dismiss on the personal involvement issue. Since this court has determined that plaintiff has stated sufficient personal involvement to survive a motion to dismiss, it is impossible to determine without more, whether the defendants would be entitled to qualified immunity. Thus, this court will not recommend dismissal of the section 1983 claims based on the defense of qualified immunity at this time.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 11) be **GRANTED** only to the extent that the complaint can be read to allege an ADA or RA claim in defendants' "individual capacities," and it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 11) be **DENIED IN ALL OTHER RESPECTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.

Charles v. New York State Dept. of Correctional Services
Slip Copy, 2009 WL 890548 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**C**

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:

(1) there was no evidence that administrative remedy was
available to inmate;

(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;

(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;

(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;

(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 2547.1

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determination
          170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** 25

170A Federal Civil Procedure
  170AI In General
    170AI(B) Rules of Court in General
      170AI(B)1 In General
        170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** 2547.1

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determination
          170Ak2547.1 k. In general. Most Cited

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

[4] Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

[5] Attorney and Client 45 ☞ 62

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A ☞ 2546

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

[6] Civil Rights 78 ☞ 1304

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[7] Prisons 310 ☞ 317

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[8] Prisons 310 ☞ 313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
    310II(H) Proceedings
        310k307 Actions and Litigation
            310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78    1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
            78k1319 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[10] Sentencing and Punishment 350H    1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[11] Sentencing and Punishment 350H    1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H    1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Prisons 310    192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
            310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** 🔑 **192**

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
         310k191 Particular Conditions and Treatments
            310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** 🔑 **192**

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
         310k191 Particular Conditions and Treatments
            310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** 🔑 **2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18] Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment
 350HVII Cruel and Unusual Punishment in General
  350HVII(H) Conditions of Confinement
   350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19] Federal Civil Procedure 170A** 🗝 **2491.5**

170A Federal Civil Procedure
 170AXVII Judgment
  170AXVII(C) Summary Judgment
   170AXVII(C)2 Particular Cases
    170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20] Civil Rights 78** 🗝 **1355**

78 Civil Rights
 78III Federal Remedies in General
  78k1353 Liability of Public Officials
   78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21] Civil Rights 78** 🗝 **1358**

78 Civil Rights
 78III Federal Remedies in General
  78k1353 Liability of Public Officials
   78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22] Federal Civil Procedure 170A** 🗝 **2491.5**

170A Federal Civil Procedure
 170AXVII Judgment
  170AXVII(C) Summary Judgment
   170AXVII(C)2 Particular Cases
    170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 ☞ 1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
**\*347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County

Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

**[1][2][3]** The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.FN1 They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving**349 at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351 transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted **352 an opposition to the motion on August 3 and August 11, 2009.[FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

*R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported **\*353** by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.FN11 For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under 42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354 Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the *356 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** _Hayes,_ 84 F.3d at 620 (internal citation omitted); _see also_ _Phelps v. Kapnolas,_ 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In _Salahuddin v. Goord,_ the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); _see also_ _Jones v. Westchester County Dep't of Corr. Medical Dep't,_ 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

### 2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

#### a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription**359** of medication for plaintiff's renal disease.

#### i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

### ii. Subjective Prong

**[15][16]** Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney,* No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **\*361** to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller, 2010 WL 597952, at *11* ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord,* No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984)] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363 regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s *364 Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' a few hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### 2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to *366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

## V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

> FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

> FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

> FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

> FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e); see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society.' " *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103,97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." _Id. at 104, 97 S.Ct. at 291_. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. _Id._ It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. _Id. at 104-105, 97 S.Ct. at 291_.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. See _Chance v. Armstrong,_ 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety." ' _Id._ (_quoting Farmer,_ 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' _Id._

*3 However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. See _Murphy v. Grabo,_ 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (_citation omitted_). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. See _Chance,_ 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. See _Murphy,_ 1998 WL 166840, at *4 (_citation omitted_).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. See _Chance,_ 143 F.3d at 702-703. In _Chance,_ the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. _Id._ at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. _Id._

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. _Id._ at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. _Id._ at 702-703 (_citation omitted_ ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." _Wimmer v. Suffolk County Police Dep't,_ 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (_Def. ['s] Ex. A, P. 4_) .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (_Qudsi Aff., P. 2_). Dr. Qudsi noted that a cavity was present in his left lower molar. _Id._ He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. _Id._ On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (_Def. ['s] Ex. B, P. 1_).

*4 Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 FN7, 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph P Paul GUARNERI, Plaintiff,
v.
Lt. James HAZZARD; Cpl J. Cronk; Deputy Paul
Marsh, Jr.; Deputy Grippin; Deputy Howland; Frederick
C. Lamy, Commissioner; Francis T. Sullivan,
Commissioner; Deputy Mace; John Doe, Deputy; and
Dr. Weitz, Defendants.
No. 9:06-CV-0985.

Feb. 27, 2008.

Joseph P Paul Guarneri, Elmira, NY, pro se.

Girvin & Ferlazzo, P.C., Gregg T. Johnson, Esq., Jacinda
Hall Conboy, Esq., Scott P. Quesnel, Esq., of Counsel,
Albany, NY, for Defendants Hazzard, Cronk, Marsh,
Grippin, Howland, and Mace.

O'Connor, O'Connor, Bresee & First, P.C., Justin O.
Corcoran, Esq ., of Counsel, Albany, NY, for Defendant
Weitz.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Bruce J. Boivin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendant Sullivan.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge David R.
Homer, duly filed on the 6th day of February 2008.
Following ten days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by
the parties herein.

After careful review of all of the papers herein,
including the Magistrate Judge's Report-Recommendation,
and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. Sullivan's motion to dismiss (Docket No. 43) is
granted and that the amended complaint is dismissed in its
entirety as to her.

3. Dr. Weitz's motion to dismiss (Docket No. 19) is:

a. Granted as to his lack of personal involvement with
the confiscation of the knee brace;

b. Denied as to his lack of personal involvement in
Guarneri's neck, back, and mental health treatments;

c. Denied as to Guarneri's back and neck injuries
sustained in 2003; and

d. Granted as to Guarneri's back and neck injuries
sustained in 2000.

4. The amend complaint is dismissed without
prejudice as to defendants Lamy and John Doe.

5. The Clerk of the Court shall serve a copy of this
Order upon all parties and the Magistrate Judge assigned
to this case.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned
for report and recommendation pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Joseph Paul Guarneri ("Guarneri"),
presently an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

this action pursuant to 42 U.S.C. § 1983 alleging that defendants, [FN2] six Schoharie County employees ("County defendants"), two New York State Commissioners ("State defendants"), and one physician, violated his First and Eighth Amendment rights while Guarneri was incarcerated at the Schoharie County Correctional Facility ("Schoharie"). Am. Compl. (Docket No. 13). Presently pending are the motions for summary judgment of the physician (Docket No. 19) and the State defendants [FN3] (Docket No. 43) pursuant to Fed.R.Civ.P. 12(b)(6). Guarneri opposes both motions. Docket No. 46. For the following reasons, it is recommended that the physician's motion to dismiss be granted in part and denied in part and that the State defendant's motion be granted.

> FN2. Guarneri initially named twelve defendants, two of whom were dismissed by an order dated March 6, 2007 (Docket No. 15) and one who remains unidentified. State Defs. Memorandum of Law (Docket No. 43, Pt. 4) at 3 n. 2.

> FN3. Defendant Lamay has not been served or otherwise appeared in this action. See State Defs. Memorandum of Law at 3 n. 5. Likewise, defendant John Doe has neither been served nor further identified. More than 120 days have elapsed since the amended complaint was filed. Accordingly, it is recommended that the amended complaint be dismissed without prejudice as to both defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

### I. Background

The facts are related herein in the light most favorable to Guarneri as the nonmoving party. See subsection II(A) infra.

Guarneri was incarcerated at Schoharie from June 6 to August 2006 for a parole violation. Am. Compl. at ¶ 2. On June 16, 2006, Guarneri represented himself at his preliminary hearing. Id. at ¶ 2. Guarneri claims that the Schoharie law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system which delivered requested material, if at all, after the date of the preliminary hearing. Id. These deficiencies "infringed and undermined [Guarneri's] constitutional rights." Id. Additionally, Guarneri claims that his time in the library was "intentionally and

unreasonably limited ...." Id. at ¶ 42. Guarneri also contends that defendant Hazzard failed to copy the appropriate Penal Law sections regarding the period of punishment and failed to provide him with the correct case law pertaining to his litigation. Id. at ¶ 45.

**\*2** Besides his legal difficulty, Guarneri also arrived at Schoharie in grave pain due to pre-existing injuries including herniated discs in his neck and lower back, torn ligaments in his knee, Post-Traumatic Stress Disorder (PTSD), bipolar disorder, and depression. Id. Guarneri claims that on July 21, 2006, he was "denied ... emergency medical care by [defendants] Weitz and [ ] Hazzard for a [knee] give-way episode...." Id. at ¶ 22. Furthermore, Guarneri contended that upon receiving medical attention in the emergency room, hours later and after suffering severe pain, the treatment was wholly inadequate. Id. at ¶ 32. Guarneri also makes reference to incidents occurring in 2000 and 2003 which resulted in his herniated discs, alleging that at the time of the incident defendants Marsh and Hazzard delivered inadequate medical care that was further perpetuated by defendants Weitz and Hazzard with their decision to prohibit Guarneri from receiving a back brace. Id. at ¶ 30. Additionally, Guarneri contends that defendants Hazzard, Crook, Marsh, Grippin, Howland, Mace, John Doe, and Weitz all colluded against him "by not letting [Guarneri] speak to mental health counselors when [he was suffering from] mental health episodes ...." Id. at ¶ 35. Lastly, Guarneri contends that after arriving at Elmira Correctional Facility in August 2006, defendants Hazzard, Mace, and John Doe deliberately interfered with his medical treatment by precluding him from wearing the hinged knee brace which had subsequently been provided to him at Schoharie. Id. at ¶ 2.

In response to defendants repossessing his knee brace, Guarneri timely filed a grievance. Id. at ¶ 22, 25. Guarneri contends that the State defendants failed to respond to this grievance because they were acting in concert with the County defendants, "deliberately and intentionally tak[ing] advantage of ... [Guarneri]." Id. at ¶ 25. The State defendants lack of communication led Guarneri to the conclusion that "resort to an administrative remed[y] would be clearly futile ...." Id.

Additionally, Guarneri alleges that defendant Hazzard

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

"deliberately and intentionally [attempted to] stop" Guarneri from practicing Catholicism while he was incarcerated. *Id.* at ¶ 36. Guarneri contends that "defendant ... has known for years that [he] has been Catholic and has known the Rev. Ferenezy is not of the Catholic faith;" therefore, Hazzard's actions of arranging meetings between the two when Guarneri requested religious counsel amounted to defendants "tr[ying] to force a different religion on [Guarneri] ... den[ying him] the opportunity to see clergy and Catholic Religious Advisors when requested." *Id.* at ¶ 39.

## II. Discussion

Guarneri asserts two causes of action under the First Amendment that he has been denied (1) meaningful access to the courts and (2) his religious freedom. Additionally Guarneri claims deliberate indifference to a serious medical need in violation of the Eighth Amendment because defendants (1) did not allow him to keep his hinged knee brace upon arrival at Elmira Correctional Facility, (2) provided delayed and inadequate emergency treatment on July 26, 2006, (3) received inadequate care at the time of his disc herniations in 2000 and 2003, and (4) was denied proper medical care when defendants refused to order him a back brace. The physician, Dr. Weitz, moves for summary judgment on the grounds that (1) there was no personal involvement, (2) the amended complaint fails to state a claim for deliberate indifference to serious medical needs, (3) the amended complaint is barred by res judicata and collateral estoppel, and (4) the medical claims relating to Guarneri's back are barred by the statute of limitations [FN4][FN5] Defendant Sullivan contends dismissal is appropriate because there was no personal involvement.

> FN4. Dr. Weitz advances this valid claim expressly, however briefly, in a footnote in his memorandum of law. Weitz Mem. of Law (Docket No. 19, Pt. 3) at 15 n. 2.

> FN5. Der. Weitz also advances the claim that Guarneri failed to state a valid pendent state law claim. However, the amended complaint fails to allege any pendent state law claims. Thus this argument need not be addressed.

### A. Legal Standard

**\*3** Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at \*3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not 'consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

> *Id.* (citations and footnote omitted).

### B. Personal Involvement

Both defendants contend that Guarneri has failed sufficiently to allege their personal involvement.

" '[P]ersonal involvement of defendants in alleged

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*4 *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Despite Guarneri's submission of an amended complaint, he has failed to allege how Dr. Weitz was involved in the deprivation of his knee brace upon his arrival at Elmira Correctional Facility. Guarneri only references defendants Hazzard, Mace, and John Doe when discussing the events surrounding the confiscation of his knee brace. Am. Compl. at ¶ 19. Thus Guarneri fails to allege any facts indicating that Dr. Weitz was personally involved in those events.

However, Guarneri has contended that Dr. Weitz "denied [Guarneri] appropriate mental health care by not letting [him] speak to mental health counselors ..." and "refused [to] prescribe treatment for (herniated disk) in [sic] the lower back and neck [FN6] ... based on non-medical concerns like cost." Am. Compl. at ¶¶ 35, 30. These allegations specifically identify Dr. Weitz as a participant in the alleged medical indifference he suffered. Thus, Guarneri has succeeded in alleging facts, indicating that Dr. Weitz was personally involved in his medical care.

FN6. This allegation pertains solely to the neck and back injuries sustained in 2003. Those injuries occurring in 2000 have been dismissed as barred by the statute of limitations. *See infra* at subsection II(E).

Additionally, Sullivan has contended that Guarneri fails to allege her personal involvement. Guarneri alleges that the "State acted in concert with [County] defendants by not answering appeals of grievances submitted by [Guarneri] in a timely manner ...." Am. Compl. at ¶ 25. However, failing to "receive a response to a complaint ... is insufficient to establish personal involvement [especially when] there is no other showing that [defendant] knew of or directly participated in any alleged violation." *Abbas v. Senkowski,* No. 03-CV-476 (GLS/DRH), 2005 WL 2179426, at *2 (N.D.N.Y. Sept. 9, 2005). Additionally, Sullivan may not be held personally liable solely because of his supervisory position. Moreover, Guarneri does not allege the creation or execution of an unconstitutional policy or negligent supervision. Thus, Guarneri's conclusory assertions are insufficient to provide a factual basis to support the personal involvement of Sullivan.

Therefore, it is recommended that Dr. Weitz's motion to dismiss be granted as to his involvement in the confiscation of the knee brace but denied with respect to his involvement in Guarneri's neck, back, and mental health treatments. Additionally, it is recommended that Sullivan's motion to dismiss be granted.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

sufficiently serious medical need. *Chance v.. Armstrong, 143 F.3d 698, 702 (2d Cir.1998).* Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*5** " 'Because society does not expect that prisoners will have unqualified access to healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id .* at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV-1089 (GLS/RFT), 2006 WL 681223 at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**1. Knee**

Guarneri may have offered evidence sufficient to conclude that the knee injury he sustained was serious. Generally, knee injuries have been "insufficient to trigger Eighth Amendment protection and support a deliberate indifference claim." *Johnson v. Wright,* 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a prisoner's torn meniscus suffered as a result of a basketball injury was not a serious medical need) (quoting *Moody v. Pickles,* No. 03-CV-850 (DEP), 2006 WL 2645124, at \*6 (N.D.N.Y. Sept. 13, 2006) (holding that a "medial meniscal tear, with joint effusion" which did not render plaintiff immobile was not a serious medical need); *see also Williamson v. Goord,* No. 02-CV-521(GLS/GHL), 2006 WL 1977438, at \*9, 14, 16 (N.D.N.Y. July 11, 2006) (holding that a prisoner's knee injuries including arthrosis, degenerative joint disease, and partially torn anterior cruciate ligament ("ACL"), did not constitute "death or degeneration, or [constitute the appropriate level of] extreme pain [contemplated by] the law").

**\*6** In this case, it is unclear how significantly the deprivation of Guarneri's knee brace affected his mobility as he has subsequently indicated his ability to ambulate. Docket No. 46 at 3. However, construing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. *Id.* Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition.

Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time. *Id.* at ¶ 32.

Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

### 2. Mental Health

Guarneri also alleges that he suffered from and received inadequate medical treatment for PTSD, bipolar disorder, and depression. "Treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle. Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984). Thus, considering all of Guarneri's various complaints concerning his mental health, it is clear that he has alleged facts sufficient to provide relief as to whether he suffered a serious medical need as a result of his mental illnesses.

Moreover, Guarneri also contends that defendants have deliberately precluded him "from speaking to mental health counselors when hav[ing] mental health episodes ...." Am. Compl. at ¶ at 34-35. If proven, this constitutes deliberate indifference to Guarneri's mental health needs. Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

### 3. Back

Guarneri alleges sufficient evidence to present a serious medical need. Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (citations omitted); *see also, Farraday v. Lantz,* No. 03-CV-1520 (SRU), 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (holding that "persistent[ ] complain[ts] of lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need). Therefore, with regard to the 2003 back injury, Guarneri has alleged a serious medical need.

Additionally, Guarneri alleges that defendant Hazzard "deliberately and with malice denied adequate medical care ...." Am. Compl. at ¶ 23. Thus, construing these allegations in the light most favorable to Guarneri, he has alleged deliberate indifference to this medical need. Thus, it is recommended that defendant's motion on this ground be denied.

### D. Res Judicata/Collateral Estoppel

**\*7** "A final judgment on the merits of an action

precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (applying res judicata to a 42 U.S.C. § 1983 action). Thus, to sustain a claim of res judicata, the defense must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000) (citations omitted). In New York State, the analysis is governed by the transactional approach in which later claims are barred if they "aris[e] out of the same factual grouping as an earlier litigated claim even if the[y are] ... based on different legal theories or seek[ ] dissimilar or additional relief." *Id.*

Under the Full Faith and Credit Clause of the Constitution, federal courts must grant state court judgments the same preclusive effects as those given to other courts located within the state. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citing *Migra v. Warren City Sch. Dist.,* 465 U.S. 75, 81 (1984)). However, the bar of res judicata will not apply where the original forum is incapable of providing the relief requested by the plaintiff. *Id.; Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986). The Second Circuit has held that a plaintiff in a § 1983 action who is seeking damages will not be vulnerable to dismissal based upon res judicata, although, a similar plaintiff seeking injunctive relief will be. *Davidson,* 792 F.2d at 277-78; *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 30 (2d Cir.1986).

As a threshold matter, Dr. Weitz correctly notes that Guarneri's previous lawsuit, also filed in the Northern District of New York, is still pending. *See Guarneri v. Bates,* No. 05-CV-444 (GLS/DRH) (report-recommendation of magistrate judge pending final decision before district court). Because the previous action has not received an adjudication on the merits, Dr. Weitz cannot overcome the first prong of the analysis. Thus, it is recommended that Dr. Weitz's motion on this ground be denied without prejudice.

In the alternative, Dr. Weitz also raises the broader affirmative defense of collateral estoppel. "Once a court has decided an issue of fact or law necessary to its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94 (1980). Collateral estoppel is applicable:

   [I]f (1) there has been a final determination on the merits of the issue sought to be precluded; (2) the party against whom ... preclusion is sought has a full and fair opportunity to contest the decision ...; and (3) the issue sought to be precluded by the earlier suit is the same issue involved in the later action.

   **\*8** *Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987) (citation omitted). The requirement of a full and fair opportunity to contest requires that the plaintiff "was fully able to raise the same factual or legal issues" in the prior litigation as asserted in the present case. *LaFleur v. Whitman,* 300 F.3d 256, 274 (2d Cir.2002).

   However, it is clear that there has not been a final determination in the pending federal case and Dr. Weitz, again, cannot surmount the first prong of the test. Therefore, Dr. Weitz's motion should be denied without prejudice on this ground as well.

### E. Statute of Limitations

   Dr. Weitz moves to dismiss Guarneri's Eighth Amendment allegations concerning inadequate treatment for his neck and back on the ground that they are barred by the statute of limitations. While there is no provision in § 1983, § 1988 provides that state law may apply if not inconsistent with the Constitution or federal law. 42 U.S.C. § 1988(a) (2003); *Moor v. County of Alameda,* 411 U.S. 693, 702-03 (1973). In New York, the applicable statute of limitations for a § 1983 suit is the three-year period governing suits to recover upon a liability created or imposed by statute. *See Owens v. Okure,* 488 U.S. 235, 249-51 (1989); *Romer v. Leary,* 425 F.2d 186, 187 (2d Cir.1970); N.Y. C.P.L.R. 214(2) (McKinney 2003).
   Federal law governs the determination of the accrual date for purposes of a § 1983 claim. *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002). The claim accrues "when the plaintiff knows or has reason to know" of the harm. *Id.* (citations omitted). "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or

she] is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980). With regard to medical indifference claims, the statute of limitations in a § 1983 suit is derived from personal injury case law, not medical malpractice. *See e.g. Owens,* 488 U.S. at 251.

   Here, Guarneri's initial complaint was filed on August 14, 2006. Compl. (Docket No. 1). Thus, claims relating to medical indifference occurring in 2000 are clearly outside the three-year period. However, claims regarding deliberate indifference resulting in herniated discs occurring in 2003 may fall within the three-year statutory period depending on when in 2003 the conduct occurred. Therefore, claims relating to the second back injury in 2003 may present facts upon which relief may be granted depending on when in 2003 the claim is shown to have accrued. At this stage, liberally construing Guarneri's amended complaint, the allegations therein are deemed to assert that claim accrued after August 14, 2003.

   Thus, Dr. Weitz's motion on this ground should be granted with regard to the neck and back injuries occurring in 2000 and denied with regard to the back injuries occurring in 2003.

### III. Conclusion

   **\*9** For the reasons stated above, it is hereby **RECOMMENDED** that:
   1. Sullivan's motion to dismiss (Docket No. 43) be **GRANTED** and that the amended complaint be **DISMISSED** in its entirety as to her;

   2. Dr. Weitz's motion to dismiss (Docket No. 19) be:

   a. **GRANTED** as to his lack of personal involvement with the confiscation of the knee brace;

   b. **DENIED** as to his lack of personal involvement in Guarneri's neck, back, and mental health treatments;

   c. **DENIED** as to Guarneri's back and neck injuries sustained in 2003; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

(Cite as: 2008 WL 552872 (N.D.N.Y.))

    d. **GRANTED** as to Guarneri's back and neck injuries sustained in 2000; and

    3. The amended complaint be **DISMISSED** without prejudice as to defendants Lamy and John Doe.

    Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.

Guarneri v. Hazzard
Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jeffery HAMM, Plaintiff,
v.
Richard HATCHER, Prison Health Services, and New
York City Department of Correction, Defendants.
**No. 05-CV-503 (KMK).**

May 5, 2009.

West KeySummary
**Civil Rights 78** ☞ **1091**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in
General
        78k1089 Prisons
           78k1091 k. Medical Care and Treatment. Most
Cited Cases
An inmate stated a sufficient claim under § 1983 for
deliberate indifference to a serious medical need against
a prison doctor. The inmate was told that he would have to
wait for ten days for his "regular medication" when he first
entered the prison. The doctor knew that the inmate had
previously been taking the medication and the inmate
further alleged that the doctor knew he was "in recovery"
and wanted him make him suicidal. Further, the inmate
alleged that he suffered from withdrawal and his medical
record demonstrated that even after he returned to his
medication was nervous, anxious, and angry. 42 U.S.C.A.
§ 1983.

Jeffery Hamm, New York, NY, pro se.

Kimberly D. Conway, Esq., New York City Law
Department, Office of the Corporation Counsel, Bronx,
NY, for Defendants.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge.

**\*1** Plaintiff Jeffery Hamm, pro se, brings this action
pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging
that the New York City Department of Correction
("DOC"), Prison Health Services ("PHS"), and DOC
psychiatrist Richard Hatcher ("Hatcher") (collectively,
"Defendants") violated Plaintiff's rights under the Eighth
and Fourteenth Amendments in connection with their
suspension and alteration of his antidepressant
medications. Defendants move to dismiss Plaintiff's
Second Amended Complaint for failure to state a claim,
pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated
herein, Defendants' motion is granted in part and denied in
part.

*I. Background*

*A. Facts*

For purposes of this Motion, the Court accepts as true all
facts alleged by Plaintiff in his Second Amended
Complaint, filed July 31, 2006.

Upon entering the custody of DOC in March 2002,
Plaintiff received antidepressant medications, including
"forty milligrams of Paxil and fifty milligrams of
T[ra]zodone." (Second Am. Compl. ("SAC") ¶ 6; Third
Unnumbered Exhibit to SAC ("Medical Records"), at first
unnumbered page ("Consent for Medication" form
indicating that on March 15, 2002, Plaintiff consented to
receive "Paxil 40mg PO QAM [orally, every morning]"
and "Trazodone 50mg PO QAM").) Plaintiff continued
taking these medications while detained at the Otis
Bantum Correctional Center ("OBCC") for one hundred
days. (SAC ¶ 6; Medical Records, at second unnumbered
page ("Progress Note" dated August 14, 2002, and signed
by "Roberto Caga-Anan, MD," indicating the location as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

"OBCC" and renewing Plaintiff's Paxil prescription at a dosage of "40mg").)

Plaintiff was subsequently transferred to the George Motchan Detention Center ("GMDC"), located at 15-15 Hazen Street, East Elmhurst, New York. (SAC ¶ 6.) At his "initial interview" upon arriving at GMDC, Plaintiff "was told by Doctor Richard Hatcher" that he "would have to wait ten days for [his] regular medication." FN1 (*Id.*) Plaintiff "protested but was told that was the facility policy." (*Id.*) After ten days elapsed, Plaintiff was "prescribed only half [of his] regular dosage of Paxil" and was "suffering from the side effects of withdrawal symptoms of Paxil [sic]." (*Id.*) Plaintiff "continually complained and requested [his] regular dosage," but did not receive it prior to being "transferred upstate." (*Id.*)

> FN1. Plaintiff's Second Amended Complaint identifies Hatcher as a "[p]sychiatrist" at GMDC. (SAC ¶ 3(a).) Defendants, in their motion papers, assert that "defendant 'Richard Hatcher' is not and has never been an employee of the Prison Health Services or [DOC]" (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") 1 n. 1); Plaintiff responds that Hatcher's signature appears "on copies from my medical record[s] ... three times" (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem."), at first unnumbered page). It appears to the Court, however, that the signature to which Plaintiff refers is that of "Richard Fletcher, NP." (Medical Records, at third-fourth unnumbered pages.) Regardless, the Court will assume for purposes of this motion that the individual at issue is named Richard Hatcher, and that he was a psychiatrist, as Plaintiff alleges, rather than a nurse practitioner. However, Defendants' counsel is requested to provide documents and other information to Plaintiff that identify the person who signed the relevant medical documents. These materials are to be provided to Plaintiff within thirty days of the date of this Opinion and Order.

A September 19, 2002 "Progress Note" signed by "Sandra Hernandez, C.S.W." indicates that Plaintiff had arrived at GMDC by that date. FN2 The note stated: "Social Work. Pt. assigned & seen this P.M. Psychosocial & C.T.P. done."

(Medical Records, at third unnnumbered page.) According to an October 25, 2002 Progress Note, allegedly signed by Hatcher, Plaintiff stated: " 'I'm getting nervous. I don't want to snap and get into more trouble. I get angry easily. Could you raise my Paxil?' " (*Id.*) The Progress Note indicated that Plaintiff "express[ed] concern about experiencing anxiety[,] anger[, and] possible loss of temper [and] control," and concluded that Plaintiff "will continue ... current regiment [sic] and add Risperidone 1mg PO BID [twice a day] for impulse control [and] depression." (*Id.*) According to a November 11, 2002 Progress Note, also allegedly signed by Hatcher, Plaintiff stated: " 'I need the Paxil raise[d] to 40mg in the morning. And I'm doing OK [with] the rest of the medicine.' ... 'I need to raise the Paxil because that's my regular dose. I need to stay more calm during the day.' " (*Id.* at fourth unnumbered page.) The Progress Note ended by listing Plaintiff's medications, stating that a physician "will give [Plaintiff] ... Paxil 40mg PO QAM for depression and anxiety." (*Id.*) In this notation, the words "Paxil 40mg PO QAM" were preceded by an arrow pointing upward. (*Id.*)

> FN2. Accompanying the Progress Note is the date and the notation "C-73," which indicates GMDC. (Defs.' Mem. 2.)

**\*2** A form dated December 31, 2002 stated that Plaintiff had complained to the mental health clinic that his "psych medication expir[ed] 2 w[ee]ks ago without renewal," saying that "[he] ha[d] been taking these medication [sic] [for] 2 y[ea]rs[;] now everything is messed up." (*Id.* at sixth unnumbered page.) According to the form, Plaintiff was "previously on Risper[idone] 3 mg QHS[, at bedtime] [,] Trazodone 50 mg QHS[, and] Paxil 20 mg QAM." (*Id.*) The form stated: "Please evaluate for continuation of meds." (*Id.*) A Progress Note dated January 3, 2003, and initialed "L.G." for "Lyubov Gorellk, MD," indicated that Plaintiff's Paxil dosage would be set to "20mg bid." (*Id.* at fifth unnumbered page.)

According to the Second Amended Complaint, Plaintiff's inability to receive his regular dosage of Paxil "further [ex]acerbated [his] condition while on trial[,] causing [him] to take a plea instead of going to trial." (SAC ¶ 6.) Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

sentenced to three to six years' imprisonment. (First Unnumbered Exhibit to SAC (*People v. Hamm,* No. 7840/01 (N.Y.App.Div. Apr.5, 2005) ("App.Div.Order"), at 12.) Plaintiff later "attempted to withdraw [his] plea on ... grounds" that he was impaired by his withdrawal from medication, "but was denied." (SAC ¶ 6.)

The Appellate Division affirmed the denial of Plaintiff's motion to withdraw his guilty plea, stating: "The record establishes that [Plaintiff's] plea was knowing, intelligent and voluntary, and it fails to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (App. Div. Order 12 (internal citations omitted).) The Appellate Division added that at his plea allocution Plaintiff "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and the court stated that the lower court "relied on its own recollection of [Plaintiff's] lucidity at the time of the plea" in denying Plaintiff's motion to withdraw his plea. (*Id.* 12-13.) Plaintiff's application for leave to appeal to the New York Court of Appeals was denied. (Second Unnumbered Exhibit to SAC (Cert. Denying Leave, dated June 18, 2005).)

Plaintiff alleges that Hatcher, knowing that Plaintiff was "in recovery," "endangered [Plaintiff's] safety as well as the safety of other inmates in an attempt to make [Plaintiff] suicidal." (SAC ¶ 6.) Plaintiff contends that Defendants "disregard[ed]" his "obvious medical condition" and "serious medical need," in violation of the Eighth Amendment, and "knew of and disregarded the risk of side effects of medication," with "[d]eliberate indifference," in violation of the Fourteenth Amendment. (*Id.*)

*B. Procedural History*

**\*3** Plaintiff filed suit on May 17, 2004, in the Northern District of New York. The action was transferred to the Southern District of New York on January 14, 2005. Then-Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend. Plaintiff filed an Amended Complaint on March 28, 2005. The case was subsequently reassigned to Judge Colleen McMahon. Plaintiff filed his Second

Amended Complaint on July 31, 2006. The case was reassigned to this Court on August 6, 2007. Plaintiff, who by this time had completed his prison term, moved for a default judgment on December 6, 2007.[FN3] The Court denied Plaintiff's motion, and this motion to dismiss by Defendants followed.

> **FN3.** According to Plaintiff's submission to the Clerk of Court, dated August 8, 2007, as of that date he was "under arrest on a parole violation" and being held at a DOC facility in Manhattan. (Dkt. No. 19.) The New York State Department of Correctional Services website indicates that Plaintiff was paroled on March 20, 2007.

*II. Discussion*

*A. Standard of Review*

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero,* 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). "When considering motions to dismiss the claims of plaintiffs proceeding pro se, courts in [the Second] Circuit ... construe the pleadings liberally[,] ... especially ... when dealing with civil rights complaints ...." *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted) (second alteration in Twombly). In *Bell Atlantic Corp. v. Twombly, see id.* at 554-63, the Supreme Court abandoned reliance on the oft-cited line from *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." As the Court explained in *Twombly,* a literal application of *Conley'*s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly,* 550 U.S. at 561 (alteration in *Twombly* ). Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.; see also Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("After careful consideration of the Court's [*Twombly* ] opinion ..., we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* (emphasis in original)).

B. *Plaintiff's Eighth Amendment Claim*

**\*4** "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "Yet not every lapse in medical care is a constitutional wrong." *Id.* "Rather, a prison official violates the Eighth Amendment only when two requirements are met." *Id.* (internal quotation marks omitted).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Id.* (internal citations and quotation marks omitted); *see also Farmer v. Brennan,* 511 U.S. 825, 844-47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280; *see also Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Salahuddin,* 467 F.3d at 280 (quoting *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003)) (second alteration in *Salahuddin* ).

"The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness entails more than mere negligence; the risk of

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

harm must be substantial and the official's actions more than merely negligent." *Id.* (internal citations omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) ("[T]he mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.").

**\*5** However, the Eighth Amendment does not apply to individuals who are in pre-trial detention at the time of the incidents of which they complain. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) ("Because as a pre-trial detainee [plaintiff] was not being 'punished,' the 'cruel and unusual punishment' proscription of the Eighth Amendment to the Constitution does not apply."); *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999) ("[T]he Eighth Amendment's protection does not apply 'until after conviction and sentence' ...." (quoting *Graham v. Connor,* 490 U.S. 386, 392 n. 6, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989))).

The Second Amended Complaint, construed liberally, does not allege any violation of Plaintiff's rights occurring after his conviction. Instead, it focuses exclusively on alleged deprivation of appropriate medication during Plaintiff's pretrial detention at GMDC, specifically alleging that Plaintiff "never received [his regular dosage of Paxil] before [being] transferred upstate" (SAC ¶ 6), i.e., before being convicted and sentenced. Thus, "[b]ecause ... Plaintiff was a pretrial detainee during his detention in [DOC custody], his challenge to the conditions of his confinement arises from the substantive component of the Due Process Clause of the [Fourteenth] Amendment and not from the cruel and unusual punishment standards of the Eighth Amendment," *Iqbal,* 490 F.3d at 168, and Plaintiff's Eighth Amendment claim is dismissed. *See Bennett v. Falcone,* No. 05-CV-1358, 2009 WL 816830, at *6 n. 9 (S.D.N.Y. Mar. 25, 2009) ("While a convicted prisoner's right to medical assistance stems from the Eighth Amendment's ban on cruel and unusual punishment, the right of a pretrial detainee to medical care arises under the Due Process Clause of the Fourteenth Amendment .").

*C. Plaintiff's Fourteenth Amendment Claim Against Hatcher*

"The rights of one who has not been convicted are

protected by the Due Process Clause; and while the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). "Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Id.; see also Cuoco,* 222 F.3d at 106 (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment").

The Second Circuit has noted that while "the Eighth Amendment ... standard for assessing deliberate indifference is a subjective one, requiring a determination as to whether the official knew of the risk to an inmate's health or safety[,] ... the Supreme Court has not stated whether the same standard should be applied in the due process context." *Weyant,* 101 F.3d at 856. In *Liscio v. Warren,* 901 F.2d 274 (2d Cir.1990), the Second Circuit "used an objective standard, requiring determination of what the official knew or should have known," *Weyant,* 101 F.3d at 856, holding that "a jury could find that [a doctor's] failure to diagnose [a pretrial detainee's] alcohol withdrawal constituted deliberate indifference," *Liscio,* 901 F.2d at 277. Notwithstanding this potential discrepancy, several district courts within the Circuit have stated that the analysis of a deliberate indifference claim is the same under the Due Process Clause as under the Eighth Amendment. *See Mitchell v. Prison Health Servs., Inc.,* No. 07-CV-8268, 2008 WL 5069075, at *3 (S.D.N.Y. Nov.20, 2008); *Jones v. Artuz,* No. 01-CV-4652, 2006 WL 2390267, at *3 (S.D.N.Y. Aug.17, 2006); *Fuentes v. Parks,* No. 03-CV-2660, 2005 WL 911442, at *4 n. 7 (S.D.N.Y. Apr.18, 2005).[FN4]

FN4. The Second Circuit has noted that "[u]nder either standard, the state of the defendant's knowledge is normally a question of fact to be determined after trial." *Weyant,* 101 F.3d at 856.

*1. Seriousness of Alleged Deprivation of Medical Care*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

**\*6** Defendants contend that "Plaintiff cannot show that the alleged temporary delay in defendant's provision of medication to plaintiff or the reduction in dose of plaintiff's Paxil prescription was objectively sufficiently serious" to state a Fourteenth Amendment due process claim. (Defs.' Mem. 4.) According to Defendants, Plaintiff must show that the alleged delay or reduction "caused a condition of urgency that could result in degeneration or extreme pain," but fails to "allege that he suffered any pain or physical harm" at all. (*Id.* 5.) The Court concludes that at least the alleged ten-day deprivation of all medication cannot, as a matter of law, be dismissed at this stage as insufficiently serious to invoke due process protection.

"[M]edical conditions[ ] may be of varying severity. The standard for Eighth Amendment violations contemplates 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). "A prisoner who nicks himself shaving obviously does not have a constitutional right to cosmetic surgery. But if prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment." *Id.; see also Harrison,* 219 F.3d at 136-37. The Second Circuit has observed that other circuits have considered "[f]actors ... includ[ing] '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain,' " *Chance,* 143 F.3d at 702 (third alteration in original), and has stated that such factors, "while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one," *id.* at 703. "[I]t is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining seriousness at the pleading stage." *Id.* at 702-03 (internal quotation marks omitted).

In his Second Amended Complaint, Plaintiff claims that when he arrived at GMDC, Hatcher allegedly told him that he "would have to wait ten days for [his] regular medication," despite Plaintiff's protests and despite the fact that Plaintiff, as Hatcher knew, was "in recovery." (SAC ¶ 6.) By the time that Plaintiff was given his medications (including a lower dose of Paxil), he was "suffering from the side effects of withdrawal symptoms of Paxil [sic]." (*Id.*) It is true that Plaintiff does not explain what the "side effects" or "withdrawal symptoms" were, and though he claims that Hatcher "attempt[ed] to make [him] suicidal," he does not allege that he actually had any suicidal thoughts. (*Id.*) However, reading the exhibits attached to the Second Amended Complaint in the light most favorable to Plaintiff, the Court deems Plaintiff to have alleged that as of October 25, 2002, he was " 'nervous,' " " " 'g[o]t angry easily,' " and was "concern[ed] about experiencing anxiety." (Medical Records, at third unnumbered page.) By this time, Plaintiff had been at GMDC for over one month, and-assuming that he began receiving medication ten days after his arrival-had been taking antidepressants, including a reduced dosage of Paxil, for most of that time. Taking as true Plaintiff's contention that his reduced dosage of Paxil caused his nervousness, anger, and anxiety as of October 25, 2002, it is reasonable to read his pleadings as alleging that he suffered similar (and ostensibly more severe) psychological and emotional effects arising from his complete "withdrawal" from all medication during the ten-day period following his transfer from OBCC to GMDC. *See Cuoco,* 222 F.3d at 106 (noting that "[c]ourts have repeatedly held that treatment of a psychiatric or psychological condition may present a 'serious medical need' "); *Young v. Coughlin,* No. 93-CV-262, 1998 WL 32518, at \*4 (S.D.N.Y. Jan. 29, 1998) ("Even pain that is psychological in origin can constitute a serious medical need. The guarantee of the minimal standards of medical care to prisoners extends to treatment of psychological or psychiatric disorders.").

**\*7** The Court cannot say that Plaintiff's allegations of psychological suffering are "so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern," *Chance,* 143 F.3d at 702, and therefore cannot conclude at the pleading stage that Plaintiff's alleged subjection to ten days of withdrawal from antidepressants was consistent with adequate medical treatment. *See id.* at 703 ("The plaintiff ... has alleged that, as the result of the defendants' actions, he suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly. It may become clear, at summary judgment or at some later stage in the litigation, that these claims are not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

adequately supported. But at the 12(b)(6) stage, we must accept the plaintiff's allegations as true and may not dismiss the case unless it is clear that it would be impossible for the plaintiff to make out a legally cognizable claim. Under this standard, the case before us should not have been dismissed."); *Tiggs v. City of New York,* No. 07-CV-7254, 2009 WL 602991, at *2 (S.D.N.Y. Feb.24, 2009) ("Although failure to treat an insect bite unto itself likely does not rise to the level of a constitutional violation, failure to timely treat a bite that appears seriously infected-as Plaintiff's bite may have been when he requested and was denied medical attention-could conceivably constitute such a violation.... [D]epending on the appearance of Plaintiff's alleged injury when he requested and was denied medical assistance, Plaintiff may be able to establish that his medical need was 'sufficiently serious' to satisfy the objective prong of the deliberate indifferen[ce] test." (footnote omitted)); *Laktas v. Health Prof'l Ltd.,* No. 03-CV-1374, 2007 WL 4379417, at *4, 12 (C.D.Ill.Dec. 12, 2007) (denying motion to dismiss claim that defendant doctors were "deliberately indifferent to ... serious medical conditions [including] ... bi-polar disorder," where plaintiff alleged that the doctors refused to renew his prescription for drugs to treat his bi-polar condition); *Hann v. Michigan,* No. 05-CV-71347, 2007 WL 894827, at *6 (E.D.Mich. Mar. 2, 2007) (R & R) (denying motion to dismiss where plaintiff alleged that "he had been prescribed ... an antidepressant, and that the medical care defendants knew this" but that they "nonetheless failed to provide him with [the antidepressant], despite his repeated protestations of his need for the medication," stating that "[t]here is no question that depression constitutes a serious medical condition," and noting that though "it may be the case that ... [plaintiff] was no longer depressed at the time the medication was discontinued, [that] matter[ ] ... may not be considered in analyzing defendants' motion to dismiss"), *adopted by* 2007 WL 895056 (E.D.Mich. Mar.21, 2007) *and* 2007 WL 1565465 (E.D.Mich. May 29, 2007); *cf. Barnard v. Beckstrom,* No.07-CV-19, 2008 WL 4280007, at *16 (E.D.Ky. Sept. 17, 2008) (awarding summary judgment on deliberate indifference claim, citing doctor's affidavit "find[ing] no merit in the claim that the ten-day delay ... in getting [plaintiff's] change in dosage and time of administration of [a psychiatric medication] ... caused [plaintiff] to suffer any adverse ... consequences"); *Caldwell v. McEwing,* No. 00-CV-1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept.28, 2006) (awarding summary judgment on deliberate indifference claim where plaintiff had not established that her psychiatric

medication was a serious medical need).

*2. Deliberate Indifference*

**\*8** Defendants further argue that Plaintiff "makes no factual allegations to show that defendants were aware of facts from which one could infer that a substantial risk of serious harm existed because of the ten-day delay in plaintiff's receipt of medication, and the reduction in his Paxil prescription." (Defs.' Mem. 7.) In other words, Defendants argue, Plaintiff fails to properly allege that he was subjected to deliberate indifference.

The Court agrees that Plaintiff has failed to state a claim that Defendants were deliberately indifferent to Plaintiff's medical needs in connection with Defendants' alleged failure to provide Plaintiff with his full dosage of Paxil. This conclusion is the same regardless of whether the relevant issue is what Defendants subjectively knew about Plaintiff's medical needs or what they objectively should have known. The medical records annexed to the Second Amended Complaint indicate that on October 25, 2002, when Plaintiff asked to have his dosage of Paxil increased, Hatcher decided instead to continue with his existing dosage of Paxil and to add an additional medication, Risperidone, "for impulse control [and] depression." (Medical Records, at third unnumbered page.) The same records further indicate that on November 11, 2002, Hatcher *did* accede to Plaintiff's request to increase his dosage of Paxil to 40 milligrams each morning.[FN8] (*Id.* at fourth unnumbered page.) Later, on January 3, 2003, Plaintiff was prescribed 20 milligrams of Paxil twice daily, for a total of 40 milligrams per day. (*Id.* at fifth unnumbered page.) Even assuming-in light of Plaintiff's allegation that he "never received" his "regular" 40-milligram dosage of Paxil while in DOC custody-that this purported increase of Plaintiff's Paxil prescription after November 11 was never actually carried out, Plaintiff's unfulfilled demand for a larger dosage of Paxil represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference, particularly in light of the medical treatment (and prescriptions) he received at the time. *See Adams v. Perez,* No. 08-CV-4834, 2009 WL 513036, at *3 (S.D.N.Y. Feb.27, 2009) ("Plaintiff's Complaint indicates that she has received significant medical attention since her fall. After Plaintiff fell she was transported to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

prison's medical unit for care. She was admitted to the infirmary overnight and x-rays were taken of her injuries. Since being discharged from the infirmary, Plaintiff has received at least four prescriptions for her pain and seen [defendant doctor] on at least three occasions. Thus, it is clearly not the case that Defendants[ ] are ignoring Plaintiff's medical needs. Additionally, the two specific treatments Plaintiff requests ... constitute a disagreement regarding course of treatment, a situation that is not actionable under the Eighth Amendment. Thus, the Court finds that Plaintiff has not stated a claim against Defendants for deliberate indifference toward her medical needs." (internal citations omitted)); *Mitchell,* 2008 WL 5069075, at *5 ("[Plaintiff's] allegations [that a Mediport placed in his chest] ... should have been flushed more frequently and should have been removed[ ] amount to, at most, a claim for medical malpractice.... Generously construed, plaintiff's allegations might state a claim for negligence. But the complaint and affirmation do not allege sufficient facts to nudge plaintiff's claim that defendants acted with deliberate indifference to his serious medical needs across the line from conceivable to plausible."); *Hughes v. Pillai,* No. 07-CV-55, 2008 WL 723510, at *1 (W.D.Pa. Mar. 17, 2008) (granting motion to dismiss deliberate indifference claim where plaintiff "does not assert in his complaint that [defendant doctor] discontinued his psychiatric medication altogether, but merely that she substituted his benzo-class medication with another psychot [ro]pic medication"). Construing Plaintiff's pleadings in the light most favorable to Plaintiff, and drawing all inferences in his favor, the Court concludes that Plaintiff's allegations confirm that Hatcher was responsive to requests for increased medication and that any disagreement they may have had over the precise drugs to be administered (or the quantity of those drugs) is grounds at most for a claim of medical malpractice.[FN6]

FN5. As noted earlier, the Court is allowed to consider materials appended to, or incorporated into, the Amended Complaint. *See Leonard F.,* 199 F.3d at 107.

FN6. The Court briefly notes that its conclusion on this issue-that Plaintiff fails to state a claim as to the reduction of Plaintiff's Paxil dosage from 40 to 20 milligrams-renders moot Defendants' argument that Plaintiff's Section 1983 claim on these grounds is barred by *Heck v. Humphrey,*

512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). (Defs.' Mem. 8-9.) In *Heck,* the Supreme Court held that in order to recover damages for harm caused by actions whose unlawfulness would render his conviction or sentence invalid, a Section 1983 plaintiff must show that that conviction or sentence had been called into question by issuance of a writ of habeas corpus or otherwise invalidated. This favorable-termination requirement applies to plaintiffs who are incarcerated at the time that they file their Section 1983 actions, regardless of whether they are later released. *See Gastelu v. Breslin,* No. 03-CV-1339, 2005 WL 2271933, at *4 (E.D.N.Y. Sept. 12, 2005) ("[Plaintiff] ... was still in prison when he initiated this § 1983 action. Because his challenge would necessarily imply the invalidity of his confinement, he is precluded from bringing an action under § 1983. The fact that he was released while his § 1983 action was pending does not alter the result."); *accord Rolle v. Connell,* No. 05-CV-991, 2005 WL 3077474, at *3 (N.D.N.Y. Nov. 16, 2005) (following *Gastelu*). Defendants argue that because "the purported 'consequence' alleged in the Second Amended Complaint of the modification in plaintiff's medication regime is that the reduction in his medication caused him to take a plea agreement," Plaintiff's claim therefore "represents nothing more than a collateral attack by plaintiff on his criminal conviction" and therefore is "prohibited" by *Heck.* (Defs.' Mem. 8-9.) Defendants are correct that Plaintiff, who was still serving his sentence when he filed this action, is barred from making any claim relying on alleged harm he suffered from entering a guilty plea. The Court's analysis of Plaintiff's claims therefore relies only on Plaintiff's allegation that Defendants' deliberate indifference caused him to suffer medical harm during his pretrial detention in DOC custody; this allegation alone, if proven, would not call into question the validity of Plaintiff's conviction and sentence.

**\*9** However, the Court cannot dismiss Plaintiff's claim that Defendants were deliberately indifferent to Plaintiff's need for medication during his first ten days at GMDC. Plaintiff alleges that Hatcher supposedly told him he would have to

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

wait ten days for his "regular medication," indicating Hatcher's understanding that Plaintiff was previously taking certain drugs; Plaintiff further claims that Hatcher was aware that he was "in recovery," that Hatcher "attempt[ed] to make [him] suicidal," and that the reason given for the delay was not an assessment that Plaintiff would be better off without medication but rather that it was a GMDC "policy ." Together with Plaintiff's claims that he suffered from withdrawal and the evidence in Plaintiff's medical records that, even after returning to his medication, Plaintiff was nervous, anxious, and angry, these allegations suffice to state a claim that Hatcher was deliberately indifferent to Plaintiff's medical needs when he first arrived at GMDC. *See Chance,* 143 F.3d at 704 ("Crucially, [plaintiff] has ... alleged that [defendant dentists] recommended extraction not on the basis of their medical views .... This allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998) ("It is ... possible that [plaintiff] could prove that [defendant nurse] acted with a sufficiently culpable state of mind when she aggravated his condition by allegedly taking away one of his crutches."); *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (holding that "[f]rom the allegations of this *pro se* complaint, it is not beyond dispute that [plaintiff] will be unable to develop evidence to show that [defendant] officers were aware of his serious medical need for ... eye-glasses," where plaintiff alleged that one officer " 'checked with' [a] nurse [ ] who had seen [plaintiff's] medical documentation" regarding the glasses, and therefore "the complaint suffices to warrant discovery to ascertain whether ... the [defendant] officers were aware of [plaintiff's] serious medical needs").

*D. Plaintiff's Fourteenth Amendment Claims Against Other Defendants*

Defendants contend that Plaintiff's claim against DOC must be dismissed because DOC is not a proper defendant. Defendants are correct. "As an agency of the City of New York, the Department of Corrections ... is not a suable entity." *Green v. City of N.Y. Dep't of Corr.,* No. 06-CV-4978, 2008 WL 2485402, at *4 (S.D.N .Y. June 19, 2008). Plaintiff's claim against DOC is therefore dismissed.

In addition, although Defendants do not address Plaintiff's claim against PHS, other than to deny that Hatcher is or has ever been a PHS employee (Defs.' Mem. 1 n. 1), the Court concludes that Plaintiff's claim against PHS must also fail for lack of any allegation that PHS was involved in the violation of Plaintiff's rights. The Second Amended Complaint does not mention PHS at all other than to name it as a defendant, and it does not appear to the Court that any exhibits annexed to the pleading mention PHS. Thus, Plaintiff's claim against PHS is also dismissed. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)).

**\*10** The Court finds it appropriate, however, to permit Plaintiff to amend his pleading one more time, so that he may allege, if warranted, claims against PHS and the City of New York ("City"). *See Myrie v. Calvo/Calvoba,* 591 F.Supp.2d 620, 629 (S.D.N.Y.2008) ("Given plaintiff's *pro se* status, it seems prudent to give him an opportunity to supplement his allegations, if he can, with specific facts tending to show ... deliberate indifference."); Fed.R.Civ.P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). The Court notes that the Second Amended Complaint alleges that Hatcher denied Plaintiff medication pursuant to a facility "policy," which could conceivably be grounds for a claim against PHS and/or the City pursuant to *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff is therefore "granted leave to reassert his Fourteenth Amendment claim as against New York City itself, since his complaint clearly reflects an effort to assert a claim against the governmental entity in addition to [Hatcher]," but is also "cautioned that he must make clear the factual basis of any federal claim he is asserting against the City of New York, because the municipality can only be held liable if the violation complained of is the product of a municipal policy, custom or practice." *Green,* 2008 WL 2485402, at *4. Plaintiff may also choose, if appropriate, to renew his claim against PHS, provided that he can explain in his amended pleading how PHS was involved in the alleged deprivation of his rights. However, Plaintiff is strongly encouraged to review the materials Defendants' counsel will be sending Plaintiff, as such records might help Plaintiff accurately identify the medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

officials who signed the relevant documents and otherwise were responsible for the plausibly actionable medical decisions in this case.

### III. Conclusion

For the reasons stated herein, Defendants' Motion to Dismiss is granted in part and denied in part. Plaintiff's Eighth Amendment claims are dismissed. Plaintiff's Fourteenth Amendment claim against PHS is dismissed without prejudice. Plaintiff's Fourteenth Amendment claim against DOC is dismissed with prejudice, and DOC is dismissed from this action. Plaintiff's Fourteenth Amendment claim against Hatcher is dismissed to the extent that it is based on allegations that Plaintiff received a lower dose of Paxil than he requested. Plaintiff's remaining claim, therefore, is that Hatcher violated Plaintiff's Fourteenth Amendment rights to adequate medical care by denying prescription medication to Plaintiff for a ten-day period after Plaintiff arrived at GMDC.

Plaintiff is also granted leave to amend his pleading, in order to substitute the correct party for Hatcher if warranted and to add claims against Prison Health Services and/or the City of New York, as described above; should Plaintiff choose to amend, he must file and serve his Third Amended Complaint by no later than sixty days from the date of this opinion. Plaintiff is directed to the pro se office (212-805-0175) for assistance in filing such a pleading.

**\*11** The Clerk of Court is respectfully directed to terminate the pending Motion (Dkt. No. 22), and to dismiss Defendants Prison Health Services and New York City Department of Correction from the case.

SO ORDERED.

S.D.N.Y.,2009.
Hamm v. Hatcher
Slip Copy, 2009 WL 1322357 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1135934 (N.D.N.Y.)

(Cite as: 2011 WL 1135934 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronald LOADHOLT, Plaintiff,
v.
William LAPE, Superintendent of Coxsackie Corr.
Facility; Dr. Miller, Facility Health Services Director;
K. Cavanaugh, Psychological Services Unit Chief;
McDermott, Lieutenant; Dr. Schlenger, Dental Health
Services; J. Smith, Deputy Superintendent of Health
Services, Defendants.
Civ. No. 9:09–CV–0658 (LEK/RFT).

March 3, 2011.
Ronald Loadholt, Hempstead, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Cathy Y. Sheehan, Esq., Richard Lombardo,
Esq., Assistant Attorney Generals, of Counsel, Albany,
NY, for Defendants.

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH E. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Ronald Loadholt filed this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging that
the Defendants violated his constitutional rights under the
Eighth and Fourteenth Amendments. Dkt. No. 9, Second
Am. Compl. Defendants bring a Motion to Dismiss the
Complaint pursuant to Federal Rule of Civil Procedure
12(b)(6), Dkt. No. 28, which Plaintiff opposes, Dkt. No.
36. For the reasons that follow, we recommend that
Defendants' Motion be **granted** and Plantiff's Second
Amended Complaint be dismissed in its entirety.

**I. BACKGROUND**

Plaintiff initiated this action on June 8, 2009, while an
inmate at Coxsackie Correctional Facility, with the filing
of a civil rights Complaint. *See* Dkt. No. 1. The Honorable

Lawrence E. Kahn, Senior United States District Judge,
found that both Plaintiff's Complaint and his subsequent
Amended Complaint (Dkt. No. 7) could not proceed as
drafted, but permitted Plaintiff, in light of his *pro se*
status, the opportunity to amend his pleadings to cure various
deficiencies therein. *See* Dkt. Nos. 6, Order, dated Aug.
12, 2009 & 8, Order, dated Sept. 29, 2009. In accordance
with those Orders, Plaintiff filed his Second Amended
Complaint with this Court on October 10, 2009. Dkt. No.
9.

On a motion to dismiss, the allegations of the
complaint must be accepted as true. *See Cruz v. Beto*, 405
U.S. 319, 322 (1972). In light of the terse, sparse, and
vague claims in Plaintiff's Second Amended Complaint,
we now restate the allegations in full and verbatim:

defendant McDermott refuse to give Plaintiff hearing
assistance Plaintiff is Learning disable and refuse OMH
testment of Plaintiff mental illness Dates 10/20/08,
12/5/08, 10/23/08 causing Plaintiff to lose freedom

defendant K cavanaugh no Psychological crisis
treatment or suicide prevention when Plaintiff stop eat
And drink lost alot of weight pacing not sleeping, or
showering Date 12–23–08 to 1–5–09 causing Plaintiff
Mental condition to get even more bad coming close to
dead phyical pain,

defendant: Dr: Schlenger no dental services for tooth
pain from 10–3–09 to 2–3–09 FN1 wait at coxsaxie
receive no dental services causing Plaintiff More pain
and lost of tooth

> FN1. Without additional supporting facts or
> clarification, this Court is unsure whether
> Plaintiff means to claim the pertinent dates were
> from February 3, 2009 until October 3, 2009,
> and simply stated in reverse, or rather from
> October 3, 2008 until February 3, 2009, and
> simply inserted a typographical error.
> Regardless, ambiguity on the stated dates does
> not change this Court's analysis.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135934 (N.D.N.Y.)

(Cite as: 2011 WL 1135934 (N.D.N.Y.))

defendant: J SMITH refuse to remove Plaintiff from RMV and place (Plaintiff) in hospital after lose alot of weight to be force feeded Date 12–21–09 to 1–05–09 [FN2] causing mental and phyical pain

FN2. *See supra* note 1.

defendant: William Lape

not given Plaintiff hearing, or grievance or legal assistance from 10–20–08 to 2–3–09 causing mental and phyical pain

defendant Dr Miller allow mental ill patients to lose alot of weight 12–23–08 to 1–5–09 place plaintiff on 3 floor and not on flat 10–5–09–2–2–09 [FN3] not give better pain medical, cane, mattress, pillow, no medical accomodational better shoe's etc.

FN3. *See supra* note 1.

Second Am. Compl. at pp. 5–7.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183 (1984)).

*\*2* "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N .D.N.Y. July 3, 1997)* (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached to or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling

on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. at 1960 (citing *Twombly* ).[FN4] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. at 1950–51.

FN4. By its opinion in *Bell Atl. Corp. v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135934 (N.D.N.Y.)

(Cite as: 2011 WL 1135934 (N.D.N.Y.))

*Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561 (2007) (quoting *Conley,* 355 U.S. 41, 45–46 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

With this standard in tow, we consider the plausibility of Plaintiff's Second Amended Complaint.

### B. Eighth Amendment

*3 Plaintiff claims, albeit in a quite cursory manner, that the Defendants violated his constitutional rights under the Eighth Amendment by their deliberate indifference to his medical needs and by subjecting him to harsh and atypical prison conditions.

To state a claim under § 1983 for deprivation of medical treatment in violation of the Eighth Amendment, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Thus, "[t]he deliberate indifference standard embodies both an objective and a subjective prong" which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.; Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Under the subjective component, the plaintiff must demonstrate that the defendants acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d at 66. This standard must be met for each claim against each individual Defendant in this action.

### 1. Defendant Cavanaugh

Plaintiff alleges that Defendant Cavanaugh did not provide "psychological crisis treatment or suicide prevention" after Plaintiff stopped eating, drinking, sleeping, or showering. Second Am. Compl. at p. 5. In accordance with the deliberate indifference standard, we will delve into Plaintiff's allegation to determine if this statement—Plaintiff's only mention of Defendant Cavanaugh—is enough to implicate both an objective substantial risk of serious harm and a sufficiently culpable state of mind.

"A serious medical condition must be 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Osacio v. Greene,* 2009 WL 3698382, at *4 (N.D.N.Y. Nov. 2, 2009) (quoting *Hathaway v. Coughlin,* 37 F.3d at 66). "Factors that have been considered in determining whether a condition is serious include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong,* 143 F.3d at 702) (other citations omitted). The "factors listed above, while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance v. Armstrong,* 143 F.3d at 703.

Here, the question is whether the deprivation of psychological treatment or suicide prevention procedures triggers an objectively serious risk of harm within the context of the Eighth Amendment. Taking the Plaintiff's claims as true, it appears he had a need for mental health services that went unmet. This Court, in accord with multiple decisions in this Circuit, recognizes that allegations of mental illness, especially when accompanied with suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious. *See, e.g., Allah v. Kemp,* 2010 WL 1036802, at *6, n. 9 (N.D.N.Y. Feb. 25, 2010) (finding the failure to provide plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet the "sufficiently serious" standard); *Hamilton v. Smith,* 2009 WL 3199531, at *14 (N.D.N.Y. Jan. 13, 2009) (finding plaintiff's claimed history of suicidal thoughts sufficient to raise a question of fact as to serious medical need); *Covington v. Westchester Cnty. Dept. of*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135934 (N.D.N.Y.)

(Cite as: 2011 WL 1135934 (N.D.N.Y.))

*Corrs.,* 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) (citing cases where courts have found that depression with suicidal ideation, or severe anxiety attacks, are sufficiently severe conditions to meet the objective prong of deliberate indifference); *see also Zimmerman v. Burge,* 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (reviewing published case law discussing whether depression either with or without suicidal ideation is a "sufficiently serious" medical condition). Therefore, Plaintiff's statement pertaining to Defendant Cavanaugh, though brief, is enough to satisfy the objective prong of the deliberate indifference standard.

*4 Regarding the subjective component, however, Plaintiff does not allege that Defendant Cavanaugh denied him medical services with any ill state of mind, or even that Cavanaugh was aware of the substantial medical risk. An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

Upon reading Plaintiff's Second Amended Complaint liberally, as well as his Opposition to Defendants' Motion to Dismiss, Dkt. No. 36, we conclude that Plaintiff makes no allegation as to Cavanaugh's awareness of Plaintiff's serious health risk. Thus, while mental illness and corresponding suicidal tendencies left untreated can be sufficiently serious to reach an Eighth Amendment claim, there are no facts in Plaintiff's pleading to allow this court to infer, let alone find, that Defendant Cavanaugh possessed the culpable state of mind required to allege deliberate indifference to a medical need. Accordingly, we recommend Plaintiff's claim against Defendant Cavanaugh be **dismissed.**

*2. Defendant Miller*

Plaintiff additionally alleges Eighth Amendment violations against Defendant Miller, who, according to the best interpretation this Court can muster, violated Plaintiff's constitutional rights by allowing him to lose weight and by failing to give Plaintiff "better pain

medica[tion], cane, mattress, pillow ... better shoes," and by placing Plaintiff on "3 floor and not on flat." Second Am. Compl. at p. 7.

This claim against Defendant Miller also fails to allege facts sufficient to survive Defendants' 12(b)(6) Motion to Dismiss. As with Defendant Cavanaugh, Plaintiff does not make any mention that Defendant Miller was aware of any serious risk to the Plaintiff, let alone that he acted with the requisite wantonness. Therefore, Plaintiff cannot claim Miller was deliberately indifferent to his medical needs.

Furthermore, to the extent that Plaintiff is claiming that the conditions of his confinement constituted cruel and unusual punishment in violation of the Eighth Amendment, this claim also falls short. In the context of an Eighth Amendment claim based on prison conditions, the prisoner must demonstrate that the deprivation is objectively sufficiently serious such that the plaintiff was "den[ied] the minimal civilized measure of life's necessities," and that the prison officials subjectively "knew of and disregarded an excessive risk to inmate health or safety." *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (internal citations omitted).

Turning to the objective analysis, Plaintiff's allegations do not trigger the conclusion that Plaintiff was denied the minimal civilized measure of life's necessities, as the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981), but instead only requires that inmates not be deprived of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety," *Helling v. McKinney,* 509 U.S. 25, 32 (1993) (citation omitted). In accord, courts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or "better shoes," as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment.[FN5] However, it is more complete to say that Plaintiff's failure to allege any facts indicating that Defendant Miller acted, or did not act, with a wanton state of mind, forecloses any colorable allegation that he was denied his constitutional rights under the Eighth Amendment regarding prison conditions. *See Vaughan v. Erno,* 8 F. App'x 145, 146–47 (2d Cir.2001) (finding complained conditions of confinement did not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135934 (N.D.N.Y.)

(Cite as: 2011 WL 1135934 (N.D.N.Y.))

constitute an Eighth Amendment violation because plaintiff failed to show defendants acted with deliberate indifference, even assuming that he sufficiently alleged a serious harm); *Carr v. Canty,* 2011 WL 309667, at *2 (S.D.N.Y. Jan. 19, 2011) (finding a plaintiff did not satisfy the deliberate indifference requirement of an Eighth Amendment claim regarding conditions of confinement because defendants responded to complaints of a wet and slippery floor "albeit, not in the manner in which [plaintiff] preferred" and took action to cover the water); *Hughes v. Butt,* 2009 WL 3122952, at *10 (N.D.N.Y. Sept. 28, 2009) (concluding that a defendant, who the plaintiff did not allege to have any visual indication or awareness that plaintiff needed a cane, back brace, or knee brace, did not act deliberately indifferent towards plaintiff); *Savage v. Brue,* 2007 WL 3047110, at *9 (N.D.N.Y. Oct. 18, 2007) (finding a nurse, who refused pain medication to an inmate confined in a special housing unit for forty-eight (48) hours with no mattress and back and neck pain due to a recent injury and who advised the inmate that he would need to "adjust to it," to be possibly negligent in her care, but not deliberately indifferent). Therefore, we recommend Plaintiff's claim against Defendant Miller be **dismissed.**

FN5. *See Brown v. Eagen,* 2009 WL 815724, at *9 (N.D.N.Y. Mar. 26, 2009) (stating that the prison officials have the broad discretion to determine the nature and character of the medical treatment afforded to inmates, as "[a]n inmate does not have the right to treatment of his choice") (citing, *inter alia, Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)); *Williams v. Perlman,* 2009 WL 1652193, at *6–7 (N.D.N.Y. Feb. 5, 2009) (finding a prisoner who specifically complained that his orthopedic shoes created "intense pain on [his] toes and arches" and caused him to develop painful callouses which needed to be "lanced from [his] feet" did not adequately suggest in his complaint that his foot, ankle, or arch condition presented an issue of degeneration or extreme pain); *Borges v. McGinnis,* 2007 WL 1232227, at *4–6 (W.D .N.Y. Apr. 26, 2007) (find that an inmate given only a paper gown, slippers, a thin mattress, and no blanket, while confined for three days in a

room with an open window that reduced the temperature to approximately 50 degrees, failed to meet the objective element of an Eighth Amendment violation); *Bell v. Artuz,* 1999 WL 253607, at *3–4 (S.D.N.Y. Apr. 29, 1999) (noting that no Eighth Amendment claim is implicated where prisoner alleges no pillows, a lack of space in double-occupancy cell, poor ventilation, asbestos on catwalk behind cells, no bacterial soap, and insufficient lighting); *Veloz v. New York,* 35 F.Supp.2d 305, 309 & 312 (S.D.N.Y.1999) (stating prisoner's foot condition, which involved increasing pain and required surgery, was not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996) (finding prisoner's ankle condition and resulting foot pain requiring the use of special footwear was not sufficiently serious).

*3. Defendant Schlenger*

**\*5** Plaintiff also claims that Defendant Schlenger, presumably in his position as a doctor of dental health at Coxsackie, did not give Plaintiff "dental services for tooth pain from 10–3–09 to 2–3–09 ... causing Plaintiff more pain and los[s] of tooth." Second Am. Compl. at p. 6.

"Dental conditions, like other medical conditions, may be of varying severity." *Chance v. Armstrong,* 143 F.3d at 702. Thus, the constitutionality of a decision to leave a dental condition untreated will depend on the facts of the particular case. *Harrison v. Barkley,* 219 F.3d 132, 137–38 (2d Cir.2000). The Second Circuit has held, in the context of failing to treat a dental injury, that a "serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Id.* at 136 (finding that while a tooth cavity is not strictly a serious medical condition, it is a degenerative condition which "is likely to produce agony and to require more invasive and painful treatments" if left untreated) (quoting *Chance v. Armstrong,* 143 F.3d at 702).

However, Plaintiff does not allege any facts regarding any particular type of oral injury or condition that would aid this Court in its 12(b)(6) inquiry, but rather only "tooth

Slip Copy, 2011 WL 1135934 (N.D.N.Y.)

(Cite as: 2011 WL 1135934 (N.D.N.Y.))

pain," which eventually led to the loss of the tooth. Plaintiff also alleges no facts to suggest that Defendant Schlenger or anyone else should have been aware of his tooth pain.[FN6] This claim against Defendant Schlenger is utterly bereft of factual allegations which would allow for the Court to deduce the plausibility of a cognizable cause of action, *Ashcroft v. Iqbal, —— U.S. ——, 129 S.Ct.1937, 1949 & 1960 (2009),* or which would permit a defendant "to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery," *Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir.1991)*. Thus, because this claim is without factual allegations setting forth that Defendant Schlenger violated Plaintiff's constitutional rights, we recommend that this claim be **dismissed.**

> FN6. Curiously, in opposing Defendants' request for dismissal, Plaintiff fails to mention Defendant Schlenger or allegations of facts supporting his claim of tooth pain, though he references his various other claims. *See* Dkt. No. 36.

*4. Defendant Smith*

Lastly, Plaintiff alleges that Defendant Smith, Deputy of Health Services, violated his rights under the Eighth Amendment by refusing to place him in a hospital after Plaintiff lost a lot of weight, resulting in "mental and physical pain." Second Am. Compl. at pp. 3 & 6.

In this case, unlike with Plaintiff's allegations against any of the previously considered Defendants, Plaintiff claims that "Smith refuse[d]" to act, which led to the alleged constitutional violation. As this Court is charged with the mandate of construing Plaintiff's claims leniently, we are willing to impute from the use of the word "refuse" enough to satisfy the wanton state of mind requirement of deliberate indifference. In order to "refuse" or decline to do something, one must necessarily be aware of the request or the issue, and subsequently choose not to act, implicating that Defendant Smith acted, or did not act, with a culpable mind set of more than mere negligence. Thus, Plaintiff has alleged enough, in this case, to satisfy the subjective prong of Eighth Amendment deliberate indifference.

*6 Regardless, Plaintiff's claim must fail, as he does not allege a sufficiently serious injury or risk of injury. He claims that Defendant Smith failed to place Plaintiff in a hospital due to Plaintiff's loss of weight. Plaintiff does not allege how much weight he lost, if that weight loss was dangerous to his health, or why he lost the weight.[FN7] Notably, Plaintiff also does not state why hospitalization was warranted or necessary to remedy this weight loss, as opposed to another form of treatment. *See O'Connor v. McArdle, 2006 WL 436091, at *5* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, that fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Therefore, there are no allegations in the pleading to "conclude that [P]laintiff's ... weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation." *Evans v. Albany Cnty. Corr. Facility, 2009 WL 1401645, at *10 (N.D.N.Y. May 14, 2009)* (quoting *Bost v. Bockelmann, 2007 WL 527320, at *8 (N.D.N.Y. Feb. 20, 2007)*). Thus, while Plaintiff has alleged enough to satisfy the subjective prong of the Eighth Amendment deliberate indifference standard, his failure to allege a sufficiently serious medical condition means this claim should be **dismissed.**

> FN7. The Court notes that Plaintiff mentions he "stop[ped] eat[ing] and drink[ing] lost alot [sic] of weight" in relation to a claim separate from his claim against Defendant Smith. Second Am. Compl. at p. 5.

**C. Due Process**

While not explicitly stated in Plaintiff's pleadings, this Court concludes that, by liberally construing Plaintiff's Second Amended Complaint, some of his allegations concern a violation of his rights under the Due Process clause of the Fourteenth Amendment. Specifically, Plaintiff complains that Defendants Lape and McDermott acted in such a way that they violated his right to procedural due process. We will examine the claims against each Defendant *seriatim.*

*1. Defendant Lape*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135934 (N.D.N.Y.)

(Cite as: 2011 WL 1135934 (N.D.N.Y.))

Plaintiff claims, in cursory fashion, that Defendant Lape, who Plaintiff describes as the "superintendent" of Coxsackie, did "not give[ ] Plaintiff hearing, or grievance or legal assistance from 10–20–08 to 2–3–09 causing mental and physical pain." Second. Am. Compl. at pp. 1 & 6.

It is well-settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977). Furthermore, the doctrine of *respondeat superior* is inapplicable to § 1983 claims. *See Polk County v. Dodson*, 454 U .S. 312, 325 (1981) (internal citations omitted); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995). Thus, a defendant may not be liable for damages simply by virtue of holding a supervisory position, without more. *See, e.g., Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Rather, the personal involvement of a supervisory defendant may be shown by evidence that:

**\*7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d at 873.

Plaintiff does not explain what Defendant Lape purportedly did to deny Plaintiff of assistance in any hearing or grievance process, nor suggest facts that Lape himself was involved in any way in any constitutional violation. Rather, Plaintiff appears to be bringing legal action against Lape due to his supervisory position only. Because the "proper focus is the [D]efendant's direct participation in, and connection to, the constitutional deprivation," *McClary v. Coughlin*, 87 F.Supp.2d 205, 215 (W.D .N.Y.2000), and because one cannot be liable solely from holding a supervisory position, we find

Plaintiff's claim against Defendant Lape should be **dismissed** for lack of personal involvement.

*2. Defendant McDermott*

Liberally construed, Plaintiff claims that Defendant McDermott refused to give Plaintiff "hearing assistance" or allow the Office of Mental Health to testify that Plaintiff is "learning disable[d]" and has a mental illness, which caused the Plaintiff to "lose freedom." Second Am. Compl. at p. 5.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must show that he possessed an actual liberty or property interest, and that he was deprived of that interest without sufficient process. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir.2004). Inmates' liberty interests are typically derived from two sources: the Due Process Clause of the Fourteenth Amendment, and state statute or regulations. *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)). With regard to State created liberty interests, the Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995).

Here, Plaintiff has not alleged enough facts to indicate a viable Due Process violation under the Constitution. He argues, in effect, that he did not receive a meaningful hearing because Defendant McDermott denied Plaintiff assistance in some unidentified hearing. The only liberty interest that Plaintiff alleged to have lost was the loss of freedom. *See* Second Am. Compl. at p. 5. Without specifics about the nature and conditions of the alleged loss of freedom, Plaintiff does not state an "atypical and significant hardship ... to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Shuler v. Brown*,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135934 (N.D.N.Y.)

(Cite as: 2011 WL 1135934 (N.D.N.Y.))

2009 WL 790973, at *7 (N.D.N.Y. Mar. 23, 2009) (quoting *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004)). The loss of freedom, inherent in the "ordinary incidents of prison life," *Sandin v. Conner,* 515 U.S. at 483–86, does not constitute, without alleging more, an atypical and significant hardship on an inmate. Nor has he shown a deprivation of liberty under the Due Process Clause. Furthermore, this statement is devoid of any factual allegation that this Court could examine to determine if the procedure provided by the State to Plaintiff was in fact insufficient, or what the deprivation exactly was. Plaintiff does not specify what hearing or hearings he is referring to, or even what the hearings were regarding. Therefore, because Plaintiff's naked assertions do not rise to the pleading standards required to withstand a Motion to Dismiss under Rule 12(b)(6), we recommend that the claim against Defendant McDermott be **dismissed.**

### D. Americans with Disability Act

**\*8** In his Second Amended Complaint, Plaintiff states that he has a cause of action under the Americans with Disability Act ("ADA"). Second Am. Compl. at p. 7. This claim is not supported with any facts, nor the names of the parties it is purportedly directed. Besides previously stating, with relation to his claims against Defendant McDermott, that he suffers from some type of learning disability, Plaintiff does not specifically allege what disability he suffers from, nor what he was denied. Furthermore, Plaintiff does not allege under which Title of the ADA he is suing under. Thus, for the preceding reasons and because the Plaintiff states no facts, allegations, nor specific discussion of this claim, we find that to the extent that Plaintiff is attempting to assert a claim under the ADA against any individual Defendant, the claim should be **dismissed.**

### III. CONCLUSION

While this Court recognizes the Second Circuit's preference to provide *pro se* plaintiffs with leave to amend their pleadings prior to dismissal, Loadholt has already been afforded two opportunities to amend his Complaint.

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 28) be **GRANTED** and Plaintiff's

Second Amended Complaint (Dkt. No. 9) be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2011.

Loadholt v. Lape
Slip Copy, 2011 WL 1135934 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

> FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jamal KEARSEY, Plaintiff,
v.
Adeyemi WILLIAMS, Defendant.
No. 99 Civ. 8646 DAB.

Sept. 1, 2005.

*MEMORANDUM & ORDER*

BATTS, J.

**\*1** Plaintiff Jamal Kearsey, proceeding *prose,* has filed the above-captioned case against Defendant Dr. Adeyemi Williams ("Dr.Williams") pursuant to 42 U.S.C. § 1983 alleging that Dr. Williams violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical needs. Defendant has moved to dismiss the Complaint for failure to exhaust administrative remedies, for failure to state a claim, and because Defendant is shielded by qualified immunity.[FN1] For the reasons stated herein, Defendant's Motion to Dismiss is DENIED.

FN1. This Court granted Defendant's Motion to Dismiss for failure to exhaust administrative remedies in its June 6, 2002 Order but vacated that Order on September 20, 2004 upon Plaintiff's motion pursuant to Fed.R.Civ.P. 60(b). *See* *Kearsey v. Williams,* No. 99 Civ. 8646, 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004).

I. BACKGROUND

In his Complaint, Plaintiff alleges that while he was incarcerated at Rikers Island Correctional Facility ("Rikers"), Defendant, a doctor at Rikers, violated Plaintiff's Eighth Amendment rights by refusing to provide him with an asthma pump when Plaintiff experienced breathing difficulties. Specifically, on April 4, 1999, Plaintiff requested to speak with a doctor because the heat in his cell was aggravating his asthma. (Compl. at 3-4.) When Dr. Williams went to Plaintiff's cell, Plaintiff stated that his chest had "tighten[ed] up" and that he "couldn't breath[e]," and requested that Dr. Williams take him "downstairs" to get an asthma pump. (Id. at 4.) Dr. Williams declined to take Plaintiff downstairs but said that he would send a pump to Plaintiff's cell that evening. (Id.) After a period of time, a corrections officer called Dr. Williams and he also informed him of Plaintiff's medical condition. (Id.) Dr. Williams told the officer that he would bring the asthma pump. (Id.) Plaintiff alleges that Dr. Williams forgot to bring the pump. (Id.)

Plaintiff complained for a third time to Dr. Williams of his inability to breathe and stated that he was experiencing chest pain. (Id.) Once again, Dr. Williams responded by promising to send an asthma pump that evening. (Id.) Plaintiff subsequently asked for Defendant's name, to which Dr. Williams allegedly responded, "I won't send you anything now!" (Id.) Dr. Williams then handed Plaintiff a note with his name. (Id. at 5.) No pump was given to Plaintiff. Shortly after Dr. Williams left, Plaintiff borrowed an asthma pump from a fellow minute, although that pump was different from the one Plaintiff was used to. (Id.) Plaintiff complained of chest pains and breathing difficulties for the rest of the day. (Id.) On April 6, 1999, Plaintiff was having blood work done and spoke with a nurse about his medical condition. (Id.) The nurse ordered an emergency pump that arrived later in the day. (Id.)

On June 24, 1999, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant exhibited deliberate indifference to his serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust administrative

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability based on the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams,* No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

**\*2** Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey,* No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at *4.

FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice.* In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum,* 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose."Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 521 (1972).

### B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**\*3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). See*Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted). Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. See*Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**\*4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at \*9 (W.D.N.Y. Feb. 18, 2005); see*also Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at \*3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening. *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at \*4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is inarguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); see*Whitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at \*4.

Plaintiff has alleged that on three separate occasions, he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites *Reyes v. Corrections Officer Bay,* No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in *Reyes,* who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. *Chance,* 143 F.3d at 703;*see also Farmer,* 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. *Hathaway,* 37 F.3d at 553.

**\*5** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06;*Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East,* 192 F.3d 329, 334 (2d Cir.1999). Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

**\*6** Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see*

*alsoHarlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id .* at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The fundamental question is whether "the state of the law" at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *Seesupra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from

consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Andrew WILLIAMS, Plaintiff,
v.
J(A) SMITH (First Deputy Supt.), Dr. J. Perilli
(F.H.S.D.), Mrs. Capuano (Nurse Admin.), Mr.
Williams (Physician Assistant), T.G. Eagan (Grievance
Director), Sergeant Krusen, Sergeant MacNamara,
Correction Officer Clark, Correction Officer
Maldonado, Correction Officer Goffe, Defendants.
No. 02 Civ. 4558(DLC).

Aug. 10, 2009.
West KeySummary**Prisons 310** 🗝 **192**

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
**Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
A prison doctor was not deliberately indifferent to a
prisoner's serious medical need in violation of the Eighth
Amendment when he determined that morning showers
were no longer necessary to treat the prisoner's back
condition. The prisoner argued that the doctor had denied
the request for continued daily showers because the
prisoner had filed grievances about the security staff not
allowing him to take the daily morning showers. However,
the prisoner failed to raise a question of material fact as to
whether the doctor acted with the necessary intent.

U.S.C.A. Const.Amend. 8.
Andrew Williams, Woodbourne, NY, pro se.

Thomas M. Biesty, State of New York, Office of the
Attorney General, New York, NY, for Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.
**\*1** Andrew Williams ("Williams"), an inmate at Sing
Sing Correctional Facility ("Sing Sing"), has brought this
*pro se* civil rights action pursuant to 42 U.S.C. § 1983
against First Deputy Superintendent Joseph Smith
("Smith"), Facility Health Services Director John Perilli
("Perilli"), Nurse Administrator Kimberly Capuano
("Capuano"), Physician Assistant Phillip Williams
("P.A.Williams"), Grievance Director Thomas Eagan
("Eagan"), Sergeants John MacNamara ("MacNamara")
and Robert Krusen ("Krusen"), and Corrections Officers
John Clark ("Clark"), Enrique Maldonado ("Maldonado"),
and Melvin Goffe ("Goffe") (collectively, "Defendants")
[FN1] for their deliberate indifference to his serious medical
needs in violation of the Eighth Amendment, and for
retaliation in violation of the First Amendment. Williams
had an arthritic right knee and he injured his back in 1996.
He had back surgery in 1997. This lawsuit complains that
the defendants failed to accommodate these ailments
following that surgery, in particular by denying him access
to daily morning showers to relieve his back pain and
requiring him to climb stairs despite his knee condition.
Defendants have moved for summary judgment. For the
following reasons, summary judgment is granted in part.

> FN1. Williams also named Physical Therapist
> Mr. Abraham as a defendant in his Amended
> Complaint. The Court noted in its September 18,
> 2003 Memorandum and Order that the plaintiff
> had provided no proof of service of Abraham.
> Plaintiff having failed to cure this defect, this
> Order and Opinion does not address Williams's
> allegations concerning Abraham.

Background

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

Unless otherwise noted, the following facts are undisputed. While an inmate, Williams fell down a flight of stairs in 1996 and hurt his back, suffering multiple disc herniations. In December 1997, Williams underwent surgery for these injuries. After he returned to Sing Sing later that month, he continued to suffer from degenerative disc disease in his spine and a bulging disc and herniation in his back. In addition, he suffered from arthritis in his right knee.

Soon after Williams returned to Sing Sing following surgery, Sing Sing began referring him to outside specialists and physical therapists regularly, often multiple times per month. Between his 1997 surgery and the filing of this summary judgment motion, he had over 100 medical consultations. He was regularly given pain and anti-inflammatory medication, was provided with a back brace, and was issued medical passes that were supposed to allow him to be moved to the flats,FN2 to take a daily shower, to use the elevator, to sleep on a firm bed, and to be served dinner in his cell on a "feed-up" tray. FN3 Nonetheless, Williams experienced pain, tenderness, and decreased range of motion in his back and legs through his filing of this suit in 2002.

> FN2. A flats pass allows an inmate to be housed on the first floor of a facility so as to avoid climbing stairs.

> FN3. The pass allowing an inmate to have dinner delivered to his cell is called a feed-up pass.

*Daily Morning Shower*

Williams complained frequently about back pain that occasionally radiated to his shoulders, buttocks, and legs. He had difficulty "bending, twisting, standing or sitting for long duration ... [and] with certain movements and lifting heavy objects." Williams also complained about pain, stiffness, tightness, and spasms in his back, particularly in the morning. Outside specialists prescribed daily morning showers as heat treatment to alleviate these symptoms.

**\*2** Inmates at Sing Sing are generally entitled to shower three evenings per week. Beginning in 1999, Williams was issued a medical pass for a daily morning shower. Despite his possession of that pass, Williams asserts that on occasion certain defendants refused to

honor his right to a daily morning shower, and instead allowed him to shower only three evenings per week.

a. Goffe, Maldonado, MacNamara, Krusen and Smith

Williams presented a valid pass for his daily morning showers to officers Goffe and Maldonado for the first time on April 30, 1999.FN4 Despite this pass, Goffe and Maldonado refused to permit a morning shower, asserting their understanding that administrative and safety considerations, as well as the housing block operating policy, did not allow inmates to take morning showers unless they were in keeplock (i.e., confined to their cells) or were inmate porters. Goffe and Maldonado consulted their superiors Krusen and MacNamara in making this determination. After this incident, officers repeatedly refused to honor his shower pass. In September 1999, Williams filed a grievance about the denial of his morning showers, which Smith asserts he rejected in reliance on "the medical department's conclusion that plaintiff did not need morning showers." He wrote on the denial that "although [Williams's] pass says AM showers, block policy dictates otherwise," and "staff can find no reason for AM shower."

> FN4. Williams's medical record shows that an outside specialist first prescribed hot showers on April 23, 1999. Before that date, he was prescribed "moist heat" and heat packs.

b. Capuano and Eagan

When Williams's September 1999 grievance was denied, he appealed to the Central Office Review Committee ("CORC") in Albany. CORC asked Nurse Capuano for information regarding the underlying events. According to Capuano, she spoke with Dr. Perilli about Williams's case and then relayed to CORC that Williams did not need daily morning showers. Relying on evidence showing that Capuano spoke to Dr. Perilli on December 23, 1999, eight days after CORC had already denied Williams's grievance on December 15, and on evidence that Dr. Perilli did not withdraw the authorization for Williams to have a daily shower until the following year, Williams claims that Capuano never spoke to Dr. Perilli about this appeal, and instead changed Williams's treatment plan herself.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

As Director of the Inmate Grievance Program for the New York State Department of Correctional Services, Eagan was responsible for the administrative function of the inmate grievance program. Although was not a voting member of CORC, he signed the December 15, 1999 CORC decision. Williams claims that Eagan was aware of Capuano's alleged misrepresentation and did not intervene. Williams does not explain how Eagan learned of Capuano's alleged misrepresentation.

c. P.A. Williams

On July 31, 2000, an outside specialist wrote in Williams's medical chart "Daily shower x 3 mos (for lumbar pain)-AM." Williams claims that when P.A. Williams reviewed this instruction, he crossed out "AM" and wrote "not indicated, has daily shower written 6/27 x 3 mos." P.A. Williams does not remember reviewing this entry for "AM" showers, and neither admits nor denies that the handwritten annotation was his. He adds that if he altered the prescription for a pass, he did so because it called for a morning shower, and the medical pass form did not permit the designation of a time for showers. Although he authorized thousands of daily shower passes, as a general practice, he authorized passes for a certain time of day "extremely rarely" because "facility, security and administrative policies weighed against" doing so.

d. Dr. Perilli

**\*3** Dr. Perilli began serving as Facility Health Services Director in December 1999. Williams had a daily morning shower pass at that time and Dr. Perilli renewed it. On October 16, 2000, however, Dr. Perilli reviewed Williams's medical chart and wrote in it *"no* need for daily shower based on his medical diagnosis." At a November 16, 2000 consultation, Dr. Perilli refused to renew Williams's pass for daily morning showers. Dr. Perilli noted in Williams's medical file on that date, "discussion held about shower pass-[patient] has chronic back problem. I will recommend shower per block, but *not* daily showers."

Williams claims that Dr. Perilli denied his request for daily shower passes at the November 16 meeting for non-medical reasons. Williams says that he told Dr. Perilli at the meeting that he had filed grievances in September 1999 about the security staff not allowing him to take

daily morning showers. In response, Dr. Perilli said "you file[d] grievance[s], oh I don't know about this," shook his head, and rescinded Williams's shower pass. Williams also claims that Dr. Perilli told him at this meeting that he would no longer issue daily morning shower passes because the security staff did not want to honor them, and the administration wanted Dr. Perilli to reduce the number of medical passes issued.

On November 20, Dr. Perilli wrote in Williams's medical file

I have reviewed ortho consultation 11-14-00 + recommendation for shower. Any outside consultant recommendations are always subject to provider review + DOC policies. As this is a chronic condition, there is no specific indicator for a daily shower (i.e., acute sprain, colostomies, etc.), but I will give shower per block [policy].

Subsequently, a number of outside specialists and physical therapists recommended daily morning showers, but Dr. Perilli repeatedly declined to issue Williams a pass for such showers, asserting it was not medically necessary.

e. Williams's Assertions of Pain Related to Deprivation of Daily Morning Showers

On November 11, 1999, Williams reported to a physical therapist that his back pain was an eight out of ten in intensity, and that this pain was relieved by hot showers. At a physical therapy appointment on April 5, 2000, he reported that showers relaxed his back, and at an appointment eight days later, the physical therapist noted that Williams's back was responding to heat and stretching. Williams asserts that he reported to an outside orthopedic specialist on November 14, 2000 that his back pain and spasms were reduced with heat treatment, but Williams's medical record does not reflect such a comment.

Williams's complaints about his back after Dr. Perilli terminated his shower pass on November 16, 2000 were similar to his complaints before. In both time periods, he complained about back spasms, back pain radiating to other parts of his body, and difficulty sitting. Williams does not make specific assertions, in either his medical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

records or in his opposition to this motion, that his back pain increased after Dr. Perilli terminated his daily morning shower pass. On September 25, 2002, almost two years after Dr. Perilli initially denied Williams a daily morning shower pass, Williams reported his pain to be a persistent five to seven out of ten in intensity, a decrease from the eight he reported November 1999.

*Climbing Stairs*

**\*4** Williams had right knee surgery in 1996. Subsequently, he suffered from arthritis, stiffness, limited range of motion, and pain. As a result, doctors recommended that Williams limit his stair climbing.
a. Feed-Up and Flats Passes

Williams was issued feed-up and flats passes so he would not have to climb stairs regularly. He claims that he presented valid feed-up and flats passes on April 30, 1999 to officers Goffe and Maldonado. Williams claims Goffe and Maldonado said they would work on accomodating these passes. A month and a half later, Williams started receiving his feed-up tray. He does not claim defendants rejected his feed-up pass or directly interfered with it in any way. Goffe, Maldonado, and Krusen assert that they had no role in determining whether Williams should be served meals in his cell or in implementing such an accommodation; Krusen asserts that he did not even know about Williams's request.

Goffe, Maldonado, and Krusen claim they also had no role in the decision to move Williams to a new cell. Williams says Goffe and Maldonado intentionally delayed his move to the flats, never notified the appropriate authorities about his request, and told him the more he asked the longer he had to wait to be moved. Williams does not explain how Krusen delayed his move to the flats; he asserts only that Krusen told him that there was no room in the flats and that a gallery officer would inform him when there was room. Williams claims that other inmates were being moved to the flats ahead of him. He was moved to the flats in October 2000, eighteen months after first presenting his flats pass.

b. Fishkill Stairs

Sing Sing sent Williams to Fishkill Correctional

Facility ("Fishkill") for physical therapy from April 1999 through December 2000. Clark worked at Fishkill and escorted Williams to the clinic there a number of times. Williams claims that "on approximately 10 occasions" Clark refused to allow Williams to use the elevator, and, instead, made Williams walk up six flights of stairs to the treatment unit, despite the fact that he had an elevator pass at Sing Sing. Williams claims that on April 13, 2000, Clark told him the elevator was not working properly and was only to be used in emergencies; after he walked up the stairs, though, he saw other inmates using the elevator. Williams refused to attend therapy sessions at Fishkill in October, November, and December 2000. He was discharged from the Fishkill clinic in December because of his refusal to attend, and he was immediately sent to another facility for therapy where he did not need to walk up stairs.
c. Williams's Assertions of Pain Related to Climbing Stairs

Over the course of the period in question, Williams complained about knee pain at dozens of medical consultations. He had limited range of motion in his right knee, complained about it giving out occasionally and being painful on range of motion tests, and he was diagnosed with right knee effusion.[FN5]

> FN5. Knee effusion is a condition where excess fluid accumulates in and around the knee joint.

**\*5** Doctors recommended that he limit his stair climbing. Williams does not make specific assertions about the quantity or quality of pain he experienced directly related to climbing stairs. He instead asserts generally that he had "perplexities" walking up stairs, and that he eventually refused to attend physical therapy at Fishkill because it was too painful to walk up six flights of stairs to the treatment unit.

Procedural History

Williams filed an amended complaint on November 12, 2002. Defendants moved to dismiss the suit on January 22, 2003. By a Memorandum and Order dated September 18, 2003, the Honorable Lawrence McKenna, to whom this case was then assigned, granted the motion to dismiss with respect to only one defendant, Superintendent Brian

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

Fisher. Defendants filed a motion for summary judgment on May 15, 2007, which became fully submitted on March 5, 2009. On June 5, 2009, this case was reassigned from Judge McKenna to this Court.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Sista v. CDC Ixis N. Amer., Inc., 445 F.3d 161, 169 (2d Cir.2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot rest "merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e); accord Sista, 445 F.3d at 169. "It is well established that the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." Triestman v. Fed. Bur. of Prisons, 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (citation omitted).

This Opinion first addresses Williams's Eighth Amendment claim, discussing in turn: personal involvement, deliberate indifference, and qualified immunity. This Opinion then discusses Williams's First Amendment retaliation claim.

*Personal Involvement*

Defendants Smith and Eagan move for summary judgment on the ground that they were not personally involved in the alleged deprivation of Williams's rights. Section 1983 provides in part that

[e]very person who, under color of any statutes, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured.

*6 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir.2008).

A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights. Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). As a consequence, "the doctrine of respondeat superior ... does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir.2003); see also Reynolds v. Giuliani, 506 F.3d 183, 190-191 (2d Cir.2007) (discussing municipal liability). It is thus "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir.2006) (citation omitted); accord Pettus v. Morgenthau, 554 F.3d 293, 300 (2d Cir.2009).

The personal involvement and liability of supervisory personnel is established when the supervisory official has "actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir.1989) (citation omitted); Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir.1999). Thus, a plaintiff may establish a supervisor's personal involvement by showing that the supervisor:

(1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

Iqbal v. Hasty, 490 F.3d 143, 152-153 (2d Cir.2007) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

Defendants argue that Smith and Eagan are entitled to summary judgment as they were not personally involved in the alleged deprivation of Williams's rights. Williams has not asserted that either Eagan or Smith were directly involved in interfering with Williams's medical treatment. Williams instead argues that Eagan is liable because he was aware of Capuano's alleged misrepresentation and failed to intervene. Williams has failed, however, to explain how Eagan became aware of Capuano's alleged misrepresentation or how he was otherwise personally involved in the deprivation of his rights. Eagan is therefore entitled to summary judgment.

Williams argues that Smith was personally involved in depriving Williams of his rights by denying Williams's grievance. Under Second Circuit law, it is "questionable" whether Smith's denial of Williams's grievance constitutes sufficient personal involvement to make him liable. *McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004). *See also Rahman v. Fisher,* 607 F.Supp.2d 580, at 585 (S.D.N.Y.2009) (personal involvement may exist where supervisor fails to act on reports of violation and violation continues). It is not necessary to reach this issue, though, as Smith is entitled to summary judgment on Williams's deliberate indifference claim for other reasons, as discussed below.

*Deliberate Indifference*

**\*7** All of the defendants argue that Williams has failed to show that he suffered a serious lapse in care for his back and knee conditions and that the defendants were deliberately indifferent to his medical needs. Although the "Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "[A] prison official violates the Eighth Amendment only when two requirements are met." *Id.* (citation omitted). The first requirement is that the alleged deprivation must be "sufficiently serious." *Id.* (citation omitted). The second requirement is that "the charged official must act with a sufficiently culpable state of mind." *Id.* at 280.
To determine whether the deprivation was sufficiently

serious, a court must first ascertain whether "the prisoner was actually deprived of adequate medical care," keeping in mind that "the prison official's duty is only to provide reasonable care." *Id.* at 279. An inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984).

A court must consider whether any deprivation was itself "sufficiently serious." *Salahuddin,* 467 F.3d at 280. This inquiry requires an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious." *Id.* If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Id.* Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003). Even in cases where an inmate "suffers from an admittedly serious medical condition," if the alleged deficiencies in treatment are "minor and inconsequential," those lapses will not sustain an Eighth Amendment claim. *Id.* "[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187.

**\*8** "Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Id.* at 185 (citation omitted). Courts use a number of factors to determine whether a medical condition is serious. These factors, which are also instructive in determining whether

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

the medical consequences of a denial of certain treatment are serious, include: "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (citation omitted). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 279 (citation omitted).

Second Circuit decisions have primarily discussed the serious medical need standard in the context of total failures to treat underlying medical conditions. *Smith,* 316 F.3d at 184 n. 8. In this context, courts in this district have determined that claims that fail to meet the constitutional standard of seriousness include: a "cut finger, even where skin is ripped off," *Sonds v. St. Barnabas Hosp. Correctional Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001); a broken finger, *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999); and a foot condition involving a fracture, bone cyst and degenerative arthritis, *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999). Claims that have met the constitutional standard of seriousness include failures to treat, *inter alia:* a painful facial keloid scar, *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003); a dental cavity at risk of "acute infections, debilitating pain and tooth loss," *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000); abscessed teeth causing "great pain" for six months and tooth degeneration, *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); ruptured Achilles tendon that resulted in swelling and pain, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-09 (2d Cir.1998) (per curiam); eye problems that resulted in loss of vision in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); and three-year extreme hip pain caused by embedded broken pins, *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994).

The question of whether persistent back pain rises to a level of constitutional significance depends upon the circumstances of the particular case presented. *Compare Mendoza v. McGinnis,* No. 05 Civ. 1124 (TJM/DEP), 2008 WL 4239760, *10 (N.D.N.Y. Sept.11, 2008) (finding degenerative disc disease to constitute a serious medical need); *Guarneri v. Hazzard,* No. 06 Civ. 0985,

2008 WL 552872, at * 6 (N.D.N.Y. Feb. 27, 2008) ("Severe back pain, especially if lasting an extended period of time, can amount to a serious medical need under the Eighth Amendment.") (citation omitted); *Faraday v. Lantz,* No. 03 Civ. 1520(SRU), 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica" leading to severe pain constitutes a serious medical need), *with Cain v. Jackson,* No. 05 Civ. 3914(LAP), 2007 WL 2193997, *6 (S.D.N.Y. July 27, 2007) (degenerative disc disease in cervical spine, which was compounded when plaintiff fell from her cell bunk and injured her back, was not sufficiently serious); *Jackson v. Fairchild,* No. 04 Civ. 73 (FJS/DRP), 2007 U.S. Dist. LEXIS 17497, *5, *9 (N.D.N.Y Mar. 12, 2007) (back pain did not constitute serious medical need where despite being seen frequently by prison medical officials, plaintiff "did not voice a significant number of concerns regarding pain, nor did he request pain medication beyond simple Ibuprofen and similar over-the-counter medications."); *Veloz v. New York,* 339 F.Supp.2d 505, 522-26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *Davis v. Reilly,* 324 F.Supp.2d 361, 368 (E.D.N.Y.2004) (A "sprained back and neck ... do not constitute a serious medical condition.").

**\*9** To show that a defendant acted with a sufficiently culpable state of mind, "it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health," which "is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*

Prison medical staff is given wide discretion in determining how to treat inmates. In this context, "[t]he decisions of physicians regarding the care and safety of patients are entitled to a presumption of correctness." *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (citation omitted); *Church v. Hegstrom,* 416 F.2d 449, 450 (2d Cir.1969) (Section 1983 "does not authorize federal courts to interfere in the ordinary medical practices ... of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

state prisons."). As such, a disagreement between an inmate and medical personnel over the course of treatment does not give rise to a deliberate indifference claim. *Chance,* 143 F.3d at 703. Moreover, a prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference. *See, e.g., Revenell v. Van Der Steeg,* No. 05 Civ. 4042(WHP), 2007 U.S. Dist LEXIS 17868, *16-17, 2007 WL 765716 (S.D.N.Y. Mar. 14, 2007); *Sully-Martinez v. Glover,* No. 00 Civ. 5997(GEL), 2001 WL 1491278, *4 (S.D.N.Y. Nov.26, 2001).

Non-medical prison staff cannot, however, alter an inmate's treatment plan. "Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors." *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). "[A] deliberate indifference claim can [therefore] lie where prison officials deliberately ignore" such medical recommendations. *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005).

a. Shower Pass

Defendants argue that they are entitled to summary judgment because the denial of Williams's daily morning showers did not cause a serious enough injury to sustain an Eighth Amendment claim. Defendants point to the fact that Williams received extensive treatment for his back, including surgery, pain and anti-inflammatory drugs, a back brace, and regular physical therapy sessions, which Williams admits helped the very back condition for which the showers were prescribed. Dr. Perilli opines that denial of Williams's daily showers did not create a serious risk of harm. Williams does not show that he suffered greater back pain in the periods when he was denied daily morning showers than when he was permitted them. In fact, almost two years after Dr. Perilli refused to renew Williams's shower pass, Williams reported his back pain to be somewhat less intense than it was during a period when he was taking daily morning showers. Moreover, Williams has made no showing that the lack of showers affected his daily activities.

**\*10** Williams does, however, show contemporaneous reports by him and by his doctors that daily morning showers helped his painful back condition. In addition,

outside specialists repeatedly found Williams's back condition and his need for daily morning showers worthy of comment. Moreover, a failure to treat serious, chronic pain adequately when such treatment is available can constitute a sufficiently serious deprivation of medical care. *See Salahuddin,* 467 F.3d at 281 (applying presumption that five month failure to treat pain causes sufficiently serious harm). This is true even when other, substantial medical care is given for the underlying condition. Although the record suggests that Williams may have difficulty meeting the seriousness inquiry at trial, all inferences must be drawn in Williams's favor at the summary judgment stage, particularly because he is proceeding *pro se.* As such, although not every denial or even series of repeated denials of medical showers constitutes a serious medical injury, the record does not permit a finding as a matter of law that the deficiency in Williams's treatment was "minor and inconsequential," or that the deficiency did not create "a significant risk of serious harm." *Smith,* 316 F.3d at 187. Williams's papers must be read as showing that for approximately a year and a half, until Dr. Perilli revoked his medical pass for daily morning showers, the defendants denied him medically prescribed treatment for the chronic pain he experienced due to a back injury from which no one disputes that Williams suffered.

Defendants argue that they are entitled to summary judgment on the second prong of the deliberate indifference inquiry. Indeed, Smith and Dr. Perilli are. Smith asserts that he deferred to the medical staff's recommendation to deny Williams's grievance. Williams does not contest that Smith did so; and Williams offers no evidence that raises a question as to whether Smith actually took this course of action or whether this course of action reflected recklessness. Dr. Perilli shows that in his medical opinion he determined daily morning heat treatment was no longer necessary for Williams's condition. As discussed below, Williams attempts but fails to raise a question as to whether Dr. Perilli's decision was based on an ulterior motive rather than on medical judgment. Williams therefore has not raised a question of material fact as to whether Dr. Perilli acted with the intent necessary to satisfy the second prong of the deliberate indifference inquiry. Both Smith and Dr. Perilli are therefore entitled to summary judgment.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

None of the remaining defendants identified as depriving Williams of a medically prescribed shower are entitled to full summary judgment on this prong. It is undisputed that Williams presented a valid medical pass for morning showers and that Goffe, Maldonado, Krusen and MacNamara did not honor that pass. Despite these defendants' claims that they were following facility protocol, a reasonable jury could conclude that their disregard of a medical pass constituted recklessness. P.A. Williams's assertion that if he changed Williams's prescription of morning showers he did so to comply with facility protocol is subject to the same analysis. As for Capuano, evidence suggesting that she changed Williams's treatment plan without consulting Dr. Perilli raises a question of material fact as to whether she acted not just recklessly but intentionally. None of these defendants is therefore entitled to full summary judgment on Williams's deliberate indifference claim related to shower passes.

**\*11** Goffe, Maldonado, Krusen, and MacNamara, are, however, entitled to partial summary judgment. After Dr. Perilli rescinded Williams's shower pass on November 16, 2000, these defendants were entitled to rely on Williams's lack of a valid medical pass to deny him daily morning showers. Williams has raised no question of material fact about whether these defendants acted recklessly in denying him daily morning showers after he no longer possessed a shower pass.

b. Climbing Stairs

Defendants are entitled to partial summary judgment on Williams's deliberate indifference claims related to climbing stairs. Dr. Perilli opines that climbing stairs at Fishkill when Clark refused to honor Williams's elevator pass and climbing stairs at Sing Sing when Williams's feed-up and flats passes were delayed did not create a serious medical risk of death, degeneration, or extreme pain. Although Williams has made only a limited showing about the pain climbing stairs caused him, he has asserted that climbing stairs did cause him pain, and outside specialists found the issue worthy of comment, and recommended that he avoid climbing stairs. Moreover, the pain of climbing stairs was apparently intense enough to cause Williams to choose not to attend physical therapy

sessions that required him to walk up stairs. Although a serious medical injury is not inflicted every time an inmate with a bad knee is required to climb stairs, in this case, with all inferences drawn in his favor, Williams has raised a question of material fact as to whether the pain caused by climbing stairs was serious enough to sustain an Eighth Amendment claim.

Goffe, Maldonado, and Krusen are entitled to summary judgment on Williams's deliberate indifference claim related to his feed-up pass. They claim that they were not responsible for accommodating Williams's feed-up pass, and Williams offers no evidence that they interfered with his pass being accommodated. Krusen is entitled to summary judgment for Williams's claim related to his flats pass, as well. Williams asserts that he had a conversation with Krusen about the delay in accommodating his pass, but he does not explain how Krusen was responsible for that delay. Goffe and Maldonado are not, however, entitled to summary judgment related to the flats pass claim. Despite their assertions that they had no responsibility for accommodating this pass, Williams's assertions that they threatened to delay his move, paired with the fact that his flats pass was not accommodated until eighteen months after his first conversation with Goffe and Maldonado, raise a question of material fact as to whether they did interfere with his move and thereby acted recklessly. Although an ordinary delay in moving an inmate to a new cell to accommodate his medical condition would not constitute a serious medical injury, Williams has alleged that these defendants intentionally delayed his move to the flats for a year and a half, while other inmates were getting moved there ahead of him.

**\*12** Clark is not entitled to summary judgment. There is no dispute that Clark knew that Williams had an elevator pass due to his knee condition. Although Clark asserts that he denied Williams access to an elevator because the Fishkill elevator had maintenance problems and was only to be used for emergencies, Williams's assertion that he saw inmates using the elevator has raised a question of material fact as to whether Clark acted intentionally or recklessly in denying Williams use of the elevator. While an occasional denial of access to an elevator would not rise to the level of serious injury to Williams's health, Williams has alleged that Clark

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

repeatedly, and without justification, refused over a period of months to allow Williams to use the elevator.

*Qualified Immunity*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citation omitted). In determining whether a defendant is entitled to qualified immunity, the "appropriate question is the objective inquiry whether a reasonable officer could have believed that his actions were lawful in light of clearly established law and the information the officer possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (citation omitted). To assess a qualified immunity claim, a court must therefore consider:

(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005) (citation omitted).

Williams has defined with sufficient specificity the Eighth Amendment right upon which his deliberate indifference claim rests; and the Supreme Court and Second Circuit have clearly established that right. As for the third prong, Goffe, Maldonado, Krusen, MacNamara, P.A. Williams and Capuano cannot avail themselves of qualified immunity as they are all alleged to have knowingly disregarded or altered Williams's medical passes or treatment plan, which was unlawful. *See Gill,* 824 F.2d at 196. Bald assertions by Goffe, Maldonado, Krusen, and MacNamara that they took their respective actions to comply with administrative and safety concerns do not provide an adequate ground for finding these actions objectively reasonable. These defendants have not explained the bases of their administrative and safety

concerns or how their actions addressed those concerns. It is therefore impossible at this point to determine as a matter of law that these defendants acted reasonably in choosing to serve those purposes rather than honor Williams's medical passes and treatment plans. If Capuano is liable to Williams, it is because she unilaterally changed his treatment plan. Although she contests the underlying allegation that she altered his plan, she offers no explanation of why a defendant who does, in fact, take such actions could reasonably believe she is acting lawfully. P.A. Williams offers a potential explanation for his actions, suggesting it was impossible for him to grant Williams's prescription for a morning shower pass because there was no place on the standard pass to indicate timing of showers. P.A. Williams's acknowledgment, however, that he has authorized medical passes for a certain time of day, albeit rarely, undercuts his explanation of why he overrode Williams's prescription in this case. He therefore offers an inadequate explanation of why a reasonable officer in his position would feel his actions were lawful.

*Retaliation*

**\*13** To prove a First Amendment retaliation claim, "a prisoner must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (citation omitted). Exercising the right to petition for redress of a grievance is protected conduct. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal,* 554 F.3d at 228. "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Williams claims that after he filed a grievance in September 1999 about the security officers denying his

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

(Cite as: 2009 WL 2431948 (S.D.N.Y.))

morning shower pass, Dr. Perilli retaliated against him by rescinding Williams's daily morning shower pass on November 16, 2000. Williams argues that there was a temporal connection between these two events, because Dr. Perilli did not know about the grievances until Williams told Dr. Perilli about them at the November 16 meeting. This argument fails. Dr. Perilli made a note one month before the November 16 meeting concluding that Williams had no medical reason for daily morning showers. This prior note requires a finding that Dr. Perilli had a proper reason to deny Williams a morning shower pass even after Williams described his grievance filing to Dr. Perilli. Williams has thus failed to raise a question of material fact as to whether Dr. Perilli's allegedly retaliatory action was causally related to Williams's filing of grievances. Dr. Perilli is therefore entitled to summary judgment on the retaliation claim.

CONCLUSION

Defendants' May 15, 2007 motion for summary judgment is granted in full as to Dr. Perilli, Eagan, and Smith. Summary judgment is also granted as to Goffe, Maldonado, Krusen, and MacNamara for Williams's deliberate indifference claim related to his shower pass after November 11, 2000; summary judgment is granted as to Goffe, Maldonado, and Krusen for Williams's deliberate indifference claim related to his feed-up pass; and summary judgment is granted to Krusen for Williams's deliberate indifference claim related to his flats pass. Summary judgment is denied in all other respects as to defendants Goffe, Maldonado, Krusen, MacNamara, P.A. Williams, Capuano, and Clark.

SO ORDERED.

S.D.N.Y.,2009.

Williams v. Smith
Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lawrence SHUSTER, Plaintiff,
v.
NASSAU COUNTY, et al., Defendants.
No. 96 Civ. 3635(JGK).

Jan. 11, 1999.

Lawrence Shuster, Fountain Valley, CA, for the Plaintiff, pro se.

Gina M. Amorini, Mineola, NY, for Nassau County.

Michael Kennedy, Assistant Attorney General, Office of the Attorney General, Division of State Counsel, Litigation Bureau, New York, NY, for Hon. Zelda Jones & NYS Dept. of Motor Vehicles.

*OPINION AND ORDER*

KOELTL, J.

**\*1** The plaintiff filed this action against various defendants alleging false arrest and malicious prosecution for violations of the New York Vehicle and Traffic Law (VTL). The docket sheet reflects that the complaint was filed on May 15, 1996. Defendants Judge Zelda Jonas, the New York State Department of Motor Vehicles (collectively, the "State defendants"), and Nassau County, who have not answered or moved with respect to the complaint or the amended complaint, have requested that the amended complaint be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure because they have never been properly served with the summons and complaint or amended complaint. The docket sheet in this action does not reflect any service on any defendant. The Court therefore by Order dated February 17, 1998 directed the plaintiff to advise the Court in writing why this action should not be dismissed for failure to serve the summons and complaint on the defendants within 120 days of filing of the complaint. While the plaintiff has responded, it is

clear that he has never properly served any of the defendants.

I.

Rule 4(m) authorizes a court upon motion to dismiss an action without prejudice as against a defendant if service of the summons and complaint is not made upon that defendant within 120 days after the filing of the complaint. This Rule also authorizes courts to dismiss an action sua sponte, provided that the court first gives notice to the plaintiff. *See* Fed.R.Civ.P. 4(m); *see also Gowan v. Teamsters Union (237),* 170 F.R.D. 356, 359-60 (S.D.N.Y.1997) (dismissing action filed by a pro se, in forma pauperis plaintiff pursuant to Rule 4(m)).

Separate rules govern service upon state agencies and upon individuals. Under the Federal Rules of Civil Procedure, "[s]ervice upon a state ... or other governmental organization ... shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state...." Fed.R.Civ.P. 4(j)(2). Service upon an individual is made by delivering a copy of the summons and complaint to the individual personally, by leaving a copy thereof at the individual's dwelling house or usual place of abode with a person of suitable age and discretion residing there, or by delivering a copy to an agent authorized to receive service of process. *See* Fed.R.Civ.P. 4(e)(2). The rule further provides that an individual may also be served in accordance with state law. *See* Fed.R.Civ.P. 4(e)(1).

Under New York law, a state officer sued in an official capacity or a state agency must be served by:

(1) delivering the summons to such officer or to the chief executive officer of such agency or to a person designated by such chief executive officer to receive service, or (2) by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by subdivision one of this section.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

**\*2** N.Y. C.P.L.R. 307(2). Subdivision (1) provides that "personal service upon the state shall be made by delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state." Hence, "[s]ervice on a state officer may be made either by personal delivery to the officer or by certified mail to the officer. Service on a state agency may be made either by personal delivery to the chief executive officer of the agency (or the chief executive's designee) or by certified mail to the chief executive." N.Y. C.P.L.R. 307(2) supplemental practice commentaries (McKinney 1998).

The New York rules for serving an in-state natural person parallel Fed.R.Civ.P. 4(e)(1), but with additional requirements. Like Rule 4, service may be by personal delivery to the person being served, see N.Y. C.P.L.R. 308(1), or to a duly appointed agent for service. See N.Y. C.P.L.R. 308(3). Service may also be made by delivering the summons to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the person to be served, provided that the summons is also mailed to that person's last known residence or sent by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(2).

In addition, where service under sections 308(1) and (2) cannot be made with due diligence, service may be effected by nailing the summons to the door of the actual place of business, dwelling place, or usual place of abode of the person to be served, and by mailing the summons to that person at his or her last known residence or by sending the summons by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(4). Under sections 308(2) and (4), the delivery and mailing must occur within twenty days of each other. See N.Y. C.P.L.R. 308(2) & (4).

## II.

On May 15, 1996, the plaintiff filed the original complaint in this action. On August 14, 1996, the plaintiff filed an amended complaint. In February 1998, well past the 120-day limit for timely service of process, the State defendants requested dismissal of the action pursuant to Rule 4(m). (See Letter from Michael Kennedy dated Feb.

13, 1998). The plaintiff was ordered to advise the Court by March 2, 1998 why the case should not be dismissed on that basis. (See Order dated Feb. 17, 1998). The plaintiff filed a response dated February 17, 1998. The plaintiff also filed a response received on August 13, 1998. In August 1998, more than two years after the original complaint was filed and nearly two years after the amended complaint was filed, the State defendants and defendant Nassau County requested dismissal of this action on the grounds that they still had not been served. (See Letter from Michael Kennedy dated Aug. 3, 1998; Letter from Gina Amorini dated Aug. 3, 1998).

### (A)

The plaintiff does not argue that he complied with Rule 4 by delivering the summons and complaint to the chief executive officer of the DMV. Nor does he allege that he delivered the summons and complaint to Judge Jonas, who is sued in her personal and official capacities, personally or to a person of suitable age and discretion at Judge Jonas' dwelling place or usual place of abode. Nor has there been compliance with N.Y. C.P.L.R. 307(2) with respect to either the DMV or Judge Jonas. With respect to the DMV, there has been neither personal delivery to the chief executive officer of the DMV or the chief executive's designee or by certified mail to the chief executive with personal service on an assistant attorney-general or the attorney-general. The plaintiff also has not complied with similar provisions with respect to Judge Jonas.

**\*3** Instead, the plaintiff contends that he had served the State defendants by twice delivering the summons and complaint to the Nassau County Regional Office of the State Attorney General, on July 30, 1996 and February 6, 1998. (See Return of Service (unsigned), attached to Feb. 17, 1998 Shuster Letter). To support his argument that service on the Nassau office constituted effective service on the State defendants, the plaintiff submitted a copy of a letter from the Office of the Attorney General stating that its Nassau office would accept service on behalf of, among others, Judge Zelda Jonas in a different action. In addition, he argues that the complaint was also attached to the Order to Show Cause which was served on the Nassau office. (See Order to Show Cause attached to Feb. 17, 1998 Shuster Letter). The plaintiff also argues that under New York State law, service on the Attorney General's Office is sufficient.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

Under New York law, delivering the summons and complaint to a regional office of the State Attorney General does not by itself constitute effective service on a state agency or an individual officer sued in her official capacity. *See Berkowitz v. New York City Bd. of Educ.,* 921 F.Supp. 963, 968 (S.D.N.Y.1996); *Dawkins v. Hudacs,* 159 F.R.D. 9, 10 (N.D.N.Y.1994); *Town of Clarkstown v. Howe,* 206 A.D.2d 377, 614 N.Y.S.2d 327, 328 (2d Dep't 1994); *Sannella v. Regan,* 111 A.D.2d 964, 490 N.Y.S.2d 61 (3d Dep't 1985). Moreover, there is no evidence that the Nassau office was authorized to accept service on behalf of the DMV. As to Judge Jonas, the fact that the Nassau office had been designated to receive service on her behalf in another case does not authorize that office to accept service for her in this case.

The plaintiff also contends that he served the State defendants by handing their attorney a copy of the complaint in this Court on or about July 30, 1996. Even if proven, this is also not sufficient under the Federal Rules and New York law unless the attorney is authorized by appointment or by law to receive service of process. *See United States v. Ziegler Bolt and Parts Co.,* 883 F.Supp. 740, 749 (Ct. Int'l Trade 1995); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1289 (S.D.N.Y.1989); *Gibbs v. Hawaiian Eugenia Corp.,* 581 F.Supp. 1269, 1271 (S.D.N.Y.1984). The plaintiff has neither alleged nor provided proof that the State defendants intended to be bound by the acceptance of the complaint by their attorney. While the authority of an attorney to accept service may be implied from the surrounding circumstances indicating the intent of the client, *J & L Parking Corp., Inc. v. United States,* 834 F.Supp. 99, 102 (S.D.N.Y.1993); *Olympus Corp. v. Dealer Sales and Serv., Inc.,* 107 F.R.D. 300, 305 (S.D.N.Y.1985), there is no evidence in this case to establish such intent. The State defendants never acted in any way to indicate that the attorney was authorized to accept service of process. The State defendants never answered the Complaint or filed a responsive pleading, and specifically asserted in correspondence that there had been no service of process. Indeed, the State defendants notified the plaintiff at least as early as February 1998 that service was insufficient. (*See* Feb. 13, 1998 Kennedy Letter).

**\*4** Although the plaintiff is acting *pro se,* his failure to comply with basic procedural rules cannot be excused, particularly in light of the fact that he is familiar with litigation. He has already filed numerous other lawsuits and numerous motions. *See, e .g., Shuster v. Eiberson,* No. CV-92-1524 (E.D.N.Y. Apr. 23, 1993); *Shuster v. Fenster,* No. 92 Civ. 2323; *Shuster v. Citibank,* No. 93 Civ. 4182, 1994 WL 267550 (S.D.N.Y. June 15, 1994); *Shuster v. Prudential Securities Inc.,* No. 91 Civ. 0991, 1991 WL 102500 (S.D.N.Y. June 6, 1991); *Shuster v. Olem,* 96 Civ.1993, 1997 WL 167046 (S.D.N.Y. Apr. 8, 1997); *Shuster v. Eiberson,* No. 97 Civ.1988, slip. op. (S.D.N.Y. Aug. 12, 1997); *Shuster v. Oppleman,* No. 96 Civ. 1689 (S.D.N.Y. filed Mar. 7, 1996); *Shuster v. Voel,* No. 96 Civ. 8240 (S.D.N.Y. filed Nov. 1, 1996). Accordingly, the State defendants' request for dismissal without prejudice pursuant to Rule 4(m) is granted.

(B)

The docket sheet also does not reflect service of process on defendant Nassau County. Fed.R.Civ.P. 4(1) requires proof of service in the form of an affidavit by the server. *See* Fed.R.Civ.P. 4(1). While it is true that, by its terms, the failure to comply with Fed. R. Civ. 4(1) does not affect the validity of the service, the plaintiff has submitted no proof of timely service for any of the defendants. Nor has the plaintiff explained how he purportedly served Nassau County pursuant to federal or state law. The plaintiff has offered no explanation for his failure to serve in response to the Court's directive or to Nassau County's letter requesting dismissal. Nor has he requested an extension of the time to serve. Because the plaintiff was given notice that the case would be dismissed absent a showing of good cause for the failure to serve the defendants, and has failed to make this showing, defendant Nassau County's application for dismissal without prejudice pursuant to Rule 4(m) is also granted. *See, e.g., Urquidez v. Officer Lyon # 7505,* No. 97 Civ. 884, 1997 WL 414158 at *-1 (S.D.N.Y. July 23, 1997).

(C)

Similarly, the docket sheet also does not reflect that any of the remaining defendants named in the amended complaint have been served. They include individual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

defendants D. Dillon, N. Levy, Richard Kramer, "Mr. Rainville," Skip Dwyer, R. Jackson, A. Aducci, and "U.S.A. (Bruce [illegible] )," each of whom is sued in his or her official and personal capacities; the Nassau County Republican Party; and unnamed "clients of Frank Cocozzelli" (collectively, the "remaining defendants"). Although the 120-day limit for service of process has long expired, courts generally consider three factors in determining whether "good cause" exists to warrant an extension of the time for service:

 (1) whether the delay in service was "the result of mere inadvertence," or whether there has been a "reasonable effort" to effect service[,] ... (2) prejudice to the defendant[,] ... [and 3] whether or not the plaintiff has moved under Fed.R.Civ.P. 6(b) for an enlargement of time in which to effect service.

 **\*5** *Gordon v. Hunt,* 116 F.R.D. 313, 319-21 (S.D.N.Y.1987).

 These factors do not support an extension of the time to serve the remaining defendants in this case. The plaintiff was directed by the Court to explain the delay in serving the defendants but failed to do so. The plaintiff has not moved for additional time to serve any of the defendants. Moreover, to permit service at this late date would unfairly prejudice the remaining defendants. *See* *Gowan,* 170 F.R.D. at 359-60. The delay in proceeding against them has been excessive. Accordingly, pursuant to Rule 4(m), the case against the remaining defendants is dismissed without prejudice.

### III.

 The plaintiff has also filed a partially illegible "letter and motion for order" in which he seeks an injunction to stop further court proceedings in Nassau County for alleged violations of section 511 of the New York Vehicle and Traffic Law. He argues that the injunction should be granted because all of his past violations of the Vehicle and Traffic Law have been expunged from his record. The Court has already considered and denied a similar motion by the plaintiff on the grounds that the plaintiff failed to show either irreparable harm or a likelihood of success on the merits. *See Shuster v. Nassau County,* 948 F.Supp. 282 (S.D.N.Y.1996). In the present motion, which consists of

one paragraph, the plaintiff offers no new facts to establish either of these requirements for a preliminary injunction. Therefore, the plaintiff's motion for a preliminary injunction is denied.

### IV.

 The plaintiff also moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). This motion is plainly improper because there have been no responsive pleadings because the defendants were never effectively served. The motion is therefore denied.

### V.

 The plaintiff also moves for an order directing Nassau County to send to the plaintiff a copy of the transcript of a 1996 proceeding before Judge Eiberson in which Judge Eiberson allegedly dismissed various Vehicle and Traffic Law charges against the plaintiff. To the extent that this is a discovery request, it is denied as moot.

### CONCLUSION

 For the reasons explained above, this action is dismissed without prejudice. The plaintiff's motion for a preliminary injunction is denied. The plaintiff's motion for judgment on the pleadings is denied. The plaintiff's motion for an order directing Nassau County to produce a court transcript is denied as moot.

 SO ORDERED.

S.D.N.Y.,1999.

Shuster v. Nassau County
Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



LEXSEE 1995 U.S.DIST. LEXIS 7136

**MINA POURZANDVAKIL, Plaintiff, -against- HUBERT HUMPHRY, JUDISICIAL SYSTEAM OF THE STATE OF MINNESOTA AND OLMESTED COUNTY COURT SYSTEAM, AND STATE OF MINNESOTA, SAINT PETER STATE HOSPITAL, DOCTOR GAMMEL STEPHELTON, ET EL ERICKSON, NORTH WEST BANK AND TRUST, OLMESTED COUNTY SOCIAL SERVICE, J.C. PENNY INSURCE, METMORE FINICIAL, TRAVELER INSURNCE, COMECIAL UNION INSURCE, HIRMAN INSURCE, AMRICAN STATE INSURNCE, FARMERS INSURNCE, C. O BROWN INSURNCE, MSI INSURNCE, STEVEN YOUNGQUIST, KENT CHIRSTAIN, MICHEAL BENSON, UNITED AIRLINE, KOWATE AIRLINE, FORDMOTOR CRIDITE, FIRST BANK ROCHESTER, GEORGE RESTWICH, BRITISH AIRWAYS, WESTERN UNION, PRUDENIAL INSURNCE, T.C.F. BANK, JUDGE SANDY KIETH, JUDGE NIERGARI, OLMESTEAD COUNTY JUDGERING, JUDGE MORES, JUDGE JACOBSON, JUDGE CHALLIEN, JUDGE COLLIN, JUDGE THOMASE, JUDGE BUTTLER, JUDGE MORKE, JUDGE MOWEER, SERA CLAYTON, SUSAN MUDHAUL, RAY SCHMITE, Defendants. [1]**

1   Names in the caption are spelled to reflect plaintiffs complaint.

**Civil Action No. 94-CV-1594**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*1995 U.S. Dist. LEXIS 7136*

**May 22, 1995, Decided**
**May 23, 1995, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a complaint accusing defendants with kidnapping plaintiff and her daughter, torturing plaintiff in the Mayo Clinic, and causing plaintiff and her daughter to suffer physically, financially, and emotionally. Certain defendants sought vacation of the defaults entered against them without proper service, some sought dismissal of the complaint, and some sought both vacation of the defaults and dismissal.

**OVERVIEW:** Plaintiff served defendants by certified mail. The court determined that such service was not authorized under federal law or under either New York or Minnesota law. Additionally, plaintiff's extraterritorial service of process was not effective under *Fed. R. Civ. P.*

*4(k)*. Defendants were not subject to federal interpleader jurisdiction, and they were not joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19*. No federal long-arm statute was argued as a basis for jurisdiction, and the alleged harm did not stem from acts in New York for jurisdiction under *N.Y. C.P.L.R. § 302(a)*. The complaint showed no basis for subject matter jurisdiction against defendants that were insurance companies with no apparent relationship to claims of rape, torture, harassment, and kidnapping, and the court found that no basis for supplemental jurisdiction under *28 U.S.C.S. § 1367(a)* existed. Venue was clearly improper under *28 U.S.C.S. § 1391(b)* because no defendant resided in the district and none of the conduct complained of occurred there. Plaintiff's claims of civil rights violations were insufficient because her complaint was a litany of general conclusions, not specific allegations of fact.

**OUTCOME:** The court vacated all defaults. The court dismissed plaintiff's complaint against all moving and non-moving defendants. The dismissal of the complaint against certain defendants premised on the court's lack of power either over the person of the defendant or the subject matter of the controversy was without prejudice, but dismissals against the remaining defendants were with prejudice. Requests for sanctions and attorney's fees were denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Residential Service*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents*
*Governments > Federal Government > Employees & Officials*
[HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2).* Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed. R. Civ. P. 4(e)(1).*

*Business & Corporate Law > Agency Relationships > Agents Distinguished > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Corporations*
[HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1), 4(e)(1).*

*Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview*
[HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *N.Y. C.P.L.R. §§ 308, 311* (Supp. 1995); *N.Y. Bus. Corp. Law § 306* (Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995).

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview*
*Governments > Local Governments > Claims By & Against*
[HN4] Service on states, municipal corporations, or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2).* Minnesota law does not authorize service on a governmental entity by certified mail. Minn. R. 4.03(d), (e) (1995).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Parties > Interpleaders > General Overview*
[HN5] A plaintiff's extraterritorial service of process in New York can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York state; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k).*

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
[HN6] *N.Y. C.P.L.R. § 302(a)* provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state such as transacting any business in the state and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General*

*Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*
[HN7] *28 U.S.C.S. § 1367(a)* requires a relationship between the state and federal claims for pendent jurisdiction so that they form part of the same case or controversy.

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN8] See *28 U.S.C.S. § 1391(a)*.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN9] See *28 U.S.C.S. § 1391(1)*.

*Civil Procedure > Venue > Federal Venue Transfers > Improper Venue Transfers*
*Civil Procedure > Venue > Individual Defendants*
*Civil Procedure > Venue > Multiparty Litigation*
[HN10] Where venue is laid in the wrong district, the court shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. *28 U.S.C.S. § 1406(a)*.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Civil Procedure > Judicial Officers > Judges > Discretion*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is to eliminate impediments to the timely disposition of cases and controversies on their merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN12] Where a court has already dismissed against the moving parties on jurisdictional grounds, it has no power to address a *Fed. R. Civ. P. 12(b)(6)* issue.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

*Civil Rights Law > General Overview*
[HN13] Complaints that rely on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights instead of a litany of general conclusions that shock but have no meaning.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN14] A pro se plaintiff's complaint must be construed liberally and should be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN15] Even pro se complaints must show some minimum level of factual support for their claims.

*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Counsel > Appointments*
*Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals*
[HN16] The United States Supreme Court explicitly has acknowledged a district court's power under *28 U.S.C.S. § 1915(d)* to dismiss as frivolous a complaint that lacks an arguable basis either in law or in fact. The Supreme Court has explicitly declined to rule, however, on whether a district court has the authority to dismiss sua sponte frivolous complaints filed by non-indigent plaintiffs. The law in the district of New York is that a district court may sua sponte dismiss a frivolous complaint even if the plaintiff has paid the filing fee.

COUNSEL: [*1]  HUBERT H. HUMPHREY, III, Attorney General of the State of Minnesota, Attorney for Hubert H. Humphry, III, Judicial System of the State of Minnesota, St. Peter Regional Treatment Center, Gerald Gammell, MD, William Erickson, MD, Thomas Stapleton, MD, the Honorable James L. Mork, Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen, and Judge Lawrence Collins, St. Paul, MN, OF COUNSEL: JEROME L. GETZ, Assistant Attorney General.

CONDON & FORSYTH, P.C., Attorneys for British Airways, P.L.C. and Kuwait Airways Corp., New York, NY, OF COUNSEL: STEPHEN J. FEARON, ESQ., MICHAEL J. HOLLAND, ESQ.

DUNLAP & SEEGER, P.C., Attorneys for Olmsted County, Raymond Schmitz, Susan Mundahl, Norwest Bank Minnesota, N.A. (the Northwest Bank & Trust), C.O. Brown Agency, Inc., Rochester, MN, OF COUNSEL: GREGORY J. GRIFFITHS, ESQ.

ARTHUR, CHAPMAN, McDONOUGH, KETTERING & SMETAK, P.A., Attorneys for J.C. Penney Insurance Co. and Metropolitan Insurance Co., Minneapolis, MN, OF COUNSEL: EUGENE C. SHERMOEN, JR., ESQ.

SHAPIRO & KREISMAN, Attorneys for Metmor Financial, Inc., Rochester, NY, OF COUNSEL: JOHN A. DiCARO, ESQ.

COSTELLO, COONEY & FEARON, Attorneys [*2] for Travelers Insurance Companies; Hirman Insurance; Commercial Union Insurance Companies, Syracuse, NY, OF COUNSEL: PAUL G. FERRARA, ESQ., ROBERT J. SMITH, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., Attorneys for American States Insurance Co. and Prudential Insurance Co., Syracuse, NY, OF COUNSEL: THOMAS N. KAUFMANN, ESQ.

STEVEN C. YOUNGQUIST, ESQ., Pro Se, Rochester, MN.

THOMAS J. MARONEY, United States Attorney, Attorney for Michael Benson, Postmaster, Northern District of New York, Syracuse, NY, OF COUNSEL: WILLIAM F. LARKIN, Assistant United States Attorney.

GEORGE F. RESTOVICH & ASSOCIATES, Attorneys for George F. Restovich, Esq., Rochester, MN, OF COUNSEL: GEORGE F. RESTOVICH, ESQ.

CONBOY, McKAY, BACHMAN & KENDALL, L.L.P., Attorneys for Western Union, Watertown, NY, OF COUNSEL: GEORGE K. MYRUS, ESQ.

RICHARD MAKI, Pro Se, Rochester, MN.

**JUDGES:** ROSEMARY S. POOLER, UNITED STATES DISTRICT JUDGE

**OPINION BY:** ROSEMARY S. POOLER

**OPINION**

***MEMORANDUM-DECISION AND ORDER***

**INTRODUCTION**

In the four and one-half months since she filed this action, plaintiff Mina Pourzandvakil has filed three amended complaints and ten motions. She also has sought and received [*3] entry of default against ten defendants, none of whom she properly served. She twice has sought and been denied temporary restraining orders. She has included in her action defendants with no apparent connection to this forum, that were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of defendants have filed a total of twelve motions, some seeking vacation of the defaults entered against them, some seeking dismissal and others seeking both. We grant defendants' motions insofar as they seek vacation of the clerk's entries of default and dismissal of the complaint. We vacate *sua sponte* the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

**BACKGROUND**

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. [*4] Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also [*5] adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint

on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (sic) [2] ("J.C. Penney"), British Airways, Kowate (sic) Airline ("Kuwait"), MSi Insurnce (sic) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (sic) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default,  [*6]  it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March  [*7]  6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper [3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

> 2   Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

> 3   Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

[*8]  The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or *Rule 12 of the Federal Rules of Civil Procedure*. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to *Fed. R. Civ. P. 12(b)* or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson  [*9]  and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to

Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. [*10] Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

> 4   The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against nonmoving defendants for failure to state a claim on which relief can be granted.

> 5   The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

[*11] Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

## ANALYSIS

### The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. [HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2).* Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed.* [*12] *R. Civ. P.*

*4(e)(1).* [HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1)* and *4(e)(1).* [HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See* N.Y. Civ. Prac. L. & R. §§ 308, 311 (McKinney Supp. 1995); *N.Y. Bus. Corp. Law § 306* (McKinney Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995). Finally, [HN4] service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2).* Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. [*13] R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

## II. The Jurisdictional Arguments

In addition to raising various [*14] other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

### A. Personal Jurisdiction

Maki, the state defendants, Olmsted County,

Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. [HN5] Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant [*15] is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Rule 14* or *Rule 19 of the Federal Rules of Civil Procedure* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*. Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to *Rule 14* or *Rule 19*. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to *Rule 4(k). See N.Y. Civ. Prac. L. & R. § 302* (McKinney Supp. 1995). [HN6] This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain [*16] minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id. § 302(a)*. The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of *Section 302(a)*. Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

### B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by *Fed. R. Civ. P. 8(a)(1)*. Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The

state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff [*17] was a party. *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983)*. These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. *28 U.S.C. § 1332*. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's [*18] address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under *28 U.S.C. § 1367(a). Section 1367(a)* [HN7] requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

> 6   We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. *28 U.S.C. § 1332(a)*. However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id. § 1332(a)(2)*. Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of *28 U.S.C. §*

*1603*. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See 28 U.S.C. § 1330*. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under *Section 1332*. *Cf. Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1511-1512 (11th Cir. 1989), cert. denied, 131 L. Ed. 2d 219, 115 S. Ct. 1362 (1995)* (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under *28 U.S.C. § 1332*.

[*19] We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

## C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. [*20] The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

[HN8] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or

omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391(a)*. Section 1391(b) provides that federal question actions, except as otherwise provided by law, may be brought only in

[HN9] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

[*21] *Id. § 1391(b)*. The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. [HN10] Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id. § 1406(a)*. Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. [HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner, 997 F.2d 1023, 1027 (2d Cir. 1993)* (holding that it was an improper exercise of discretion to dismiss rather than transfer [*22] when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United

States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

### III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).* [7] [HN12] We already [*23] have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the *Rule 12(b)(6)* issue only on ASI's motion. *See Bell v. Hood, 327 U.S. 678, 682-83, 90 L. Ed. 939, 66 S. Ct. 773 (1946)* (subject matter jurisdiction); *Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)* (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

> 7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other [*24] defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. [HN13] Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation [*25]

of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987).* [HN14] A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr, 810 F.2d at 363.*

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not [*26] pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to [*27] amend her pleading and plaintiff still was not able to offer specifics. [9] [HN15] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White, 886 F.2d 721, 724 (4th Cir. 1989)).* We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).*

> 8    Former Supreme Court Justice Harry A. Blackmun.
> 9    We note also that plaintiff has not requested leave to amend in this action.

We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under *28 U.S.C. § 1915(d)*, holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. [*28] [HN16] The Supreme Court explicitly has acknowledged a district court's power under *Section 1915(d)* to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).* The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id. at 329 n.8.* The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter, 151 F.R.D. 537, 540 (S.D.N.Y. 1993), aff'd 41 F.3d 1500 (2d Cir. 1994); cf. Pillay v. I.N.S., 45 F.3d 14, 17 (2d Cir. 1995) (per curiam)* (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts [*29] and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler, 151 F.R.D. at 540.*

## IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture, 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991).* Moreover, her litigiousness has not yet reached the point

at which courts in this circuit have justified injunctive relief. *See id. at 694* (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants [*30] on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id. at 695.*

## CONCLUSION

All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 188-9 (5th Cir. 1986)* (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co., 377 F.2d 194, 199 n.3 (2d Cir. 1967)* (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 875 (3d Cir.) cert. denied, 322 U.S. 740, 88 L. Ed. 1573, 64 S. Ct. 1057 (1944)* (dismissal for lack of personal jurisdiction is not [*31] a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

DATE: May 22, 1995

Syracuse, New York

ROSEMARY S. POOLER

UNITED STATES DISTRICT JUDGE